## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| BRIAN PIETRYLO, et al., | : | Hon. Faith S. Hochberg, U.S.D.J. |
|  | : | Hon. Patty Shwartz, U.S.M.J. |
|  | : |  |
| Plaintiffs, | : | CIVIL ACTION NO. 06-5754 (FSH) |
|  | : |  |
| vs. | : |  |
|  | : |  |
| HILLSTONE RESTAURANT GROUP | : |  |
| D/B/A/ HOUSTON'S, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : | Document Filed Electronically |
|  | : |  |

---

### TRIAL BRIEF OF DEFENDANT
### HILLSTONE RESTAURANT GROUP, d/b/a HOUSTON'S

---

McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey  07962-2075
973-993-8100
Attorneys for Defendant,
Hillstone Restaurant Group, d/b/a/ Houston's

**Of Counsel**:
Donna duBeth Gardiner, Esq.

**On the Brief**:
Donna duBeth Gardiner, Esq.
Michael O'B. Boldt, Esq.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

STATEMENT OF FACTS ......................................................................................... 1

LEGAL ARGUMENT

    POINT I

    THERE CAN BE NO STATUTORY LIABILITY WHERE HOUSTON'S
    DID NOT KNOWINGLY AND INTENTIONALLY ACCESS THE
    SPEC-TATOR WITHOUT AUTHORIZATION FROM AN AUTHORIZED
    USER ........................................................................................................... 4

    A.    The Stored Communications Act ........................................................ 4

        1.    The Statute requires a "knowing or intentional" violation for
              a civil action.......................................................................... 5

        2.    The Statute's Prohibition Against Exceeding a Valid Authorization
              Does Not Apply Here. .............................................................. 8

    B.    Because The Statute Require "Knowing" Or "Intentional" Violations,
        St. John's Mental State Is Not An Issue Where There Is No Evidence
        Of Threats Or Coercion. ..................................................................... 9

    C.    Authority For One Is Authority For All ............................................. 12

    D.    The New Jersey Wire Tapping and Electronic Surveillance Act. .......... 13

    POINT II

    PLAINTIFF CANNOT PREVAIL ON A CLAIM OF INVASION
    OF PRIVACY.............................................................................................. 14

    POINT III

    PLAINTIFFS WERE NOT TERMINATED IN VIOLATION OF A
    CLEAT MANDATE OF PUBLIC POLICY................................................... 17

    A.    The Court Must Make the Initial Determination of Whether Plaintiffs'
        Claim for Wrongful Discharge Goes to the Jury .................................. 17

        1.    Plaintiffs Have Not Articulated A Clear Mandate of Public Policy.......... 18

B.     Even If Plaintiffs Have Articulated A Valid Public Policy, Houston's Did Not Discharge Plaintiffs Because They Exercised Their Right To Privacy ................................................................................................................ 21

CONCLUSION .............................................................................................................................. 22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Computer v. Boerbomm International, Inc.,*
967 *F.2d.* 108 (8th Cir. 1991) ........................................................................................................ 11

*American Computer v. Jack Farrell Implement,*
763 F. Supp. 1473 (D. Minn. 1991) .............................................................................................. 11

*Bansal v. Server Beach,*
285 Fed. Appx. 890 (3d Cir. 2008) ................................................................................................. 7

*Borse v. Piece Goods Shop, Inc.,*
963 F.2d 611 (3d Cir. 1992) ......................................................................................................... 21

*Cardinal Health 414, Inc. v. Adams,*
582 F. Supp. 2d 967 (M.D. Tenn. 2008) ........................................................................................ 7

*Chas. A Winner, Inc. v. Polistina,*
2007 U.S. Dist. LEXIS 407411 (D.N.J. June 14, 2007) ................................................................. 6

*Fischer v. Mt. Olive Lutheran Church,*
207 F. Supp. 2d 914 (W. D. Wis. 2002) ......................................................................................... 8

*General Board of Global Ministries of the United*
*Methodist Church v. Cablevision Lightpath, Inc.,*
2008 U.S. Dist. LEXIS 86826 (Nov. 30, 2006) .............................................................................. 5

*Griggs-Ryan v. Smith,*
904 F.2d 112 (1st Cir. 1990) ........................................................................................................ 11

*Kaufman v. Nest Seekers, LLC,*
2006 U.S. Dist. LEXIS 71104, 2006 WL 2807177 (S.D.N.Y. Sept. 26, 2006) .............................. 5

*Kent v. United States,*
272 F.2d 795 (1st Cir. 1959) ........................................................................................................ 11

*Martinez v. Cardinal Health Partners, LLC,*
2008 U.S. Dist. LEXIS 32861 (3d Cir. April 21, 2008) ................................................................. 17

*RTC Mortgage Trust 1994 N-1 v. Fidelity National*
*Title Insurance Co.,*
58 F. Supp. 2d 503 (D.N.J. 1999) ................................................................................................. 12

*Sherman & Co. v. Salton Maxim Housewares, Inc.*,
94 F. Supp. 2d 817 (E.D. Mich. 2000) ........................................................................11

*United States v. Dixon*,
548 U.S. 1 (2006) ...........................................................................................................7

