## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRIAN PIETRYLO, et al., | : Hon. Faith S. Hochberg, U.S.D.J. |
| | : Hon. Patty Shwartz, U.S.M.J. |
| Plaintiffs, | : |
| | : Civil Action No. 06-5754 (FSH) |
| | : |
| vs. | : |
| | : **Motion Returnable: August 3, 2009** |
| HILLSTONE RESTAURANT | : |
| GROUP, d/b/a/ HOUSTON'S, | : |
| | : **Oral Argument Requested** |
| Defendant. | : |
| | : Document Filed Electronically |
| | : |

**BRIEF IN SUPPORT OF MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. P. 50(b) AND FOR A NEW TRIAL PURSUANT TO FED. R. CIV. P. 59**

McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
973-993-8100
Attorneys for Defendant,
Hillstone Restaurant Group Inc. d/b/a Houston's

**Of Counsel:**
Donna duBeth Gardiner, Esq.

**On the Brief:**
Donna duBeth Gardiner, Esq.
Michael O'B. Boldt, Esq.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii-iv

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ................................................................................. 2

ARGUMENT

    I.    STANDARD FOR MOTIONS FOR JUDGMENT OR A NEW TRIAL.............. 7

    II    PLAINTIFFS OFFERED NO EVIDENCE TO PROVE THE STATUTORY ELEMENTS AND THE JURY VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE PRESENTED ................................................................ 9

        A.    There Was No Evidence To Support The Conclusion That St. Jean Did Not Authorize The Use Of Her Password to Access The Spec-Tator ................................................................ 10

        B.    Plaintiffs Presented No Evidence That Houston's Managers Acted With A "Knowing" or "Intentional" or "Purposeful" State of Mind ................................................................ 14

    III.    THE EVIDENCE DID NOT SUPPORT THE JURY'S AWARD OF LOST DAMAGES ................................................................ 20

        A.    Plaintiffs Turned Down Substantially Similar Employment at Legal Seafood ................................................................ 23

        B.    Plaintiffs Earned More Working for Morton's Steakhouse.............. 23

    IV.    THERE WAS NO EVIDENCE TO SUPPORT THE FINDING OF "MALICIOUS" CONDUCT BY HOUSTON'S ..................................... 25

    CONCLUSION ................................................................ 30

## TABLE OF AUTHORITIES

*Acumed LLC v. Advanced Surgical Serv.*, 561 F.3d 199 (3rd Cir. 2009)......................................29

*American Computer v. Boerbomm International, Inc.*, 967 F.2d 108 (8th Cir. 1991) *aff'd sub nom.*, *American Computer v. Boerbomm International, Inc.*, 967 F.2d 108 (8th Cir. 1991) ...13

*Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505 (1986)......................................26

*Bansal v. Server Beach*, 285 Fed. Appx. 890 (3d Cir. 2008) ......................................16

*Blancha v. Raymark Indus.,* 972 F.2d 507 (3d Cir.1992)......................................8

*Booker v. Taylor Milk Co.,* 64 F.3d 860 (3rd Cir. 1995)......................................22

*Brennan v. Norton,* 350 F.3d 399 (3rd Cir. 2003) ......................................26

*Cardinal Health 414, Inc. v. Adams,* 582 F. Supp. 2d 967 (M.D. Tenn. 2008) ......................................16

*Caufield v. Ctr. Area Sch. Dist.*, 133 Fed. Appx. 4 (3rd Cir., May 20, 2005) ......................................23

*Chas. A. Winner, Inc. v. Polistina*, 2007 U.S. Dist. LEXIS 40741 (D.N.J. June 14, 2007)......................................20

*Continental Bank of Pa. v. Barclay Riding Acad., Inc.,* 93 N.J. 153 (1983)......................................12

*Dijkstra v. Westerink,* 168 N.J. Super. 128  (App. Div. 1979), *certif. den.*, 81 N.J. 329 (1979) ......................................28

*Eichenlaub v. Township Of Indiana,* 214 Fed.Appx. 218, 223-24 (3rd Cir. 2007)......................................26

*Fairway Dodge, LLC v. Decker Dodge, Inc.,* 191 N.J. 460 (2007)......................................16

*Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, (3d Cir. 1992), *cert. denied,* 507 U.S. 921(1993)......................................7

*Gay v. Petsock,* 917 F.2d 768 (3rd Cir. 1990) ......................................21

*General Board of Global Ministries of the United Methodist Church v. Cablevision Lightpath, Inc.,* 2008 U.S. Dist. LEXIS 86826 (Nov. 30, 2006)......................................14

*Goodman v. London Metals Exchange, Inc.,* 86 N.J. 19 (1981)......................................21,22

*Griggs-Ryan v. Smith,* 904 F.2d 112 (1st Cir. 1990)......................................12

*Kaufman v. Nest Seekers, LLC,* 2006 U.S. Dist. LEXIS 71104, 2006 WL 2807177 (S.D.N.Y. Sept. 26, 2006)................................................................................................14

*Kent v. United States,* 272 F.2d 795 (1st Cir. 1959) ................................................................12

*Lightning Lube v. Witco Corp.,* 4 F.3d 1153 (3d Cir. 1993) ......................................................7

*Lind v. Schenley Industries, Inc.,* 278 F.2d 79 (3d Cir. 1960)....................................................8

*Malley-Duff & Associates v. Crown Life Ins. Co.,* 734 F.2d 1335 (3d Cir.1984) ....................29

*Moss v. City of Colorado Springs,* 871 F.2d 112 (14th Cir. 1989)............................................29

*Patzig v. O'Neil,* 577 F.2d 841 (3d Cir. 1978)............................................................................7

*Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58 (1980)........................................................28

*Roebuck v. Drexel University,* 852 F.2d 715 (3d Cir.1988) ........................................................8

*Sellers v. Delgado College,* 902 F.2d 1189 (5th Cir. 1990) .....................................................22

*Sherman & Co. v. Salton Maxim Housewares, Inc.,* 94 F.Supp. 2d 817 (E.D. Mich. 2000) ........13

*Slim CD, Inc. v. Heartland Payment Sys.,* 2007 U.S. Dist. LEXIS 62536....................................16

*State v. Simon,* 161 N.J. 416 (1999) ....................................................................................16, 18

*U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235 (1989)..........................................................19

*United States v. Silva,* 449 F.2d 145 (1st Cir. 1971) ............................................................12,13

*Walter v. Holiday Inns, Inc.,* 985 F.2d 1232 (3d Cir. 1993).......................................................7

*Weigand v. Motiva Enterprises, LLC,* 295 F. Supp. 2d 465 (D.N.J. 2003)...............................28

*Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344 (3d Cir. 1991).......................................8

*Wolf v. Marlton Corp.,* 57 N.J. Super. 278 (App. Div. 1959) ...................................................12

*Wood v. Holiday Inns, Inc.,* 508 F.2d 167 (5th Cir.1975) ........................................................29

## STATUTES

18 U.S.C. §§ 2701 to -11 ................................................................................8, 9, 13, 17, 29

18 U.S.C. § 2701(c)(2)...............................................................................9, 13

18 U.S.C. § 2707(a) ..........................................................................................9

42 U.S.C. § 1983 ............................................................................................26

N.J.S.A. 2A:38A-1 to -6 ................................................................................16

N.J.S.A. 2A:156A-27.......................................................................................9

N.J.S.A. 2A:156A-32a......................................................................................9

## RULES

Fed. R. Civ. P. 50...........................................................................................6, 7

Fed R. Civ. P 50(a) ...........................................................................................7

Fed. R. Civ. P. 50(b)...............................................................................1, 7, 30

