# EXHIBIT A

1.1

```
 1                              THE UNITED STATES DISTRICT COURT
                                FOR THE DISTRICT OF NEW JERSEY
 2                              CIVIL ACTION NO. 06-5754 (FSH)
        - - - - - - - - - - - - - - - - - x
 3                                         :
        BRIAN PIETRYLO, et al.,            :
 4                                         :        TRANSCRIPT
                     Plaintiffs,           :            OF
 5            -v-                           :        PROCEEDINGS
                                           :
 6      HILLSTONE RESTAURANT GROUP, et     :
        al.,                               :
 7                                         :
                     Defendants.           :
 8      - - - - - - - - - - - - - - - - - x

 9
                                June 9, 2009
10                              Newark, New Jersey

11      B E F O R E:   HONORABLE FAITH S. HOCHBERG, U.S.D.J.

12                              AND A JURY

13      A P P E A R A N C E S:

14                      RAMP & PISANI, ESQS.,
                        BY:  FRED J. PISANI, ESQ.,
15                      Attorney for the Plaintiffs

16                      MC ELROY, DEUTSCH,
                        MULVANEY & CARPENTER, ESQS.,
17                      BY:  DONNA duBETH GARDINER, ESQ.,
                             MICAHEL O'B. BOLDT, ESQ.,
18                      Attorneys for the Defendants

19

20
        _____
21      Purusant to Section 753 Title 28 United States Code, the
        following transcript is certified to be an accurate record
22      taken stenographically in the above entitled proceedings.

23

24      _____
        JOHN KEVIN STONE,
25      Official Court Reporter
```

1.2

```
 1
 2                         I_N_D_E_X
— — — —                                                    —
 3
 4     WITNESS          DIRECT   CROSS   REDIRECT   RECROSS
 5
 6     BRIAN PIETRYLO
 7
 8     By Mr. Pisani:   52
 9
10
11
12                       E_X_H_I_B_I_T_S
— — — — — — — —
13
14     NUMBER               DESCRIPTION              ID
15
16
17
18
19
20
21
22
23
24
25
```

JOHN KEVIN STONE, CSR

```
1                          *           *            *
2              THE CLERK:  All rise.
3              ( Jury enters ).
4              THE COURT:  All right.
5              You may all be seated.
6              Ladies and gentlemen, the courtroom deputy is now
7       going to administer the oath for those of you who swear by
8       oath, and/or affirmation for those of you who affirm.
9              THE CLERK:  Please rise and raise your right hand.
10             ( Jury sworn ).
11             THE COURT:  All right.  Thank you, ladies and
12      gentlemen.
13             I hope you've gotten accustomed to the fact you now
14      have a role as a juror.  For those of you who are first time
15      jurors, I hope you find this process to be one of serious
16      hard work, but something that really does teach you a lot
17      about life and about the system of justice.
18             Under our system of justice the role of the jury is
19      to find the facts of the case based on the evidence
20      presented in the trial.  You will be the ones deciding the
21      facts, and you must decide the facts only from the evidence
22      presented to you in this trial.
23             After all the evidence has been heard and arguments
24      and instructions are finished, you will meet to make your
25      decision at that time.  You will determine facts from all
```

1    the testimony and the other evidence that is presented in
2    this courtroom.  You are the sole and exclusive judges of
3    the facts.

4         The law permits me to comment on the evidence in
5    the case during the trial or while instructing the jury.
6    Any comments that I make are only expressions of my opinion
7    and I rarely make any of them.  If you hear me make any
8    comment, you are free to disregard my comment entirely if it
9    relates to a finding of fact.  Because you yourselves are to
10   determine for yourself the weight of the factual evidence
11   and the credibility of each of the witnesses.

12        While it is your responsibility to determine the
13   facts, you are required to accept the rules of law that I
14   give you, whether you agree with them or you do not agree
15   with them.  Each of my instructions of law is important.
16   You must not substitute your own notion or opinion about
17   what the law is or ought to be.  You must follow the law
18   that I give you whether you agree with it or not.

19        Perform your duties as jurors fairly and
20   impartially.  Do not allow sympathy, prejudice, fear or
21   public opinion to influence you.  You should also not be
22   influenced by any persons race, color, religion, national
23   ancestry, gender, sexual orientation, professional
24   occupation, celebrity, economic circumstances or position in
25   life, or position in the community.

1.5

1          Before the trial begins I am giving you

2     instructions to help you understand what will be presented

3     to you and how you should conduct yourself during the trial.

4     During the trial you will hear me use a few terms you may

5     not have heard before.  Let me briefly explain.

6          The party who sues is the called the plaintiff.  In

7     this action the plaintiffs are Brian Pietrylo and Doreen

8     Marino.  The party being sued is the defendant.  In this

9     case, in this action, the defendant is Houston's, Hillstone

10    Restaurant Group, which may be referred to as Houston's

11    during the process of this trial.

12         You will sometimes here me refer to "counsel."

13    Counsel is just another way of saying lawyer or attorney,

14    and I sometimes refer to myself as "the court," or the

15    attorneys may refer to me as "Judge" or "Your Honor."  It

16    all means the same thing.

17         During the course of trial you may hear the lawyers

18    make objections.  It is the lawyers' duty to object when one

19    side offers testimony or other evidence that the lawyer

20    believes is not admissible.  When I sustain an objection, I

21    am excluding that evidence from this trial for a good

22    reason.  When you hear that I have overruled an objection, I

23    am permitting that evidence to be admitted.  When I say

24    "admitted into evidence," or "received into evidence," I

25    mean that this particular statement or the particular

1    exhibit may be considered by you in making the decisions you

2    must make at the end of the case.  If I sustain or uphold an

3    objection to a question that goes unanswered by the witness,

4    you should not draw any inference or conclusion from the

5    question, and you should not infer or conclude from any

6    ruling or any other comment that I make that I have any

7    opinion on the merits of this case favoring one side or the

8    other.  I do not.

9         By your verdict you will decide the disputed issues

10   of fact.  I will decide all questions of law that arise

11   during the trial.

12        Before you begin your deliberation at the close of

13   the case I will instruct you in greater detail on the law

14   that you must follow and apply.

15        Because you will be asked to decide the facts of

16   this case, you should give careful attention to the

17   testimony and the evidence presented.  Keep in mind that I

18   will instruct you at the end of the trial about determining

19   the credibility or the believability of witnesses.  During

20   the trial, please keep an open mind and do not form or

21   express any opinion, even to each other, about the case,

22   until you've heard all of the testimony and seen all of the

23   evidence and heard all of the lawyers' closing arguments and

24   my instructions on the law.  And you'll hear me at breaks

25   repeatedly caution you, don't talk about this case with each

1    other, and/or with anybody in your families when you go home

2    at night.  I do that for a reason so that you keep an open

3    mind and hear everything before you form a conclusion.

4            During the trial it may be necessary for me to talk

5    with the lawyers outside of your hearing about questions of

6    law and procedure.  Usually, these discussions will take

7    place on the side of my bench, just like you often came up

8    during jury selection.  You won't be able to hear these,

9    what we call side bar discussions.  I ask you advise me

10   through my Courtroom Deputy, Miss Buro, if you are able to

11   hear the side bar discussions, because we really do try to

12   keep them out of your earshot.

13           Do not try to guess what we discussed.  Sometimes

14   you may be excused from the courtroom during these

15   discussions, but I try to keep them at a minimum.  I

16   constantly remind the lawyers that the side bars are a

17   private discussion between us, and they should keep them to

18   a minimum wherever possible, so that we don't have you

19   sitting with nothing to do.  But on occasion it will be

20   necessary to have them and I will permit them, and you

21   should not draw any inference against any lawyer because one

22   lawyer asks for more side bars than another.

23           I may not always grant a lawyer's request for a

24   side bar conference.  Do not consider whether I grant or

25   deny a request for a side bar conference as suggesting any

JOHN KEVIN STONE, CSR

1.8

1       opinion of the case or what your verdict should be.

2              Now, a brief word about the order of presentation

3       of the evidence.  Here's how the case will proceed.

4              First, the lawyers for each side will make opening

5       statements.  What is said in the opening statement is not

6       evidence.  It's simply an outline, a kind of a road map to

7       what that lawyer is going to present as his or her evidence.

8              After the opening statements the plaintiffs will

9       present evidence in support of their claims and then the

10      defendants' lawyers may cross-examine those witnesses.

11             At the conclusion of the plaintiffs case the

12      defendants' lawyer may introduce evidence and the plaintiffs

13      may cross-examine that witness.  Please understand that in

14      this case, because many of the same people are in fact

15      witnesses for both sides, that the standard order of proof

16      may vary a bit.  It's not important for you are to try to

17      figure out who's calling a particular witness to the stand,

18      but concentrate on what the witness is saying through the

19      questioning by the lawyer.  And the lawyers will bring out

20      from that witness what they feel is important information

21      for you to know by way of factual matter from that witness.

22             During the trial I may sometimes ask the witness

23      questions.  Please do not assume that I have any opinion

24      about the subject matter of my questions.

25             After the evidence is presented, the parties'

JOHN KEVIN STONE, CSR

```
 1      lawyers may make closing arguments explaining what they
 2      believe the evidence has shown.  Again, just like in the
 3      opening statements which are not evidence, the closing
 4      statements are not evidence.  The lawyers words are not the
 5      evidence.  The evidence is what the witnesses say from the
 6      witness box and the documents admitted into evidence in this
 7      case, regardless of which lawyer brought out the testimony
 8      of the witness or introduced the document.

 9              I will finally instruct you on the law that you
10      will use in reaching your verdict.  You will have a copy of
11      my legal instructions with you in the jury room so that
12      you're not expected to memorize everything I've said about
13      some fairly complicated areas of law, and you will then
14      decide the case.

15              To ensure fairness, here are the rules that you
16      must follow:  Do not talk to each other about this case or
17      about anyone involved in this case until the end of the
18      trial, when you go to the jury room to decide on your
19      verdict.  I will tell you when to discuss this case amongst
20      yourselves.  But until I tell you to go and deliberate, I
21      really don't want you to talk about the case.  I know
22      there's a strong temptation to do it.  I'm asking you and
23      ordering you not to.  There are many things to learn about
24      each other in the jury room and you can talk about all kinds
25      of things in the world, just not this case.
```

1        Do not talk with anyone else about this case.  Or

2   about anyone involved in this case.  Until the trial has

3   ended and you have been discharged as jurors.

4        When I say don't talk to anybody else, that

5   includes members of your family and your friends.  You can

6   tell people you are a juror, but do not start discussing the

7   case with them.

8        In addition, modern technology has made me add this

9   as an admonition.  Whatever you may wish to do in your

10   private life while you are a juror, do not refer to this

11   case or anything about this case, on any Internet sites that

12   you use, do not use twitter, Facebook, My Space or any chat

13   rooms to discuss what's occurring in this courtroom.

14   Outside the courtroom do not let anyone tell you anything

15   about the case, or about anyone involved with it until the

16   trial is ended.  If someone tries to talk to you about the

17   case, please report it to Miss Buro immediately.

18        During the trial you should not speak to any of the

19   parties or their lawyers or the witnesses in the case.  You

20   should not even pass the time of day with them or be polite.

21   It is important not only that you do justice in this case,

22   but also that you give the appearance of doing justice.

23   If -- if you run into the lawyers in the ladies' room in the

24   hallway, whatever, they'll probably look the other way or

25   just smile and nod and say nothing.  That is what they are

1    required to do.  I give them the same admonition I give you.
2    I want no contact between any of the parties, witnesses, and
3    the lawyers and the jury, while this case is on.

4          Do not read any press stories or articles about the
5    case or about anyone involved with it.  Don't listen to any
6    radio or television reports about the case, or about anyone
7    involved in it.  You must decide this case only from the
8    evidence presented at this trial.  Do not do any of your own
9    research.  Don't check dictionaries or hunt around or do any
10   investigation of your own, and do not make up your mind
11   during the trial about what the verdict should be.  Keep an
12   open mind, as I've said before, until after you have heard
13   everything.  As they say when you're a kid, you got to hear
14   both sides.  That's serious.  You really have to keep an
15   open mind until you've heard everything that is the evidence
16   in the case and you've heard my instructions on the law.

17         If there's something you need to tell me, please
18   give a signed note to Miss Buro and she will convey it to
19   me.

20         I do not permit jurors to ask independent questions
21   of the witnesses or the lawyers.  So please do not attempt
22   to interrupt the lawyers during their examination of
23   witnesses.  If you are unable to hear a witness or a lawyer,
24   please raise your hand immediately and I will see to it that
25   that is corrected.

1.12

1          At the end of the trial you will have to make your
2     decision based on what you remember about the evidence.  I
3     will provide you with notebooks in order to permit you to
4     take notes, and the notebooks you will get as soon as the
5     evidence begins.  I use that as a physical way of reminding
6     you that the lawyers statements are not evidence.  It is the
7     witnesses statements and the exhibits that are the evidence.
8     So I will give you a notebook as soon as the actual evidence
9     part of the case begins.  And we will take those notebooks
10     away from you before the summations at the end of the case,
11     as a way of making sure you understand what's evidence and
12     what's not.  You will have all the exhibits that are
13     introduced in the trial.  You will have with you in the jury
14     room, so you need not worry about memorizing what's in a
15     particular document.

16          I urge you to pay close attention to the testimony
17     as it's presented.  When you're able to take notes, of
18     course you may take notes, but just don't let the notetaking
19     interrupt your train of thought and your ability to observe
20     and think about the witnesses and what they're saying.  The
21     evidence will consist of the following.  The sworn testimony
22     of the witnesses; no matter who called the particular
23     witness; all exhibits received in evidence, regardless of
24     who produced the exhibits; and if there are any facts that I
25     take by way of either a stipulation or through judicial

JOHN KEVIN STONE, CSR

1    notice.  If evidence comes in by way of either a stipulation
2    or of judicial notice, counsel will give it to me in a
3    written form, and I will read it to you and tell you that
4    this is a stipulation of fact agreed to by both sides, or it
5    is a matter that I tell you is a fact in the case that I
6    have taken notice of judicially.

7         Depositions may also be received in evidence.
8    Depositions contain sworn testimony, with the witness -- the
9    lawyers for each side being entitled to ask questions.
10   Deposition testimony may be accepted by you subject to the
11   same instructions that apply as if a witness was testifying
12   in open court.  Statements and arguments of the lawyers are
13   not evidence in the case.  If I sustain an objection to any
14   evidence or I order any evidence stricken, that evidence
15   must be entirely ignored by you.

16        Sometimes evidence is admitted for a limited
17   purpose only.  When I instruct you that an item of evidence
18   has been submitted for a limited purpose, you must consider
19   it only for that purpose and for no other purpose.

20        Finally, you are to consider only the evidence in
21   the case.  But in your consideration of the evidence you're
22   not limited just to the words the witness says.  You are not
23   limited solely to what you see and hear as the witness
24   testified.  You may draw from the facts that you find to
25   have been proved, such reasonable inferences or conclusions

1    as you feel are justified in light of your own experience

2    and common sense.  That's why we have juryies of our peers.

3         At the end of the trial you will have to make your

4    decision based on what you recall of the evidence.  You will

5    not have a written transcript to consult.  And it is

6    difficult and time consuming for a court reporter to read

7    back lengthy testimony.  I urge to you pay close attention

8    to the testimony as it is given, take notes where you think

9    it's appropriate, and trust your own experience, judgment,

10   and wisdom, when you evaluate the witnesses' testimony at

11   the end of the case.  And don't worry about memorizing these

12   instructions.  I'll give you far more lengthy instructions

13   at the end of the case about assessing the credibility of

14   witnesses and what you may do when you hear a witness, when

15   you consider a witness's testimony.

16        When a lawyer asks a question or offers an exhibit

17   into evidence and a lawyer on the other side thinks it is

18   impermissible under the rules of evidence, the lawyer is

19   supposed to object and does object, you should draw no

20   inference from the fact one lawyer may make more objections

21   than another, or I may sustain objections made by one lawyer

22   and overrule objections made by another lawyer.  You should

23   not worry about this.  The main rule that you need to know

24   is, if I overrule an objection and say that the question may

25   be answered or the exhibit received into evidence, then the

1    answer is evidence and the exhibit is evidence.  If I

2    sustain the objection, the question cannot be answered and

3    the exhibit is not received into evidence, and you should

4    disregard anything you may have heard or seen about that

5    exhibit.  If I sustain an objection to a question or the

6    admission of an exhibit, please ignore the question and

7    don't try to guess what the answer might have been, and do

8    not consider evidence that I have ordered stricken from the

9    record.  And finally, when I say admitted into evidence, or

10   received in evidence, then the particular statement or

11   exhibit, if it was objected to, is being permitted into

12   evidence..