*United States v. Silva*,
449 F.2d 145 (1st Cir. 1971).........................................................................................11

*Weigand v. Motiva Enterprises, LLC*,
295 F. Supp. 2d 465 (D.N.J. 2003).............................................................................20

## STATE CASES

*Bisbee v. John C. Conover Agency, Inc.*,
186 N.J. Super. 335 (App. Div. 1982)...........................................................................14

*Callgrove v. Behrle*,
63 N.J. Super. 356 (App. Div. 1960)..............................................................................12

*Continental Bank of Pa. v. Barclay Riding Academy, Inc.*,
93 N.J. 153 (1983) .........................................................................................................10

*DeVries v. McNeil Consumer Products Co.*,
250 N.J. Super. 159 (App. Div. 1991)............................................................................19

*Dijkstra v. Westerink*,
168 N.J. Super. 128 (App. Div. 1979).............................................................................16

*Hail v. Heavey*,
195 N.J. Super. 590 (App. Div. 1984) ............................................................................14

*Hennessey v. Coastal Eagle Point Oil Co.*,
129 N.J. 81 (1992) ...................................................................................................18, 21

*MacDougall v. Weichert*,
144 N.J. 380 (1996) ......................................................................................................18

*Pierce v. Ortho Pharmaceutical Corp.*,
84 N.J. 58 (1980) ....................................................................................................17, 19

*Schwartz v. Leasametric, Inc*,
224 N.J. Super. 21 (App. Div. 1988)........................................................................19

*Warthen v. Toms River Community Memorial Hospital*,
199 N.J. Super. 18 (App. Div.1985).......................................................................17, 19

*White v. White*,
344 N.J. Super. 222 (Ch. Div. 2001) .................................................................................... 15, 16

*Wolf v. Marlton Corp.*,
57 N.J. Super. 278 (App. Div. 1959) ............................................................................................ 10

## FEDERAL STATUTES

18 U.S.C. 2701(a) ........................................................................................................................ 4

18 U.S.C. § 2701(c) ................................................................................................................... 11

18 U.S.C. 2701 (c)(2) ................................................................................................................... 4

18 U.S.C. §2707(a) ....................................................................................................................... 6

18 U.S.C. §§ 2701-11 ................................................................................................................... 4

1986 U.S.C.C.A.N. at 3500 ........................................................................................................... 8

## STATE STATUTES

NJSA 2A:156A-27 ......................................................................................................................... 4

N.J.S.A. 2A:156A:-27a ................................................................................................................ 14

N.J.S.A. 2A:156A-32a ................................................................................................................. 13

## STATEMENT OF FACTS

In 2006, Plaintiffs Brian Pietrylo ("Pietrylo") and Doreen Marino were employed Houston's restaurant at Riverside Square in Hackensack, New Jersey, operated by defendant Hillstone Restaurant Group, d/b/a Houston's ("Houston's" or "Defendant").

In early March 2006, Pietrylo created a group on "myspace.com" called "The Spec-Tator." The purpose was for "s\*\*t talking" about the restaurant and its managers. Even the name, "The Spec-Tator", mocked the service and quality requirements or "specs" that Houston's required of its employees and its restaurants. The Spec-Tator also published a stolen test that a manager had designed for employees on a new wine list. The Spec-Tator contained ethnic slurs and derogatory comments about guests and managers as well as discussions about drug use and sexual acts.

Pietrylo send email invitations to other employees, inviting them to become members of The Spec-Tator. The email invitation contained a link to The Spec-Tator and once the invitee accepted the invitation, a link to the site would permanently appear on the invitee's own home page, also stored on the "myspace.com" website. Among the invitees was Karen St. Jean ("St. Jean") a greeter at the restaurant.

Plaintiffs posted offensive and derogatory comments about Houston's and its managers on The Spec-Tator. In May 2006, St. Jean, an authorized member of the group, showed the site and its content to TiJean Rodriguez ("Rodriquez"), a Houston's manager who was also St. Jean's social friend. This occurred during dinner party at the Rodriguez home. Rodriguez told another manager, Robert Anton ("Anton") about the site. Anton and his wife had been the target of sexual speculation and otherwise offensive postings on The Spec-Tator. When asked, St. Jean

gave Anton her personal email address and password that would allow him to access The Spec-Tator from Karen's personal myspace.com home page. She explained how to use it the log-in information and Anton accessed the site from his home. At no time did St. Jean express any reservations or place any conditions on his use of the password information or his access to the site.

In deposition, St. Jean testified that she was never threatened by anyone at Houston's or coerced in any way when asked for access to The Spec-Tator. She gave the information freely and stated that she knew that it would be shared with other managers.

Anton found the Spec-tator's contents to be offensive and disturbing. In addition to postings personally attacking the Antons and other managers, there were obscenities, drug references and proprietary business information that the members were not authorized to have. Pietrylo had posted a test on the new wines that had been drafted by Rodriquez and was slated to be given to the wait staff.

Anton brought the site to the attention of Robert Marano ("Marano"), a regional supervisor of operations for Houston's. Marano consulted with other senior management at Hillstone Restaurant Group, explaining that he had learned that "there is a website out there that's dedicated . . . to making a mockery of [Houston's] and [its] management staff." Marano reviewed The Spec-Tator and its contents, and also found the site disturbing and its contents were vulgar and offensive. Marano terminated Pietrylo and Marino.