Fed. R. Civ. P. 59...................................................................................1, 7, 30

Fed R. Civ. P. 59(a) (1) ....................................................................................7

## OTHER AUTHORITIES

9 *Moore's Federal Practice* §50.82 at 50-112 to-14 (3rd ed. 2009), ...........................26

9 *Moore's Federal Practice* §59.13[2][f] at 59-72 (3rd Ed.2009).................................8

*New Jersey Model Civil Jury Charges, 4.10 at n.8.* .......................................12

O'Malley, Grenig & Lee, *1A Federal Jury Practice and Instructions*..........................12

United States Court of Appeals for the Third Circuit, *Model Civil Jury Instructions, Instructions for Employment Discrimination Claims Under Title VII, Instruction 5..4.3* (February 2009)..............................................................23

United States Court of Appeals for the Third Circuit, *Model Criminal Jury Instruction 5.02* .....12

## PRELIMINARY STATEMENT

The jury in this matter returned a verdict in favor of plaintiffs Brian Pietrylo ("Pietrylo") and Doreen Marino ("Marino"), and against defendant Hillstone Restaurant Group Inc. d/b/a/ Houston's ("Houston's" or "Defendant"), finding that:

> (a)  Houston's managers knowingly or intentionally or purposefully accessed, "The Spec-Tator," without authorization; and
>
> (b)  Houston's conduct in accessing The Spec-Tator was "malicious," so as to justify an award of punitive damages.[1]

The jury awarded lost pay of $2,500 for Pietrylo and $903 for Marino.

Based upon the evidence at trial, none of the jury's findings in plaintiffs' favor can be sustained. There was no evidence upon which the jury could reasonably have concluded that the managers knowingly, or with intention or purpose, accessed The Spec-Tator without authorization. Also, there was not a shred of evidence that Houston's conduct was malicious.

Moreover, the undisputed evidence also demonstrated that plaintiffs were offered (and turned down) substantially similar positions on the same day that their Houston's employment was terminated. The documentary evidence also showed that plaintiffs they earned more from their subsequent employment at Morton's Steakhouse than they were earning at Houston's, completely mitigating their damages. In addition, Marino testified that she voluntarily reduced her hours in 2007 and admitted that reduction could have accounted for the $903 difference in her 2007 income. Houston's therefore respectfully applies under Fed. R. Civ. P. 50(b) for entry of judgment in its favor and against plaintiffs, or in the alternative under Fed. R. Civ. P. 59 for a new trial.

---

[1] The jury denied Pietrylo's claim for emotional distress damages and found for Houston's on plaintiffs' common law invasion of privacy claim which also negated plaintiffs' claim of wrongful discharge.

## STATEMENT OF FACTS[2]

At the trial of this matter, the parties' proofs established the following:[3]

1.     In 2006 Pietrylo and Marino were employed at the Houston's restaurant at Riverside Square in Hackensack, New Jersey. (6/9 Tr. 55, 61.)

2.     In early March 2006, Pietrylo created a group on "myspace.com" called "The Spec-Tator." (6/9 Tr. 66.) The purpose was for "s**t talking" about the restaurant and its managers." (D-2.) Even the name, "The Spec-Tator," mocked the service and quality requirements or "specs" that Houston's required of its employees and its restaurants. (6/11 Tr. 66.) The Spec-Tator also published a stolen test that a manager had designed for employees on a new wine list, with answers. (6/9 Tr. 47-48.) The Spec-Tator contained ethnic slurs and derogatory comments about guests and managers as well as discussions about drug use and sexual acts. (D-2.)

---

[2] Relevant portions of the trial transcript and Exhibits E and F referenced in the within Motion are attached as Exhibits to the Certification of Counsel (the "Counsel Certif.") submitted in support of this Motion. References to the transcript are in the format "[date] Tr. [page]." Exhibits to the Counsel Certif. are:

- The Transcript of Proceedings on June 9, 2009 ("6/9 Tr. __"), is Exhibit A.
- The Transcript of Proceedings on June 10, 2009 ("6/10 Tr. __"), is Exhibit B.
- The Transcript of Proceedings on June 11, 2009 ("6/11 Tr. __",) is Exhibit C.
- The Transcript of Proceedings on June 16, 2009 ("6/16 Tr. __",) is Exhibit D.
- The Court's Jury Instruction is Exhibit E.
- The completed Jury Verdict Form is Exhibit F.

References to "P-" and "D-" Exhibits are to the exhibits admitted at trial in the Court's possession.

[3] This Brief will provide background information as necessary, but will focus on the limited and largely undisputed evidence concerning the circumstances at the crux of the major issue relating to plaintiffs' statutory claims:  Access to The Spec-Tator provided by Karen St. Jean to Houston's managers TiJean Rodriguez, Robert Anton and Robert Marano.

3.      Pietrylo invited other employees to join The Spec-Tator.  The email invitation contained a link to The Spec-Tator and once the invitee accepted the invitation, a link to the site would permanently appear on the invitee's own "myspace.com" home page. (6/9 Tr. 74-75.) Among the invitees was Karen St. Jean ("St. Jean"), a greeter at the restaurant.  (6/10 Tr. 89; 6/11 T. 104.)    Plaintiffs used the federally-registered trade mark "Houston's" without authorization, and posted offensive and derogatory comments about Houston's and its managers on The Spec-Tator.  (D-2; 6/10 Tr. 30-53.)

4.      In May 2006, St. Jean showed The Spec-Tator to a Houston's manager, TiJean Rodriguez ("Rodriguez"), and his wife at the Rodriguez home.  She used Rodriguez' home computer. (6/10 Tr. 91-93.)

5.      Rodriguez told another manager, Robert Anton ("Anton"), about the site.  Anton and his wife were one of the targets of the offensive postings on The Spec-Tator.  When requested, St. Jean gave Anton her personal email address and password that would allow him to access The Spec-Tator from St. Jean's personal myspace.com home page.  She also explained to him how to use the log-in information. (6/10 Tr. 94-95; 6/11 Tr. 65.)  Anton then accessed the site from his home. (6/11 Tr. 65.)

6.      St. Jean testified that Anton did not "pressure" her to provide him with her log-in information.  (6/10 Tr. 95.)  There was no evidence that she was pressured by anyone at Houston's to provide her log-in information, and there was no evidence that she was threatened or coerced in any way when asked for access to The Spec-Tator. (*E.g.*, 6/10 Tr. 95-96.)

7.      Plaintiffs presented no evidence that St. Jean expressed any reservations or placed any conditions on Anton's use of the password information or his access to the site.  Asked at trial whether she had "second thoughts" **after** providing Anton with access to The Spec-Tator,

St. Jean testified that she "felt guilt" because she did not want others to get in trouble, and she "told [Rodriguez], I asked why he had gone and told them." (6/10 Tr. 98.)  Also telling was her testimony about sharing these "second thoughts" with Jason Sokolow ("Sokolow"), the restaurant's general manager:

> A.    I went up to him and I asked him, well, I told him, like that I felt really guilty, and I felt bad, and I didn't know -- **I didn't want anybody to know it was me**.
>
> Q.    Did you also tell him that they had asked me for my password and I really didn't want to give it to them?
>
> A.    No, I don't remember saying that.

(*Id.* (emphasis supplied)).