13          We are about to begin the trial of the case you

14   heard about during selection as a jury.  I will review the

15   nature of the case once more.  Defendant, Hillstone

16   Restaurant Group, owns and operates a variety of restaurants

17   in locations around the United States.  Among them,

18   Houston's Restaurants, including the Houston's at Riverside

19   Square in Hackensack, New Jersey.

20          Plaintiffs, Brian Pietrylo and Doreen Marino worked

21   as waiters at the Riverside Square restaurant between March

22   2004 and May 2006.  Mr. Pietrylo and Miss Marino lived

23   together in early 2006.  Mr. Pietrylo created a group on My

24   Space call The Spec-tator.  He designated the group as

25   private.  He invited approximately 20 Houston's employees to

1    join the group, in which they exchanged comments about the

2    restaurant, its customers, other employees, and each other.

3    The Spec-tator could not be viewed without a specific on

4    line invitation from Mr. Pietrylo.  Once an invitee accepted

5    the invitation by clicking on the link to The Spec-tator, a

6    permanent gateway to The Spec-tator would be located on each

7    invitees own personal My Space.com home page.  An invitee

8    would join The Spec-tator, could access the site to leave

9    postings from other members, or to add postings of their

10   own.  The plaintiffs did not access The Spec-tator from the

11   defendants' computers or at the workplace.  Houston's

12   managers learned about the web site, and at least one

13   manager asked one of the members of The Spec-tator, while

14   both were working, for her password, and she provided it to

15   him.  After viewing the content of the web site, Houston's

16   terminated Mr. Pietrylo and Miss Marino.

17          The claims in this case involve alleged violations

18   of federal and state statutes concerning access to stored

19   electronic communications.  Pietrylo and Marino also allege

20   that their right of privacy was violated when Houston's

21   managers viewed the web site, and they allege that they were

22   wrongfully terminated in violation of the public policy

23   right to privacy.

24          Houston's contends that it did not violate the

25   statutes, because it had permission to enter the web site

1.17

1    from an authorized member of The Spec-tator.  Houston's also

2    asserts that the plaintiffs did not have a reasonable

3    expectation of privacy in the content of The Spec-tator, and

4    they were not and that they are not wrongfully terminated.

5         You are here to make a determination as to what

6    actually occurred, and you should suspend all your own

7    judgments about what you think occurred until you've heard

8    all the evidence in this case.

9         As I said before, we'll start each day about 9:30

10   in the morning, we will probably take a mid to late morning

11   break, and break for lunch at about 1 p.m.  We'll have lunch

12   from one to two, approximately.  I will adjust the times

13   based on natural breaks that occur with the witnesses.

14        We'll probably take one mid-afternoon break and

15   we'll conclude just prior to 5 o'clock.  We may -- I may let

16   you go early some days.  It all will depend, the precise

17   times will depend on the convenience of the trial and where

18   we are at a particular moment.

19        Now, having instructed you on these preliminaries,

20   we can begin the trial.  We'll start with the opening

21   statements of the plaintiff.

22        You may proceed.

23        MR. PISANI:  Judge Hochberg, Miss Gardiner, ladies

24   and gentlemen of the jury.  Good afternoon.

25        My name is Fred Pisani.  I'm an attorney.  And I

1    represent the two plaintiffs in this case, Brian Pietrylo

2    and Doreen Marino.

3          I want to take this opportunity at this moment to

4    thank all of you for being willing to serve as jurors in

5    this case, and to render a decision on some very important

6    issues that are part of this case.

7          Now, what is this case about?

8          This case is about an employee's legal right to

9    speak their mind, even about work, in the privacy of their

10   home, on their own time, and on their own personal

11   computers.  And then not to get fired later for doing that.

12   It's as simple as that.

13         Now, Brian Pietrylo and Doreen Marino were told by

14   Houston's, their employer, that they were fired because they

15   had created and participated in The Spec-tator.

16         Now, The Spec-tator is a password protected, by

17   invitation only, group that was set up by Brian Pietrylo

18   within My Space.  And My Space is a social networking site.

19   The Spec-tator was for a group of employees to chat or talk

20   on computers about what had been occurring and what goes on

21   at work.

22         Houston's customers, as well as the

23   public-at-large, were not exposed to any of the postings.

24   Those are the writings that appear on the group The

25   Spec-tator.  Management was specifically not invited by

1    Brian Pietrylo.  In this day and age of technology, when

2    there's so much going on, its akin or kind of takes the

3    place, or supplements what in my day we used to do after

4    work, where you go down to a local bar or pub or a diner,

5    and with your co-workers you chat and talk about work.  Same

6    thing, except now with technology people tend, younger

7    people tend to do it on the computers.

8         Some of the comments that were made on The

9    Spec-tator were about the participants on The Spec-tator,

10   the people who are members of The Spec-tator.  Some of the

11   comments made were about work.  Some of the comments made

12   were about managers at work.  Even some of the comments were

13   made about customers.  Some of the comments were even made

14   and contained foul or language that contained swear words.

15   And the important thing, however, regardless of the

16   language, is all of those comments, all of the statements,

17   all of the postings were done privately.  They were never

18   done at work.  They were never done on the computers at

19   work; they were never done at the workplace; they were never

20   said to any of the managers at the workplace; they were

21   never said to any of the customers who frequented the

22   restaurant.  And there is a big difference between what

23   someone says and what they, in what they perceive to be a

24   private setting, with a level of comfort and trust, with the

25   people who are part of it, as opposed to saying things at

1.20

1    the workplace to your boss or to a customer who comes to the
2    restaurant.  There's a big difference.

3            Now, when Brian set up The Spec-tator, he -- I'm
4    sorry for that.  The reality about the comments is that when
5    you make those types of comments, if you make them
6    privately, the reality is that you would not have a job if
7    you were fired every time you made a comment.  I'm a lawyer
8    and I can probably guess about right now that my secretary's
9    in my office saying something about me.  Now if I happened
10   to fire them because they happened to talk about me when I
11   wasn't there, then I would be working in an office of one.
12   The reality is that comments are made from the first day
13   anybody ever employed anybody.  From time **immemorial.
14   Employees talk their managers, managers talk about their
15   superiors.  The superiors talk about the vice presidents of
16   the corporation.  The vice presidents talk about the owner's
17   of the corporation.  And if you could get fired for what you
18   said privately, and not to their face, then we wouldn't have
19   much of a work force left.

20           Now, Brian and Doreen started to work for Houston's
21   in 2004.  They started working as waiters at the
22   establishment.  You will hear evidence they were both good
23   employees.  And in fact, in 2006, when all of this was going
24   on, they had a ranking for servers, and Brian was ranked
25   within the top three servers in the group.  Brian and Doreen

JOHN KEVIN STONE, CSR

1.21

1      were also a couple at the time, and in fact they went and

2      started working at Houston's together at the same time.

3             Sometime in 2006 Brian set up and he already had a

4      My Space account.  For now, those of you not familiar with a

5      My Space account, My Space is a social networking site.  If

6      you want to join My Space, you have to join by putting in an

7      e-mail address and putting in a password that you choose.  A

8      personal, protected password.  Once you do that, then you

9      can become a member of My Space and you can engage with

10     other members of My Space.

11            So Brian did that.  He did that on his home

12     computer.  Doreen did that, and joined My Space with her

13     e-mail address and her password, and did it on their home

14     computer.

15            Thereafter, while they were still working at

16     Houston's, Brian decide he wanted to set up a private group.

17     He decided to call the group The Spec-tator.  And the name

18     comes from restaurant specs.  I guess at restaurants they

19     have specifications how you do certain things, how you make

20     certain decisions, how you clean certain tables, and things

21     like that.  So as a take off on that, he decided to name it

22     The Spec-tator.  And when he did that, he decided to set up

23     a group.  And the way you set up the group, and Brian is

24     going to be demonstrating it to you when he testifies, is

25     you go to your My Space account, and you log in with your

1.22

1    e-mail address and your password.  You then, they have

2    different tabs.  You would click "Groups."  And then you

3    click -- there are different categories, and one would say

4    "Create a group."  So you would create a group.  And

5    immediately when you click on "Create a group," My Space

6    itself prompts you with a variety of different settings you

7    can choose in setting up the group.  You have different

8    controls on how you want it to be set up.  Some of the

9    controls included, do you want it to be a public forum; do

10   you want it to be a hidden group.  Do you want a member --

11   if I invite you, now you're a member with me.  Do you want

12   the member to be able to invite other people.

13         Well, Brian will tell you that he chose to have the

14   group set up as hidden.  He will tell you that he chose to

15   not have it be a public forum.  And he chose to not allow

16   members to invite other people.  Which meant he would

17   control who gets invited.  Only Brian Pietrylo would be able

18   to invite the people that he wanted to invite.  So if he

19   invited Doreen or he invited me, I couldn't invite one of

20   you.

21         So he did all of that set up on his home computer

22   as well.  And after he did that, he now needed to set up

23   what The Spec-tator would look like.  So The Spec-tator has

24   a first page.  And the first page was set up by him.  I

25   think he put a picture on it, and you'll see it when he

JOHN KEVIN STONE, CSR

1   testifies.  He even had a statement about what the site was

2   about.  And basically, paraphrasing it, and you'll see it in

3   evidence, what it actually said, it said it was basically

4   for the employees to talk about all the drama, the crap and

5   the gossip that occurs at work.  And that past and present

6   employees were welcome, and that was for private eyes only,

7   that he didn't want anybody prying in.

8        He then proceeded to invite his co-workers.  Okay?

9   And his co-workers included Doreen Marino and a variety of

10  other waiters and waitresses that were at the establishment.

11  I think he ended up inviting between 15 to 18 people.  He

12  did not invite any members of management.  And I guess this

13  is a good point, because they're players in this case, to

14  describe for you in 2006 who the managers were.

15       The managers at the establishment where they worked

16  in Riverside Square Mall on a day-to-day basis were a --

17  people named Jason Sokolow, Robert Anton and TJ Rodriguez

18  and you're going to hear that some of them during this time,

19  they were the ones who were managers at the site on a

20  day-to-day basis, none of those people were invited.

21       Rob Marano, seated next to defense counsel, is the

22  regional director or supervisor at the time of seven

23  Hillstone Restaurants in the tri-state area.  He was also

24  responsible for this particular Houston's, although this

25  Houston's was the only Houston's out of the seven that he

1.24

1    was in charge of.

2         Mr. Marano, you will hear, is the one who actually

3    fired Brian and Doreen.  Brian -- Rob's supervisor or boss

4    above him in the corporate structure is a person named Tino

5    Chimburello.  He's stationed in California.  You'll hear

6    evidence that he oversees 45 restaurants nationwide.  And

7    another individual involved in this case is a person named

8    Michael Lamb.  He's the head of human resources.  He's also

9    stationed in California, and he oversees 6,000 people

10   nationwide as the head of human resources.

11        Now, going back to what we were talking about when

12   Brian set up his group The Spec-tator.  He invited Doreen,

13   he invited others.  And the way I've learned that you get

14   invited to these things is, he sends an electronic

15   invitation to you, and it says, I've invited you to be a

16   member of The Spec-tator, would you like to join.

17        Now, in order for you to join, you then have to

18   accept by sending back an electronic communication saying,

19   "I accept."  And then you're a member.

20        So all of the invitations that were made and all of

21   the acceptances that were derived also occurred outside the

22   workplace.  None of it occurred at work; none of it occurred

23   on the defendants' computers.  In fact, there is no Internet

24   access for any employees at Houston's.  So even if you

25   wanted to get on their computers and go on the internet at

JOHN KEVIN STONE, CSR

 1    work, you can't.

 2             So the acceptances and the invitations, they took

 3    place on their home computers, their laptop computers

 4    outside of work, not during work hours.

 5             Now, we have The Spec-tator and it's set up.  Now,

 6    the way Brian set it up, and you'll also see this about My

 7    Space, and it's fascinating, the different layerings that

 8    are -- I don't have a My Space account, but I've learned it

 9    being involved in this case.  When you go on your My Space

10    account, you go basically first to your home page.  And you

11    can put stuff on the home page.  And the home page has some

12    general stuff, you can have some more specific stuff.  You

13    can make it public or private.

14             If you went on Brian Pietrylo's home page you

15    couldn't see any of the comments that were made at The

16    Spec-tator.  You also had a profile which would be another

17    page that you could click on to get to, that was underneath

18    the home page.  On his profile page he had his picture; he

19    had some more personal information; but once again, he chose

20    not to have anything regarding The Spec-tator or any of the

21    comments on the profile.  So if you were able to gain access

22    to this, to his profile page, you would not see anything

23    about The Spec-tator.  You would not see any of the comments

24    made by anybody on The Spec-tator.  What he chose, as I told

25    you before, is he chose to have it hidden.  So what you had

1    to do then is, if you were a member, you would be able to go
2    on to your computer, log into your own My Space account, and
3    on your home page you wouldn't see anything.  You can go to
4    your profile on your own profile, you wouldn't see anything.
5    You would then have to click on a tab to get to "groups."
6    You would click on "groups" and you'd come to your different
7    groups.  You still couldn't see any of the comments.  You
8    you could have more than one group.  We're only concerned
9    here today with The Spec-tator.  You can have two, three,
10   groups, 10 groups.  So you would maybe see an icon of The
11   Spec-tator group, still couldn't see anything.

12           You'd click on The Spec-tator.  Now you get to the
13   first page of The Spec-tator.  And guess what?  You still
14   couldn't see any of the comments.

15           What would happen then is you would scroll down,
16   you'd see the first page where he made the statement about,
17   you know, the issue about why he did this and why it was
18   private, and why it was for employees, and then you'd go
19   further down, and on the bottom you'd see topics.  Because
20   that's how they exchanged information.  Somebody would start
21   a topic about anything.  Not -- one of the topics was about
22   work hours, or rankings for the employees, so somebody would
23   say something about work hours, somebody would say something
24   about the rankings, and then you'd be able to respond.  And
25   then you'd have a whole listing of the responses, as if we

1    were having a conversation today, where I bring up a topic,

2    I'd say something to you, you'd say something to me, except

3    now it was done on this computer.  So none of those postings

4    would be able to be seen even on the first page.  You would

5    have to then click on a topic, and then you would finally be

6    able to see the person who started the topic, and then the

7    actual comments about the topic.  That's how layered all of

8    this was.

9           Now, this group functioned for about a two month

10   period.  I think the evidence will be at the end of February

11   of 2006 it started, and then they were fired May 10th or May

12   11th, 2006.  So for approximately two months the group

13   existed.  And they were able to participate in it without

14   issue.

15          Now, you say to yourself, well, then what happened?

16   How did Houston's management gain access?

17          Well, there's a variety of versions of how they

18   initially, initially gained access.  Because they, the

19   evidence is going to show you, that they accessed it a

20   number of times.

21          One version is Karen St. Jean, who will testify

22   tomorrow I believe, she was a greeter.  She was at the front

23   of the restaurant and would say hello to people as they came

24   in.  She was also friends with Brian Pietrylo.  She was also

25   a member of The Spec-tator.  She got invited, and she

JOHN KEVIN STONE, CSR

1.28

1    accepted, and she was also friends with one of Houston's

2    managers, a person named Tijon Rodriguez.  And you may hear

3    from him.

4        So after she was invited, she would go on to The

5    Spec-tator once or twice a week.  Although she didn't

6    participate in the comments, she would just read what

7    everybody else was saying back and forth, and she never

8    really wrote any of the postings herself.

9        So she, her husband, Tijon Rodriguez, the daytime

10   manager, and her husband, went out on a social engagement.

11   I think it was a Saturday, and they went out, had dinner,

12   came back to Tijon's apartment, and somehow the conversation

13   came up that there's this thing called The Spec-tator.  So

14   Karen's husband said to her, you know, why don't you show

15   Tijon The Spec-tator.  So she said, okay.  So she went to

16   the computer, sat down, put in her e-mail address, put in

17   her password and accessed The Spec-tator.  She did not give

18   Tijon her e-mail address or password.  He did not ask for

19   it.  She's never given it to him.  But because she went on,

20   he was able to either sit next to her or look over her

21   shoulder, he was able to see the comments.

22       Now, according to Karen they had a laugh and that

23   was the end of it, and they went on with their socializing.