In this action, plaintiffs allege that when Houston's managers accessed The Spec-Tator, Houston's violated federal and state statutes which prohibit a "knowing" "unauthorized access" to stored electronic information. Plaintiffs also claim that when its managers accessed the Spec-

tator, that access violated their right of privacy and that their termination violated New Jersey public policy.  A jury trial in this matter is scheduled for March 17, 2009.

## LEGAL ARGUMENT

## POINT I

### THERE CAN BE NO STATUTORY LIABILITY WHERE HOUSTON'S DID NOT KNOWINGLY AND INTENTIONALLY ACCESS THE SPEC-TATOR WITHOUT AUTHORIZATION FROM AN AUTHORIZED USER

Plaintiffs claim that Houston's "accessed . . . stored electronic communications," in violation of the federal Stored Communications Act, 18 U.S.C. §§ 2701-11 (Second Count), and the parallel provision of the New Jersey Act, N.J.S.A. 2A:156A-27 (Fourth Count).

**A.     The Stored Communications Act.**

Under the Stored Communications Act, a criminal offense occurs when a person

> (1)     intentionally accesses without authorization a facility through which an electronic communications service is provided . . . and thereby obtains, alters or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system.

18 U.S.C. 2701(a).

Significant to this case, there is no statutory violation when the access is authorized "by a user of that service with respect to a communication of or intended for that user." 18 U.S. C. 2701 (c)(2).

It is stipulated that St. Jean was an authorized user of the Spec-Tator. It is also not disputed that she is the one that alerted Houston's to the existence of the Spec-tator when she showed it to one Houston's manager, Rodriquez, who was also her friend.

Rodriquez read some of the content and was concerned about what was being said by employees about other managers. He told Anton about the Spec-tator and Anton went to St. Jean and asked for her password. It is undisputed that St. Jean gave Anton her password without objection and without conditions. She testified that no one ever threaten her or coereced her when asking for the password. While she "thought something would happen" if she didn't

provide the password, she never voiced those concerns to anyone. In fact, Anton went to her twice to ask for the password because he had lost it. She gave it to him the second time, again without voicing any objections or concerns.

Anton told Houston's Regional Manager, Marano, about the Spec-tator. Marano called the restaurant and spoke with Rodriquez and asked for the password. St. Jean was standing close by and, with Marano on the telephone, Rodriquez told St. Jean that Marano wanted the password and she provided it. After Marano viewed the Spec-tator, he made the decision to terminate Pietrylo and Marino because he believed the content of the postings by the employees threatened the morale of the restaurant and undermined the Core Values of the company.

The testimony conclusively proves one simple, clear and convincing fact – an authorized user of The Spec-Tator, Karen, consented on several occasions to access by Houston's managers. She first volunteered access to Rodriquez by showing him the website at his home during a social evening. Then, when asked by Anton, she twice provided him with her email address and password which would allow him to access the site. Finally, when Marano, the Regional Manager, asked for the same pass code and access, she again provided it. There is simply no liability for permissive access.

1.    **The Statute requires a "knowing or intentional" violation for a civil action.**

The Stored Communications Act is primarily a criminal statute directed at computer hackers *Kaufman v. Nest Seekers, LLC*, 2006 U.S. Dist. LEXIS 71104, 2006 WL 2807177, at *4 (S.D.N.Y. Sept. 26, 2006). Its purpose was, in part, to protect privacy interests in personal and proprietary information and to address "the growing problem of unauthorized persons deliberately gaining access to, and sometimes tampering with, electronic or wire communications that are not intended to be available to the public." *General Board of Global*

*Ministries of the United Methodist Church v. Cablevision Lightpath, Inc.*, 2008 U.S. Dist. LEXIS 86826 *1, *8 (Nov. 30, 2006) (emphasis added).

The statute only allows a civil action where the "conduct constituting the violation is engaged in with a knowing or intentional state of mind." 18 U.S.C. §2707(a).   The requirement for a "knowing and intentional" state of mind eliminates any possibility that a plaintiff could proceed on a theory of negligent access to the "Spec-Tator."    Indeed, a civil action requires the same scienter as for a criminal act.   Of course, the burdens of proof are different *i.e.* preponderance of the evidence versus beyond a reasonable doubt.

Here, Plaintiffs contend that the access was not authorized because   St. Jean had unspoken reservations about what would happen if she did not provide her management with her password.  In her deposition, she stated that while she didn't think she would get fired, she didn't want to get into trouble and she thought "something" would happen if she didn't give her managers the password.   It is plaintiffs' position that her unexpressed concerns negated her express authorization for Houston's to access the Spec-tator because her managers should have known that a subordinate employee would feel pressured.  This position is not supported by the express requirement for a "knowing or intentional" violation where, as here, St. Jean provided her password without expressly voicing any conditions or reservations.