8.    Robert Marano ("Marano") was Sokolow's supervisor.   Marano also testified about St. Jean's misgivings that arose after she had provided her log-in information to him (*see infra* ¶ 11):

> A.    I don't remember what it was, a few days later one of the managers, it may have been Jason, may have been Tijon, had said to me that Karen was very uneasy with the fact that she had given me and the rest of the managers her password.  So I felt it fitting to talk to Karen about that.  So I approached her and I said, "Karen, I want you to know you did the right thing.  No one's going to know that you gave us your password.  And if they find out and they treat you differently or badly, it's my responsibility to make sure while you're in this building that you're protected."
>
> Q.    Did -- when the manager told you that she was uncomfortable, did they relate the source of her discomfort?
>
> A.    She felt she was worried that people were not going to be nice to her anymore, and that she would lose her friends because the staff would find out that she was the one who let management know about the site.

(6/10 T. 191-92.)

9.    Anton found The Spec-Tator's contents to be offensive and disturbing.   In addition to postings personally attacking the Antons and other managers, there were obscenities, sexual and drug references and proprietary business information that the members were not

authorized to have.  (6/10 Tr. 33-54; 6/11 Tr. 71-72, 94-95, 96-97.)  Pietrylo had posted a test on the new wines that had been drafted by Rodriquez and was slated to be given to the wait staff. (6/10 Tr. 47-48.)  Anton printed out the contents of the website.  (6/11 Tr. 97.)

10.    Anton and Rodriguez brought the site to the attention of Marano, who was a regional supervisor of operations for Houston's.  Anton told Marano about the contents of the site.  (6/10 Tr. 119.)  Anton also gave Marano a copy of the printed-out contents of The Spec-Tator.  6/11 Tr. 97.)

11.    Marano consulted with other senior management at Hillstone Restaurant Group, explaining that he had learned "[t]hat it had come to my attention that there was a web site that had been created by one of the staff members of Riverside Square that was really dedicated to making a mockery of the restaurant, and it had damaging comments about the managers."  (6/10 Tr. 115.)  One of these senior managers asked how to access The Spec-Tator.  Marano called the Riverside Square Houston's to ask Rodriguez, who had previously gained access through St. Jean.  (6/10 Tr. 118, 129-30; 6/11 Tr. 94-95.)

12.    When Marano called, St. Jean answered the telephone and Marano identified himself and asked to speak to Rodriguez.  Marano asked Rodriguez if he knew how to access The Spec-Tator and Rodriguez asked St. Jean, who was standing beside him, for her log-on information so he could give it to Marano, and she provided it.  Marano was able to hear St. Jean and Rodriguez speaking with each other, although he could not hear all of the conversation. (6/10 Tr. 130-31; 6/11 Tr. 99-101.)

13.    Plaintiffs presented no evidence that St. Jean told any manager that she did not want to provide her password or that she verbalized any reservations about or placed any conditions on the use of the password information or access to the site.

12981154                                    5

14.    In the closing argument, plaintiffs' counsel contended that St. Jean did not "voluntarily" authorize Anton or Marano to access The Spec-Tator because the authorization was given in the context of the supervisor/employee relationship. (6/16 Tr. 27.) Yet St. Jean testified that she was not pressured by Anton (6/10 Tr. 95), and there was no evidence that she was ever coerced or threatened by anyone at Houston's. There is absolutely no testimony in the record that St. Jean ever objected to providing access.

15.    Moreover, St. Jean did not deny that she provided her access information to Marano during the telephone call. She simply did not recall. (6/10 Tr. 97.)

16.    At no time did plaintiffs ever present any evidence from which the jury could have concluded that Houston's <u>knew</u> it was accessing The Spec-Tator without St. Jean's authorization or that it purposely or intentionally accessed the site without authorization.

17.    Houston's counsel moved for entry of judgment at the close of plaintiffs' case (6/11 Tr. 76-81) and also at the close of the evidence pursuant to Fed. R. Civ. P. 50. (6/11 Tr. 113.) Houston's also moved to remove any issue of punitive damages from the jury. (6/11 Tr. 80-81.) Because (a) plaintiffs were offered substantially similar jobs at the Legal Seafood restaurant in Riverside Square on the same day that their employment was terminated at Houston's (6/10 Tr. 217, 241), and (b) plaintiffs were paid more when they worked at Morton's Steakhouse after they were terminated from their positions at Houston's, Defendant also, in part, moved to keep plaintiffs' lost wage claim from the jury. (6/11 Tr. 76-78.) The Court reserved on the Motions. (6/11 Tr. 78, 80, 114.)

18.    After deliberations, the jury found that Houston's had knowingly or intentionally or purposefully accessed The Spec-Tator without authorization and that the violation was "malicious." It awarded compensatory damages for lost pay to Pietrylo and Marino for $2,500

and $903, respectively.  Pursuant to a stipulation between the parties, the Court also awarded

punitive damages of four times the compensatory damages verdict, or $13,612.


# ARGUMENT


## I.  STANDARD FOR MOTIONS FOR JUDGMENT OR A NEW TRIAL

The standards for entry of judgment under Rule 50(a) or a new trial under Rule 59 are

well-settled.  Under Rule 50, judgment as a matter of law should be granted if the evidence at

trial, viewed in the light most favorable to the verdict, is not sufficient to support the verdict:

> Such a motion should be granted only if, viewing the evidence in the light most
> favorable to the nonmovant and giving it the advantage of every fair and
> reasonable inference, there is insufficient evidence from which a jury reasonably
> could find liability. In determining whether the evidence is sufficient to sustain
> liability, the court may not weigh the evidence, determine the credibility of
> witnesses, or substitute its version of the facts for the jury's version. *Fineman v.
> Armstrong World Indus., Inc.*, 980 F.2d 171, 190 (3d Cir. 1992), *cert. denied*, 507
> U.S. 921(1993). Although judgment as a matter of law should be granted
> sparingly, a scintilla of evidence is not enough to sustain a verdict of liability.
> *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993). "The question is
> not whether there is literally no evidence supporting the party against whom the
> motion is directed but whether there is evidence upon which the jury could
> properly find a verdict for that party." *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir.
> 1978) . . . . Thus, although the court draws all reasonable and logical inferences in
> the nonmovant's favor, [the motion for judgment should be granted if] it is
> apparent that the verdict is not supported by legally sufficient evidence.

*Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citations and quotations

omitted).

Under Rule 59(a)(1), a new trial may be granted "for any reason for which a new trial has

heretofore been granted in an action at law in federal court."  Whether there should be a new trial

is committed to the district court's discretion.  *See, e.g., Blancha v. Raymark Indus.*, 972 F.2d

507, 512 (3d Cir.1992). A district court should order a new trial, however, when "in [its] opinion

. . ., the verdict is contrary to the great weight of the evidence, thus making a new trial necessary

to prevent a miscarriage of justice." *Roebuck v. Drexel University*, 852 F.2d 715, 736 (3d

Cir.1988); *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991).    In

making that determination, the district court properly weighs the evidence and considers the

credibility of witnesses. *Id.*; *9 Moore's Federal Practice* §59.13[2][f] at 59-72 (3rd ed. 2009)

("The judge must review the evidence, view all the evidence as a whole, and weigh the relative

strengths and weaknesses of the evidence . . . , considering the credibility of the witnesses,

conflicting testimony, and the forcefulness of the evidence").    "Where a trial is long and

complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a

verdict should be scrutinized more closely by the trial judge than is necessary where the

litigation deals with material which is familiar and simple." *Lind v. Schenley Industries, Inc.*,

278 F.2d 79, 90-91 (3d Cir. 1960).

        With respect to each point, the verdict was contrary to the evidence and plaintiffs,

therefore, failed to meet their burden of proof as a matter of law. Alternatively, even if judgment

for Defendant at the close of the evidence were not compelled, the verdict on each of these points

was against the clear weight of the evidence, requiring a new trial.

## II.    PLAINTIFFS OFFERED NO EVIDENCE TO PROVE THE STATUTORY ELEMENTS AND THE JURY VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE PRESENTED.