24       The next time that she went to work, couple,

25   following days after that, she was called in by another

JOHN KEVIN STONE, CSR

```
 1        daytime manager person named Robert Anton.  And you'll hear
 2        testimony from his deposition, because he's not going to be
 3        testifying live.  But he's been deposed by both sides.  He
 4        calls her in, says -- now she's working, she's in her work
 5        uniform and she is at work.  He is a manager working that
 6        day.  During her work shift, he calls her over and says,
 7        please, you come with me, I want to talk to you.  And they,
 8        I believe she said, goes to the back bar area or something.
 9        And he sits her down and he says, and this is very
10        important, listen to what he says, "Karen, I need your
11        password so that I can go on to The Spec-tator and view
12        these postings myself."  Okay?
13             So she does not want to give him the password, but
14        because she's at work, and because he's a manager and
15        because he's a boss, she gives it to him.  She thought that
16        if she did not give it to him something would happen to her
17        at work.  She had already been written up previously for
18        allegedly being late, so she had had some issues with her
19        work performance, and so she gave it to them and gave it to
20        him because she thought something would happen to her.
21             Now, Robert Anton says that he went on the site at
22        his home, and the first time he went on he used her
23        password.  And when he was on he read the postings.  Now
24        this is the beginning of May.  So we have all the postings
25        that were there from March, April and beginning of May.  He
```

1    made copies of those postings.  And he took those postings
2    that he made copies of, and according to Mr. Anton, he gave
3    them, he gave the postings to Mr. Marano, and he gave Mr.
4    Marano Karen's e-mail address and password.  Karen will tell
5    you that she never, ever gave Mr. Marano her e-mail and
6    password.  That she never authorized him to use it to access
7    the site.
8             Now, we have another version.  Mr. Marano's
9    version.  He's going to tell you that he found out about The
10   Spec-tator from a conversation he had with Tijon Rodriguez,
11   the person we talked about, the friend over the weekend at
12   the apartment, and Robert Anton.  That he left the
13   restaurant after having the conversation, went back to his
14   office, called up Tino Chimburello and Michael Lamb.  Talked
15   to them about it.  Then he called the restaurant back.  And
16   supposedly Karen answered the phone.  He asked for Tijon.
17   Tijon got on, and Rob said to Mr. Rodriguez, "you know, I
18   want to get on that site you have, give me directions and do
19   you have a password."  Tijon supposedly told him, "I don't
20   have a password, oh, but by the way, Karen is either
21   standing next to him or is walking by, and Rob Marano says,
22   "oh, all right, get her password."  And Tijon says, "oh,
23   Karen, can I have your password, or can Rob have your
24   password?  And Karen, she's not privy to this conversation
25   at all.  She may or may not have even been there.  And she

1    supposedly, automatically gives Tijon her password, and then
2    Tijon gives it to Mr. Marano.

3        Now, how Karen knew that the password Tijon was
4    referring to was her password to her My Space account or to
5    The Spec-tator, or to other passwords that she has, things
6    for -- I mean I have lots of passwords, I'm sure many of you
7    that have computers and things like that do as well.  Credit
8    cards, all that type of stuff you have passwords.  Somehow
9    she knew, without talking to them, what the password they
10   wanted was.  You're going to have to decide.  You're going
11   to have to decide which version you believe.

12       But I will say this:  Regardless of which version
13   you believe, there is no dispute that Mr. Marano used
14   Karen's e-mail address and password to access The
15   Spec-tator.  He accessed it the first time on or about May
16   5th, 2006.  He will tell you that when he accessed it he
17   knew the first time he went on that Brian Pietrylo had
18   created the site.  So he knew Brian was the creator of The
19   Spec-tator the first time he went on.  And he will also tell
20   you that he made copies of all the postings from March 'til
21   May.

22       Now, with that knowledge, what does Mr. Marano do
23   thereafter?  Does he go to the workplace at Houston's the
24   next work day and fire Brian Pietrylo or Doreen Marino for
25   the postings that were on there that they made or other

1    people made, or that Brian created The Spec-tator?  No.

2           Does he go to work and sit Brian down and put

3    Doreen down and say, "I want you to know I've been on The

4    Spec-tator and I'm warning you, I don't like what I'm seeing

5    on it"?  No.

6           Does he go or call them or go to work and sit them

7    down and say, "hey, I've been on The Spec-tator, I'd like to

8    now go back on to The Spec-tator, do you mind if I use your

9    password and information to get on it in the future"?  No.

10           Now, these comments that are on the site, some of

11    them he perceived to be negative.  He perceived them to

12    violate the company's core values about what they wanted in

13    an employee.

14           Now, did he say when he read them, "wow, there's a

15    lot of comments by a lot of people.  There's a problem.  Is

16    it the problem with the employees; is it the problem of the

17    company?  Is it a problem amongst all of us?  I should

18    investigate this."  Did he do that?  No.

19           What does he do?  He keeps Brian and Doreen totally

20    in the dark.  Never tells them he's ever visited The

21    Spec-tator.  Never ever tells them he's been on the group

22    set up by Brian Pietrylo.  And he proceeds to go back on

23    again to the site, and then he goes back on again.  And we

24    have an e-mail from May 10th, five days after he went on the

25    first time, that he sent Tino Chimburello, his boss, saying,

1    "I tried to go on again but the site's down."  You'll see

2    it.  It's a writing, an e-mail.

3         Well, why do you go back on?  He was on it

4    supposedly with authorization the first time, he had access,

5    he gets the stuff, he can fire them.  He doesn't.  I went

6    through all of that.  Okay?

7         Why did he go back on?  Unless he wanted to see

8    what they were doing.  He wanted to watch them.  He wanted

9    to see, were there any new comments being made by Brian,

10   Doreen or anyone else that was on the site.  And I don't

11   know how, any other way to say this, but he was spying on

12   them.  He never told them that he was on.  In fact, when

13   they got fired, they had no idea.  They were totally in the

14   dark that they were getting fired because of what was going

15   on on that site.  And that Mr. Marano and Robert Anton had

16   been on the site on a number of occasions.

17        Also, you will hear and see that during this same

18   time frame, Mr. Marano drafts an e-mail that he sends to

19   Tino Chimburello and Michael Lamb, they're the two people I

20   told you before aren't involved with this, with just this

21   local restaurant, they're big-whigs, top guys.

22        Chimburello oversees 45 restaurants, Michael Lamb

23   is the head of human resources for 6,000 employees.  He

24   sends them an e-mail, and in the e-mail he proceeds to

25   advise them of Karen St. Jean's e-mail address and her

1.34

1    password.  And then states, in explicit, step-by-step

2    detail, how to get on the site.  And tells them, "call me."

3    To review.  And you will see that when Mr. Marano testifies.

4            You know, they say Karen St. Jean voluntarily gave

5    us access.  Well, how far does the access go?  I mean if I

6    give you my credit card, and I say to you, can you go to

7    Staples and buy me a couple of reams of paper," and you take

8    my car and you go buy the paper, does that mean you can then

9    go back to Staples with my credit card and use it to buy

10   plants, to buy T.V. screens, to buy supplies and give my

11   card to somebody else?  I don't think so.

12           That's what we have here.  This went all the way up

13   the corporate food chain to top level guys.  Did they ever

14   ask Karen to just show, if they wanted to investigate these

15   negative, supposedly, comments, and it affecting the

16   workplace, well, why didn't they just go to Karen, as she

17   did we Tijon, and say, hey, Karen, can you go on with your

18   password, because we don't want your password, and show us.

19   And we'll look at it, we'll make copies of it, and that will

20   be the end of it.  Then fire them, do whatever you want.

21   But they didn't want to do that.  Why?  Why didn't they want

22   to do that?  I think it's pretty obvious.  Because they

23   wanted to be able to go back on and wanted to be able to

24   watch, and they wanted to be able to spy.  And that's what

25   happened.

JOHN KEVIN STONE, CSR

1          And after that occurred, Brian Pietrylo was called

2     in by Mr. Marano for a meeting, and Brian thought, because

3     he was doing so well, and he was a top performer, that he

4     was actually going to get a promotion.  That's what he

5     thought.  He was going to get a promotion.

6          Instead, he sat down, and for the first time he

7     hears from Rob Marano, I found out about the site, I've been

8     on the site, I don't like what you said on the site, it

9     deconstructs and destroys or company core values of

10    professionalism, of attitude, and some other things.  And

11    we're going to have to part ways.  Brian says to him, "Rob,

12    I'm willing to take down the site.  I'll take it down."  And

13    Rob tells him, too late, you're gone.  And he's fired.

14         The next day Doreen is fired, and she's told that

15    she was fired because she was a member of the group, had

16    participated in the group, and had made postings on the

17    group.

18         Now, you're going to hear from both of them.  On

19    how they've been affected by their firing.  You're going to

20    hear about their claim of economic and financial damages.

21    You'll hear their efforts to find a new job.  You'll hear

22    how the new jobs and what they make there are different from

23    what they were doing when they were at Houston's.

24         Brian Pietrylo also has a claim for emotional

25    distress.  Now, he's going to testify to you about how this

1.36

1   has affected him emotionally.  And you're going to hear from

2   Brian, and he'll tell you that about his family history.

3   He'll tell you about how his parents separated when he was

4   young.  He'll tell you how his mother remarried.  That he

5   had two half-sisters.  And the mother and his two

6   half-sisters, they had a myriad of problems with alcohol and

7   drugs.  I believe one of his brothers went to prison.  I'm

8   bringing all of this out to you because they're going to

9   bring it out to you so, I'm telling you in advance so you

10  know.

11          Notwithstanding all of the family history though,

12  Brian Pietrylo never sought psychiatric help.  He never went

13  for any type of counselling.  He never was prescribed a

14  medication to deal with any of this family history.  In

15  fact, he didn't even go to the doctors right after he got

16  fired.  He continued to work and got a new job at Morton's,

17  and so did Doreen.  That's another steakhouse in the area,

18  has servers, and about six months after he got fired, and a

19  couple months after he started working for Morton's, he was

20  doing so well, they told him, we're going to do a background

21  check, but we want to promote you.

22          Now, you would think, wow, this is great.  I'm

23  getting promoted.  But Brian will tell you that he had this

24  emotional meltdown.  After he hears this news, about a week

25  and a half later he just starts to cry hysterically in his

Case 2:06-cv-05754-FSH-PS    Document 65-4    Filed 07/03/2009    Page 39 of 122

1.37

```
 1    home.   That he had thoughts of suicide.   That he actually
 2    cut his arms.  And he's thinking to himself, what is going
 3    on?
 4          Doreen found out, and of course she was with him
 5    and supported him and said, you got to get some help.  So he
 6    went to see Dr. Heimbach.  A doctor, who you will hear from,
 7    who's a psychiatrist who treated him.  And based upon what
 8    the doctor was told, the doctor diagnosed him with having
 9    enhanced anxiety and depression.  And he will also tell you
10    that a major factor in why he was suffering from that was
11    this triggering event from him being fired.  And he got
12    fired at Houston's, he thought he was getting promoted, so
13    now he thinks I'm getting promoted again, it's going to
14    happen again, I'm going to get fired again.
15          He also told him that he had stress at work, which
16    was a contributing factor, and that he had stress from being
17    engaged -- he had started this process from being engaged in
18    this lawsuit process.  As a result of his diagnosis, the
19    doctor told him to get counselling, which he did, for a
20    number of months.  He put him on medication.  Which Brian
21    went on.  But Brian doesn't like taking medication.  So he
22    didn't want to keep taking it.  So after awhile, he stopped
23    taking it, and you'll hear he's not here to cry and moan to
24    you that this is devastating to him forever, but he had that
25    period of time where he was devastated by this.  He was
```

JOHN KEVIN STONE, CSR

1    treated for it, but now he's doing a lot better in terms of

2    his emotional state.  He's moved on.  He's moved to Florida.

3    He has a new job there.  He's no longer getting counselling,

4    he's no longer taking medication.

5         Now, the defense, who gets to speak to you next, is

6    probably going to tell you that one of the reasons Brian

7    Pietrylo got fired was that he supposedly fed answers to an

8    upcoming test for bartenders, and put them on the site.  And

9    I can look at you now and tell you that that is not a reason

10   why he was fired.  Now, how could I look at you and tell you

11   that?  Very simply.  Not because I'm saying it.  Because I'm

12   only the lawyer.  But when Rob Marano fired Brian, he kept

13   meticulous and copious notes of the firing.  And you will

14   see the notes.  And in the notes is there any reference to

15   him being a cheater and unethical and providing employees

16   with answers to a test?  Don't you think if that was a real

17   reason that it would be in those notes?

18        Well, when you see the notes, you will see that

19   there's nothing in there about any type of answers to a

20   test.  What's in there is what I've told you, which is he

21   created the site, he thought it violated the core values,

22   and that's why he got fired.

23        They're also probably going to tell you, as I've

24   been telling you about this, that the main reason that this

25   happened and they got fired is because they have these core

1.39

1    values that they rely upon about professional attitude and
2    good work behavior, and that Mr. Marano, in his opinion,
3    even though this all took place outside of work, not on work
4    computers, all in their private time, that they weren't
5    supposed to see any of this, that it still, in his opinion,
6    would have an overflow, a negative aspect or a negative
7    effect at the workplace.

8              Now, my clients posit the opposite.  They say,
9    look, it's like any type of counselling group.  When you
10   have a counselling group you bond.  You connect, you make
11   yourselves feel better, and that's what they did with this
12   group outside the workplace.  And that they say, because
13   they vented outside of the workplace, that when they came to
14   the workplace they had a more positive attitude.

15             Now, whether you want to believe them or Mr. Marano
16   about the opinion, let's look at what the facts will show.
17   Houston's has this thing called written counselling forms.
18   I don't know if you've ever experienced it where you work.
19   But they have these forms that if their employees need some
20   improvement on something, or they need some counselling,
21   they can issue them a written counselling form.  And these
22   counselling forms have different categories specifically
23   listed at the top.  One category actually is violation of
24   company policy, which is what they're saying is happening
25   here.  Number two, is a poor work attitude or an

1.40

```
 1        inconsistent work behavior.  You will you have all those
 2        three categories.
 3              Now, did Mr. Marano try to verify his opinion about
 4        what these this Spec-tator group was doing, and having an
 5        effect on the workplace?  Did he go and look into any of
 6        these people who were members and see any of them between
 7        March and May had been issued a form for any of these
 8        categories?  He did not.
 9              And Houston's cannot produce a single form,
10        counselling form, between that time when this site was up,
11        that they would -- that they issued to any of the other
12        people that were participating in it, that they had a
13        problem with them when they were working, with their
14        attitude, their behavior, or that they were violating
15        company policy?
16              So, at the end of the case I'm going to have an
17        opportunity another opportunity to come and speak to you and
18        at that time I'm going to ask after you listen to all the
19        evidence, to enter a verdict in my clients' favor for their
20        actual damages for emotional distress for Brian Pietrylo,
21        and ask you to consider punitive damages because I believe
22        their conduct was that egregious, and I believe it will be
23        warranted, because I believe the evidence is going is to cry
24        out to you that what Houston's did, and how they did it, was
25        wrong.  And it violated the federal and state statutory laws
```

1    regarding intentional access to these types of

2    communications without authorization, and it violated their

3    common law right to privacy.  They had a right to have this

4    stuff remain private.  It wasn't hurting anyone.  They were

5    doing it on their own time.  And how they access this and

6    continued to go on and then used it to fire them, violated

7    the law.

8            Thank you very much for listening to me.

9            THE COURT:  Miss Gardiner, the court reporter needs

10   to change his papar.  One second.

11           ( Pause ).

12           MS. GARDINER:  Good afternoon.

13           I'm not going to be that long, because I know that

14   if you're anything like me, right now you'd like the

15   afternoon break.

16           But I do have a few things to tell you.  And again,

17   my name is Donna duBeth Gardiner, and I'm the attorney who's

18   representing Hillstone Restaurant Group, the defendant in

19   this matter, and yes, Hillstone does own some restaurants,

20   and one of them is Houston's in Riverside Square.

21           Hillstone is not a publicly traded major

22   corporation.  It's a family owned business, started by a

23   man, run by a man and his wife and their children, and they

24   own restaurants in about 16 states.

25           And Mr. Pisani is right.  I am going to tell you

1.42

1    about the values and the philosophies and the expectations

2    that Houston's has for all of its employees.  And the values

3    and philosophies that these employees are trained upon and

4    that it's managers are trained upon.

5           People at Houston's don't just walk in and become a

6    manager.  They don't just walk in and become a waiter.  They

7    go through training.  Managers go to special classes down in

8    Atlanta to be trained as managers.  Waiters go through a

9    four to eight day training session at local restaurants to

10   be waiters.  And one of the things they are taught that you

11   are going to hear about, are the core values of the

12   restaurants, if you will, the family values of the

13   restaurants:  Respect for each other; professionalism; a can

14   do attitude; respect for customers.  And Houston's has

15   specific requirements for the way customers are treated and

16   the way service occurs at its restaurants.  And those

17   requirements are referred to in the restaurant as specs.

18          So you can imagine when the restaurant heard and

19   learned there was a web site called The Spec-tator, it was a

20   little concerned, because that name in itself made fun of

21   the exact requirements for customer service that the

22   restaurant cared about.