A negligence standard simply cannot be grafted onto the statute.  A criminal statute that provides for civil redress must be narrowly construed and "encompasses only that conduct Congress intended to criminalize.  It follows then – unless it expressly states otherwise – that when Congress created a private cause of action within this criminal statute it intended to limit that cause of action to the conduct reached by the criminal statute." *Chas. A Winner, Inc. v.*

*Polistina*, 2007 U.S. Dist. LEXIS 40741*1, *14 (D.N.J. June 14, 2007) (unpublished) (attached as Exhibit A).

"Knowingly" requires the actor to have actual knowledge of the elements that comprise the offense. *United States v. Dixon*, 548 U.S. 1, (2006). "Intentionally" means that the defendant had (1) a conscious desire or purpose to act in a certain way or to cause a certain result, or (2) knew that they were acting in that way or would be practically certain to cause that result. United States Court of Appeals for the Third Circuit, Model Criminal Jury Instruction 5.01, 5.03. The defendant's "knowledge" cannot be found where there is "ignorance, mistake, accident or carelessness" *Id.* at §502, Comment.

Several courts have explicitly recognized the heightened state of culpability that the statute requires to succeed on a civil claim:

> Section 2007 of the SCA provides that any person aggrieved by an SCA violation may sue the violator, provided that he or she can show that the act was violated with a "knowing or intentional state of mind." . . . Courts have settled that determining whether there was unauthorized access under the SCA is akin to determining whether there was trespass to property. . . A big distinction between committing the tort of common law trespass and violating the SCA, of course, is that intentional conduct is required to violate the SCA i.e. a highly culpable state of mind is required. "The term 'intentional in this context is narrower than the dictionary definition of 'intentional.' 'Intentional' means more than one voluntarily engaged in conduct or caused a result. Such conduct or the causing of the result must have been the person's conscious objective."

*Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 975-76 (M.D. Tenn. 2008). *See also*, *Bansal v. Server Beach*, 285 Fed. Appx. 890, (3d Cir. 2008) (dismissing plaintiff's civil claims because he failed to allege and could not adduce facts to show that "defendants accessed his account 'with a knowing and intentional state of mind.').

Therefore, unless plaintiffs can demonstrate that Houston's managers had actual knowledge that they were not authorized to access the Spec-Tator and knew they were accessing it without authorization, there can be no civil liability under the federal law. There is no provision or allowance for a "knew or should have known" standard of proof.

Under the express terms of the statute and given St. Jean's testimony, there is no doubt but that the managers at Houston's believed they had authorization, acted in good faith and are not liable under the statute's provisions.

> ### 2. The Statute's Prohibition Against Exceeding a Valid Authorization Does Not Apply Here.

Plaintiffs contend that St. Jean only authorized Anton to access the Spec-Tator and that when other Houston's managers were provided access, Houston's exceeded the authorization in violation of the statute. However, this is not the clear meaning of the law. The statute expressly prohibits a person from "intentionally exceeding an authorization to access that facility." Therefore, in order for a person to "exceed authorization" they must use that authorization to delve into other protected stored communications beyond that which was authorized. This interpretation of the statute is made clear in the legislative history in which the Senate Report stated:

> For example, a computer mail facility authorizes a subscriber to access information in their portion of the facilities storage. Accessing the storage of other subscribers without specific authorization to do so would be a violation of the act. Similarly, a member of the general public authorized to access the public portion of a computer facility would violate this section by intentionally exceeding that authorization and accessing the private portions of the facility.

*Fischer v. Mt. Olive Lutheran Church*, 207 F. Supp. 2d 914, 926 (W. D. Wis. 2002) (citing 1986 U.S.C.C.A.N. at 3500).

There is no factual basis for the allegation that Houston's exceeded its authorization to access the Spec-Tator. In fact, St. Jean testified that when a manager would sign-on he would actually enter her own myspace.com account where there would be a link to the Spec-tator. She also testified that someone accessing the Spec-tator in that manner would not be able to access any private pages belonging to the plaintiffs.

Furthermore, even if "exceeding authorization" could be construed to providing the password to others, St. Jean's testimony makes it clear that she knew that was part of her "authorization":

> Q.    At any point at any time did Robert Anton ever ask you if it would be okay if he showed the content of [The Spec-Tator] to anyone else?
>
> * * *
>
> A. . . . Was it okay for him to show the other managers? . . . I pretty much thought after I gave him the password all the managers were going to see it.

### B.    Because The Statute Require "Knowing" Or "Intentional" Violations, St . John's Mental State Is Not An Issue Where There Is No Evidence Of Threats Or Coercion.

The plaintiffs contend that St. Jean's authorization was not "voluntary" because of her subjective fears. However, as discussed above, the plaintiffs must show a knowing and intentional wrongdoing by defendant. Therefore, St. Jean's internal misgivings are not at issue here. Her own testimony makes it clear that Houston's engaged in no wrongful conduct::

> Q.    Had anyone at Houston's ever threatened you with being fired over anything?
>
> A.    My husband actually because I was late all the time.
>
> Q.    Your husband threatened you?
>
> A.    Yes. I used to dislike him very much.
>
> Q.    Because you were late?

A.    Yes.  Because I was late all the time.

Q.    Other than that?

A.    No.

Q.    And again, no manager ever said if you don't give us the password you're going to be fired, you're going to be suspended?