        In order to prevail, plaintiffs were required to offer sufficient evidence to allow the jury

to conclude that Houston's managers knowingly, intentionally or purposefully accessed The

Spec-Tator without St. Jean's authorization in violation of the federal Stored Communications

Act ("SCA"), 18 U.S.C. §§ 2701-11, and a parallel New Jersey statute, The New Jersey Wire

Tapping and Electronic Surveillance Act, N.J.S.A. 2A:156A-27 (the "New Jersey Act"). The SCA allows a private right of action only in one specific circumstance:

> (a) Cause of Action. – Except as provided for in section 2703(e), any provider of electronic communication service, subscriber, or other person **aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind** may, in a civil action, recover from the person or entity which engaged in that violation such relief as may be appropriate.

18 U.S.C.§ 2707(a) (emphasis added).[4]

Of central significance to this case, there is no statutory violation when the access is authorized "by a user of that service with respect to a communication of or intended for that user." 18 U.S.C.§ 2701(c)(2). Critically, there is no liability under the statutes for unauthorized access unless the person obtaining access is aware he lacks authority. Under the terms of the statute, in order to find statutory liability, the jury was required to find that (1) St. Jean did not authorize Houston's to use her log-in information to access The Spec-Tator, (2) the managers at Houston's knew they did not have authorization, and (3) despite that knowledge, the managers intentionally or purposely accessed The Spec-Tator. There was no evidence upon which a reasonable jury could have made these findings, which must be set aside pursuant to Rule 50(b).

### A. There Was No Evidence To Support The Conclusion That St. Jean Did Not Authorize The Use Of Her Password to Access The Spec-Tator.

The following facts are undisputed:

1.    St. Jean was an authorized user of The Spec-Tator.

2.    She showed The Spec-Tator to Rodriquez.

---

[4] The New Jersey Act parallels the SCA and is also a criminal statute with a limited private right of action against one who "knowingly or purposely" violates the Act. N.J.S.A. 2A:156A-32a.

3.     Anton went to St. Jean and asked for her password and she gave it to him. (6/11 Tr. 96-97.)[5]

4.     Anton and Rodriquez told Marano about the site. (6/10 Tr. 113-15.)

5.     Marano obtained the password from Rodriquez during a telephone call in which St. Jean was asked for the password and gave it to Rodriquez knowing it was for Marano. (6/10 Tr. 129-31; 6/11 Tr. 100-01.)[6]

There was no testimony that St. Jean told any manager that she did not want to provide her password. To the contrary, she stated that she did not tell Anton or Sokolow that she did not want to give her password to the managers. (6/10 Tr. 95, 98.)    There is no evidence that her password was stolen by a manager.   The only thing plaintiffs were able to produce was speculation of St. Jean's unspoken, internal reservations. That is simply not evidence to allow a jury to conclude that she did not authorize access.

Because the statutes require intentional, purposeful or knowledgeable conduct by Defendant, the jury was not permitted to infer that St. Jean did not "voluntarily" authorize access to The Spec-Tator. Yet, that is exactly what plaintiffs argued in summation:

> If a co-worker had asked her, she wouldn't have given it to him.  She gave it to him because she felt something would happen to her at work.  She gave it to him

---

[5] The testimony diverged over exactly what the conversations were between St. Jean and Anton and between Marano and Anton.  *Compare* 6/10 T. 94-95 and 6/11 T. 63-64.  The jury could have either believed that St. Jean offered Anton her log-in information or accepted St. Jean's testimony that he asked her for it. The jury could have also accepted Anton's testimony that he provided Marano with the log-in information after telling St. Jean it was for Marano (6/11 Tr. 70-71) or accepted Marano's testimony that she provided it during a telephone call with Rodriquez. (6/10 Tr. 120, 129-31.)  No matter which facts were accepted by the jury, the only evidence was that St. Jean had voluntarily provided her log-in information to both Anton and Marano.

[6] St. Jean did not recall this conversation, but she also would not deny that it had occurred. (6/10 Tr. 97.)   The testimony of Marano and Rodriguez in this regard was undisputed and unchallenged, and the jury could not reasonably have disregarded it.

---

12981154                                    10

under those circumstances, and there's a big difference, ladies and gentlemen, in my opinion, when you're at work, all of you have worked before. You get called in by your boss, and you're asked for something, and you have an imbalance in power. You're usually going to give it to them, unless they're asking you to jump off a bridge. You're going to do what they tell you, because they're your boss. And that is not authorization which has to be consent, which has to be voluntarily and freely given.

(6/16 Tr. 27.)

The plaintiffs improperly asked the jury to infer that St. Jean did not authorize access simply because of the employer-employee relationship. That is not allowed under either the instructions given to the jury or under the law. Indeed, the jury could have only reached its verdict by concluding that (a) St. Jean's unexpressed concerns negated her authorization for Houston's to access The Spec-Tator, and (b) her managers should have known that a subordinate employee would feel pressured. These suppositions provide no basis for liability in light of the statutory requirement for a "knowing," "intentional," or "purposeful" violation, where, as here, St. Jean provided her password without voicing any conditions or reservations, and where her managers had no basis to conclude anything except that she had authorized their access by showing Rodriguez the site (and offering him her log-in information (6/11 Tr. 105-06)) and then providing access information to Anton and Marano upon request.

Raising the question as to whether her authorization was "voluntary" would have asked the jury to conclude that Houston's "should have known" that the request would have produced an involuntary or invalid consent. As stated in the Court's Instructions, "The terms 'knowingly,' 'purposefully' and 'intentionally' as those terms are being used in these instructions, means that the act was done voluntarily and intentionally and not because of ignorance, mistake or

accident."[7] Finding liability based on what Houston's purportedly "should have known" is diametrically inconsistent with the statutory requirements of specific states of mind.

Furthermore, under the law of duress, before such an issue could even go to the jury (assuming it was permissible) the court would have to make a finding of some wrongful or unlawful act or threat by Houston's which <u>forced</u> St. Jean to do what she would not have done voluntarily in order to procure the authorization. *Continental Bank of Pa. v. Barclay Riding Acad., Inc.,* 93 N.J. 153, 176 (1983); *Wolf v. Marlton Corp.,* 57 N.J. Super. 278, 285 (App. Div. 1959) (where county court, sitting without a jury, rejected the builder/defendant's defense that its non-performance was justified by the plaintiff's threats, Appellate Division held that trial court's determination was not entitled to the deference accorded a fact finding). *See also* New Jersey Model Civil Jury Charges, 4.10 at n.8.

Defendant submits that imposing liability because of concerns about the genuineness of St. Jean's apparent consent is inconsistent with the language and purpose of the SCA. This is especially so in light of the plethora of cases in which "consent" was construed as broadly for Fourth Amendment purposes as the Legislature intended for "authorization" to be construed under the SCA, as reflected in the Court's Instructions.[8] *See, e.g., Kent v. United States,* 272 F.2d 795, 797 (1st Cir. 1959) (members are threatened with criminal prosecution unless the accused does plead guilty); *United States v. Silva,* 449 F.2d 145 (1st Cir. 1971) (the promise of

---

[7] *See* Counsel Certif., Exhibit E at 16 (to find statutory liability, the jury was required to find that "accessing the Spectator without authorization must have been the [Houston's] managers' conscious objective or desire"); *see also* United States Court of Appeals for the Third Circuit, *Model Criminal Jury Instruction* 5.02; O'Malley, Grenig & Lee, 1A <u>Federal Jury Practice and Instructions</u> (6th Ed. West 2008), §17:04 at 569-71.