23          Now, this whole case is really focused on a few

24   days in May.  Sounds like an old movie.  Sometime around the

25   1st of May, Karen St. Jean, who you've heard about, who was

JOHN KEVIN STONE, CSR

1.43

1    a greeter at the restaurant and who at that time was dating
2    someone who had been a manager, told a manager, Tijon
3    Rodriguez, that The Spec-tator existed, and showed it to him
4    on Tijon's computer at home, granted during a social
5    occasion.  They didn't just laugh about it and Tijon walk
6    away.  What Tijon is going to tell you is he was concerned.
7           Number one, the web site was using the trademarked
8    logo of Houston's.  Houston's is very protective of that
9    logo.  It's not to be used on a web site which you're going
10   to see as this trial goes on, is full of pornographic
11   references, swear words, racial -- racial comments, and
12   comments that no manager wants to see, no corporation wants
13   to see on something that has its logo right at the top, the
14   logo for anyone to see who comes to that site.
15          Now, when I say anyone to see who comes to that
16   site, Mr. Pisani during this case is going to make a great
17   deal, the plaintiffs are going to make a great deal out of
18   the fact that this was a private site.  And granted, it was
19   set up so that only Mr. Pietrylo could invite people to
20   join, who could post on the web site, and for those like me,
21   posting is the same thing as publishing.  And I've learned
22   these terms, it's like writing something.  And if I were
23   writing a book, I would publish it.  If I'm on the web, I
24   post it.  So that's one of the words you're going to hear
25   during this case.

JOHN KEVIN STONE, CSR

1.44

1          Mr. Pietrylo invited 20 other people at Houston's
2     to join this Spec-tator where -- where he encouraged them to
3     write about all the quote, "crap and drama at work."  You're
4     going to see that document.  I'm going to show you pages of
5     The Spec-tator.  I doubt if Mr. Pisani is going to show you
6     those pages, but I will.

7          Mr. Pietrylo invited 20 other people besides
8     himself.  There were 20 members when -- when Houston's saw
9     The Spec-tator.  There were no restrictions on who those 20
10    members could show it to.  Those 20 members could call
11    anyone over they wanted at their house and say, "look, at
12    this."  Those 20 members could give their My Space password
13    to anyone they want.  Those people could have gone in,
14    clicked on The Spec-tator, and saw what was being written
15    about managers, about customers, about employees.  And come
16    away with an impression of Houston's that is absolutely
17    horrific.

18         And when Houston's saw the web site, it was
19    horrified.  Its manager was horrified at what was going on,
20    and what was being said, especially by people they thought
21    were their top servers.  People they could trust.

22         Now, how did Houston's find out about this web
23    site?  Because someone who was authorized to use it told us
24    about it.  And what happened after that?  The manager who
25    saw the logo being used, the wine test, yes, I'm going to

JOHN KEVIN STONE, CSR

1    talk to you about the wine test.  Because there was a test
2    that was devised by Tijon Rodriguez to train service people,
3    to train the waiters and the bartenders on new wines he was
4    bringing into the restaurant.  A test to talk about where
5    the wines came from.  To test on the knowledge of the taste,
6    the heartiness.  I'm not a wine connoisseur.  But there were
7    about 20 questions he intended on testing the wait staff on.
8    And what does he see when Karen St. Jean shows him this web
9    site?  This test that he hasn't given to the web site,
10   posted, with Brian saying, "I'm your father, I'll take care
11   of you, I'll find the answers, and I encourage anyone else
12   to do the answers, so that when we take this test we can all
13   do well."
14            Now, if I did that in college I'd be kicked out.
15   But that's what was going on at The Spec-tator with the wine
16   test.
17            Now, Mr. Pisani says that's not why they were
18   fired, because Mr. Marano never wrote that in the notes he
19   took.  What Mr. Marano is going to tell you is when he
20   talked generally about violating the philosophies and the
21   values of the company, one of those values is integrity.
22   And you don't steal the wine test and cheat by posting the
23   answers.  You don't do that and expect to remain employed.
24            Now, the main issue in this case is how did
25   Houston's get access.  And that really is going to be your

1.46

1    focus as you listen to the evidence.  What you're going to

2    hear is that when Mr. Rodriguez went to work after he had

3    seen the web site, he told another manager about it, Robert

4    Anton.  And one of the things that he told Mr. Anton is, you

5    had better be careful about your friendships with some of

6    the waiters, because they are saying horrible things about

7    you.  They're calling your -- one of the things on this web

8    site, Mr. Anton had recently married, his wife was pregnant.

9    They were referring to the unborn child as Satan's spawn.

10           Mr. Anton obviously wanted to see the web site.  He

11   knew no one at Houston's had heard about it before this.  He

12   goes to Karen St. Jean, he doesn't call her in, "call her

13   in," sounds like there's an office somewhere.  No one had

14   offices.  It's a restaurant.  He brought her, he asked her

15   in the bar area, "I'd like to see it.  Can I have your

16   password?"  She said "yes."  He looked at it, he printed out

17   a few pages, he took them to his general manager, a man

18   named Jason, who you'll hear referred to, but he will not be

19   testifying.  He works for Houston's in Arizona.  And Jason

20   never went on the web site as far as any of us -- as far as

21   we know.  And he never had the password.  But Jason was the

22   general manager of the restaurant and was also concerned.

23           When Mr. Marano, who's the general manager at that

24   time, supervising seven restaurants, one of them being the

25   one in Hackensack, came to the restaurant right after Mr.

JOHN KEVIN STONE, CSR

1    Marano had looked -- or Mr. Anton had looked at The
2    Spec-tator, both Mr. Rodriguez and Mr. Anton pulled Rob
3    aside and said, "you need to know this is going on.  And we
4    need to know how to approach -- approach it and what to do."
5         Mr. Marano didn't say much at that meeting because
6    he's a good manager.  He listened.  He looked at the few
7    pages that Mr. Anton had printed out, and he did call his
8    bosses.  You're going to hear that Mr. Marano had only been
9    a general manager for about six months.  He probably talked
10   to those two bosses 30 times a day.  "What should I do about
11   this?  How should I handle this?  Or I'm going to do this,
12   is this okay?"  So he called the head of H-R and the
13   operations manager and said, "I've heard about this web
14   site, and I'm not sure what to do, but I wanted you to be
15   aware of it."  They both talked, told him to talk to legal
16   counsel.
17        When Mr. Marano got home that night, as he's
18   driving up his street he's thinking about the fact that he
19   only has a few pages, and he wants to see the entire
20   Spec-tator, so he can make a management decision.  He calls
21   the restaurant, Karen St. Jean answers the phone.  You're
22   going to hear from Mr. Marano, she answered the phone, he
23   said "hi, it's Rob, can I talk to Tijon."  Because at this
24   point I don't -- I think you're going to hear Mr. Marano
25   wasn't sure how to access the site.  He didn't know how to

1.48

```
 1      get on.  He didn't know who to ask.  He asked Tijon, because
 2      Tijon had spoken to him earlier in the day.  "Tijon, how do
 3      I get on the web site?"  Because Karen St. Jean had answered
 4      the phone and was standing right there when Mr. Rodriguez
 5      was -- Mr. Rodriguez didn't even put the phone on hold,
 6      you're going to hear testimony that Mr. Marano heard him
 7      turn to Karen, say, "Karen, Rob needs to get on the web
 8      site."  She spells out her e-mail address and her password,
 9      both of which are needed to access The Spec-tator.  Mr.
10      Rodriguez, he repeats it, Rob writes it down, and when he
11      gets home that night, after he's been inside with his
12      family, he goes into his home office, he goes on The
13      Spec-tator, and yes, he prints it out.  And we're glad he
14      printed it out.  Because it's the only evidence you're going
15      to have of what that entire site looked like and what those
16      postings were.
17              Now, there wasn't a great deal of time while Mr.
18      Marano, and apparently as counsel would have you believe,
19      some kind of voyeuristic mode went in and out of The
20      Spec-tator.  He was concerned about what it was saying.  And
21      he went in on a Friday, May 5th, and by the following
22      Tuesday both were being fired, both plaintiffs were being
23      fired.  The decision had been made to fire them because of
24      the content.
25              This is not a First Amendment case and you're not
```

1.49

1    going to be asked to decide First Amendment issues and
2    whether they had a right to say what they said.  They did
3    not have a right when it was something that was so
4    deconstructing.  I will use the word Mr. Pisani used, and
5    the word that Mr. Marano used, something that so undermined
6    the values and had the potential for destroying the morale.
7    When you see what these pages are and you hear Mr. Marano,
8    you're going to understand the restaurant took steps to
9    protect itself.  This really is not a case about privacy.
10    This is a case about a restaurant protecting itself, its
11    employees, and its customers, from what you're going to see
12    were the postings.
13          Now, the plaintiffs are asking for money.  That's
14    why plaintiffs come to court.  They're asking for what they
15    claim are lost wages.  I suggest to you, after you see all
16    the evidence, you're going to see they're earning the same
17    now, that they earned the same when they went to Morton's
18    and they found a job two and a half weeks later.  They're
19    earning the same or more.  There are no lost wages.
20          I suggest to you when you hear the testimony on the
21    emotional distress that Mr. Pietrylo is claiming, you're
22    going to scratch your head and wonder, is it really
23    emotional distress related to his termination?  When you
24    hear evidence that, as Mr. Pisani said, he had never gone to
25    a psychiatrist before, and suddenly goes to one within two

JOHN KEVIN STONE, CSR

```
 1    months of this lawsuit being filed, nine months, nine and a
 2    half months after the termination, lawsuit gets filed and
 3    suddenly he's seeing a psychiatrist.  You're going to have
 4    to make the determination on whether -- whether Houston's
 5    did anything wrong.  Because the issue here is did Houston's
 6    have permission to access the web site.
 7            Now, Mr. Pisani is right.  You are going to hear
 8    differing testimony about how Mr. Marano got the password.
 9    In his deposition Mr. Anton said that he gave Mr. Marano the
10    password.  Mr. Marano is going to tell you that's not true.
11    He's remembering incorrectly.  Karen St. Jean is going to
12    tell you she doesn't remember.  It's going to be up to you
13    to decide.  It's three years ago.  People have differing
14    memories of events.  And it's going to be up to you to
15    decide.
16            And at the end of all of the evidence I'm going to
17    come back to you.  And I'm going to ask you to enter a
18    verdict in favor of the defendant, finding that the
19    defendant had permission to access the web site, which is
20    the main issue here; that the defendants -- that the
21    plaintiffs were not wrongfully terminated, because there was
22    a legitimate business reason.  And I'm going to ask you to
23    find that the privacy was not invaded impermissibly, because
24    when you invite 20 other people to share your hotel room and
25    you leave your diary out, how can you expect it to be
```

1.51

1    private when they can let anyone else in?  And that's what
2    the issues are that you're going to be hearing about over
3    the next few days.
4        I thank you very much for your attention, and I
5    look forward to talking to you at the close of the evidence.
6        Thank you.
7        THE COURT:  All right.
8        Ladies and gentlemen, that concludes the opening
9    statements.
10        The next phase of the trial is the taking of the
11    evidence.  We will pass out notebooks, but before I do that,
12    just by a show of hands, how many would like a 10-minute
13    break and how many of you would like to just start with the
14    the evidence?  I'm going to first ask who wants a 10-minute
15    break.
16        Okay.  Now I'm going to ask, just show of hands who
17    would like to start the evidence.
18        Guess that wins.  All right.  We're not going to
19    take a break.  We will start the evidence, we will pass out
20    the notebooks and we will call the first witness.
21        All right.
22        You may begin and call your first witness, Mr.
23    Pisani.
24        MR. PISANI:  Thank you, Your Honor.
25        My first witness will be Brian Pietrylo.

JOHN KEVIN STONE, CSR

1.52

```
 1              Is there something you're holding up that notebook

 2      for?

 3              MR. PISANI:  Yes.  Pursuant to the requirements, I

 4      have the documents, I made a copy for counsel, copy for you,

 5      copy for the witness.

 6              THE COURT:  Excellent.  You may hand it up to Miss

 7      Buro.

 8              MS. GARDINER:  Okay.  Thank you very much.

 9              MR. PISANI:  I'd like to call as my first witness

10      Mr. Brian Pietrylo.

11              THE CLERK:  Please raise your right hand and place

12      your left hand on the Bible.

13      B R I A N     P I E T R Y L O, sworn.

14              THE CLERK:  Please state and spell your name for

15      the record.

16              THE WITNESS:  Brian Pietrylo.  B-r-i-a-n.

17      P-i-e-t-r-y-l-o.

18              THE COURT:  All right.

19              You may be seated.

20              You may begin your questioning.

21              MR. PISANI:  Thank you, Your Honor.

22      DIRECT EXAMINATION

23      BY MR. PISANI:

24      Q   Good afternoon, Mr. Pietrylo.

25      A   Good afternoon.
```

Pietrylo-direct                    1.53

1   Q   You and Doreen Marino are plaintiffs in this matter.
2   Correct?
3   A   Yes.
4   Q   How do you know Doreen?
5   A   We had met several -- many years ago in the Florida
6   Keys, we were working together at the Outback Steakhouse in
7   Islamorada.
8   Q   And after you met, did you begin to have any type of
9   relationship with her?
10  A   No.  Over the course of two years we slowly became
11  friends and then it led to becoming something more.
12  Q   And then at some point did you have a relationship?
13  A   Yes, we became involved.
14  Q   And when did that start?
15  A   Pardon?
16  Q   When did that start?
17  A   That would have been early 2000.
18  Q   Did there come a point in time when you began to live
19  together?
20  A   Yes.
21  Q   When was that?
22  A   That was near the same time as well.
23  Q   Okay.
24      And where were you residing at the time?
25  A   We were renting from the hotel that was attached to the

JOHN KEVIN STONE, CSR

1    restaurant, we lived in a little bungalow on the property on

2    the beach.

3    Q    And what restaurant was that?

4    A    Outback Steakhouse.

5    Q    Did there you come a time when you moved to New Jersey?

6    A    Yeah.  Shortly thereafter, when 9-11 -- I actually had

7    my prior dates off.  After 9-11, tourism in that area really

8    hurt the economy, and it's really high cost of living area.

9    So we decided to relocate to New Jersey to Doreen's home and

10   look for work up here.

11   Q    And that was some time after 9-11-2001?

12   A    Sure, a few months after, yes.

13   Q    And did you both try to get jobs in New Jersey --

14   A    We each --

15   Q    -- let me finish my question, please.

16        Did you try to get jobs in New Jersey when you got

17   here?

18   A    We transferred within the company we were working for.

19   Q    and that was Outback?

20   A    Outback Steakhouse, yes.

21   Q    And what did you do for them?

22   A    Both servers and bartender, and Doreen also had an

23   hourly management position.

24   Q    Is it fair to say that that's been pretty much your work

25   experience?

1    A    Pretty much, yes, sir.

2    Q    Did there come a time you started to work at Houston's

3    at Riverside Square Mall?

4    A    Yes.

5         Two year years after we relocated, it would have

6    been March of 2003 by my memory.  We were looking for a

7    better opportunity to make more money, and we decided that

8    Houston's would be a good step up.  Also because their style

9    of food expediting, it was very similar to Outback's

10   concept.

11   Q    And did you apply for a server position?

12   A    Yes.

13   Q    With whom did you apply, do you remember?

14   A    With whom did I apply?

15        The manager at the time who I met for the first

16   interview when I applied was Josh Stratford.

17   Q    Okay.

18        And after that interview did you get offered a job?

19   A    No.  We got offered a second interview.  The way

20   Houston's worked at the time is you had to have a series of

21   three interviews.  One with a manager, one with a manager in

22   charge of servers, and then one with the general manager.

23   Q    Okay.

24        And then at some point in time you got offered a

25   job?

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.56

1   A    Yes.

2   Q    To be what?

3   A    A server.

4   Q    And at the time you started what was your level of

5   compensation?  Were you paid an hourly rate wage and tips

6   both?

7   A    During the training period we were paid minimum wage.

8   After that we were given a server wage which was at the time

9   $2.12 an hour plus our gratuities.

10  Q    Okay.

11       You said you were involved in a training period?

12  A    Yes.

13  Q    When you first started working for Houston's?

14  A    Yes.

15  Q    During the training period did you ever receive a copy

16  of any type of Houston's handbook?

17  A    Yes.  You have to sign off that you received it.

18       MR. PISANI:  Your Honor, I would like to refer the

19  witness to the first exhibit in the booklet, D-1.

20       THE COURT:  You may show the witness D-1 for

21  identification.

22       Is it marked?

23       MR. PISANI:  We haven't marked it yet.

24       Can we mark it?

25       THE COURT:  All right.  Yes.

JOHN KEVIN STONE, CSR

Pietrylo-direct                         1.57

1          You need to -- we'll give you exhibit markers and
2    mark them as you go.
3          MR. PISANI:  That would be fine.  Thank you.
4          THE COURT:  Then at a break, just make sure that
5    all sides have exhibits premarked.
6          MR. PISANI:  May I approach the witness, Your
7    Honor?
8          THE COURT:  You may.
9    BY MR. PISANI:
10   Q    I'm going to show you what's been marked as Defense
11   Exhibit 1.  Can you look through that very --
12   A    Yes.
13   Q    Take your time and see if you can identify the document.
14   A    This is the Houston's service employee handbook.  And
15   it's just basically, through the table of contents it gives
16   you an overview of the history, the philosophy, and values
17   of the company expectations, responsible service of alcohol,
18   professionalism, and procedures for answering the telephone,
19   and then just a description of some of the front house
20   positions.
21   Q    When you first reviewed it -- and you subsequently
22   reviewed it.  Correct?
23   A    Yes.
24   Q    Have you noticed any references in the employee handbook
25   dealing with the use of computers?