A.    No.

Q.    No threats?

A.    No.  No.

It is beyond dispute that there was no coercion and no threats.  Karen was an authorized user who voluntarily told Houston's management about the website; voluntarily showed managers the website and voluntarily provided her access information to them on several occasions.  Houston's, therefore, cannot be liable under any of the applicable statutory provisions.

As is discussed in the Defendant's objections to Plaintiffs' proposed jury charges, in order for the jury to make a determination of "freely and voluntarily," the Court would have to turn to the law of duress and independently make a finding of some wrongful or unlawful act or threat by Houston's which <u>forced</u> St. Jean to do what she would not have done voluntarily in order to procure the authorization.  <u>Continental Bank of Pa. v. Barclay Riding Acad., Inc.</u>, 93 N.J. 153, 176 (1983); <u>Wolf v. Marlton Corp.</u>, 57 N.J. Super. 278, 285 (App. Div. 1959) (where county court, sitting without a jury, rejected the builder/defendant's defense that its non-performance was justified by the plaintiff's threats, Appellate Division held that trial court's determination was not entitled to the deference accorded a fact finding).  *See also*, New Jersey Civil Jury Charges, 4.10 at n.8.  Defendant suggests that this is not what the SCA intended,

especially in light of the plethora of cases in which "consent" was construed as broadly for Fourth Amended purposes as the Legislature intended for "authorization" to be construed under the SCA.[1]  *See, e.g.,*  Kent v. United States, 272 F.2d 795, 797 (1st Cir. 1959) (members are threatened with criminal prosecution unless the accused does plead guilty); . United States v. Silva, 449 F.2d 145 (1st Cir. 1971) (the promise of leniency to one criminal defendant is not enough to establish that he did not consent to wire tapping and is not coercive unless the indictment itself was improperly brought).

In the civil arena, courts treat consent with equal liberality.  *See, e.g., Sherman & Co. v. Salton Maxim Housewares, Inc.,* 94 F.Supp. 2d 817, 821 (E.D. Mich. 2000) (in light of admission that defendant was authorized to access information on computer, a viable § 2701(a) claim required an affirmative showing that authorization had been removed); *American Computer v. Jack Farrell Implement,* 763 F. Supp. 1473, 1494-95 (D. Minn. 1991) *aff'd sub nom., American Computer v. Boerbomm International, Inc.,* 967 F.2d. 108 (8th Cir. 1991) (finding consent to interception under the Wiretap Act and authorization for access to stored electronic communications under 18 U.S.C. § 2701(c) from the same conduct, and granting summary judgment dismissing claims).

St. Jean's unexpressed reservations are insufficient to subject Houston's to liability based upon a mere "assumption" that she might have felt pressured.  She has admitted that no threats were made   Therefore, the jury never gets to the issue of whether her consent was "voluntary." [2]

---

[1] Griggs-Ryan v. Smith, 904 F.2d 112, 116 (1st Cir. 1990) (" We agree with the Second Circuit that "Congress intended the consent requirement to be construed broadly.")

[2] The Court has also offered its own formulation of this issue, one that dispenses with plaintiffs' "voluntarily and freely given" language and identifies the remaining disputed issue of material

## C.    Authority For One Is Authority For All.

A corporation can only act through its agents. *See* Callgrove v. Behrle, 63 N.J. Super. 356, 366 (App. Div. 1960) ("it is settled that knowledge of an agent is chargeable to his principal wherever the principal, if acting for himself, would have received notice of the matters known to the agent"); *RTC Mortgage Trust 1994 N-1 v. Fidelity National Title Insurance Co.,* 58 F. Supp. 2d 503, 538 (D.N.J. 1999) (under New Jersey law, knowledge obtained by agent is imputed to the principal when knowledge is received by the agent while acting within the course and scope of his employment).    Therefore, once one manager gained access to the site, Houston's had gained access to the site and it does not matter what other managers saw it.    Anton owed a fiduciary duty to his employer to ensure that Houston's was protected and that the core values of

---

fact as "whether or not Ms. St. Jean voluntarily consented to and authorized Defendant's access the restricted website." Order of September 24, 2008 at 3 n.1.

Perhaps because plaintiffs never provided any legal foundation for the "freely and voluntarily" standard they advocate, the Court's "voluntarily" language does not refer to case law that would enable the parties and the Court to address many of the vexing issues relating to the practical application of this standard, <u>e.g.</u>, who must prove that Ms. St. Jean acted voluntarily (or involuntarily); whether a supervisor's simple request for the information needed to access the Spec-tator can in and of itself be sufficient to negate the voluntariness of Ms. St. Jean's consent and authorization, or whether it is necessary to prove that there was something wrongful and threatening about the request in order to negate this voluntariness; whether her voluntariness should be judged objectively, from the perspective of the conduct and intent of the Houston's managers to whom she gave consent and authorization, or subjectively, from her personal point of view (whether expressed to others at the time or not); whether Ms. St. Jean's unexpressed concerns and reservations should be given any weight by the jury and, if so, to what extent; whether her failure to express any restriction or limitation on her authorization and consent, and her failure ever to retract it, should be given any weight by the jury and, if so, to what extent.