[8] *Griggs-Ryan v. Smith,* 904 F.2d 112, 116 (1st Cir. 1990) (" We agree with the Second Circuit that "Congress intended the consent requirement to be construed broadly.")

leniency to one criminal defendant is not enough to establish that he did not consent to wire tapping and is not coercive unless the indictment itself was improperly brought).

In the civil arena, courts treat consent with equal liberality. *See, e.g., Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F.Supp. 2d 817, 821 (E.D. Mich. 2000) (in light of admission that defendant was authorized to access information on computer, a viable § 2701(a) claim required an affirmative showing that authorization had been removed); *American Computer v. Jack Farrell Implement*, 763 F. Supp. 1473, 1494-95 (D. Minn. 1991) *aff'd sub nom., American Computer v. Boerbomm International, Inc.*, 967 F.2d. 108 (8th Cir. 1991) (finding consent to interception under the Wiretap Act and authorization for access to stored electronic communications under 18 U.S.C. § 2701(c) from the same conduct, and granting summary judgment dismissing claims).

St. Jean's unexpressed reservations were insufficient to subject Houston's to liability because her managers were not required to assume that she might have felt pressured. She testified that she was not pressured, and there is no evidence that there were any threats or coercion. Therefore, there was no basis for the jury to consider the issue of whether her consent was "voluntary."[9] The Court did not instruct the jury on this issue. For the jury to consider this issue and to enter a verdict on this basis – which would have been necessary to find in plaintiffs' favor – was neither reasonable nor proper.

Moreover, the jury was not instructed on the issue of Houston's exceeding St. Jean's authorization, because the Court determined that there was no legal basis for plaintiffs to assert such a claim. Plaintiffs' counsel nonetheless focused extensively on this argument (*e.g.*, 6/16 Tr.

---

[9] Plaintiffs never provided any legal foundation for the "freely and voluntarily" standard they advocated and argued to the jury at trial (6/16 Tr. 27).

22-24, 26, 29-33). There simply was no evidence of any restrictions by St. Jean upon the use of her password and the jury could not have reasonably made such a finding.

**B.      Plaintiffs Presented No Evidence That Houston's Managers Acted With A "Knowing" or "Intentional" or "Purposeful" State of Mind.**

Regardless of whether St. Jean's unexpressed reservations about Houston's access could have some tenuous connection as to whether she authorized Houston's access, her testimony in this regard had no bearing at all on the other separate and distinct issue, *i.e.,* whether Houston's managers knew St. Jean had not authorized their access but went ahead anyway. On this issue, there was no evidence to support a jury verdict in plaintiffs' favor. The facts establish that St. Jean authorized and provided Houston's access to The Spec-Tator site on numerous occasions. Even more clearly dispositive of this Motion, there was no basis for a reasonable jury to conclude that any Houston's manager actually knew that he was accessing the group without St. Jean's authorization.

Both the SCA and the New Jersey Act are primarily criminal statutes directed at computer hackers. *Kaufman v. Nest Seekers, LLC*, 2006 U.S. Dist. LEXIS 71104, 2006 WL 2807177, at *4 (S.D.N.Y. Sept. 26, 2006). The legislative purpose was, in part, to protect privacy interests in personal and proprietary information and to address "the growing problem of unauthorized persons <u>deliberately</u> gaining access to, and sometimes tampering with, electronic or wire communications that are not intended to be available to the public." *General Board of Global Ministries of the United Methodist Church v. Cablevision Lightpath, Inc.*, 2008 U.S. Dist. LEXIS 86826 *1, *8 (Nov. 30, 2006) (emphasis added). Indeed, a civil action under the statutes requires the same *scienter* as for a criminal act – only the burdens of proof differ.

As the Court's Instructions to the jury made clear, plaintiffs were required to prove that Houston's managers had actual knowledge that they were not authorized to access The Spec-Tator and knew they were accessing it without authorization:

> To establish that Houston's is liable for violating the statutory claims in this case, Plaintiffs must prove by a preponderance of the evidence that: A Houston's manager knowingly, intentionally, or purposefully accessed without authorization Karen St. Jean's myspace page using her Myspace password to access the Spectator.
>
> In deciding this question, you must make determinations about the state of mind of the Houston's managers at certain times. Often the state of mind with which a person acts at any given time cannot be proved directly, because one cannot read another's person's mind and tell what he or she is thinking. However, a person's state of mind can be proved indirectly from the surrounding circumstances. Thus, to determine the managers' state of mind, i.e. what they knew and what they intended, at a particular time, you may consider evidence about what they said, what was said to them, what they did or failed to do, how they acted, what they were told and all of the other facts and circumstances shown by the evidence that may prove what was in the managers' minds at that time. It is entirely up to you to decide what the evidence presented during this trial proves, or fails to prove, about their state of mind.
>
> The terms "knowingly," "purposefully" and "intentionally" as those terms are being used, in these instructions, means that the act was done voluntarily and intentionally and not because of ignorance, mistake or accident.
>
> In this case you must determine whether the Houston's managers acted with a knowing, intentional or purposeful state of mind. **Proof of a "knowing, intentional or purposeful" state of mind means proof by a preponderance of the evidence that the Houston's managers were consciously aware of the nature of their actions and of the surrounding facts and circumstances necessary to establish that they did not have authorization to use Karen St. Jean's MySpace password to access the Spectator. It means that accessing the Spectator without authorization must have been the managers' conscious objective or desire.**

(Counsel Certif., Exhibit E at 15 (emphasis supplied.))

The Court's instruction was consistent with the heightened state of culpability required as a prerequisite for civil liability:

Section 2707 of the SCA provides that any person aggrieved by an SCA violation may sue the violator, provided that he or she can show that the act was violated with a "knowing or intentional state of mind." . . .

Courts have settled that determining whether there was unauthorized access under the SCA is akin to determining whether there was trespass to property. . . . A big distinction between committing the tort of common law trespass and violating the SCA, of course, is that intentional conduct is required to violate the SCA, *i.e.* a highly culpable state of mind is required. "The term 'intentional' in this context is narrower than the dictionary definition of 'intentional.' 'Intentional' means more than one voluntarily engaged in conduct or caused a result. Such conduct or the causing of the result must have been the person's conscious objective.

*Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 975-76 (M.D. Tenn. 2008) (citations omitted). *See also Bansal v. Server Beach*, 285 Fed. Appx. 890, 892 (3d Cir. 2008) (dismissing plaintiff's civil claims because he failed to allege and could not adduce facts to show that "defendants accessed his account 'with a knowing and intentional state of mind'").

The same analysis applies under the New Jersey Act and New Jersey Courts draw a careful distinction between the statutory terms "purposely" and "knowingly," and lesser requirements such as "reckless." For instance, in *Fairway Dodge, LLC v. Decker Dodge, Inc.*, 191 N.J. 460, 468-70 (2007), the New Jersey Supreme Court left no doubt that the terms "knowingly" and "purposely" carried the same scienter for both criminal and civil actions. In that case, the Court affirmed the dismissal of a civil action against two defendants under the Computer Related Offenses Act, N.J.S.A. 2A:38A-1 to -6 (the "Computer Act") because there was no evidence of knowledge or purpose. Significantly, the Court relied upon a criminal case, *State v. Simon*, 161 N.J. 416 (1999), to define "knowingly" and "purposefully." *State v. Simon* emphasized the sharp distinction between "purposeful or knowing" conduct and "reckless" conduct. The Court distinguished this level of intent from "merely reckless" conduct. 161 N.J. at 449; *see also Slim CD, Inc. v. Heartland Payment Sys.*, 2007 U.S. Dist. LEXIS 62536*1,*39 (D.N.J. August 24, 2007) (noting that knowing or purposeful violations must be pled and proved

under the state Computer Fraud Act). Plaintiffs' proofs fell completely short of this mark, and there can be no civil liability under the SCA or the New Jersey Act.