Pietrylo-direct                          1.58

 1    A    Not at all.

 2    Q    Okay.

 3         In reviewing the first time, and subsequently

 4    reviewing it, are there any references to using work

 5    computers to engage in private conduct, for instance, doing

 6    any type of e-mails or engaging in a social networking site

 7    while at work?

 8    A    I don't believe so.  Usually that's -- when you're a

 9    waiter in a restaurant, a computer is not even part of your

10    work at all.

11    Q    And to your knowledge, when you were working at

12    Houston's, did they have computers?

13    A    Every restaurant has a computer for bookkeeping purposes

14    and communication with the home office, etcetera.

15    Q    Were you able to, as an employee, access the Internet

16    from the working --

17    A    No.

18    Q    You have to wait, let me finish the question.

19    A    I'm sorry.

20    Q    Were you able to access the Internet from any of the

21    defendants' work computers?

22    A    No, sir.

23    Q    When did you first start to work, how old were you when

24    you started to support yourself?

25    A    I got my very first job at 16.

Pietrylo-direct                    1.59

```
 1    Q    So when you first started to work for Houston's, did
 2    your compensation include any type of health insurance
 3    benefits?
 4    A    I do believe so.  I don't really remember the time
 5    period that you had to be involved there.  I do remember
 6    that there was the insurance you could buy into, or after a
 7    period of employment you could get what we consider to be
 8    the good insurance.
 9    Q    By the end of your employment with Houston's, did you
10    have health insurance coverage with them?
11    A    Yes.
12    Q    And you had to pay a small stipend towards that
13    coverage?
14    A    Yes.  It was a bi-weekly payment of $66.
15    Q    So on the average when you first started working there,
16    how many hours did you work per week?
17    A    In the beginning, when you first start at Houston's, you
18    only work lunch shifts.  You have to work your way up to the
19    dinner shifts.  So at the very beginning it wasn't any more
20    than I would say maybe 25 hours a week until you were able
21    to work the dinner shifts where you made better money.
22    Q    Okay.
23         Did there come a time when you started to work the
24    dinner shifts?
25    A    Yes.
```

Pietrylo-direct                          1.60

1    Q    And how far into your employment did that happen?

2    A    It was probably about two and a half weeks into it.

3    Q    Okay.

4         And then after you started doing the dinner shift,

5    what were your approximate hours that you worked per week?

6    A    35 to 40 hours.

7    Q    And that would have been in 2004?

8    A    At that period, yes.

9    Q    Okay.

10        Between 2004 and 2006 when you were terminated, did

11   your hours increase or decrease?

12   A    Towards the end, because I had moved up in the server

13   rankings and had the better shifts, I wasn't working as many

14   days a week anymore, because I didn't need to.

15   Q    So your hours decreased?

16   A    I would say they decreased, maybe about 32 hours a week.

17   Q    And as of 2006, May --

18   A    Hhmm-hmm.

19   Q    -- what was your compensation?

20        Did you have an hourly rate, what was it at the

21   time?

22   A    It was still the server wage, 2.12 an hour plus

23   gratuities.

24   Q    Okay.

25        Now, was there any type of policy with Houston's

JOHN KEVIN STONE, CSR

1    regarding the splitting of tips?

2    A    There is a tip out.  At the time I worked there there

3    was 3 percent of your sales you had to pay out, whatever 3

4    percent of your sales, that went to tip out the bartenders

5    and the geeters, which would be the same thing as a hostess

6    in other restaurants.

7    Q    And in your time there you complied with that?

8    A    Yes.

9    Q    So I'd like to direct your attention to March of 2006.

10   Were you still working at Houston's?

11   A    Yes.

12   Q    At or about that time, did Houston's ever do any type of

13   rankings of the various servers?

14   A    Yes.  The entire time I worked for Houston's, every two

15   months the managers would do a mutual evaluation of each one

16   of the staff.  They would evaluate you on things like

17   grooming, attire, professionalism, your smile.  There were a

18   lot of different categories.  And you were given a score.

19   And what the ranking system did is whoever was higher-up,

20   you got the better shifts and the better sections.  And if

21   you were in the top eight servers, you also received a 200

22   dollar bonus every two months.

23   Q    Okay.

24        So in 2006, the last time you got a ranking, do you

25   remember where you were?

```
 1    A    I believe I was number three.

 2    Q    Out of approximately how many?

 3    A    60.

 4    Q    Out of 60?

 5    A    ( Indicates affirmative ).

 6    Q    Did you receive all the thing you just mentioned before?

 7    A    Yes.  Yes.

 8    Q    You got the better hours and shifts?

 9    A    ( Indicates affirmative ).

10    Q    And you got the bonus?

11    A    Yes, sir.

12    Q    Do you know when the ranking was in 2006, what month?

13    A    It would have been March.

14    Q    March.

15             In March 2006, do you know who the managers who

16    worked at the Houston's in Riverside Square Mall on a

17    day-to-day basis were?

18    A    Yes.

19    Q    Who were they?

20    A    The regional manager was Robert Marano.  The general

21    manager of that location was Jason Sokolow.  And the -- then

22    the other managers were Robert Anton and Tijon Rodriguez.

23    Q    Okay.

24             When you say Rob Marano was the regional manager,

25    what do you mean?  Was he there everyday?
```

Pietrylo-direct                                      1.63

```
 1    A    At our store we saw quite a lot of him.  At least three
 2         times a week we saw him.  He had other stores that he
 3         visited on a regular basis too.
 4    Q    What about Tijon and Mr. Anton and Sokolow, were they --
 5    A    They had a regular schedule in the store, yes.
 6    Q    And their responsibility was to be at that location?
 7    A    Yes, sir.
 8    Q    In early 2006 did you own a computer?
 9    A    Yes.
10    Q    Where was the computer?
11    A    At home in my living room.
12    Q    Did you own a laptop computer?
13    A    No, sir.
14    Q    Did you share the computer with anyone?
15    A    Yes, with Doreen.  It was -- actually she purchased the
16         computer.  It was hers and we shared it.
17    Q    So you both shared one computer a person, personal
18         computer?
19    A    Yes, sir.
20    Q    At home.
21              So are you familiar with My Space?
22    A    Yes, sir.
23    Q    What is it?
24    A    It's a social networking web site, that's -- slogan is,
25         a place for friends.
```

JOHN KEVIN STONE, CSR

Pietrylo-direct                        1.64

```
 1    Q    Did there come a time when you wanted to join?
 2    A    Yes.
 3    Q    When was that?
 4    A    That would have been February of 2006.
 5    Q    Did you in fact join?
 6    A    I did.
 7    Q    And can you explain to the jury how you joined My Space?
 8    A    You pretty much create an account, very similar as the
 9         same way you would create a e-mail account on Yahoo or
10         Facebook.
11              Basically, all you need to get started is just your
12         e-mail address, whatever e-mail you use outside of My Space,
13         and then your password to get into the site.  After you do
14         that, once you get into it, you can build a profile for
15         yourself.  Where you put your interests.
16              There's a little "about me" section, those things
17         are called blurbs, just little tidbits of information about
18         you, your favorite movies, your favorite music, very similar
19         to what you'd find on a dating web site, if you will.  But
20         this would be more friend based.
21    Q    Is there a home page?
22    A    Yes.  Everybody would have their own individual home
23         page.  And each time you log into your account it has
24         notifications whether it's -- you have new e-mail messages
25         or new friend requests or there's so many different things
```

Pietrylo-direct                          1.65

```
 1    that that site does.
 2    Q    Can you put information that you want on your home page
 3    or is it what My Space gives you?
 4    A    Well, My Space gives it to you.  You can organize it the
 5    way you want, and you can say either I don't want this or
 6    want this.  So you can decide what you want.
 7              But as far as things that you want to put up there,
 8    that goes onto a separate page which is called your profile.
 9    Q    Okay.
10              Did you said up a profile page on My Space?
11    A    Yes.
12    Q    Okay.
13              What information generally did you decide to put on
14    your profile page?
15    A    First of all would be a picture.  Most people use a
16    picture of themselves.  Other people use something
17    different.  And lot of people don't put anything at all.
18              Or what I had was my "about me" section, where I
19    just said a little bit about myself.  Then I had interest
20    and my interests.  You can put music on your profile page,
21    your favorite artists, whatever musicians, comedians, pretty
22    much.  You can also put where you went to high school and
23    stuff like that.  I don't put in on my page, but a lot of
24    people do.
25    Q    Now, when you joined My Space, where did you join My
```

Pietrylo-direct                    1.66

1      Space from, what computer did you use?

2      A    It was my home computer.

3      Q    Okay.

4           And when you created your home page and your

5      profile, where did you do that from?

6      A    At my home computer.

7      Q    Okay.

8           Did there come a time when you decided to create a

9      group?

10     A    Yes.

11     Q    Did you create more than one group?

12     A    No.  I only created one.

13     Q    Okay.

14          Did you create this group at the time that you

15     created your home page and profile?

16     A    No.  This would have been maybe a little over a month

17     later.

18     Q    Which would have been when?

19     A    This would have been in March of '06.

20     Q    Okay.

21          Why did you decide to create a group?

22     A    Well, I wanted to have a group, and the whole reason I

23     even got into My Space at that time is everybody at work was

24     doing it.  And the majority of friends that I had on My

25     Space, most were my co-workers.  And they're pretty much

JOHN KEVIN STONE, CSR

Pietrylo-direct                          1.67

1    groups what you have on the internet.  I'm probably -- no,
2    I've now, I'm probably about a member of 150 of them,
3    ranging from favorite movies, favorite authors, and I
4    created The Spec-tator, a common interest group with me and
5    my friends who were co-workers.
6    Q    Did you decide to name the group?
7    A    Yes, I named the group The Spec-tator.
8    Q    And why did you name it The Spec-tator?
9    A    In the restaurant business "spec" is a very operational
10   word.  Something used for specifics.  Like you have spec
11   attire or spec arrangement of food, or there's a spec for
12   everything.  So I figured the Spec-tator was very fitting.
13   Q    Now, can you explain to the jury, verbally first, what
14   steps you took to create The Spec-tator group?
15   A    Okay.  Pretty much on your home page there is, at the
16   time there was a link for groups.  You would click on the
17   link and it would bring up all the groups you're a member
18   of.
19            And then towards the left of the screen you
20   had my groups, search for groups, edit groups, and there was
21   a link to create or own group.  So I went in, created the
22   group.  And before you even start becoming the group, you
23   have to set certain things like do you want it to be group
24   for the public or a private group.  I chose to accept it as
25   private.

JOHN KEVIN STONE, CSR

Pietrylo-direct                              1.68

1           Next one you say would be public forum, can anybody
2      anywhere else post, or do they have to be a member of the
3      group.  I said "no" to the public forum.
4           Another one was, would you like to invite, can the
5      members of the group outside of yourself invite people in.
6      I also decided "no" because I wanted it to just be my group.
7      Q    And why did you choose all those particular settings?
8      A    Because the right to privacy.  My intention was, we need
9      a place to vent, and this is much better than doing it in
10     public in a bar.  And I felt that it would be a safe space
11     for people to express feelings or concerns.
12     Q    At the time that you created the group, did you also
13     create the first page of The Spec-tator?
14     A    Yes.  Much like you set up your own personal profile,
15     you have the same thing in a group.  There is a section for
16     group photos, there's a section for what they call
17     bulletins.  And then there's another thing called threads,
18     which are pretty much just postings where people respond to
19     one another.  It's an on-line conversation.
20     Q    Okay.
21          So what type of things did you put on the first
22     page?
23     A    I put an introduction.  I said, "welcome to The
24     Spec-tator.  It's like an underground newspaper.  Place for
25     us to talk about all the crap, gossip or drama that's

Pietrylo-direct                              1.69

 1    occurring in our lives, without outside eyes prying in."  I
 2    said past and present employees were welcome, but this is a
 3    very private group.  So only participants will stay a part
 4    of it.
 5    Q    And when you did all of this creating and setting up,
 6    where did you do that --
 7    A    Pardon?
 8    Q    Where did you do that, from home, at work?
 9    A    From my home computer.
10              MR. PISANI:  Okay.
11              At this time, Your Honor, I would like the
12    opportunity to allow Mr. Pietrylo to demonstrate to the jury
13    what he just testified to.
14              THE COURT:  Okay.
15              MR. PISANI:  In terms of using the computer and
16    going step-by-step.
17              THE COURT:  All right.
18              He may do the demonstration.
19              MR. PISANI:  Thank you very much.
20    BY MR. PISANI:
21    Q    If you want to step over to that computer and then it's
22    going to be on the screen so the jury can see what he just
23    explained.
24              And Mr. Pietrylo, when you go step-by-step, I'd
25    like you to just verbally explain to the jury what you are

Pietrylo-direct                              1.70

1       doing and what it shows.
2       A    Okay.  Right now there is the icon, you can see in the
3       lower left hand corner it's a link to "My Space, a place for
4       friends."
5            It's basically, now we're pulling up the internet.
6       We're now on-line if all works properly.
7            This would be the My Space start page.  If you just
8       type in www.My Space.com, it's going to bring you here.  And
9       down here is the log-in area where you would enter your My
10      Space, your e-mail address you use for My Space, as well as
11      your password.
12           So now we're logging in.  This is going to take me
13      to what we call your home page.  It's the center navigation
14      point for when you're on you My Space.  So this will be my
15      home page.
16           I have -- one alert pop-ups, "view my friends,"
17      then I have "my friend request," it says I have new status
18      comments, blog posts.  So you get into the groups area, you
19      would go over to this more, and you would go down to
20      "groups."
21           Now, to create a group or go to "my groups,"
22      there's "my groups," which is already up, that's going to be
23      all the groups that I'm a part of.  And then to create a
24      group this is what I did.  Right here.  And it says,
25      "starting a group on My Space is fun and easy.  Just enter

Pietrylo-direct                                    1.71

1    basic info."  So the first would have been a "group name."
2    So it would have been The Spec-tator.

3             And then it chooses a "category."  I probably put
4    this one as "other."  I would have to double-check.  I'm not
5    sure if it actually had a category option when I set it up
6    few years ago, back.  Open "join," that -- this means that
7    nobody who is browsing through the groups on My Space can
8    just go ahead and automatically join your group.  I went and
9    put that as "no."

10            Hitting "group," that meant that nobody can just
11   type the URL, which would be the web address of the group or
12   search through dot -- like search through groups and find
13   your groups.  I also chose "no."

14            "Members can invite," I put "no."  That meant only
15   me as the moderator and creator of the group would be able
16   to invite people to the group.

17            Next would be "public forum."  I put "no" also as
18   well.  That means people could post in your group even if
19   they weren't a member of it, but because it was hidden any
20   way, that wasn't really even necessary.

21            "Members can post bulletins and images," I had put
22   "yes" for both of these.  Meaning that the members who were
23   part of the group could actually post and say things on the
24   group.  And at the time I don't believe "mature content" was
25   a part of it.  I think that's something they added to

Pietrylo-direct                    1.72

```
1     protect themselves from pornography and stuff.  But I would
2     have still put "no" on them because there was nothing about
3     -- pornographic in my opinion on the site.
4            They have "country, state, region," I would just
5     fill that in.  I was living in Dumont.  I don't even know if
6     it was necessary, or if I did or if it's even relevant right
7     now.
8     Q    And then what would you do, you'd click on something to
9     create and say "accept" or "okay"?
10    A    Yes.  Once you filled all that out, description.
11    Q    Then "create group"?
12    A    Then "create group."
13    Q    Okay.
14           So after you created, now you have The Spec-tator.
15    Right?
16    A    Yes.  And testified to the first page.  Can you go to
17    the first page.
18    A    Of The Spec-tator.
19    Q    Of The Spec-tator.
20    A    Just one moment.  And this would be The Spec-tator as it
21    looks today.
22    Q    Okay.
23           Now, go down.  Is that the statement that you
24    testified to?
25    A    Yes, sir.
```

1    Q    Starting with "a place for those of us at Riverside
2    Square" is that --
3    A    Yes.
4    Q    -- the statement that you made?
5    A    ( Indicates affirmative ).
6    Q    Okay.
7         So now can you just go back to your home page of
8    your account.  Okay.  Did you set up the home page of your
9    account so that any -- oh, you're not at your home page.
10   Where is your home page?
11   A    This would be the home page.
12   Q    Okay.
13        When you set up The Spec-tator, did you set up your
14   home page so any of the comments posted on The Spec-tator
15   could be seen if somebody accessed your home page?
16   A    No.
17   Q    Okay.
18        Go to your profile page.
19        Okay.  When you set up The Spec-tator did you set
20   up your profile page so that any of the comments made on The
21   Spec-tator could be visible or seen on the profile page?
22   A    No, on my profile page there's not any listing of
23   groups.  Let me delete that.  Sorry about that.
24   Q    Okay.
25        So only if you went through all of the steps and

Pietrylo-direct                    1.74

1    tabs would you then be able to see?