These are among the issues that arise under the law of duress, which would a framework for evaluating whether a party's unexpressed reservations about that party's apparent agreement can serve to negate that agreement, but which the Court has suggested may not be the optimal starting point for the applicable legal analysis. Unfortunately, posing the issue as whether Ms. St. Jean acted "voluntarily" does not provide any other framework for analyzing these issues or providing the jury with a framework for answering them.

---

the Company's underlying values were upheld. Had he not taken the step that he took, he would have breached his duty of loyalty to his employer.

It is undisputed that Anton was Houston's agent and owed a fiduciary duty to Houston's to protect it from harm. Anton asked St. Jean for her password while they were both on duty at the restaurant. St. Jean assumed that by giving it to him, all managers would see it. Furthermore, it was clear from the content of their conversation that he was acting as Houston's agent:

> Q.    Can you recall specifically as best you can what he said to you?
>
> A.    He said it's disgusting what they're doing –talking about Brian and the group – and it's not right and that something needs to be done about it and that they needed my password to get into MySpace to get in and see the group.
>
> * * *
> Q.    Did you say anything to him before you gave it to him?
>
> A.    No.

In giving Anton the password, St. Jean gave it to Houston's and what other managers viewed the Spec-tator within the scope of their employment is irrelevant. If, as is plaintiffs contention, St. Jean did not authorize Marano, then her only possible cause of action would have been against Marano and the statute of limitations has run.

### D.    The New Jersey Wire Tapping and Electronic Surveillance Act.

This statute parallels the federal act and is also a criminal statute with a limited private right of action against one who "knowingly or purposely" violates the Act. N.J.S.A. 2A:156A-32a. The New Jersey statute also criminalizes accessing, without authorization, a facility through which an electronic communication service is provided in order to obtain an electronic

communication. N.J.S.A. 2A:156A:-27a. The same legal applications discussed apply equally to the state statute.

Again, the indisputable facts establish that St. Jean authorized and provided Houston's access to the Spec-Tator site on numerous occasions.

**POINT II**

**PLAINTIFFS CANNOT PREVAIL ON A CLAIM OF INVASION OF PRIVACY**

Plaintiffs claim that Houston's violated their common-law right to privacy by accessing the Spec-tator. Under New Jersey common law, there are four areas of the general tort of "invasion of privacy." These are (a) unreasonable intrusion; (b) appropriation of one's name or likeness; (c) unreasonable publicizing of another's private life; and (d) publicity placing another in a public false light. *Bisbee v. John C. Conover Agency, Inc.*, 186 *N.J. Super.* 335, 339 (App. Div. 1982), (*citing* 3 *Restatement, Torts* 2d, §562A at 376 (1977)). The plaintiffs allege the first of this quartet of harms – unreasonable intrusion. In order to prevail, the plaintiffs must adduce facts which show that Houston's (1) intentionally without authorization; (2) intruded upon the plaintiff's solitude or seclusion or their private affairs; and (3) the infringement would be highly offensive to a reasonable person. 3 *Restatement, Torts* 2d Section 652B; *see also Bisbee*, 186 N.J. Super. at 340-41. They can demonstrate neither.

First, to be actionable, the intrusion must lack consent and be an intentional invasion without consent. *Hail v. Heavey*, 195 N.J. Super. 590, 597 (App. Div. 1984). There is no provision for a negligence theory of liability. As discussed above, St. Jean, clearly gave her consent – without conditions. St. Jean, as a user of the Spec-tator had the clear right to give others access. Plaintiffs did not seclude themselves and their crude text, but rather circulated it among co-workers who were all free to share the contents of The Spec-tator with anyone they

chose. It is irrelevant that Pietrylo and Marino never consented to access by Houston's, because they did consent to St. Jean's access. St. Jean in turn authorized access by Houston's. The concept of a "reasonable expectation of privacy" in the shared content of The Spec-Tator is utterly inapplicable.

No reasonable person could expect writings on the Spec-tator to be private – regardless of whether it was called "private." Pietrylo created a website to which he invited many other people to read his postings and to respond. Marino voluntarily participated in the site knowing that her postings would be read by others. Pietrylo admits that The Spec-tator represented "private communications between me and my friends." That admission destroys any assertion that expected the writings to be private and protected from view. He also admits that no one gained access to his private email and it is not alleged that Houston's gained access to any document other than the Spec-tator. Therefore, to the extent Houston's had access to plaintiffs' "private affairs or concerns," this occurred because plaintiffs chose to air their private affairs and concerns with others, thereby removing them from plaintiffs' private realm.

Thus, as in *Bisbee*, where most of the information at issue was public, there was no intrusion into plaintiffs' solitude or seclusion, and nothing particularly private or intimate about the information in any event.

Plaintiffs must also prove that the intrusion would be highly offensive to a reasonable person. The crux of the allegation "turns on one's reasonable expectation of privacy. A 'reasonable person' cannot conclude that an intrusions is 'highly offensive' when the actor intrudes into an area in which the victim has either a limited or no expectation of privacy." *White v. White*, 344 *N.J. Super.* at 222. "A person's expectation of privacy to a room used for storage and to which others have keys and access is not reasonable. . . . [A] subjective belief that

the room was private is irrelevant." *Id.* at 223. In so observing, the *White* Court concluded that a husband had no reasonable expectation of privacy in emails stored in a computer room that the entire family used.