There was no basis in the evidence for the jury to have concluded reasonably either that access to The Spec-Tator by Houston's managers was unauthorized, or that these managers knew that they were accessing the group without St. Jean's authorization. There was no such testimony at any time. To the contrary, the evidence at trial could only lead to one reasonable conclusion – the Houston's managers reasonably believed St. Jean authorized their access to The Spec-Tator. She never objected to providing her log-in information and when she did tell the managers that she was "uneasy," this unease related solely to her concern was that other employees would find out that she had told Houston's management about The Spec-Tator. There was no basis for the jury to conclude otherwise.

There is no provision or allowance for a "knew or should have known" standard of proof and therefore there was no ground for the jury to speculate as to whether St. Jean really meant "No" when she showed Rodriguez The Spec-Tator, twice provided Anton with her log-in and password information, and provided Rodriguez with her log-in and password information for Marano to use.

It is undisputed that St. Jean gave Anton her password without objection and without condition. She testified that Anton did not pressure her for her log-in information. (6/10 Tr. 95.) Plaintiffs presented no evidence that anyone ever threatened or coerced St. Jean when asking for the password. While she "felt that [she] had to give it to him" and "thought that [she] would get into trouble" if she didn't provide the password (6/10 Tr. 96), St. Jean never voiced those concerns to anyone. In fact, Anton went to her twice to ask for the password because he had lost it. She gave it to him the second time, again without voicing any objections or concerns. (*Id.* at

97.) Her internal, unvoiced thoughts cannot impute knowledge or intent or purpose to Houston's.

In reaching its verdict, the jury could have concluded only that (a) St. Jean's unexpressed concerns negated her authorization for Houston's to access The Spec-Tator, and (b) her managers should have known that a subordinate employee would feel pressured. These suppositions provide no basis for liability in light of the statutory requirement for a "knowing," "intentional" or "purposeful" violation, where, as here, St. Jean provided her password without voicing any conditions or reservations, and where her managers had no basis to conclude anything except that she had authorized their access.

Perhaps the jury could have found liability under a "should have known" standard, but there is no provision or allowance for liability here under such a standard of proof. Plaintiffs were required to prove knowing, purposeful or intentional wrongdoing by Defendant. They were required to prove both that St. Jean did not authorize Houston's access and that the managers acted purposefully, intentionally or with knowledge in spite of her lack of authorization. Therefore, St. Jean's internal misgivings were a legally insufficient basis for a reasonable jury to find that she did not authorize Rodriguez, Anton or Marano to access The Spec-Tator or that the managers knew they were unauthorized. Her own testimony made it clear that Houston's engaged in no wrongful conduct in obtaining her authorization to access The Spec-Tator, and that no Houston's manager ever threatened her or pressured her. (6/10 Tr. 95, 97-98.)

This is the sum total of St. Jean's testimony that could even hint that Houston's could have discerned hesitation on her part:

> Q. After you gave the password to Mr. Anton the first time . . .did you have any second thoughts about what you had done?
>
> A. Well, I felt guilt, 'cause I didn't want anybody to get in trouble.

Q.  You didn't want to get in trouble either.  Right?

A.  Well, yeah.  I mean I didn't want this to be a big – you know, a big deal.

Q.  Did you share those thoughts with any manager?

A.  Well, I told Tijon, I asked him why he had gone and told them.

Q.  Did you share your thoughts with Jason Sokolow?

A.  Yeah, I did as well.  I went up to him and I asked him, well, I told him, like that I felt really guilty, and I felt bad, and I didn't know -- I didn't want anybody to know it was me.

Q.  Did you also tell him that they had asked me for my password and I really didn't want to give it to them?

A.  No, I don't remember saying that.

(6/11 Tr. 97-98.)

St. Jean "didn't want anyone to get in trouble," "felt really guilty" and "felt bad."  Even if this information were known to them when they accessed The Spec-Tator – and there is absolutely no evidence that it was – neither Mr. Anton nor Mr. Marano would have known that he lacked St. Jean's authorization to use her log-in information.  Moreover, there was no evidence from which a jury could find coercion or threats.  St. Jean was an authorized user who voluntarily told Houston's management about the website and showed it to a manager, and then provided her access information to them on request on several occasions.  Houston's, therefore, cannot be liable under any of the applicable statutory provisions.

A negligence standard, upon which the jury seemingly relied, is simply incompatible with the statutory provisions.  The United States Supreme Court has repeatedly emphasized that where a statute's language is plain, "the sole function of the courts is to enforce it according to its terms."  See, e.g., *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989).  A criminal statute

that provides for civil redress must be narrowly construed and "encompasses only that conduct Congress intended to criminalize. It follows then – unless it expressly states otherwise – that when Congress created a private cause of action within this criminal statute it intended to limit that cause of action to the conduct reached by the criminal statute." *Chas. A. Winner, Inc. v. Polistina*, 2007 U.S. Dist. LEXIS 40741*1, *14 (D.N.J. June 14, 2007) (unpublished).

The record is absolutely devoid of any testimony which could have possibly led a reasonable jury to conclude that Anton and/or Marano acted with conscious knowledge that St. Jean had not given her permission to use her password to access The Spec-Tator. Absent such evidence, the jury's finding for plaintiffs on the statutory claims was against the weight of the evidence and the verdict must be vacated and judgment entered for the Defendant.

## III. THE EVIDENCE DID NOT SUPPORT THE JURY'S AWARD OF LOST DAMAGES.

Plaintiffs' own evidence demonstrated that neither Pietrylo nor Marino sustained a compensable claim for lost wages. The Court should enter judgment pursuant to Rule 50 vacating the award as a matter of law because (a) both plaintiffs turned down "reasonably similar" employment on the day they were terminated from Houston's, (b) each plaintiff earned as much or more working for Morton's Steakhouse as at Houston's, and (c) Marino voluntarily reduced her work hours during 2007, the year she claimed to have sustained lost pay, in order to seek work as a yoga instructor. As a fundamental matter of law, this eliminates any claim for lost wages. In the alternative, the Court should grant a new trial pursuant to Rule 59.

Defendant recognizes, as it must, that "[i]t is rarely appropriate to grant a directed verdict or judgment n.o.v. in favor of the party having the burden of proof; such action is reserved for those extreme circumstances where the effect of the evidence is not only sufficient to meet his

burden of proof, but is overwhelming, leaving no room for the jury to draw significant inferences in favor of the other party. . . . On any such motion, the evidence must be viewed in the light most favorable to the nonmoving party." *Gay v. Petsock*, 917 F.2d 768, 771 (3rd Cir. 1990) (citations omitted).

The evidence, however, is undisputed, compelling and clear. According to plaintiffs' testimony and tax documents, both plaintiffs (1) were offered server jobs at Legal Seafood on the same day that they were terminated from Houston's, and (2) earned more working for Morton's Steakhouse (in the same shopping center where Houston's and Legal Seafood are located) than Houston's; and (3) Marino voluntarily reduced her work hours during 2007 and admitted that the reduction could account for the diminution in earnings. The law of damages and mitigation requires that each plaintiff make reasonable efforts to find comparable employment, and then reduces their lost pay claims in the amount of their earnings.