2    A    Only once you're in the group is the only way you could

3    ever see anything that was there.

4    Q    Any posting.

5              All right.  Thank you, Your Honor.

6              THE COURT:  All right.

7              We can take it down now.  Take it off.

8              MR. PISANI:  You can return to the witness stand.

9    BY MR. PISANI:

10   Q    Okay.

11             So now you've set up the group.

12   A    Yes.

13   Q    But you don't have any members to post, to chat with.

14   Correct?

15   A    Yes, sir.

16   Q    So what did you do to gain members?

17   A    On the group, as the moderator was a link for me to be

18   able to invite members.  When I would click on that, it

19   would pull up a list of all of my friends on My Space,

20   regardless of who they were, and then it would let me choose

21   who I wanted to send an invitation to the group.

22   Q    Okay.

23             So who did you decide to invite to the group?

24   A    Pretty much the people I worked with who were on My

25   Space that I was friends with.


JOHN KEVIN STONE, CSR

Pietrylo-direct                          1.75

```
 1    Q    To be invited, did an invited person have to have a My
 2    Space account of their own?
 3    A    Yes.
 4    Q    So if he they didn't have a My Space account, they
 5    couldn't be invited?
 6    A    No.
 7    Q    And then they couldn't see The Spec-tator unless --
 8    A    No, sir.
 9    Q    -- they had an invitation or they used somebody else's?
10    A    The only way they would ever gain access is if they were
11    a member on My Space who received an e-mail invitation from
12    me.
13    Q    And when you made the invitations, you did them from
14    what computer?
15    A    My home computer.
16    Q    Okay.
17         You say you invited -- approximately how many
18    people did you invite from Houston's that were your
19    co-workers?
20    A    Probably 18 to 20.
21    Q    How many of them accepted?
22    A    18 to 20 of them.
23    Q    How do you accept an invitation?
24    A    They would receive an e-mail, it would arrive in their
25    in-box, it would say, "Brian, would like to invite you to
```

Pietrylo-direct                    1.76

1    join this group," and then they could either accept or
2    decline.
3    Q    And once they accepted, how would you know that they
4    were now members?  Would there be any icon indication?
5    A    Because -- on the group page, The Spec-tator itself,
6    there is a box that said members, and then their name and
7    picture, their My Space picture would be listed within the
8    members.
9    Q    Did you invite any member of management?
10   A    No, sir.
11   Q    Did you invite Tijon Rodriguez?
12   A    No.
13   Q    Did you invite Robert Anton.
14   A    No, sir.
15   Q    Did you invite Jason Sokolow?
16   A    No, sir.
17   Q    Did you invite Robert Marano?
18   A    No.
19   Q    Did you invite Tino Chimburello?
20   A    No, sir.
21   Q    Did you invite Michael Lamb?
22   A    No.
23   Q    So once a person accepts, do you know what they see when
24   they go on their My Space account and insert their e-mail
25   address and password and then come to The Spec-tator?

Pietrylo-direct                              1.77

```
 1    A    Well, they'll see just what they put on The Spec-tator,
 2         yes, as far as their own personal home page or anything, I
 3         wouldn't have access to that.
 4    Q    But do you know how they gain access to The Spec-tator?
 5    A    After they're already members?
 6    Q    Yes.
 7    A    They would just, as I showed you,  click on "my groups,"
 8         their groups would come up and they would -- they could
 9         click on which ever group they wanted to go to.
10    Q    So now that some people have become members and you were
11         the creator, how did you communicate on The Spec-tator?
12    A    There was one thing called "bulletins."  And it's just
13         basically, it's not something anybody could respond to.
14         Just something that you could say that was very active on
15         The Spec-tator at all, which was the forums.  And any member
16         who was a group of The Spec-tator could start a forum on any
17         range of topic.  And then they would post something and then
18         somebody could reply to them, and it's what we call a thread
19         on-line and it's just a conversation between the members of
20         the group.
21    Q    Now, when you created the first page of The Spec-tator
22         and you made the statement you previously made, could you
23         see any of the actual comments that were posted regarding
24         bulletins or topics on the first page of The Spec-tator?
25    A    No.  You would have to click into the topic to get on
```

JOHN KEVIN STONE, CSR

Pietrylo-direct                                        1.78

1    there.  It would just have the list of topics, but there

2    wouldn't be any comments.

3    Q    Right.  So you couldn't see it, the home page, you

4    couldn't see the profile, you couldn't even see comments on

5    the first page of The Spec-tator.  Correct?

6    A    Correct.

7              MR. PISANI:  Your Honor, may I approach the witness

8    and show him document P-2?

9              THE COURT:  You may.  It's premarked P-2, show it

10    to the witness for identification.

11              MR. PISANI:  Yes.

12              ( Received and marked ).

13    BY MR. PISANI:

14    Q    Okay.

15              I'd like to show you what's been marked as an

16    exhibit for identification P-2.  And please explain, can you

17    identify that document?

18    A    Yes.  This would be a printout of the home page of The

19    Spec-tator as it was January 23rd, 2007.

20    Q    And that's the first page of The Spec-tator?

21    A    Yes.

22    Q    That you've been testifying about?

23    A    Yes.

24    Q    And that contains the statement you made when you

25    created it?

JOHN KEVIN STONE, CSR

Pietrylo-direct                          1.79

1    A    Yes.

2    Q    And it also shows the topics at the bottom but no

3    comments.  Correct?

4    A    Yes.

5    Q    And that's how it existed on -- in January of 2006?

6    A    No, this would have been later on, this printout is

7    dated January 23rd, 2007.  Anybody who had been a member of

8    My Space and a member of the group who deleted their My

9    Space account, everything they would have said on The

10   Spec-tator would have just gone -- oh, sorry, gone away into

11   cyber space somewhere, and it, right here it just says two

12   members at the time, because when this first happened I was

13   concerned about everybody's privacy so I just deleted

14   everybody, member from the group.

15             THE COURT:  Mr. Pisani, I have interrupt you for a

16   minute.  I have something as P-2, something entirely

17   different in your exhibit book.

18             MR. PISANI:  I'm sorry.  I'm sorry.  In our -- I

19   shouldn't have marked that P-2, it's P-1.

20             THE COURT:  Is it in fact the P-1 that's in your

21   exhibit book P-1?

22             MR. PISANI:  Yes.

23             THE COURT:  All right.  But didn't you mark

24   something else P-1 a minute ago?

25             MR. PISANI:  I marked D-1.  I referred to one of

JOHN KEVIN STONE, CSR

Pietrylo-direct                          1.80

```
 1     the defendants' exhibits.
 2              THE COURT:  All right.
 3              MR. PISANI:  And this would be P-1.  First page of
 4     The Spec-tator listing picture and listing the topics.
 5              I'm sorry.  Can I change that to P-1?
 6              THE COURT:  All right.  You may.
 7     BY MR. PISANI:
 8     Q    Now, with regard to P-1, the statement that you wrote,
 9     is that exactly the way you wrote it when you created the
10     first page of The Spec-tator the first time you did it?
11     A    Yes, that is exactly the same.
12     Q    Okay.
13              MR. PISANI:  At this time, Your Honor, I'd like to
14     offer P-1 into evidence.
15              THE COURT:  Any objection to P-1?
16              MS. GARDINER:  I do have an objection, Your Honor,
17     in that this a Mr. Pietrylo --
18              THE COURT:  Is it a hearsay objection?  What's the
19     rule?  Is the objection under --
20              MS. GARDINER:  Well, foundation, relevance, and
21     it's inaccurate.  It is not The Spec-tator from the time
22     that's relevant to this period.  It's The Spec-tator a year
23     later, the first page.
24              MR. PISANI:  We're offering it for a limited
25     purpose, Your Honor.
```

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.81

1          THE COURT:  And what is the limited purpose it's
2     offered for.
3          MR. PISANI:  Two purposes.  One, it shows what he's
4     testified to, that statements made on The Spec-tator cannot
5     be viewed on the first page, and that's been the case from
6     day one, and that the statement he made when he created it
7     in the middle, "place for us to vent."
8          THE COURT:  Is the statement in the middle
9     unchanged, is that the proffer?
10          MR. PISANI:  I asked him that, it's exactly
11     identical to what he put on when he created it.
12          THE COURT:  Okay.
13          It will be admitted solely for the limited purpose
14     of demonstrating that the statement made in the middle of
15     the page is unchanged from the original.  Other than that,
16     it's only admitted for that purpose.
17          MS. GARDINER:  Thank you.
18          MR. PISANI:  Thank you.
19          THE COURT:  All right.
20     BY MR. PISANI:
21     Q   Now, did you start any topics yourself on The
22     Spec-tator?
23     A   I did.
24     Q   Okay.
25          Did you post comments to other topics?


JOHN KEVIN STONE, CSR

Pietrylo-direct                                1.82

1    A    I did.

2    Q    Do you know how many topics you posted?

3    A    Myself, off the top of my head, I would say maybe four

4    or five.  I would have to go back and look at the full

5    documents.

6    Q    Did you post any comments on The Spec-tator from work?

7    A    No, sir.

8    Q    During work hours?

9    A    No, sir.

10    Q    Using work computers?

11    A    No, sir.

12    Q    Are any of the comments posted on The Spec-tator stored

13    on the defendants' computers?

14    A    Stored on the -- how would I know that?

15    Q    You don't know?

16    A    Oh, you're talking about the work computers?  I was

17    thinking their private computers.

18    Q    Yes.

19    A    No, sir.

20    Q    Can you describe to the jury some of the comments that

21    you made on The Spec-tator?

22    A    A few of them here, I could see that there was a

23    statement about the INS.  There was a INS situation at

24    Garden State Plaza, and somebody else started that topic,

25    just talking about, I replied to that.  Here I was talking

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.83

1      about Robert Anton and I can see there was also, where we
2      were discussing the server rankings.
3      Q    Can you describe the types of comments you made?
4      A    Some of them would be satirical and funny.  Some of them
5      were serious things about when we discussed things like
6      raising the minimum wage for servers in the State of New
7      Jersey.  Some of them would just be to have a good laugh.
8      Q    Did you ever use swear words in any of your postings?
9      A    I don't -- I don't know.
10     Q    Did any of the other members of the group, to your
11     knowledge, use any swear words in their postings?
12     A    Yes, sir.
13     Q    Do you remember specifically any of them --
14     A    I know --
15     Q     -- of the people, of the members?
16     A    Yes.  I know that Miss Marino had made some comments.
17     Q    Anyone else?
18     A    I also know that Melanie Ferrante, who worked with us,
19     had made a few comments that had profane language.
20     Q    Do you recall making any comments about managers?
21     A    Yes.
22     Q    Okay.
23          Did anyone else to your knowledge post comments
24     about managers?
25     A    Yes.

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.84

1    Q    Do you know who they were?

2    A    There was Jessica Jarkowitz, who said some things.

3    Melanie Ferrante.  Miss Marino.  And that's all that comes

4    to the top of my memory at the moment.

5    Q    Do you know if Jessica or Melanie were ever fired by

6    Houston's for making comments on The Spec-tator?

7    A    Neither was fired.

8    Q    Out of the entire membership, do you know who were the

9    only employees that were fired by Houston's?

10    A    Just myself and Miss Marino.

11    Q    Did you ever verbally make any of these comments that

12    would be attributable to you while you were at work?

13    A    No, sir.

14    Q    Did you ever verbally make any of these comments in

15    front of a manager at work?

16    A    No, sir.

17    Q    Did you ever verbally make any of these comments in the

18    presence of a customer while you were at work?

19    A    No, sir.

20    Q    Would you ever use this type of language to speak to a

21    manager or a customer at work?

22    A    No, sir.

23    Q    So why did you use the language that you attributed to

24    you on the site?

25    A    Because it was a completely private, electronic --

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.85

1   electronic communication between me and my friends from home

2   computers.  I felt that if there was any way that I could

3   actually vent, that that would be a good form in which to do

4   so.

5   Q   So for what period of time were postings made on The

6   Spec-tator after you started it?

7   A   It would have been from March to late April, early May

8   of 2006.

9   Q   Was one of the people that you invited to The Spec-tator

10  Karen St. Jean?

11  A   Yes, sir.

12  Q   And who was she?

13  A   She was a greeter at the restaurant at the time.

14  Q   So between when you started The Spec-tator and when were

15  you fired --

16  A   I was fired in May of 2006.

17  Q   Between that entire time, 'til the day you were fired,

18  did you ever have any conversation with any management level

19  personnel regarding The Spec-tator?

20  A   No, sir.

21  Q   Never had a conversation with Mr. Anton?

22  A   No, sir.

23  Q   Or Mr. Rodriguez?

24  A   No, sir.

25  Q   Or Mr. Sokolow?

JOHN KEVIN STONE, CSR

Pietrylo-direct                          1.86

1    A    No.

2    Q    Mr. Marano?

3    A    No, sir.

4    Q    When was the first time you had a conversation with any

5    of them -- strike that.

6         Did there ever come a time when you did have a

7    conversation with them about The Spec-tator or any of them?

8    A    Yes, sir.

9    Q    And when was that?

10   A    That was the day that I was called in, the day of my

11   termination, it was my day off.  I received a phone call

12   from Mr. Sokolow, the general manager at the time, to please

13   come in and meet him at the restaurant at 4:30 that

14   afternoon.  Whereas when I arrived he went and grabbed Mr.

15   Marano and then he sat me down and we had the conversation

16   about The Spec-tator.

17   Q    Okay.

18        As we sit here today, and I know it's a long time

19   ago, but explain to the jury the gist of what he said to you

20   and what you said to him?

21   A    From my memory, he sat me down and he said, "Brian,

22   we're about ready to have a very uncomfortable conversation.

23   It's come to my attention that there is a group on My

24   Space."  He said "it's against the values and beliefs of the

25   company," and that I was basically going to be terminated

JOHN KEVIN STONE, CSR

 1    for it.

 2    Q   And what did you say to him?

 3    A   I offered, I told him that I never meant any of it to be

 4    malicious, that I can't take responsibility for anything

 5    that anybody else said.  And that I would be more than happy

 6    to delete the group.  And he had told me that we were beyond

 7    that point.

 8    Q   Did you think there was going to be a different purpose

 9    for this meeting with Mr. Marano?

10    A   I did.

11        I was under the notion that I was awe probably up

12    for a promotion.  About a few weeks earlier they had

13    terminated the service captain at the time who was working

14    for them.  Which is basically like an hourly manager, kind

15    of an in between, kind of like what you would do on your

16    road to become a manager.

17        One day after my lunch shift, as I was doing head

18    wait in the office, and he had terminated Bill Warren, Tijon

19    Rodriguez told me we needed somebody strong and reliable to

20    take his position, we need you, and I just replied, well,

21    that's something to think about.  I didn't really think

22    about it much more.  But I really couldn't see any reason

23    why I would be call in on my day off to have a conversation

24    except for a promotion.

25    Q   At the time you were terminated, did you have any

JOHN KEVIN STONE, CSR

Pietrylo-direct                                            1.88

```
 1    knowledge that any member of Houston's management had
 2    actually been able to read the postings on The Spec-tator?
 3    A    No.
 4    Q    When did you find out?
 5    A    When Rob Marano had told me.  But I still hadn't even
 6    know known if it had been read or if it was something that
 7    they had actually seen or just something that they caught
 8    wind of.
 9    Q    Hhmm-hmm.
10         During your employment with Houston's, were you or
11    did you have knowledge of what's known as a Houston's
12    written counselling form?
13    A    Yes.
14    Q    And why do you have knowledge of those forms?
15    A    Well, pretty much any business you work in, whether
16    corporate or private, they have, basically they're called
17    write-ups.  And it's something that, you know, businesses do
18    to protect themselves from such things as unemployment
19    lawsuits, or you know, it's just documentation of
20    infractions by employees, or sometimes they're often used as
21    a good thing as well, to show congratulations for doing a
22    good job at the same time.
23    Q    Hhmm-hmm.
24         And in your employment did you ever receive a
25    counselling form from Houston's?
```

Pietrylo-direct                    1.89

 1    A    Yes.  I had received one I think it was a few months
 2    prior, or maybe one month prior, for ordering food late at
 3    night without asking permission first.
 4    Q    And did they actually -- well, explain what happened?
 5    Did you get called in and talked to verbally about it, or
 6    did they just give you the form?
 7    A    It was just that night, I was starving, and I just
 8    worked a busy Saturday, and I guess I was breaking the
 9    rules, and then pretty much the manager on duty that night,
10    the closing manager, Casey, after we were finished, closing
11    the restaurant, doing side work, sat me down and counseled
12    me about it.
13              MR. PISANI:  Your Honor, may I show the witness a
14    document?
15              THE COURT:  You may.
16              MR. PISANI:  D-22.
17    BY MR. PISANI:
18    Q    I want to show you what's been marked D-22 for
19    identification.  Ask if you can identify it?
20    A    This is the counselling form that I had just talked
21    about.
22    Q    Between March and 2006, were you ever issued a
23    counselling form for violation of company policy?
24    A    No, sir.
25    Q    And there's a category on D-2 at the top specifically

JOHN KEVIN STONE, CSR

Pietrylo-direct                         1.90

1    for that under "reasons for counselling"?