The Spec-tator is the same as the room analogized in *White*. Once Pietrylo gave other people a key to the Spec-tator room, he and Marino had no reasonable expectation of privacy where many people had keys and access. There was nothing reasonable about the plaintiffs' subjective expectation that The Spec-Tator would remain private. The plaintiffs invited at least 20 participants to the Spec-tator. The plaintiffs had no control over others whom those participants showed the site and could not reasonably expect privacy protections in their written words when they were already sharing those words and had no reasonable expectation that their words would not be seen by others.

Given the obscene and sexually graphic references contained in The Spec-tator postings, it is understandable plaintiffs might be embarrassed that their words were seen.. However, to claim that their privacy rights have been violated trivializes legitimate privacy interests.

Additionally, a claim for invasion of privacy is subject to the same defenses as for libel or defamation, including qualified privilege. *Dijkstra v. Westerink*, 168 N.J. Super. 128, 135-36 (App. Div. 1979) *certif. den.,* 81 N.J. 329 (1979). An employer has a qualified privilege in the plaintiffs' communications where the morale of the restaurant was being undermined, the restaurant and its managers were being mocked and undermined and even Houston's logo was misappropriated for unauthorized use. Therefore, Houston's authorized entry in to The Spec-Tator cannot be considered an actionable invasion of plaintiffs' private realm.

Plaintiffs published the information at issue in this action to other persons; one of these people provided the information to Houston's. Simply put, plaintiffs suffered no actionable

intrusion into their solitude, seclusion or private affairs, and even if they had, no reasonable person could find this to be "highly offensive."

## POINT III

### PLAINTIFFS WERE NOT TERMINATED
### IN VIOLATION OF A CLEAT MANDATE OF PUBLIC POLICY

The plaintiffs claim that their employment was terminated in violation of the public policy common law guarantee of the right to privacy. They have not articulated how their termination invaded their right to privacy. For this claim to go to the jury, the Court must first determine whether the plaintiffs have articulated a clear cause of action by balancing the interests of the public, the employer and the plaintiffs. Only if the Court determines that the termination implicates a clear interest of the public and not just a private dispute between plaintiffs and Houston's will the jury determine the factual questions.

**A.    The Court Must Make the Initial Determination of Whether Plaintiffs' Claim for Wrongful Discharge Goes to the Jury.**

It is well established that "identifying the mandate of public policy is a questions of law, analogous to interpreting a statute or defining a duty in a negligence case." *Warthen v. Toms River Community Memorial Hospital*, 199 N.J. Super. 18, 24 (App. Div.1985).

> "[W]here a discharged at-will employee asserts wrongful discharge on public policy grounds, the trial court must, as a matter of law, determine whether public policy justified the alleged conduct. Then, assuming the pleadings raise a genuine issue of material fact, it is for the jury to determine the truth of the employee's allegations."

*Id.* at 25. *Accord Martinez v. Cardinal Health Partners, LLC*, 2008 U.S.Dist. LEXIS 32861 *1, *8 (3d Cir. April 21, 2008); Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 72 (1980) ("Absent legislation, the judiciary must define the cause of action.").

As discussed below, the plaintiffs have not articulated a "clear mandate of public policy" and their wrongful discharge claim should not be submitted to the jury.

### 1.    Plaintiffs Have Not Articulated A Clear Mandate of Public Policy

The alleged mandate of public policy must be firmly grounded. *MacDougall v. Weichert*, 144 N.J. 380, 391 (1996). . "A vague, controversial, unsettled and otherwise problematic public policy does not constitute a clear mandate.  Its alleged violation will not sustain a wrongful discharge cause of action" *Id* at 392.  "More is needed that simply the breach of public policy affecting a single person's rights to constitute the breach of a 'clear mandate' of public policy that *Pierce* requires." *Hennessey v. Coastal Eagle Point Oil Co.*, 129 N.J. 81, 99 (1992).

Public policy must be determined by "weighing competing interests, " *id.,* and this Court must balance the plaintiffs' interests against the interests of the public and the employer's interests. *MacDougall*, *supra*, 144 N.J. at 390.   When this balancing is done, it is clear that there is no mandate of public policy which precludes the plaintiffs' termination.

Here, plaintiffs claim that their employment was terminated in violation of their common-law right to privacy. This, in and of itself, is vague and problematic.  The plaintiffs have never explained exactly what protected activity was impeded by their termination.  Is it their right to establish a private on-line group?  Or is it their right to privacy in the content of the Spec-tator?  It can't be the former.  The plaintiffs were not terminated for the mere fact that they created and participated in an on-line group.

It is undisputed that the plaintiffs were terminated because Houston's was distressed by the content of the Spec-tator and concerned that it was undermining employee morale and the

Four Values that defined the corporate culture.[3]  Plaintiffs were terminated for initiating

employee attacks upon the company, the restaurant, its managers and its customers.  Had the

Spec-tator's content not been directed at Houston's, the plaintiffs would not have lost their jobs.

Even assuming that under these facts, the plaintiffs had an expectation of privacy in the

Spec-tator, there is no clear mandate of public policy where the plaintiffs' discharge only

implicated private interests.  *See, e.g., DeVries v. McNeil Consumer Prods. Co.*, 250 N.J. Super.