The Court instructed the jury as follows with regard to mitigation:

> You are instructed that Plaintiffs have a duty under the law to "mitigate" their damages – **that means that Plaintiffs must take advantage of any reasonably similar opportunity that may have existed under the circumstances to reduce or minimize the loss or damage caused by Houston's.** It is Houston's burden to prove that Plaintiffs have failed to mitigate. So if Houston's persuades you by a preponderance of the evidence that Plaintiff failed to take advantage of a similar opportunity that was reasonably available to them, then you must reduce the amount of Plaintiffs' damages by the amount that could have been reasonably obtained if they had taken advantage of such an opportunity.

(Counsel Certif., Exhibit E at 21; emphasis supplied.)

This Instruction, and the conclusion that there was no basis for a reasonable jury to have awarded lost pay damages, is compelled by the policy and logic underlying the law applicable to damage awards for lost pay, and clear from the cases and model jury instructions setting forth that law. In *Goodman v. London Metals Exchange, Inc.,* 86 N.J. 19 (1981), long a touchstone

with regard to the mitigation of damages obligations of an employment discrimination plaintiff under the New Jersey Law Against Discrimination, the New Jersey Supreme Court explained the mitigation obligation in terms generally applicable to lost wage claims:

> When a wrongful discharge of an employee occurs, the measure of damages is usually the employee's salary for the remainder of the employment period. . . . However, since the employee has available time which may be used profitably, the employer has been permitted to reduce its damages by showing that the employee has earned wages from other employment. . . . . The employer may also reduce the award by showing that the employee could have secured other employment by reasonable efforts, but did not.

86 N.J. at 34-36 (citations omitted).  *See also, Booker v. Taylor Milk Co.,* 64 F.3d 860, 866 (3rd Cir. 1995) (quoting *Sellers v. Delgado College,* 902 F.2d 1189, 1193 (5th Cir. 1990) ("'employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated.'").

In setting forth its touchstone analysis of a plaintiff's mitigation analysis, *London Metals* made clear that one fundamental basis for this analysis was the requirement that compensation from any new position attained would reduce the plaintiff's claim: "Mitigation depends upon the facts of the case. **If the claimant has actually obtained other employment, it is simple enough to credit the employer with the amount of those earnings.**" 86 N.J. at 36 (emphasis supplied). As the *London Metals* court explained, "No one questions the proposition that there should be deducted from the back pay award amounts that [plaintiff] actually earned during the period in question." 86 N.J. at 42.  Federal law also imposes an obligation to mitigate lost wage claims, *e.g., Booker,* 64 F.3d at 864.

A.    **Plaintiffs Turned Down Substantially Similar Employment at Legal Seafood.**

Eliminating plaintiffs' back pay claim because they declined employment at Legal Seafood is mandated by the legal requirement that a plaintiff's back pay claim is to be reduced (or eliminated) even when there has been no subsequent employment – where he or she has failed to use reasonable, diligent efforts to find such employment, as also provided in the Third Circuit's Title VII Instructions:

> You are further instructed that [plaintiff] has a duty to mitigate [his/her] damages--that is [plaintiff] is required to make reasonable efforts under the circumstances to reduce [his/her] damages.  It is [defendant's] burden to prove that [plaintiff] has failed to mitigate. So if [defendant] persuades you, by a preponderance of the evidence, that [plaintiff] failed to obtain **substantially equivalent job opportunities that were reasonably available to [him/her]**, you must reduce the award of damages by the amount of the wages that [plaintiff] reasonably would have earned if [he/she] had obtained those opportunities.

United States Court of Appeals for the Third Circuit, *Model Civil Jury Instructions, Instructions for Employment Discrimination Claims Under Title VII, Instruction* 5.4.3 (February 2009) (emphasis supplied).

Pietrylo's back pay claim is based solely on the allegation that he lost $2,500 during the three weeks between the end of his Houston's employment and the beginning of his employment at Morton's. (6/16 Tr. 60-61.)  But he turned down a substantially equivalent server job at the same location, offered on the same day that he was terminated from Houston's.  There was no basis for a reasonable jury to conclude that the Legal Seafood position was anything other than substantially equivalent.  If the employer successfully proves that the plaintiff failed to mitigate damages, then "any back-pay award to an aggrieved employee will be cut off or reduced beginning at the time of the employee's failure to mitigate and any front-pay award will be foreclosed." *Caufield v. Ctr. Area Sch. Dist.*, 133 Fed. Appx. 4, 11 (3rd Cir., May 20, 2005).

**B.    Plaintiffs Earned More Working for Morton's Steakhouse.**

Plaintiffs earned more at Morton's Steakhouse than they had at Houston's.    This eliminates their back pay claim.    Based on the documentary evidence, Pietrylo sustained no lost wage damages, and he is not entitled to any compensatory damages award.    Working at Houston's in 2005 he earned $33,599.    (Exhibit D-3.)    In 2006, working at both Houston's and Morton's, he earned $34,983. (Exhibit D-4.)    *Prima facie*, he suffered no lost wage damage, because any earnings must be subtracted from his claimed lost pay from Houston's and the only evidence shows that he earned more at Morton's than he did at Houston's (that is, more in 2006 than in 2005).

This is reinforced by the only other evidence pertaining to lost wages that was produced by Pietrylo, copies of three 2007 pay stubs from Morton's.    (Exhibit. D-7.)    Looking at the third page of Exhibit D-7 as an example, Pietrylo had earned $26,611.65 through August 5, 2007, a 31-week period.    On a weekly basis, he was earning $858.44 ($26,611.65 ÷ 31).    This substantially exceeds both his 2005 per week earnings at Houston's of $646.13 per week ($33,599 ÷ 52) (Exhibit D-3) and his 2006 per week combined earnings at Houston's and Morton's of $672.75 ($34,983 ÷ 52). (Exhibit D-4.)

Pietrylo supplied no other evidence of his earnings, despite the fact that this action was filed on November 30, 2006, and his duty to mitigate damages and to preserve and produce evidence ran from that same time through trial.    There was no basis for any award of lost pay damages to Pietrylo.    The three weeks in which he did not work were more than compensated for by subsequent earnings at Morton's in 2006.

Based on the evidence at trial, neither did Marino sustain any lost wages.    Working at Houston's she earned $20,281 in 2005.    (Exhibit D-10.)    In 2006, working at both Houston's and

Morton's, she earned $28,404.00 (Exhibit P-13.) In 2007, working at Morton's she was paid $27,307.14. (Exhibit P-13.) But her 2006 Houston's W-2 shows that she was paid $9,512.29 for the 18 weeks she worked there ($528.46 per week), and her 2006 Morton's W-2 shows that she was paid $18,892 for her 32 weeks of work there ($590.38 per week). (Exhibit D-12.) Because the only explanation for a reduction in pay between 2006 and 2007 was her decision in 2007 to cut back from five work days to four (*see Subpoint 1. infra*), Marino sustained no lost wage damages as a matter of law because any earnings at Morton's must be subtracted from her claimed lost pay at Houston's and the only evidence shows that she earned more at Morton's on a weekly basis than she did at Houston's.

### 1.    Marino Voluntarily Reduced Her Work Hours During 2007.

By the end of the trial, Marino's lost wage claim related only to the year 2007, during which she claimed to have earned $903 less than she had in 2007. (6/16 T. 34.) Marino admitted, however, that she cut back her work week from five days to four days in September 2007 in order to look for work as a yoga instructor, reducing her work hours. (6/10 T. 246.) A plaintiff who voluntarily reduces her potential earning is not entitled to be compensated for that decision.

Regardless of Houston's liability to plaintiffs, they have not sustained a compensable lost wage claim. Rather, in complying with their obligation to mitigate any lost wage damages, they eliminated any such claims by equaling or exceeding their Houston's earnings. Defendant Houston's respectfully submits that the Court must enter judgment in its favor as to plaintiffs' claims for lost pay.