2    A    Yes, sir.

3    Q    Okay.

4          Between March and May 2006, were you ever issued a

5    counselling form for inconsistent work behavior?  That's

6    also a reason specifically listed.

7    A    No, sir.

8    Q    Were you ever issued one?  No.

9    A    Hhmm.

10   Q    First question is, is it listed as a reason under the

11   counselling at the top?

12   A    No, sir.

13   Q    "Inconsistent work behavior"?

14   A    No, sir.

15   Q    Reasons --

16         THE COURT:  Mr. Pisani.

17         MR. PISANI:  Maybe he misunderstands my question.

18         THE COURT:  That's possible too.  But until an

19   exhibit is in evidence, just make sure nobody reads from it.

20   You can't read from an exhibit not in evidence.

21   BY MR. PISANI:

22   Q    Okay.

23         Were you ever issued a counselling form for

24   inconsistent behaviour in between March and May of 2000?

25   A    No.

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.91

1   Q   Were you ever issued a reason for counselling form for
2   poor work attitude?
3   A   No, sir.
4   Q   So after you were fired, how did you feel?
5   A   I was shocked.  I was devastated.  I was just mostly in
6   shock.  I couldn't actually believe that I was being
7   terminated for such reasons.
8   Q   And why didn't you believe it?
9   A   I just -- because I was exemplary employee.  I did a
10  wonderful job.  They had me train at the time most of their
11  new staff who came into the restaurant.
12  Q   So after you were fired, did you try to find another
13  job?
14  A   Yes.  Eventually I ended up working for Morton's
15  Steakhouse in Hackensack, New Jersey.
16  Q   Okay.
17          When did you find the job at Morton's?
18  A   It was about maybe two to three weeks after I had left
19  Houston's.
20  Q   Okay.
21          So for those two to three weeks, were you paid any
22  type of compensation by Houston's?
23  A   No, sir.
24  Q   Did you get unemployment during that two to three week
25  period?

JOHN KEVIN STONE, CSR

Pietrylo-direct                      1.92

1    A    I filed for unemployment, but I was denied.

2    Q    Okay.

3         So when -- so you had no income then for the two to

4    three weeks between when you were fired from Houston's and

5    when you started at Morton's?

6    A    No, sir, no income.

7    Q    Approximately how much were you making per week when you

8    were fired at Houston's?

9    A    It really depends, when you're working for tips.  On

10   average, towards the end I would say probably about $750 a

11   week to my memory.

12   Q    And that would be gross?

13   A    That would be what I took home in tips basically.

14   Because gross, I would have to put a paycheck, but we never

15   really saw paychecks, because they all went straight to

16   taxes.  So they were all zero dollars.  Gross with an hourly

17   wage.

18   Q    And tips, I want you to include it all --

19   A    Have a calculator.  Off the top of my head, I would say

20   with the hourly wage and taxes, maybe $840 a week.

21   Q    Can you be more accurate on when you started with

22   Morton's, was it two weeks or three weeks after you were let

23   go?

24   A    I want to say three weeks.

25   Q    So you were without $840 a week for up to three weeks

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.93

```
 1    between the time you left Houston's and started at Morton's?
 2    A    Yes, sir.
 3    Q    Where is Morton's located?
 4    A    It's also in the Riverside Square Mall as well.
 5    Q    And with whom did you interview to get a job at
 6    Morton's?
 7    A    The first person I spoke with would have been the
 8    executive chef at the time John Corey Simms, and then I met
 9    with the assistant manager, Chad Alvis.
10    Q    Okay.
11         And after those interviews were you offered a job?
12    A    Yes.  Pending the results of a drug test.
13    Q    Okay.
14         And after those results came in, were you offered
15    the job?
16    A    Yes.  I started training shortly thereafter.
17    Q    And you were hired to do what?
18    A    Server.
19    Q    And in terms of compensation, how was Morton's job
20    different from the job you had at Houston's?
21    A    Well, the money at Morton's wasn't nearly as consistent
22    as the money at Houston's.  I definitely had to work more
23    hours at Morton's than I did at Houston's.  I didn't make
24    the money quick enough in the same day at first.
25    Q    Any other differences?  Were you offered -- why don't
```

Pietrylo-direct                    1.94

1    you tell me, when you started working for Morton's --

2    A    Yes.

3    Q    -- what was your compensation package, if any?

4    A    It was pretty much the same exact pay as Houston's.

5    2.12 an hour, plus what you brought home in your tips after

6    you paid the tip outs.

7    Q    Was the tip out the same or different than it was at

8    Houston's?

9    A    It was a lot higher at Morton's.  It was 25 percent or

10   more some nights.

11   Q    So Morton's was approximately 25 percent and Houston's

12   was what?

13   A    Morton's was 25 percent of your tips, and Houston's, you

14   tipped out on your sales, so it would be 3 percent of what

15   your sales were.

16   Q    Okay.

17        Explain to me what that means and what the

18   distinction is?

19   A    Well, the way Houston's, with the tip outs that go to

20   the other employees, like geeters, if you sold $1,000 in

21   sales, your tip out to those employees would be $30.  At

22   Morton's, let's say if you sold $1,000 and you walked away

23   with let's say 20 percent of your sales, that would be $200,

24   your tip out, unless it was a weekend when we had a foot

25   runner on a normal night, would have been 50, and if there

Pietrylo-direct                          1.95

1    were food runners, it would have been 50 plus an additional
2    $5 for each food runner we had.
3    Q    So did you make, because of this tip out difference, did
4    you have to do anything different at Morton's to make the
5    same amount of money that you made at Houston's?
6    A    I definitely had to work more hours.
7    Q    Okay.
8          So when you were let go in Houston's, how many
9    hours were you working?
10   A    At that period I would say about 32.  Once again, this
11   all depends on business, what time of year it is.  The is a
12   staffing -- there's a lot of variables when it comes to
13   restaurants.
14   Q    Right.
15         To the best of your ability to be as exact as you
16   can.
17   A    Hhmm-hmm.
18   Q    Approximately 32 hours?
19   A    Yes.
20   Q    And because of the this tip out situation, did you have
21   to increase your hours at Morton's?
22   A    Yeah.  I did have to work more hours, when I could get
23   them, yes.
24   Q    Approximately how many more hours?
25   A    38 hours, usually they wouldn't let us go into overtime.

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.96

1    Q    So did you have to work the additional hours at Morton's
2    because of the tip out, to make the same amount of money
3    that you were making at Houston's with less hours?
4    A    Yes.
5    Q    Okay.
6         Have you calculated approximately how many hours
7    per week more you had to work at Morton's to make the same
8    that you were making at Houston's?
9    A    I would say about, it was about a day of work a week
10   more.  Because I went from working four days a week to five
11   or six.  But on average I would say it would probably be
12   about six more hours a week that I had to work at Morton's
13   to make the money, compete with the money I made at
14   Houston's.
15   Q    Have you calculated what your combination in terms of
16   your hourly rate and your tips that you were making at
17   Morton's, what that would be, based on an hourly basis, like
18   if you added up your tips and how much you were basically
19   making an hour at Morton's?
20   A    I have a rough idea, yes.
21   Q    Okay.  And what was that?
22   A    I would say my Houston's, by the hour, at the end of the
23   day, probably would have been about $24 an hour.  At
24   Morton's, to the best of my memory, I'm going to say
25   probably about 15 to $18 an hour.

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.97

1    Q    Okay.
2              So based on those figures, have you calculated the
3    difference between how much you -- more hours you had to
4    work at Morton's to make the same that you were making at
5    Houston's from the time you were let go in May of 2006 until
6    October 2007, which is your claim for lost wages?
7    A    Well, also with my time at Morton's I did receive a
8    promotion with a pay raise.
9    Q    Hhmm-hmm.
10   A    But we didn't really see too much of that, that really
11   only went to your gross.  But I'm sorry, I forgot the
12   question.  So many numbers going on right now.
13   Q    I'm asking you if you've done a calculation in terms of
14   what you claim your lost wages are from the date you got
15   fired until October of 2007, which is your period of claim
16   for lost wages?
17   A    Yes.  I do believe it's somewhere around $14,000.
18   Q    Okay.
19              Can you explain how you calculated that?
20   A    Pretty much number of hours worked per week, plus the
21   gross money, minus tip out divided down.
22   Q    When you started working for Morton's, were you offered
23   or did you receive health insurance coverage?
24   A    No, sir.  They do have it, I was offered it, but I
25   didn't accept it.


                    JOHN KEVIN STONE, CSR

Pietrylo-direct                          1.98

1    Q    And how much does it cost to get the health insurance

2    coverage?

3    A    At that time it was $180 a month.

4    Q    And why didn't you accept it?

5    A    At the time I was -- couldn't afford it.

6    Q    But you had health insurance coverage when you were

7    terminated by Houston's?

8    A    Yes, sir.

9    Q    And during the time that you worked at Morton's, did you

10   have health insurance coverage at all?

11   A    No, sir.

12   Q    So you've gone without health insurance coverage?

13   A    Since, yes.

14   Q    Did there come a time when you stopped working at

15   Morton's?

16   A    Yes.

17   Q    And when was that?

18   A    It would have been November of 2007.

19   Q    And why did you stop working for them?

20   A    Because I moved back down to the Florida Keys.

21   Q    And when you moved back down to the Florida Keys, did

22   you try to get a job?

23   A    Yes.

24   Q    And how quickly did you get a job?

25   A    The first day I was there.

JOHN KEVIN STONE, CSR

Pietrylo-direct                              1.99

1    Q    Okay.

2         Did you have a job waiting for you?

3    A    No.

4    Q    You went out and got a job in one day?

5    A    ( Indicates affirmative ).

6    Q    Wow.  And where did you get a job?

7    A    It would have been a Bentley's Restaurant in Islamorada,

8    Florida.

9    Q    What type of restaurant is that?

10   A    Its steak, seafood and raw bar.

11   Q    And what do you do for them?

12   A    I, at the time I served, bartended and also hosted.

13   Q    So prior to your termination, did you ever go to a

14   psychiatrist or psychologist for treatment of any condition?

15   A    No, sir.

16   Q    Can you please explain to that jury, very generally,

17   your family background and history?

18   A    Yes.  j.

19         As we'll see later, I did come from a very

20   dysfunctional family.  My parents did divorce very young.

21   My mother eventually remarried, and we were in the Air

22   Force, traveled around quite a bit.

23         There were some problems.  Each one of my siblings

24   did end up getting into trouble legally, and having

25   substance problems at the time, well, years later on

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.100

1     throughout their life.  I just kind of in high school, kind

2     of stepped away and ended up living with this other family

3     for awhile while I was working towards finishing school.

4     And I started working to support myself.

5     Q    Have you ever been treated by a doctor or a psychiatrist

6     for anything dealing with what you've just described?

7     A    Going prior to my termination at Houston's?

8     Q    Yes.  Prior to that.

9     A    No.

10    Q    Have you ever been prescribed any type of medication for

11    anything having to do with your past family history?

12    A    No, sir.

13    Q    So explain to the jury what happened to -- strike that.

14           Did there come a time when you did go to see a

15    doctor, psychiatrist?

16    A    Yes, sir.

17    Q    And when was that?

18    A    It would have been late January, early February of 2007.

19    Q    And when were you let go from Houston's?

20    A    Houston's, that would have been May of 2006.

21    Q    Okay.

22           And in January 2007 where were you working?

23    A    I was working for Morton's at the time.

24    Q    Okay.

25           And can you explain to the jury what happened to

Pietrylo-direct                                    1.101

1    you in January 2007?

2    A    January 2007, I, for reasons I didn't understand at the

3    time, pretty much just had a complete nervous breakdown.  I

4    don't even know what brought it on.  I was -- how it

5    happened, I just remember waking up one morning and just

6    started going into hysterics for hours upon hours.

7    Q    Anything else?

8    A    In regards?

9    Q    Any other physical manifestations that you --

10   A    Yes.  There was a instance where I did cut myself on a

11   part of broken glass.

12   Q    Were you experiencing any type of emotional feelings as

13   well?

14   A    It was just hysterics.  It was like crying, and then

15   maybe bouts of laughter, and then back to crying, and then

16   exhaustion for a little while.

17   Q    At the time did you have any idea why you were

18   experiencing this?

19   A    I honestly didn't have a clue.

20   Q    After you met with the doctor, did you come to some sort

21   of conclusion as to why you were experiencing this?

22   A    Yes.  Yeah, working in therapy, we were trying to figure

23   out what brought it on, what was the trigger, and with going

24   through like just all the things that had happened

25   throughout the last year, we noticed because I had just

Pietrylo-direct                        1.102

1     been offered a promotion to captain at Morton's.

2     Q     When was that?

3     A     This would have been in January of 2007.

4     Q     About that time?

5     A     Yes.  And it was kind of a very similar position that I

6     thought I was going to be promoted to at Houston's.  And he

7     eventually put two and two together, and my therapist asked

8     me, like do you think that this is related, that here you

9     are, up for promotion again, and for some reason now you're

10    just breaking down, maybe experiencing the emotions you

11    didn't actually go through when you were terminated from the

12    last job.

13    Q     And when this happened to you in January of 2007, had

14    you in fact yet been promoted by Morton's?

15    A     Not yet.  They had offered it to me.  There wasn't --

16    actually, we hadn't done any paperwork yet.

17    Q     Did they have to do a background check and things like

18    that?

19    A     Yeah.  But that came later.

20    Q     So did you decide on your own to go see a doctor?

21    A     It was my own decision, but it was on the suggestion of

22    Miss Marino, who was my significant other at the time, and

23    she saw me and obviously was concerned and was like, well,

24    maybe you need to get some help.

25    Q     And did you take her up on that suggestion?

JOHN KEVIN STONE, CSR

```
 1    A    I did.  I did.  She offered to going and getting a

 2    puppy.

 3    Q    Did you get a puppy?

 4    A    We did get a puppy.

 5    Q    Did that help?

 6    A    It did.

 7    Q    What type of puppy did you get?

 8    A    Labrador Retriever.

 9    Q    And did you go see a doctor?

10    A    Yes.  I started seeing a doctor and working with a

11    therapist.

12    Q    Who did you go see?

13    A    Dr. Sidney Heimbach.

14    Q    And with what entity is he associated?

15    A    He -- Vantage Health System in Dumont, New Jersey.

16    Q    And why did you choose to go to Vantage Health System

17    and see Dr. Heimbach?

18    A    It was close to home and it was also something I could

19    afford, considering I didn't have insurance.  You brought

20    your forms in and then they based the fee on your income.

21    Q    Well, how did you know that before you went?  Did you

22    know?

23    A    Because I called them up and talked to them and then

24    they interviewed me, and it was a bit of a process before I

25    actually saw the doctor.
```

Pietrylo-direct                              1.104

```
 1    Q    And when did you finally see Dr. Heimbach?
 2    A    I believe it was February 1st of 2007.
 3    Q    And when you saw Dr. Heimbach, was anybody else present
 4    or was it just you and him?
 5    A    It was just me and him.
 6    Q    And how long did you meet with him the first time?
 7    A    It was probably about a little over an hour the first
 8    time we met.
 9    Q    And was that the first time you ever met him?
10    A    Yes.
11    Q    And to the best of your recollection, what did you tell
12    him, did he ask you what was bothering you?
13    A    Yeah.  From my memory, the first thing is like, okay,
14    why are you here today, and I brought up like, well, I'm
15    dealing with anxiety and, you know, I'm getting concerned.
16    Then he pretty much, well, you know, we went over family
17    history, I told him about the stressful year I had had.  You
18    know.  And brought up things like getting terminated from
19    Houston's and things that were going on, and the stresses of
20    that time period.
21    Q    Did he ask you what your present problems or symptoms
22    were?
23    A    Yeah.
24    Q    Do you remember what you told him?
25    A    I told him that I had just a feeling of anxiousness that
```

Pietrylo-direct                                    1.105

1    you -- I couldn't get rid of.  I was dealing with a lot of
2    stress.  I had an upsetting time.  I was very upset about
3    losing my job.  We, I believe we had already begun the legal
4    process then, and the stresses of that I told him about.
5    And then there were the stresses of family issues, which
6    weren't really bothering me so much at the time, but I was
7    concerned about.  And then that came out when he took a
8    family history.
9    Q    Did you offer your family history to him or did he ask
10   you about your family history?
11   A    Oh, he asked me lots of questions.
12   Q    So did he ask you or did you offer that to him?
13   A    He asked me for the family history, but I believe that's
14   kind of the protocol for any doctor of that caliber.
15   Q    Were you seeing him that first time because of your
16   family history?
17   A    No, sir.
18   Q    What else did he do with you?
19   A    He eventually gave me a diagnosis for.
20   Q    Do you remember what that was?
21   A    I believe it was for anxiety and depressive --
22   depression, and he had prescribed three medications for me.
23   Q    And what were they?
24   A    He put me on the anti-depressant Wellbutrin.  And then
25   for sleeping, he put my on Trazodone, which also was a

Pietrylo-direct                        1.106

```
 1    anti-depressant at the time, but more prescribed for sleep.
 2    And Tomazipam, which I think it was a hypnotic prescribed
 3    for sleep.
 4    Q    Did he offer you any other type of treatment options?
 5    A    Yes.  He recommended that I start seeing a therapist on
 6    a regular basis, Shirley Feldstein.
 7    Q    Okay.
 8            Did you agree to take the prescriptions?
 9    A    Yes.
10    Q    Did you take the prescriptions?
11    A    I did.
12    Q    How often would you have to take them?  Daily, weekly,
13    monthly?
14    A    The Wellbutrin he had put me on I had to take twice a
15    day.  And then the sleeping medications I took just one
16    before bed at night.
17    Q    And how long did you take them?
18    A    I believe it was for three months.  Maybe a little
19    longer.  No, three months I believe.
20    Q    And then you stopped taking them?
21    A    Yes.
22    Q    Why did you stop taking them?
23    A    Well, I was feeling better.  I mean as time went on and
24    actually going through therapy, I was feeling better and I
25    didn't like being on medication, really, I knew that I
```

Pietrylo-direct                                        1.107

1    wanted to use it for that time to get better.  But I didn't

2    want to stay on it for the rest of my life.  Because I feel

3    that like especially psychiatric medications can really

4    damage a person.  Towards the end I even expressed my

5    concerns about this to Dr. Heimbach.  And I felt like I had,

6    -- I was feeling better, but I felt like I had lost my sense

7    of humor.  And I felt very irritable all of the time.  And I

8    just -- I wasn't quite feeling like myself.  And I was like,

9    well, maybe I want to go off the drugs.