159, 172 (App. Div. 1991) (plaintiff's discharge for having distributed expired drugs at the

employer's direction did not violate clear mandate of public policy because the discharge

"implicated only the private interests of the parties."); *Schwartz v. Leasametric, Inc*, 224 N.J.

Super. 21, 30 (App. Div. 1988) (no clear mandate of public policy where the employee was

discharged to avoid paying him sales commissions); *Warthen*, supra, 199 N.J. Super. at  28

(discharge of nurse refusing to perform dialysis on a dying patient implicated only her personal

morals.)

Balanced against the vague privacy interests articulated by the plaintiffs, the Court must

weigh the interests of the employer and the public.  "Employers have an interest in knowing

they can run their businesses as they see fit as long as their conduct is consistent with public

policy."  *Pierce*, 84 N.J. at 71.  Below is a sample of the Spec-tator content:

- Sarcastic comments about Houston's quality, service and standards and its managers;

- Derogatory and vulgar references to customers including references to the customers' names. *E.g.,* "Manischevitz," the "Fleggler brothers," "Mrs. Fricke" and "the Cherynobls";

---

[3] This Court has already dismissed plaintiff's wrongful termination claims based upon the state and federal constitutions, holding that plaintiff's speech was not a protected activity. *See* Opinion and Order at 11(July 24, 2008).

- References to workplace violence such as  "The Navajo rug needs to be set on fire;" "Tonight, as one of our bosses actually rose to the occasion of doing the [W]atco [applying "Danish Oil Finish" to tabletops] himself, I had to stop Doreen from approaching the fumes with a lighter;"

- References to illegal drug use such as poll asking "If you had to drop acid with one person in Houston['s who would it be?"; "management and cocain[e] DO NOT MIX!!!!"

- A complete copy of a new test that was to be given by Rodriguez to the entire wait staff concerning a new wine list.  This was proprietary information that had been  posted by Pietrylo without permission.

- "Stupid corporate f***s."

- "The pain of being born to Mr. Anton."  "Who would do that?  Make a baby with Robert [Anton]?  Ew . . . ."

- "[M]anagement dick suckers . . . . I gave Jason a rim job for no good reason."  "Jason" was the general manager of the restaurant and, as Marino explained in deposition, a "rim job" referred to a sexual act involving the anus.   Gardiner Certif., Exhibit C at T72:4-9.

- "Does anyone know the new spec on fellatio?"

- " "F*** the f***ing F***s who thought this one up, ANTON!  . . .

Houston's had the right and obligation to protect its employees from harassment and humiliation.

It had the right and the obligation to protect its customers from religious slurs.  It had the right

and the obligation to protect its own core values.  *See, e.g., Weigand v. Motiva Enterprises,*

*LLC,* 295 F. Supp. 2d 465, 477 (D.N.J. 2003) ( where an employee was terminated for running

an on-line business selling racist and Nazi music and paraphernalia, the employer had a "strong

interest in ensuring that their employees are not associate with such speech or ideals. . . and, as

private employers, still had a very strong interest in regulating the speech of their convenience

store supervisor to ensure that it personified their values of respect for all."). Houston's  right to

protect its business runs parallel to the public's right to be protected from ridicule and the public's interest in places of public accommodation that are free from bias and hostility.

Houston's is aware of no case where a court has found that employee internet postings containing references to drug use, mocking criticisms of the company's policies and managers, and depictions of anal and oral sex with management, racial slurs and derogatory comments about the restaurant's guests are entitled to privacy protection. There are no privacy protections for the contents of The Spec-Tator that could possibly furnish the basis for a "public policy" claim.

The only cases in which courts have suggested that there might be a potentially protectable privacy interest that might be infringed by an employer dealt with compelled urine testing. See, e.g., Borse v. Piece Goods Shop, Inc., 963 F.2d 611 (3d Cir. 1992), Hennessy, supra. Those cases fail to support plaintiffs' privacy-based Pierce claim. The Spec-Tator is not, as a matter of law, a valid basis for a wrongful termination claim under the Pierce doctrine.

**B.     Even If Plaintiffs Have Articulated A Valid Public Policy, Houston's Did Not Discharge Plaintiffs Because They Exercised Their Right To Privacy.**

As stated above, Plaintiffs were terminated because they exercised their right to privacy. They were terminated because of the content of The Spec-tator and not because they started or participated in it. Plaintiffs were terminated to protect Houston's business interests and the public policy was not offended. Houston's did not care whether The Spec-tator was created or continued – it cared about the potential damage that its content posed. Thus, plaintiffs were not terminated for having a semi-private on-line group, only for the content directed at Houston's, its employees and its customers.

## CONCLUSION

Based on the foregoing, defendant Hillstone Restaurant Group, d/b/a Houston's, respectfully submits that it should prevail at trial and that all claims against it should be dismissed.

Respectfully submitted,

McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
Attorneys for Defendant,
Hillstone Restaurant Group, d/b/a Houston's


By___/s/Donna duBeth Gardiner_____
DONNA duBETH GARDINER

Dated: March 3, 2009