## IV.    THERE WAS NO EVIDENCE TO SUPPORT THE FINDING OF "MALICIOUS" CONDUCT BY HOUSTON'S

There was no basis for submission of either of the questions concerning punitive damages to the jury, and much less support for a finding that Houston's access of The Spec-Tator was "malicious." Judgment should be entered on this issue as a matter of law pursuant to Rule 50(b).

As established in detail in Point I, *supra*, there was no evidence of malicious conduct on the part of Houston's or any of its managers. To the contrary, as far as Rodriguez, Anton and Marano knew, St. Jean volunteered to show Rodriguez the site in his home on his computer, and then provided her log-in information, without objection, to both Anton and Marano. There was simply no evidence to show that any manager engaged in malicious wrongdoing *i.e.* "an evil-minded act."

Plaintiffs' were required to prove Houston's alleged malicious conduct by "clear and convincing evidence." Thus, the Court's scrutiny of this aspect of the jury's verdict should be more demanding and less deferential.

> Trial courts are also required to apply a different standard in ruling on motions for judgment as a matter of law in causes of action involving burdens of proof higher than the typical 'preponderance of the evidence.' In essence, the court considers the underlying burden of proof in ruling on the motion for judgment. For example, in claims requiring proof of 'clear and convincing' evidence, such as libel and patent invalidity cases, a trial judge's inquiry on motion for judgment will be whether the evidence presented would require a reasonable jury applying the clear and convincing evidentiary standard to find for the nonmoving party.

9 *Moore's Federal Practice* §50.82 at 50-112 to -14 (3rd ed. 2009), *citing Anderson v. Liberty Lobby*, 477 U.S. 242, 254, 106 S.Ct. 2505 (1986) (footnotes omitted). *See Eichenlaub v. Township Of Indiana*, 214 Fed.Appx. 218, 223-24 (3rd Cir. 2007) (upholding district court's entry of judgment dismissing punitive damage claim under 42 U.S.C. § 1983 where there was

"not sufficient evidence in the record to establish that [defendant] acted with the heightened culpability, above and beyond a retaliatory motive, to justify an instruction on punitive damages"); *Brennan v. Norton*, 350 F.3d 399, 428-30 (3rd Cir. 2003) (upholding district court's entry of judgment dismissing punitive damages claim under 42 U.S.C. § 1983 where plaintiff failed to produce sufficient evidence to satisfy punitive damages standard).

The Court's Instruction to the jury concerning punitive damages stated:

> You will be asked two questions at the end of your jury questionnaire. Those questions concern whether Plaintiffs have proven, by clear and convincing evidence, that the harm suffered by the plaintiff was the result of defendant's actions or omissions and that either (1) the defendant's conduct was malicious or (2) the defendant acted in wanton and willful disregard of another's rights. Malicious conduct is intentional wrongdoing in the sense of an evil-minded act. This "intentional" conduct is different from the "intentional" state of mind required to find that the defendant's conduct violated the Stored Communications Act. In terms of deciding these questions, you are asked to determine whether the defendant intentionally engaged in an "evil-minded act."

\* \* \*

> With respect to these questions, conduct must be so morally reprehensible that it implies a criminal indifference to civil obligations.

(Counsel Certif., Exhibit E at 22.)

There was simply no evidence from which the jury could have concluded that Rodriguez, Anton or Marano acted maliciously or that any of them engaged in "intentional wrongdoing in the sense of an evil minded act," or that their conduct was "morally reprehensible." (Counsel Certif., Exhibit F at 22.) As established above with regard to the underlying issue of statutory liability, there was no evidence that any manager knew that St. Jean had not authorized their access to The Spec-Tator or of malice or evil-mindedness is any respect. This is borne out by the plaintiffs' closing argument in which counsel relied upon a "should have known" standard of liability. Moreover, the undisputed evidence demonstrated that these managers pursued access

to The Spec-Tator for reasons that were manifestly non-malicious: To inspect and investigate offensive, disturbing postings that they reasonably believed to pose a threat to the proper operation of the restaurant, to the working environment for Houston's managers and employees, and to the services and hospitality afforded to its customers.

In this regard, it is therefore significant that an employer has a qualified privilege in the plaintiffs' communications where the morale of the restaurant was being undermined, the restaurant and its managers were being mocked and undermined and even Houston's logo was misappropriated for unauthorized use. *See Dijkstra v. Westerink*, 168 N.J. Super. 128, 135-36 (App. Div. 1979), *certif. den.*, 81 N.J. 329 (1979). "Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy." *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 71 (1980). The contents of The Spec-Tator are in evidence, as is the testimony of Houston's managers Anton, Rodriguez and Marano as to why they felt that the group's postings were offensive and disturbing.

Houston's had the right and obligation to protect its employees from harassment and humiliation. It had the right and the obligation to protect its customers from religious and ethnic slurs. It had the right and the obligation to protect its trade mark. It had the right and the obligation to protect its own core values. *See, e.g., Weigand v. Motiva Enterprises, LLC*, 295 F. Supp. 2d 465, 477 (D.N.J. 2003) (where an employee was terminated for running an on-line business selling racist and Nazi music and paraphernalia, the employer had a "strong interest in ensuring that their employees are not associated with such speech or ideals. . . and, as private employers, still had a very strong interest in regulating the speech of their convenience store supervisor to ensure that it personified their values of respect for all.").

It is also significant that the jury answered "No" as to whether Houston's conduct "was wanton or willful." In this context,

> "Wanton or willful" means a deliberate act or omission with knowledge or a high degree of probability of harm to another who foreseeably might be harmed by defendant's acts or omissions and reckless indifference to the consequences of the acts or omissions. The conduct must be so morally reprehensible that it implies a criminal indifference to civil obligations.

(Counsel Certif., Exhibit F at Additional Jury Question 1). To find liability under either question required the jury to find an "evil-minded act," and the verdict with regard to Additional Jury Question 1 recognized (as the evidence inescapably proved) the lack of any "evil-minded act" by Houston's or any of its managers. The inconsistent finding with respect to Question 1 seriously calls into question the finding with regard to Additional Jury Question Number 2. In *Acumed LLC v. Advanced Surgical Serv.*, 561 F.3d 199, 216-220 (3rd Cir. 2009), the United States Court of Appeals for the Third Circuit held that judgment should have been entered in the trial court pursuant to Rule 50(b), where, as here, the jury's verdict was "internally incompatible," 561 F.3d at 218. Moreover, it is well-established that a new trial is warranted where a jury's verdicts are logically inconsistent on their face, reflecting jury confusion, *see Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 175 (5th Cir.1975), and the verdicts cannot be "harmonized," *see Moss v. City of Colorado Springs*, 871 F.2d 112, 114 (10th Cir. 1989). *See also Malley-Duff & Associates v. Crown Life Ins. Co.*, 734 F.2d 133, 145 (3d Cir.1984) (vacating damage award and granting new trial based on inconsistent verdicts).

Defendant respectfully submits that the Court must enter judgment as a matter of law in its favor with regard to plaintiffs' claim for punitive damages under the SCA or the New Jersey Act.

## CONCLUSION

Based on the foregoing, defendant Hillstone Restaurant Group Inc., d/b/a Houston's, respectfully submits that the Court should enter judgment as a matter of law in its favor and against plaintiffs pursuant to Fed. R. Civ. P. 50(b) or, in the alternative, grant a new trial pursuant to Fed. R. Civ. P. 59.

Respectfully submitted,

McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
Attorneys for Defendant,
Hillstone Restaurant Group Inc., d/b/a Houston's

By    /s/Donna duBeth Gardiner
        DONNA DUBETH GARDINER

Dated: July 3, 2009

12981154

30