10   Q   And you decided to do that?

11   A   Yes.

12   Q   Did your condition improve or get worse after you went

13   off the drugs?

14   A   It actually improved.

15   Q   And then you said you -- he suggested that you see or

16   had counselling from you said Shirley Feinstein?

17   A   We would -- I had already been seeing Shirley Feldstein

18   for this.

19   Q   Feldstein.  Sorry.

20            And when did you start seeing her?

21   A   I believe two weeks after the first time I saw Dr.

22   Heimbach.  I'd have to double-check though.

23   Q   How often would you see her?

24   A   Originally I saw her once a week.  And then we started

25   moving it to every other week.

JOHN KEVIN STONE, CSR

Pietrylo-direct                          1.108

1    Q    How long did you see her once a week?

2    A    I believe for the first month.

3    Q    One month of once a week, and then how long did you see

4    her every other week?

5    A    I think it was for two months after that, to the best of

6    my memory.

7    Q    Did there come a time when you stopped seeing her?

8    A    Yes.

9    Q    Do you know when that was?

10   A    That was I believe either August or October of 2007, as

11   I was preparing to get ready to move to Florida.

12   Q    Okay.

13        That was going to be my next question.  Why did you

14   stop seeing her?

15   A    Because I was relocating to go to Florida.  I was

16   feeling a lot better and, you know, I needed the money.  So

17   I just felt it was time to terminate that.

18   Q    When you were on the prescription drugs, did that help

19   your emotional state at all?

20   A    It did.  It did.  I felt a lot better.  Eventually I

21   felt a lot better.

22   Q    And did you find that the counselling sessions with Miss

23   Feldstein helped?

24   A    I felt they helped, yes.

25   Q    Okay.

Pietrylo-direct                    1.109

1          What type of counselling would she engage you in,
2     what would happen, what would you do?
3     A    Usually, it would just -- I would just start talking and
4     then she would ask me questions about whatever I was talking
5     about, or how was your week, how are you feeling, are you
6     still taking your medication, have you seen the doctor
7     lately, you know, regular therapist style questions.
8     Q    And how do you feel as we sit here today or stand here
9     today?
10    A    Well, I'm a little nervous sitting in a courtroom.  But
11    outside of this whole process, I'm pretty happy.
12    Q    Okay.
13         And you're not on medication?
14    A    No, sir.
15    Q    And you're not seeing any counselors?
16    A    No, sir.
17    Q    And have you again gone back to any other doctor --
18    A    No, sir.
19    Q    -- including Dr. Heimbach?
20         Now, when you were on and part of The Spec-tator,
21    you've been hearing some comments about some wine test?
22    A    Hhmm-hmm.
23    Q    What do you know about that?
24    A    It was a wine test that had -- that Tijon had drawn up,
25    he had administered it to all the bartenders.

JOHN KEVIN STONE, CSR

Pietrylo-direct                    1.110

1    Q    He had administered it already?

2    A    It had been administered to some of the bartenders, yes.

3    And it was pretty basic.  I don't think it was a serious

4    test at all.  There was a copy of it in the bar schedule

5    book.  Most of the servers had already seen it.  I received

6    an e-mail from one of the bartenders at the time with the

7    wine test on it.  And I did put it on The Spec-tator.

8    Q    Why did you put it on there?

9    A    Well, I felt like it wasn't serious, since it was a test

10   that had already been given to the bartenders, and I

11   figured, if anything, I was helping share some knowledge of

12   the wine really.

13   Q    Were there any members of The Spec-tator who were

14   bartenders or were they all servers?

15   A    There were two bartenders at the time who were members

16   of The Spec-tator.

17   Q    And who were they?

18   A    That would have been Joshua Hirsheimer and Christina

19   Ballentine.

20   Q    Okay.

21        Do you know if they had taken the test?

22   A    I don't know.

23   Q    When you were sat down by Rob Marano and fired, did he

24   ever bring up any issue with regard to wine tests or

25   answers?

JOHN KEVIN STONE, CSR

1    A    He never mentioned it to me.

2    Q    I'm sorry?

3    A    He never mentioned it.

4    Q    Are you and Doreen still together?

5    A    No, we parted ways a year and a half ago.

6    Q    Why did you part ways?

7    A    Well, we had been together for six years now, and I felt

8         like we had reached a point where we were wanting different

9         things and wanting to do different things, and that it would

10        be wise of us just to part on, you know, admirable terms.

11        And we had a discussion about it, and it wasn't really out

12        of anger at all, and we agreed that it would be best.

13             MR. PISANI:  One moment, Your Honor.

14             THE COURT:  One moment.

15             MR. PISANI:  I have no further questions of this

16        witness at this time, Your Honor.

17             THE COURT:  Okay.  Thank you.

18             Approximately how long is your cross?  Two hours?

19             MS. GARDINER:  Probably an hour-and-a-half I'm

20        guessing.  And I --

21             THE COURT:  Do you wish to start now or would you

22        like to start in the morning?

23             MS. GARDINER:  I'd like to start in the morning, if

24        I could.  Especially with our assignment for tonight.

25             THE COURT:  Okay.  Fair enough.  I'm going to grant

JOHN KEVIN STONE, CSR

Pietrylo-direct                                    1.112

1       that request.

2                   MS. GARDINER:  Thank you.

3                   THE COURT:  You may step down for today.

4                   THE WITNESS:  What do I do with all --

5                   THE COURT:  Just leave it there and your attorney

6       will get it at the appropriate time.

7                   ( Witness exits ).

8                   THE COURT:  Ladies and gentlemen, we'll let you go

9       home early.  It's 4:15.  I hope you'll appreciate that if I

10      should ever keep you a little bit later.  I'm going to try

11      not to, but I know it's been a long day for all of you, and

12      a trying day I'm sure.  So you're going to get home early.

13      Enjoy the sun, if there is any sunshine out there enjoy.

14      And I'd like to ask you to be back here tomorrow morning at

15      9:20 or so, so we can start, get started promptly at 9:30.

16                   As I always say to you, you'll get tired of hearing

17      me, please don't talk about this case with each other and/or

18      anybody else.  And enjoy your evening, and you'll see with

19      many of my words I said, I'll occasionally let you out

20      early.  You're excused for the evening.

21                   Miss Buro will let you get back to the jury room

22      and let you collect your things and we'll see you back in

23      the morning.

24                   THE CLERK:  All rise.

25                   ( Jury exits ).

JOHN KEVIN STONE, CSR

Pietrylo-direct                            1.113

1            THE COURT:  All right.

2            We're concluded for the day, counsel will work

3     together on the matter we discussed early this morning.  I

4     know you're tired.  And let's see, it's quarter past four,

5     will you make a good faith effort, obviously give the jury a

6     half an hour to get themselves out of there.  Maybe you

7     should start working, you can use this table in the

8     courtroom, no one will be in here except my law clerk and my

9     staff.  Maybe you can get started in the courtroom.  In

10    fact, you can stay at that table as long as Miss Buro will

11    let you.

12            MS. GARDINER:  The parking lot is going to kick us

13    out.

14            THE COURT:  Someone will kick you out at some

15    point, yes.  And then you can either continue in the jury

16    room or Whipple Room.  I'd like you to work until at least

17    6:30, until we have something, and then I'm going to release

18    you for the evening, so you can work on your cross for

19    tomorrow.

20            MS. GARDINER:  How late is the parking lot open?

21            THE COURT:  Oh, very good question.

22            MS. GARDINER:  See --

23            THE COURT:  Which lot are you in?

24            MS. GARDINER:  Right down the square, you know,

25    right across, and I'm not sure it's open --

JOHN KEVIN STONE, CSR

Pietrylo-direct                                    1.114

1           THE COURT:  Yes.  I don't, either, I honestly don't

2       know the answer to that question.

3           MR. PISANI:  If you're in the same lot I'm in, it

4       says 6 o'clock on the thing.

5           THE COURT:  All right.

6       Why don't --

7           MS. GARDINER:  Are you in the same place we were

8       before?

9           MR. PISANI:  Is that where you are?

10          MS. GARDINER:  Yes.

11          THE COURT:  Okay.  Leave at 5:45.  Get as much done

12      as you can.  That will give you time to go back to your

13      offices and work on cross.  We'll resume tomorrow at 9:30.

14      But I've got something I've got to get to outside of the

15      office.

16          MS. GARDINER:  I have one question for you, Your

17      Honor.  Mr. Pisani prepared this book for -- that you have

18      for the exhibits he was using.

19          THE COURT:  It's not necessary that it always be in

20      a book.

21          MS. GARDINER:  Thank you.

22          THE COURT:  My rules are that you have available

23      for you and for your adversary a folder that you intend to

24      use with your witness, so -- so that it goes smoothly and

25      doesn't waste time.

JOHN KEVIN STONE, CSR

Pietrylo-direct                                      1.115

1               MS. GARDINER:  We will.

2               THE COURT:  So in other words, that you have a copy

3       for you, if he's got a whole exhibit book, you simply can

4       tell him the exhibit number.

5               MS. GARDINER:  That's what I was asking.

6               THE COURT:  You don't have to give him a copy.

7       That's fine.

8               The reason I do this, because too often we'd be

9       trying cases and counsel will be wasting valuable minutes of

10      the jury's time fumbling around looking for exhibits, not

11      having a spare copy for the adversary.  As long as your

12      adversary has a copy, you can say, I'm now turning to D-35.

13              MS. GARDINER:  Perfect.

14              THE COURT:  General rules are you draw -- you have

15      an extra copy for the witness on the the stand that you

16      seamlessly bring up to him or her.  You don't have to ask

17      permission to approach your own witness or the other side's

18      witness.

19              If it gets nasty or rough, then I'll change those

20      rules.  But that's okay.  I'm just trying to save time and

21      everybody's been polite so far.  The point is to never be

22      fumbling or looking.

23              MS. GARDINER:  No, no.  We're organized.

24              And you have our exhibit books, and that's what I

25      was wondering, if I could you just say D-2.

JOHN KEVIN STONE, CSR

1          THE COURT:  I have a separate set.  He -- in
2     general that rule is for folders but --
3          MR. PISANI:  Do I get extra credit for making those
4     books?
5          THE COURT:  That's right.  There you go.
6          You can have your book back if you want to use the
7     notebook for another function, you may do so.  We have two
8     sets of exhibit books.  I'm sorry, wrong one.
9          Here, you can have your little extra book, I'll put
10    it there.  You can have it back.
11         The idea is to make sure that you've got everything
12    planned out ahead of time.  And if there is some exhibit
13    that isn't in your book for some reason, make sure you have
14    an extra copy of it and your alerted your adversary in
15    advance.
16         MS. GARDINER:  The other question I have, Your
17    Honor, is do you have any objection or does Mr. Pisani, if I
18    introduce evidence on cross, documents on cross?
19         THE COURT:  I don't object.
20         MR. PISANI:  Okay.
21         THE COURT:  Use the old-fashioned rules where one
22    did not, but I find that now people are doing it on
23    anybody's case, and it doesn't seem to pose a problem.
24         MS. GARDINER:  It makes more sense, especially with
25    some of the documents we have.  Thank you.

```
 1              THE COURT:  Fair enough.

 2              MS. GARDINER:  Great.

 3              THE COURT:  I have no objection to that, especially

 4     since the witnesses are so commonly joint here.

 5              MS. GARDINER:  Okay.  Thank you very much.

 6              THE COURT:  Be productive.

 7              I know we've got a lot of law issues that are

 8     waiting for us at the charge conference.  I've got three

 9     interns and law clerks working on the legal issues involved

10     in this case.  I think this case is far more legal issues

11     than factual issues.

12              MS. GARDINER:  And we're going to focus on the

13     common law tonight.  Correct.

14              THE COURT:  Common -- well, the common law claim of

15     invasion of privacy and the standard New Jersey cause of

16     action for public policy, whatever the elements are they

17     are.  I understand that there is, for example, in your jury

18     charge book, and I don't have any reason to say you're

19     wrong, that I have to make a legal determination in advance.

20              MS. GARDINER:  You do.

21              THE COURT:  Question is, we don't usually try New

22     Jersey causes of action.  What do judges do?  Do they recess

23     and make a legal determination before they he send it to the

24     jury?

25              MS. GARDINER:  Yes.
```

Pietrylo-direct                                    1.118

1          THE COURT:  Do they just make a five minute legal
2     determination?
3          MS. GARDINER:  They make a legal determination
4     before the case gets sent to the jury, and how each judge
5     does it is, you know, as many judges as there are.  But
6     there is usually some thinking about it either at the close
7     of the plaintiffs case, or at the close of the defense case,
8     before charges are given, there's a decision on whether or
9     not there is a public policy --
10         THE COURT:  Implicated.
11         MS. GARDINER:   -- to charge with.
12         THE COURT:  Right.  I'm having research done on
13    that obviously as we speak.
14         MS. GARDINER:  Okay.
15         THE COURT:  But I'm relying on you to give me the
16    neutral version of the elements.
17         MS. GARDINER:  The -- correct.
18         THE COURT:  So if I decide it goes to the jury,
19    I've got a charge to give them.  I will then decide at the
20    charge conference whether there is a case to go to the jury
21    on that element.
22         MS. GARDINER:  Thank you very much, Judge.
23         THE COURT:  Also, I mean one of the questions in my
24    understanding, if you both want to be thinking about it, how
25    does that count differ from the basic invasion of privacy

Pietrylo-direct                                        1.119

1    count?  In other words, if he's saying in his side of the
2    jury charge, if you found, I think the plaintiffs, if they
3    found invasion of privacy, then you go on and consider this
4    next count of public policy.  What more -- how does it add
5    anything to the case?  I don't, I couldn't figure that out.
6              MS. GARDINER:  I couldn't either.  Because the
7    damages are the damages.
8              THE COURT:  Right.  The damages don't seem to
9    differ.
10             MS. GARDINER:  If there are damages, they don't
11   change.  So I'm not sure why, you know --
12             THE COURT:  That was my question as well, as I was
13   reading it.  If, in other words, if -- they don't get to it
14   unless they found an invasion of privacy, which makes sense.
15   Then the only thing, are the damages different.  I don't
16   know.  Although --
17             MS. GARDINER:  They're not.
18             MR. PISANI:  Let me give it some thought.  But that
19   may be right.
20             THE COURT:  If so, then why are we -- you know, --
21             MR. PISANI:  Why are we going down --
22             THE COURT:  Why are we going town this road.
23             MR. PISANI:  Right.
24             THE COURT:  Unless they found the invasion of
25   privacy.

JOHN KEVIN STONE, CSR

Pietrylo-direct                                    1.120

1          Okay.  So now you know what's in my mind.  I do

2     read these things.

3          MR. PISANI:  I -- we know you do.

4          THE COURT:  You know, on page whatever I can tell

5     you what's your footnote.  Okay?  But I always have

6     questions.

7          Okay.  Thank you, have a lovely evening.

8          MR. PISANI:  Okay.  Thank you.  You too.

9          ( Court adjourned ).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOHN KEVIN STONE, CSR