# EXHIBIT B

2.1

```
 1                         THE UNITED STATES DISTRICT COURT
                           FOR THE DISTRICT OF NEW JERSEY
 2                         CIVIL ACTION NO. 06-5754 (FSH)
         - - - - - - - - - - - - - - - - x
 3                                       :
         BRIAN PIETRYLO, et al.,         :
 4                                       :        TRANSCRIPT
                      Plaintiffs,        :           OF
 5              -v-                       :        PROCEEDINGS
                                         :
 6       HILLSTONE RESTAURANT GROUP, et  :
         al.,                            :
 7                                       :
                      Defendants.        :
 8       - - - - - - - - - - - - - - - - x

 9
                              June 10, 2009
10                            Newark, New Jersey

11       B E F O R E:   HONORABLE FAITH S. HOCHBERG, U.S.D.J.

12                              AND A JURY

13       A P P E A R A N C E S:

14                       RAMP & PISANI, ESQS.,
                         BY:  FRED J. PISANI, ESQ.,
15                       Attorney for the Plaintiffs

16                       MC ELROY, DEUTSCH,
                         MULVANEY & CARPENTER, ESQS.,
17                       BY:  DONNA duBETH GARDINER, ESQ.,
                              MICAHEL O'B. BOLDT, ESQ.,
18                       Attorneys for the Defendants

19

20
         _____
21       Purusant to Section 753 Title 28 United States Code, the
         following transcript is certified to be an accurate record
22       taken stenographically in the above entitled proceedings.

23

         _____
24
         JOHN KEVIN STONE,
25       Official Court Reporter
```

JOHN KEVIN STONE, CSR

2.2

```
 1                          I_N_D_E_X
                                                              _
 2
        WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
 3
        BRIAN PIETRYLO
 4      By Ms. Gardiner:          3                   68
        By Mr. Pisani:                  56
 5
        KAREN ST. JEAN
 6      By Mr. Pisani:   80
        By Ms. Gardiner:         103
 7
        ROBERT MARANO
 8      By Mr. Pisani:   106            194
        By Ms. Gariner:          183
 9
        DOREEN MARINO
10      By Mr. Pisani:   198
        By Ms. Gardiner:         242
11
                          E_X_H_I_B_I_T_S
12
        NUMBER              DESCRIPTION           ID
13

14

15

16

17

18

19

20

21

22

23

24

25
```

JOHN KEVIN STONE, CSR

```
 1              THE COURT:  You may all be seated.  Stay -- remain
 2     seated.
 3              We finally have all, a full complement of jurors.
 4              As those of you who came in viad 21 may understand,
 5     the problem the jurors had, there was some type of fire
 6     truck, police activity on Route 21 that probably caught
 7     those jurors we were missing until recently.
 8              We're ready to bring them in.
 9              The witness can resume the stand.
10     B R I A N      P I E T R Y L O, witness resumes.
11              THE CLERK:  All rise.
12              ( Jury enters ).
13              THE COURT:  You may all be seated.
14              The trial will resume.
15              Cross-examination may commence.
16              MS. GARDINER:  Thank you, Your Honor.
17     CROSS-EXAMINATION
18     BY MS. GARDINER:
19     Q    Good morning, Mr. Petillo.
20     A    Good morning, Miss Gardiner.
21     Q    How are you doing?
22     A    I'm well.  How about yourself?
23     Q    I'm doing okay.
24              I want to talk a little bit about your work as a
25     server at Houston's.
```

Pietrylo-cross                          2.4

1              At the end of the night what were your financial
2       responsibilities?
3       A    Pretty much you have a printout, and what it does, you
4       also have cash in your pocket that you take from tables, and
5       at the end of the night you're balancing out your credit
6       cards and the cash that you have to give to the house, to
7       Houston's, and then what is left at the end would be your
8       tips.
9       Q    And are you required to log your cash tips on that
10      financial sheet?
11      A    Yes.
12      Q    And you logged those accurately.  Correct?
13      A    I believe so, yes.
14      Q    And the credit card receipts, are you supposed -- you're
15      supposed to divide those up into American Express, Visa,
16      Mastercard?
17      A    And -- yes.
18      Q    And those, during the course of an evening, when charges
19      are made, are entered into a computer.  Correct?
20      A    Yes.
21      Q    And at the end of the night on your printout you have a
22      total of your sales and you have a total of tips that were
23      charged to the credit card.  Is that correct?
24      A    Yes.
25      Q    So at the end of each day Houston knows the amount of

Pietrylo-cross                               2.5

 1    tips you got in cash, and the amount of tips you got in

 2    credit cards.  Correct?

 3    A    Yes.

 4    Q    And those amounts are reflected in your end of the year

 5    income along with the $2.13 an hour you're earning.

 6    Correct?

 7    A    Yes.

 8    Q    And was the process similar at Morton's?

 9    A    No, Morton's was a different system.

10    Q    And what was Morton's?

11    A    Morton's we entered our tips and our cash into a

12    computer that was attached to the time clock.

13          Houston's had a different system, you would write

14    it on your check out and then as when you were head waits,

15    doing the financial, there was nothing written, there it was

16    an automatic 10 percent of the sales, 10 percent of the

17    sales that Houston's would claim for you.

18    Q    What do you mean "claim for you"?

19    A    Well, headwaiter is that position, and the server at the

20    end of the night is in charge of taking off of the cash and

21    the printouts and the tips from all the other servers and

22    putting them into the computer.  And we were trained, those

23    who did head waits, if there's nothing claimed on their

24    slip, we automatically enter 10 percent of the sales into

25    the computer.

Pietrylo-cross                    2.6

1    Q    So if there was nothing claimed on what?  Do you mean
2    cash sales, or nothing claimed for cash tips, nothing
3    claimed for what?
4    A    On our handwritten -- after we have -- it represents our
5    tip out and our cash at the end of the night, there was a
6    line at the bottom where you claimed your tips.  What you
7    were actually going home with.  Most often servers didn't
8    put anything there, and the head wait would automatically
9    claim 10 percent.
10   Q    And you're talking about cash you were going home with
11   at the end of the night?
12   A    Yes.
13   Q    Okay.
14        That's different from charge tips?
15   A    No.  The cash -- let me try to explain it a little
16   better.  I'm sorry.
17   Q    Okay.
18   A    On your printout you're going to have your total sales
19   for the evening.  This these would be the cash transactions
20   and your credit card transactions.  You went ahead, the tips
21   that were on the credit cards, you actually brought that
22   home with you as cash.  At the end of the shift.  And then
23   the credit card companies reimburse Houston's and so forth.
24   Q    And Houston's had an accurate record of what those
25   charges were?

JOHN KEVIN STONE, CSR

1    A    Yes.

2    Q    So Houston's knew what you were earning in credit card

3    tips and relied upon you to put in your cash tips?

4    A    Yes.

5    Q    Okay.

6         MS. GARDINER:  I'm going to refer, Your Honor, and

7    counsel, to Defendant's Exhibits 3, 4 and 7.

8    BY MS. GARDINER:

9    Q    Mr. Petillo, can you identify Defendant's Exhibit 3?

10   A    This would be my tax return Form 1040 for the year 2005.

11   Q    And what was your total amount of earnings?

12   A    That would be 33,599.

13   Q    And that included wages, tips, any income you earned

14   during that year.  Correct?

15   A    Correct.

16   Q    And you accurately reported your income to the IRS.

17   Correct?

18   A    Yes.

19   Q    Okay.

20        MS. GARDINER:  I'd like to enter Exhibit 3, Your

21   Honor.

22        THE COURT:  Any objection to Defendant's 3?

23        MR. PISANI:  No objection.

24        THE COURT:  Defendant's 3 is in evidence.

25   BY MS. GARDINER:

Pietrylo-cross                    2.8

1    Q    Okay.

2                Could you identify Exhibit 4 for us, please, Mr.

3    Petillo?

4    A    Yes.  This would be my tax return from 2006.

5    Q    And in 2006 part of your income was from Houston's and

6    part was from Morton's.  Is that correct?

7    A    Correct.

8    Q    Okay.

9                And what was your total income?

10   A    That would be 34,983.

11   Q    And you recall that I asked during your deposition if

12   you could locate your W-2 Forms for 2006 so that we could

13   know how much you earned from Morton's and how much from

14   Houston's?

15   A    Hhmm-hmm.

16   Q    And you were not able to locate those.  Is that correct?

17   A    That is correct.

18   Q    But we do know that for four months, approximately, you

19   worked for Houston's, and for eight months you worked for

20   Morton's in 2006?

21   A    Yes.

22   Q    Okay.

23                MS. GARDINER:  I'd like to enter Exhibit 4 into

24   evidence.

25                THE COURT:  Any objection to D-4?

JOHN KEVIN STONE, CSR

Pietrylo-cross                    2.9

1          MR. PISANI:  No objection.

2          THE COURT:  D-4 is in evidence.

3          ( Received as marked ).

4    BY MS. GARDINER:

5    Q   And finally, can you identify Exhibit 7, D-7 for me, Mr.

6    Petillo?

7    A   Yes.  This would be my earning statements from Morton's.

8    Q   And this was through September 21st of 2007.  Is that

9    correct?

10   A   Correct.

11   Q   I'm sorry, let me correct that.  It was through

12   September 16th of 2007, that was the end of the period and

13   you were paid on September 21st, 2007?

14   A   Yes.  That's correct.

15          MS. GARDINER:  I would like to enter Exhibit 7,

16   Your Honor.

17          MR. PISANI:  No objection.

18          THE COURT:  D-7 is in evidence.

19          ( Received as marked ).

20   BY MS. GARDINER:

21   Q   And can you tell me what your total year-to-date

22   earnings were as of September 16th, 2007 at Morton's?

23   A   I'm sorry, Donna, where do I find that?

24   Q   Okay.

25          Do you see the column that says "year-to-date"?

JOHN KEVIN STONE, CSR

```
 1    A    Yes.

 2    Q    Okay.

 3              Look at the very bottom of that column where it

 4    says "gross pay."

 5    A    Okay.

 6    Q    And what is that number?

 7    A    That's $30,386.70.

 8    Q    So in 2005 at Houston's you earned $33,599.  Correct?

 9    A    Correct.

10    Q    And between Houston's and Morton's in 2006 you earned

11    about $1500 more.  Correct?  You earned $34,983?

12    A    Correct.

13    Q    And then for the first nine months of 2007 you had

14    earned $30,000, and if we average that to about $3300 a

15    month, you would be close to $40,000, or I'm sorry, 3300

16    every two weeks, you'd be close to $40,000 by the end of the

17    year if you had stayed at Morton's, wouldn't you?

18    A    There's no -- had I stayed at Morton's there's no way

19    for me to know what business I would have made.  It's the

20    restaurant business and we don't have a set income.  It

21    varies.

22    Q    I understand that.

23              But if we took an average of what you were earning

24    every two weeks and took it out to the end of the year,

25    would you agree with me on that average you would be
```

1    somewhere around $40,000 for the year of 2007?

2    A    Had I stayed with that company, somewhere along those

3    lines.

4    Q    Now, the tip out that you were describing where you take

5    part of your tips to pay other people who assist, like

6    bartenders and the greeters at Houston's.  At Houston's that

7    was 3 percent of your total food sales.  Correct?

8    A    That would be food and beverage and alcohol sales

9    combined.

10   Q    You're sure about that?

11   A    I'm pretty sure.  I'm sorry.  No.  The tip out at

12   Houston's, from my memory, was 3 percent of your gross sales

13   including more than just food, because we would also, you

14   charge people for drinks as well.  And I do believe we

15   tipped out on that as well.

16   Q    Well, let's say you had a thousand dollars of sales in

17   one night.  Your tip out would be $30.  Correct?

18   A    Correct.

19   Q    And as I understand it, Morton's you paid 25 percent of

20   your actual tips rather than 25 percent of gross sales.  Is

21   that correct?

22   A    That is correct.

23   Q    So if you had a thousand dollars of sales at Morton's,

24   and I don't want anyone to think I'm doing this in my head,

25   I actually worked it out last night.  If you had a thousand

Pietrylo-cross                            2.12

```
 1    dollars in sales, and let's assume 15 percent tip on that
 2    thousand dollars sales you'd be tipping out $37.50 based on
 3    your 25 percent tip out at Morton's.  Is that correct?
 4    A    If you go by 15 percent, yes.  But usually at Morton's
 5    we generally made better tips than 15 percent.
 6    Q    You did make better tips?
 7    A    Yes.  We usually included 18 percent, I believe, for
 8    large parties and whatnot.
 9    Q    And you did the same thing at Houston's also, 18 percent
10    for large parties?
11    A    Correct.
12    Q    Now, I understand you testified that you paid $66 every
13    two weeks for health insurance at Houston's.  Do I have that
14    correct?
15    A    Correct.
16    Q    And had you taken health insurance at Morton's you would
17    have been required to pay $180 in what period of time?
18    A    Monthly.
19    Q    Monthly.
20             So $80 every two weeks, more or less?
21    A    More or less, yes.
22    Q    But you didn't take the health insurance at Morton's.
23    Correct?
24    A    Correct.
25    Q    So you never paid that $180 every month?
```

JOHN KEVIN STONE, CSR

1    A    No.

2    Q    It wasn't an out-of-pocket expense to you, it isn't lost

3    income.  Correct?

4    A    Correct.

5    Q    I learned a long time ago if I move slowly I make fewer

6    mistakes.  Bear with me.

7    A    No worries.

8    Q    All right.

9         I want to talk a little bit about your claim for

10   emotional distress damages.  And I am not doing any of this

11   to embarass you, but I'm doing it so we understand.  Okay?

12        It's correct that you left high school in 1999

13   about one month shy of graduation.  Correct?

14   A    Correct.

15   Q    And you told me it was because you were bored with

16   school?

17   A    No, it was not because I was bored with school.

18   Q    Okay.

19   A    It's because at the time I was supporting myself,

20   working a full time job, as well as going to school.  And

21   when you get home at midnight from work and still have to

22   study and get up at 6 o'clock in the morning, it's a a heavy

23   load to bear.

24   Q    Now, leading from that, you stopped living with your

25   family at age 16?

Pietrylo-cross                                    2.14

1     A    Correct.

2     Q    And that's because your mother and your sisters were

3     moving about 30 miles away and you didn't want to move?

4     A    I didn't want to have to change high schools at that

5     point.

6     Q    And you started living with a family of a friend?

7     A    Yes, a family of a friend, people I had known for a long

8     time.

9     Q    And were you still living with that family one month shy

10    of graduation?

11    A    Yes.

12    Q    You haven't lived with your biological father since the

13    age of four?

14    A    That is correct.

15    Q    And your mother remarried when you were approximately

16    eight years old?

17    A    Kindergarten, five years.

18    Q    Five years old?

19    A    Yes.

20    Q    And he was attached to the military.  Correct?

21    A    Correct.

22    Q    When you were 11 your mother went into rehab for drug

23    and alcohol use.  Correct?

24    A    Correct.

25    Q    And when you were 11 you were required to go to

Pietrylo-cross                              2.15

1    intervention and learn why your mother was in the hospital?
2    A   It wouldn't be a requirement, but it was something
3    beneficial, yes.
4    Q   That happened.
5            And as I understand it, her -- her drugs of choice
6    were crystal meth, cocaine and marijuana in addition to
7    alcohol?
8    A   I didn't learn this until I was an adult, but yes, that
9    is correct.
10   Q   And your mother divorced her second husband when you
11   were 14?
12   A   Yes.
13   Q   And that marriage with her second husband -- and I
14   believe you took his name, Mr. Petillo?
15   A   Yes, he adopted me.
16   Q   That marriage produced two-step sisters?
17   A   Half sisters.
18   Q   Correct.  I stand corrected.  Two half sisters.
19           You also have a brother?
20   A   Yes.
21   Q   Is it correct that your brother's been in prison for
22   drug sales?
23   A   Yes.
24   Q   And both of your sisters' have drug issues?
25   A   There were some issues, yes.

JOHN KEVIN STONE, CSR

Pietrylo-cross                                        2.16

```
 1    Q   Okay.

 2            And one of them at least has been in prison?

 3    A   No, that's not correct.

 4    Q   Neither has been in prison?

 5    A   Neither has been in prison.  There was some jail time

 6    but not a correctional facility.

 7    Q   Okay.

 8            But jail time?

 9    A   Yes.

10    Q   And that was for drug use?

11    A   I don't know the details of it.  I can speculate, yes.

12    Q   Okay.

13            Well, we don't need to go any further with that.

14            I understand that as a teenager for a period of

15    about two years you would cut yourself occasionally?

16    A   Yes.

17    Q   Was this the same kind of cutting that you described in

18    your testimony yesterday that occurred in February or

19    January of 2006?

20    A   No, it was different.

21    Q   It was different.  Different how?

22    A   Well, during the teenage years I ran around with the,

23    you know, rock and roll crowd, and there would be things

24    like carving AC/DC in the arms and grunge, it was a trendy

25    type of thing.
```

JOHN KEVIN STONE, CSR

Pietrylo-cross                                    2.17

1    Q    A trendy type of thing.
2              So it wasn't, you don't think, an emotional
3    cutting?
4    A    No, I don't think so.
5    Q    And it was an emotional cutting in January of 2007?
6    A    Yes.
7    Q    Did you -- do you remember telling your psychiatrist or
8    your therapist that it was just a trendy kind of thing?
9    A    I do believe I did, yes.
10   Q    Would you be surprised if their notes do not reflect
11   they thought it was just a trendy kind of thing?
12   A    I wouldn't be surprised.  During that time I was upset
13   and a lot of the things that I may have said I'm not sure,
14   so...  What's in the notes was probably, is what is correct
15   I would say.
16   Q    Now, you told Dr. Heimbach when you first saw him that
17   you were stressed for a number of reasons.  Do you remember
18   that?
19   A    I believe they were just pressures of work with my job
20   at Morton's.  The legal process that I was involved in and
21   then the upset that I had over being terminated with
22   Houston's.
23   Q    So there were several things going on that brought you
24   to Dr. Heimbach?
25   A    Well, that was a few, several would be four.

JOHN KEVIN STONE, CSR

Pietrylo-cross                                    2.18

1    Q    Okay.

2              There were amount least three things --

3    A    Yes.

4    Q    -- that brought you to Dr. Heimbach?

5    A    Yes.

6    Q    Two-thirds of them not your termination from Houston's.

7    Correct?

8    A    Correct.

9    Q    Do you remember telling your therapist that you had

10   nausea because of this lawsuit?

11   A    I believe I told my therapist when I would get -- during

12   this time period anything that was stressing me out was

13   causing my nausea.

14   Q    Including getting your rent paid on time?

15   A    Yeah, normal pressures of life.

16   Q    Do you remember telling Dr. Heimbach that you were very

17   depressed as a teenager?

18   A    I do remember telling that there was a period during my

19   teenage years and I equate that to regular growing

20   adolescent pains.

21   Q    Is that the same period of time you were trendily

22   cutting yourself?

23   A    No, I don't believe so.

24   Q    And I believe that we established yesterday that you

25   would agree you came from a somewhat dysfunctional family?

JOHN KEVIN STONE, CSR

Pietrylo-cross                                    2.19

```
 1    A    Well, that's obvious, Donna.
 2    Q    And at some point your mother was diagnosed as bipolar?
 3    A    I believe so, yes.
 4    Q    Your therapist at one point denoted that you were
 5    obsessed with weight loss and diet?
 6    A    No, I believe she put that because when I was on the
 7    medication I expressed concerns that I thought that the
 8    medication was causing a weight loss.  Because it was a
 9    weight loss I hadn't seen before.  As far as the diet, I
10    would love to put on some weight.  You know.
11    Q    In -- in March your therapist noted that you were
12    feeling much better, March of '07?
13    A    Yes.
14    Q    Was that accurate?
15    A    That is accurate.
16    Q    She also noted that you and Doreen bought a puppy?
17    A    Yes.
18    Q    And you spent $900 on this puppy?
19    A    Yes, mutually, yes.
20    Q    And you spent about 350 of that 900?
21    A    Yes.
22    Q    Who got the puppy?  Who got the puppy?
23    A    We got the puppy.
24    Q    No, after you split up.
25    A    After we split up, I had taken the puppy down with me to
```

JOHN KEVIN STONE, CSR

1    Florida, and I was feeling a little bit guilty, because I

2    was by myself, and I didn't want to leave her in the

3    apartment, so I found a family who used to puppy-sit for me

4    up here, and I was like, can she stay with you are a little

5    while while I get a little more established down in Florida.

6    Few months went by, I could see they had and attachment to

7    the dog, and this dog had a really good life, so I decided I

8    would give them the gift of Bailey.

9    Q    In April you told your therapist you were worried about

10   your mother and sisters.  Right?

11   A    Yes.

12   Q    You had gotten a phone call, something about them being

13   in -- one being arrested or being in jail?

14   A    Probably.

15   Q    Okay.

16        And they were, your mother, at least one sister at

17   that point was living in a shelter?

18   A    Yes.

19   Q    And you reported that you were concerned about them?

20   A    Concerned, yes.

21   Q    And then a few days later in April you hadn't heard from

22   them and you noted that in a meeting that you had with your

23   therapist?

24   A    Yes.

25   Q    Do you recall telling your therapist that you always

JOHN KEVIN STONE, CSR

Pietrylo-cross                          2.21

1    expect the worst?

2    A   Well, I learned pretty early on that for my own self

3    preservation, survival, I had to separate myself from all

4    the craziness that was going on, so not expect the worst,

5    like expecting bad things to be happening, but be prepared

6    for bad news.

7    Q   She also described what she termed "obsessive thinking."

8    Do you recall any obsessive thinking?

9    A   I don't really call it obsessive thinking.  I think she

10   just obviously, in a therapy session I'm going to go over

11   well, like what are the things that are on your mind right

12   now, and I think there was just making a note of that.  But

13   I don't actually correctly agree with obsessive thinking.

14   Q   And she correctly reported that you liked your job

15   because you got a lot of attention?

16   A   Yes.

17   Q   Then in October of 2007 your mother came to New Jersey.

18   Correct?

19   A   Yes.

20   Q   And lived with you and Doreen for a little while?

21   A   For a short while, yes.

22   Q   And then went into a shelter?

23   A   She's actually in a group.  She shares a home with other

24   women who have gone through other situations, it's not a

25   shelter, she pays rent and it's a shared house.

JOHN KEVIN STONE, CSR

Pietrylo-cross                                    2.22

1    Q    Was that in 2007 or are you describing now?

2    A    That was 2007 and she's still in the same situation now.

3    Q    So if you told me in your deposition that it was a

4    shelter, you were mistaken?

5    A    Well, it is protected.  It's protected housing for women

6    who are victims of domestic violence.

7    Q    Yesterday you were talking about when you and Doreen

8    first started a romantic relationship.  And I understand you

9    knew each other for a period of 18 months or 24 months

10   before you moved in together.

11              When did you move in together?

12   A    Let me recall.  I believe it would have been October of

13   2000.

14   Q    And you would be 19 or 20?

15   A    I would -- I was 20 years old.

16   Q    20.

17   A    How old am I now?  19 or -- 19, I believe.

18   Q    Okay.

19              And Doreen was 34, 35?

20   A    Correct.

21   Q    Can you estimate for me when you stopped being anxious

22   because you had been fired from Houston's?

23   A    Around summertime of 2000 -- summer or fall of 2007.

24   Q    At the time that you were seeing Dr. Heimbach and going

25   through therapy, you and Doreen had stopped having an

```
 1    intimate relationship.  Is that correct?
 2    A    It wasn't -- this is embarrassing, my goodness.
 3    Q    I'm sorry.
 4    A    I know it's necessary.  It wasn't a regular intimate.
 5    There were intimate moments, but it wasn't on a regular
 6    basis.
 7    Q    The relationship, and you actually separated around
 8    October of '07 and stopped living together.  Correct?
 9    A    Correct.
10    Q    So the relationship had been declining for a period of
11    months at least through 2007 if not before?
12    A    It's hard to define our relationship that we had at the
13    time.  Because like we're still even very, very close today.
14          But as far as if you want to say as far as a
15    romantic relationship, yes, it would have been during 2007.
16    Q    And you in fact told your therapist at one point that
17    you were waiting to get money from this lawsuit so that you
18    would not have to be financially dependent upon each other.
19    Is that correct?
20    A    Well, it was kind of like I never knew when I was
21    talking to my therapist I was actually going to expose
22    everything I said in confidence.  I said that I just worried
23    about the status of our relationship and financial affairs,
24    and that perhaps if we didn't have to be financially
25    dependent on each other we might view our relationship a
```

Pietrylo-cross                          2.24

1    little bit differently.

2    Q    And you specifically mentioned money from this lawsuit

3    so that you would not have to be financially dependent,

4    didn't you?

5    A    Yes.

6    Q    When you first started training at Houston's, or when

7    you first started at Houston's you went through a period of

8    training.   Correct?

9    A    Correct.

10   Q    And how long was that training?

11   A    I believe all together, orientation included, it's about

12   a period of eight days.

13   Q    And during that eight day period you were paid regular

14   minimum wage rather than the $2.13 an hour that waiters get?

15   A    Correct.

16   Q    And just so everyone here understands, waiters get $2.13

17   an hour under federal and state law because of the amount of

18   gratuities that you make make up any difference in the

19   minimum wage requirements.   Is that correct?

20   A    That is correct.   It has gone up since then, the wage

21   for servers.   But at the time it was $2.12 and the rest were

22   your gratuities.

23          MS. GARDINER:   Defendant's Exhibit 18, Your Honor,

24   Mr. Pisani.

25   BY MS. GARDINER:

JOHN KEVIN STONE, CSR

Pietrylo-cross                           2.25

1    Q    Do you recognize this package of documents?

2    A    This is your whole training package, it includes the

3    tests you would take after your training, during your

4    training period, as well as the evaluations from your

5    trainers.

6            MS. GARDINER:  I'd like to move Defendant's Exhibit

7    18 in, Your Honor.

8            THE COURT:  Any objection?

9            MR. PISANI:  No objection.

10           THE COURT:  D-18 is in evidence.

11           ( Received as marked ).

12   BY MS. GARDINER:

13   Q    You see this area right here?

14   A    Yes.

15   Q    Is that part of the training that you received?

16   A    Yes.

17   Q    And you see that this last item, "Houston's values,

18   above and beyond approach to service"?

19   A    Yes.

20   Q    That's part of your training.  Correct?

21   A    Yes.

22   Q    And you in fact signed this document acknowledging that

23   you received this training.  Correct?

24   A    Correct.

25   Q    All right.

JOHN KEVIN STONE, CSR

Pietrylo-cross                                    2.26

1           I'm going to refer to Defendant's Exhibit 2, which

2      was entered -- I mean 1, excuse me.  Which was entered into

3      evidence yesterday.

4           MR. PISANI:  It was just marked.

5           MS. GARDINER:  It was marked.

6           Do you have any objections to it being entered?

7           MR. PISANI:  No, I do no not.

8           THE COURT:  What -- does it have a number?

9           MS. GARDINER:  Defendant's Exhibit 1.

10          THE COURT:  All right.  D-1.

11          D-1 is already in evidence.  Correct?

12          MS. GARDINER:  D-1 was identified but not admitted

13     into evidence.  There's no objection at this point for it's

14     submission.

15          THE COURT:  All right.

16          You want it in evidence.  All right.

17          ( Received as marked ).

18     BY MS. GARDINER:

19     Q    Would you turn to page 4 of that handbook, Mr. Petillo

20     -- am I saying -- Pietrylo?

21     A    Pietrylo.

22     Q    I'm sorry.  I heard myself.

23     A    No worries.

24     Q    Technology is absolutely amazing.

25          Okay.  Are these the philosophies and values of

1      Houston's that you were trained upon?

2      A    To the best of my ability to remember, yes.  This

3      handbook is actually dated after the time of my termination,

4      but I believe this is still the same core philosophy and

5      values.

6      Q    These are the same ones?

7      A    Yes.

8      Q    And as a matter of fact, you and Doreen, one of you

9      produced the handbook you were given when you started at

10     Houston's and these are the same?

11     A    Okay.  I'm not disputing that, I'm just stating the

12     facts.

13     Q    All right.

14            "Every one of our people is treated with dignity

15     and respect at all times.  In return, we expect the highest

16     standards of honesty, fairness, commitment and

17     professionalism."

18            Did you understand that was an expectation of

19     Houston's?

20     A    Yes.

21     Q    "We want all of our guests to feel at home when they

22     dine with us."

23            That was an expectation of servers.  Right?

24     A    Yes.

25     Q    "Guidelines help maintain a sense of order and

Pietrylo-cross                           2.28

1    efficiency."
2            Those would be the specs that we talked about in
3    the restaurant industry?
4    A   Yes.
5    Q   All right.
6            Let's go to page 5, which is the next page and
7    what -- what's on this page?
8    A   This would be what they called the four values.
9    Q   And what are those?
10   A   Professionalism; positive mental attitude; team work and
11   then aim to please approach.
12   Q   And the four values, again, are those values that the
13   Hillstone Restaurant Group expects its employees to embody?
14   A   Yes.  And to work.
15   Q   And you knew that in March of 2006.  Correct?
16   A   Correct.
17   Q   That those values, those philosophies, were what were
18   expected of you?
19   A   Yes.  And I did bring all of those four values into work
20   with me each day.
21           MS. GARDINER:  Your Honor, the plaintiff has
22   stipulated at least in our own conversations, with the
23   admissibility of Defendant's Exhibit 2 which is The
24   Spec-tator.
25           MR. PISANI:  There are two sets with two different

Pietrylo-cross                    2.29

1   dates.  I would suggest that we split them up into two

2   different exhibits and then I would have no objection.

3            MS. GARDINER:  I have no problem with them.

4            THE COURT:  Okay.  Let's mark them D-2 A and D-2.

5   And --

6            MS. GARDINER:  Yes.

7            THE COURT:   -- and put the appropriate stickers on

8   them and you may proceed.

9            MS. GARDINER:  Okay.

10           Is there a stapler up there?  If not I'll use a

11  clip.

12           THE COURT:  Whatever you have.

13           MS. GARDINER:  The staple may pinch some fingers,

14  so...  Let me take one for this.

15           THE CLERK:  No problem.

16           MS. GARDINER:  Thank you.

17           And if you've got a blue -- otherwise I have it in

18  my briefcase, a blue defendant's sticker.

19           All right.

20           So we'll have Defendant's Exhibit 2 and 2 A.

21           MR. PISANI:  And which one's --

22           MS. GARDINER:  For -- for clarification, Exhibit 2

23  is Bates stamped numbers 211 through 244.  All the pages

24  dated 5-5-2006.

25           MR. PISANI:  Okay.

1              MS. GARDINER:  Exhibit D-2 A are the pages Bates

2       stamped 2000 -- I'm sorry, 245 through 249 and they are

3       dated 5-3-2006.

4              THE COURT:  By stipulation both D-2 A and D-2 B are

5       in evidence.

6              MS. GARDINER:  Okay.

7              ( Received as marked ).

8       BY MS. GARDINER:

9       Q    Let me just show you both of these, Mr. Pietrylo.  These

10      are both collections of pages from The Spec-tator, are they

11      not?

12      A    They are.

13      Q    All right.

14             Do you see the numbers at the bottom of the page, H

15      000245?

16      A    Yes.

17      Q    At times I'm going to refer you to those numbers on the

18      pages, so that -- but you'll be able to see the screen also.

19      A    Okay.

20      Q    So you don't necessarily have to turn the pages.

21      A    Okay.

22      Q    Now, this is the same, this document which is dated

23      5-3-2006 bearing the Bates stamp number H 00245 has the same

24      message as the exhibit, Plaintiff's Exhibit 1, that was

25      entered yesterday and dated 2007 that you had printed off of

1    the web site a year after --

2    A    Yes.

3    Q    -- you were terminated?

4         And we will stipulate that even though, and this is

5    how it was copied back in 2006, even though part of the

6    language is cut off, your statement in the center, we will

7    stipulate it was the same as that which you put into

8    evidence yesterday.  What I'd like to look at is this

9    section that says "members."

10        Does that indicate that besides yourself there were

11   20 members of The Spec-tator as of the 3rd of May 2006?

12   A    Correct.

13   Q    And.

14   Q    You had invited 20 other people to participate?

15   A    Yes.

16   Q    All of them Houston's employees?

17   A    Correct.

18   Q    This is the Houston's logo.

19        Where did you get that?

20   A    I believe I probably did a Google image search.  Google

21   is a search engine and I believe I typed in an image search

22   for a Houston's restaurant and that came up.

23   Q    And you copied it and pasted it onto your first page of

24   The Spec-tator?

25   A    Correct.

Pietrylo-cross                           2.32

1    Q    You had no one's permission to use that logo.  Correct?

2    A    Well, I wasn't using the logo for any reason.  It was on

3    my private page, so...

4    Q    You had no permission to use it from Houston's, did you?

5    A    Well, that is correct.

6    Q    And I believe you testified yesterday that the name

7    Spec-tator is a play on words, because Houston's requires

8    certain specifications be followed, certain quality

9    standards, certain specifics?

10   A    Correct.

11   Q    You wrote this on March 2nd when you created The

12   Spec-tator.  Correct?

13   A    Correct.

14   Q    "Good day, team.  This is my first time doing any kind

15   of group thing."  Play on word meaning group sex?

16   A    Correct.

17   Q    "I just thought this would be a nice way to vent about

18   any BS we deal with at work, without any outside eyes."

19        So your intent with creating The Spec-tator was so

20   other employees could -- could talk about Houston's?

21   A    Correct.  I thought that it would be much better than

22   going out to the bars after work and bad mouthing, you know,

23   business.

24   Q    So this was purely humanitarian.  You were trying to

25   help Houston's by creating a site where people wouldn't have

JOHN KEVIN STONE, CSR

Pietrylo-cross                     2.33

1    to go to bars and talk publicly?

2    A   I wasn't trying to help Houston's.

3    Q   You never told any of these 20 members that you had,

4    that they shouldn't show the web site to anyone else, did

5    you?

6    A   No.

7    Q   And when you set up the web site, you didn't have any

8    restrictions that would stop someone from using a member's

9    password and coming in and seeing it, did you?

10   A   Well, it's an expectation of privacy.  If I send

11   somebody a love letter, they might go around and show it to

12   anyone, that could happen.  But I still expect that they

13   would keep it private.

14   Q   You have no idea, sitting here today, who any of your

15   members showed this web site to, do you?

16   A   No.

17   Q   You don't know how many people may have had the password

18   of any of those 20 members and come in and out of The

19   Spec-tator, do you?

20   A   No.

21   Q   Now, I believe you described yesterday that anyone who

22   was a member of The Spec-tator could start a topic.  And am

23   I correct that this, for instance, shows a topic that Miss

24   Helrig started called "Just hilarious"?

25   A   Correct.

Pietrylo-cross                                    2.34

1    Q    And I believe that you have told me before that the very

2    first posting is the person who started the topic and then

3    everything that follows are responses or comments on that

4    topic?

5    A    Correct.

6    Q    Correct?

7         So Miss Helrig writes, "at Hillstone the

8    uncompromising quality of our food service art and

9    architecture has set the standard in our industry for nearly

10   three decades."  Goes on to say, "a progressive management

11   culture unlike any in our industry, in which the craft of

12   managing and developing people is as important as culinary

13   arts itself."

14        I believe you told me this was taken from a

15   Hillstone web site?

16   A    Well, she actually writes at the top of the message that

17   she did that.

18   Q    So this again is -- is a statement of philosophy, a

19   statement of customer service, a statement of corporate

20   culture that Houston's and Hillstone lives by, isn't it?

21   A    Yes, it's a very beautiful philosophy.

22   Q    And she writes, "managing is now a craft, in that case

23   Robert is the best artist I've ever known, bullshit artist

24   that is."

25        Robert was one of the managers at Houston's?

JOHN KEVIN STONE, CSR

Pietrylo-cross                                          2.35

1    A    Correct.

2    Q    And I believe you responded, did you not?

3    A    I believe I did, yes.

4    Q    And in fact, if we look at the bottom of this page, you

5    were BriGuy.  Am I correct?

6    A    Yes.

7    Q    And BriGuy is going to respond to what Miss Helrig

8    wrote.  So first we have what Miss Helrig wrote.  Correct?

9    A    Correct.

10   Q    And then Helrig.  And then on the next page we have your

11   response to it.  Let's wait for the light to make this

12   visible.

13        Any idea how to make this visually show up?  All

14   right.

15        THE CLERK:  I think it's just the transparency.

16   BY MS. GARDINER:

17   Q    What we have here, and you can see it in the document

18   The Spec-tator you have in front of you at page --

19   A    213.

20   Q    Thank you.

21        You have a picture of a woman spraying and it says

22   "bullshit."  In fact, it says "smells like bullshit,"

23   doesn't it?

24   A    Correct.

25   Q    And you're talking about the Houston -- the Houston

Pietrylo-cross                    2.36

1    philosophy, the Houston statement of corporate culture that

2    Miss Helrig had posted, aren't you?

3    A    Actually --

4    Q    You're responding to her topic?

5    A    Actually, no.  I was responding what she wrote below

6    that quote about Robert being a, pardon my language,

7    bullshit artist.

8    Q    Okay.

9         So you weren't really talking about Houston's, just

10   one of its managers?

11   A    I wasn't talking, I just put up a funny picture.

12   Q    Put up a picture of a woman spraying an aerosol can with

13   the logo that says, "smells like bullshit"?

14   A    Correct.

15   Q    There was quite a discussion about a change in the start

16   time for the night crew.  Is that right?  The 4:30 end time.

17   A    The end time, yes, the time the servers arrive for the

18   p.m. shift.

19   Q    And some of the people did not think that was a correct

20   change that management had made.  Is that correct?

21   A    I wouldn't say correct.  We could say they disagreed

22   with the idea of that change.

23   Q    So when Doreen, and that's this, this message by Doreen,

24   she started this topic.  Correct?

25   A    Correct.

JOHN KEVIN STONE, CSR

Pietrylo-cross                                    2.37

1   Q   And that's Doreen who's the plaintiff here.  Correct?

2   A   Correct.

3   Q   And she writes, "fuck the fucking fucks who thought this

4   one up, Anton."  And Anton is a manager.  Right?  Robert

5   Anton?

6   A   Correct.

7   Q   You wouldn't have said this to Mr. Anton directly.

8   Correct?

9   A   No, this was private, at home.

10  Q   You wouldn't say it to any manager?

11  A   No, that would --

12  Q   Because you know you would be fired?

13  A   Well, I wouldn't say that to anybody in a professional

14  setting whatsoever.  In a private setting, you know, this is

15  the age of Comedy Central, I think in the privacy of your

16  own home you should have the right to say whatever you want.

17  And when you look at what other people posted, what I

18  actually posted myself was minimal.  And what these other

19  people wrote, and some of which are still employed by

20  Houston's.

21  Q   Mr. Petillo, one of the things that I would ask is -- so

22  I don't have to jump all over you.

23  A   Okay.

24  Q   Just answer my question.

25  A   I apologize.

JOHN KEVIN STONE, CSR

Pietrylo-cross                                    2.38

1    Q    We'll get to that.

2    A    Okay.

3    Q    I know you want to talk about that and we will get

4    there.

5              This topic started by H is called, "Dropping acid."

6    Acid refers to LSD, I believe?

7    A    It's my understanding, yes.

8    Q    So we're now talking about the use of illegal drugs?

9    A    Correct.

10   Q    And he's taking a poll, if you had to drop acid with one

11   person at Houston's, who would it be?

12   A    Correct.

13   Q    And he answers "you"?

14   A    Hhmm-hmm.

15   Q    And you say you're honored, and then you say you would

16   not like to drop acid with Robert Anton because that would

17   leave permanent damage.   Correct?

18   A    Correct.

19   Q    Robert Anton, again, is a Houston's manager?

20   A    Yes.

21   Q    Now, you also say here, "of course none of us would ever

22   participate in such illegal activities."   Why did you feel

23   compelled to say that?

24   A    Because I -- I don't think he was actually serious I

25   think he meant this all as a metaphor and we would not

Pietrylo-cross                               2.39

 1     participate in illegal activities.
 2     Q    Just in case maybe someone was reading it you wanted to
 3     make sure everyone knew you wouldn't engage in such illegal
 4     activities?
 5     A    Yes.
 6     Q    Wotco, what is Wotco?
 7     A    It is a Danish oil finish for wood surfaces.
 8     Q    And it's something that -- Houston's has wood tables.
 9     Correct?
10     A    Correct.
11     Q    And Wotco is something you put on the tables every
12     night?
13     A    Yes, to polish them, keep them in good condition.
14     Q    There seemed to have been some dissatisfaction with
15     having to put on the Wotco.  Is that correct?
16     A    Correct.
17     Q    And as I understand this message which was posted by
18     you --
19     A    Hhmm-hmm.
20     Q    -- you write, "after an additional 15 minutes
21     penetration, wipe wood completely dry, ready for use in
22     eight to ten hours, parenthesis, how long do we have to get
23     fucked before it's over."  Does this refresh your memory
24     from yesterday when you said you didn't remember whether you
25     swore or not --

Pietrylo-cross                                    2.40

1    A    Yes. It does refresh my memory.

2    Q    -- in writing?

3         This was a sexual double **entendre, wasn't it?

4    A    In layman's terms could you -- I don't understand the

5    question.

6    Q    You were making a sexual joke, weren't you?

7    A    It was an innuendo, yes.

8    Q    Now, you also write, "tonight, as one of my hostesses

9    actually rose to the occasion of doing the Wotco himself,

10   I'm sorry, bosses, not hostesses, bosses, rose to the

11   occasion of doing the Wotco himself, I had to stop Doreen

12   from approaching the fumes with a lighter.  Gotta love

13   Doreen."

14        Now, I don't think anyone believes that Miss Marino

15   actually took out a cigarette lighter and approached a boss

16   who was working with flammable fumes.  What were you saying?

17   A    Once again, it was just another metaphor.  Doreen was

18   somebody at work who always stood up to the occasion and

19   would call people out when they were wrong about certain

20   things.  So that was just kind of, I was basically, she

21   wasn't going to do it at all, but it was a just a way of

22   expressing how Doreen is a warrior, if you will.

23   Q    A what?

24   A    A warrior.

25   Q    A warrior?

JOHN KEVIN STONE, CSR

Pietrylo-cross                              2.41

```
 1    A    Yes.

 2    Q    She was fighting for what?

 3    A    She would always stand up for people.  What brought up

 4    the Wotco topic was it was a management responsibility for

 5    the majority of time I worked there, and once they weren't

 6    getting -- managers weren't getting it taken care of at the

 7    end of the night, it became a server responsibility.

 8    Q    So Doreen in your estimation was standing up for the

 9    rights of the servers?

10    A    For anything.  Doreen is really one who stands up for

11    what she feels is right.

12    Q    Okay.

13         Ballentine starts a topic, "Let's be honest."  You

14    see that?

15    A    Yes.

16    Q    "Let's be honest.  Maneschevitz knows more about me than

17    me."  Maneschevitz was a customer?

18    A    A patron, yes.

19    Q    Okay.

20         And I understand it was a woman, Mrs. Maneschevitz,

21    that was her real name?

22    A    Correct.

23    Q    "The Frock loves black people."

24         What was that reference to?

25    A    That's in reference to one of the -- one of -- another
```

Pietrylo-cross                          2.42

1     patron, a lady, and there were times that she made racial

2     slurs to us in the past.  I think that's what she was

3     referring to.  You'd have to ask her what she actually meant

4     by that.

5     Q    Did you report her to management so management could

6     take appropriate action?

7     A    Not me personally.  But there was a situation where one

8     of the servers did approach management about it.

9     Q    And when was this?

10    A    It would have been early 2007, late 2006 to the best of

11    my memory.

12    Q    Well, you weren't working there, were you?

13    A    Oh, I'm -- I have my years mixed up.  Late 2005 to 2006.

14    I'm sorry.

15    Q    And were you witness to that conversation?

16    A    No, I wasn't.

17    Q    So you don't know what was said, you just know what

18    someone told you?

19    A    Yes.

20    Q    Who's Jason?

21    A    I believe that's in reference to Jason Sokolow who was

22    the general manager at the time.

23    Q    "Jason wants to see the guns on Jessica's thighs."  What

24    does that mean, if you know?

25    A    Once again, you'd have to ask Ballentine.  It's my

JOHN KEVIN STONE, CSR

Pietrylo-cross                                          2.43

```
 1    understanding that -- all I know about that statement is the
 2    server Jessica J, she did have two guns tatooed on the
 3    inside of her thighs.
 4    Q    Guns tatooed to the inside of her thighs?
 5    A    Correct.
 6    Q    So you're saying the general manager wants to see the
 7    inside, or Miss Ballentine was saying the general manager
 8    wants to see the inside of her thighs?
 9    A    That's what she's saying.
10    Q    And you respond.  Correct?  I see this posting right
11    below "BriGuy"?
12    A    Yes.
13    Q    And then everything is repeated.
14          Oh, by the way, before -- let's go back one other
15    question.  See where it says "Jason snow boards?  What?"
16    Jason had a stroke, hadn't he?
17    A    Correct.
18    Q    Was this a reference to the fact, if you know, that --
19    A    I --
20    Q    -- this general manager had a stroke and snow boarding
21    was the last thing he could do?
22    A    I don't know.
23    Q    You don't know.
24          This is your response, isn't it, starting here with
25    "nobody seems to ever want to want a straw with their iced
```

JOHN KEVIN STONE, CSR

1    tea"?

2    A    Correct.

3    Q    What's a check wait?

4    A    A check wait would be a -- it was two servers who at the

5    end of the night, it was there job to check out the other

6    servers side work before they went home.

7    Q    And you thought they were lazy?

8    A    No.  Absolutely.  I thought quite the opposite.  That

9    was a sarcastic comment.  I was just check waits.

10   Q    Would someone reading this perceive, do you think, that

11   this was sarcastic?

12        MR. PISANI:  Objection in terms of speculation.

13   How could he know?

14        MS. GARDINER:  I'll withdraw.

15        THE COURT:  All right.

16   BY MS. GARDINER:

17   Q    Okay.

18        You also write here at the bottom, I can move this

19   over so we can all see it.  "We all love our job.  The

20   greeters really earn their tip share.  Not you girls, the

21   other ones.  The ones not Spec-tator worthy."  So you're

22   criticizing some of the greeters that you think are not

23   working as hard as those you've invited into The Spec-tator.

24   Is that accurate?

25   A    I actually don't remember the thought I had at the time

1    of writing that.  But from what I read before, I can

2    speculate that that seems to be true.

3    Q    "Soon we will all have to take permission -- ask

4    permission to take a shit while on the clock."

5         What does that mean?

6    A    Well, at Houston's they have very hard standards and for

7    just about anything, whether it's to eat or sometimes go out

8    and have a cigarette at the end of the shift, there are

9    rules.  You had to ask a lot of permission.

10   Q    "If Miss Maneschevitz has so many complaints, why does

11   she eat here?"  You're talking about a customer.  Right?

12   A    Yes.

13   Q    "Everything Anton."  And again, Mr. Anton's a manager?

14   A    Correct.

15   Q    Okay.

16        BriGuy writes, "this one comes from our brilliant

17   Miss Helrig.  See if I can get this better.  The pain of

18   being born to Mr. Anton."

19        Are you referring to the fact that Mr. Anton's wife

20   was about to have their first child?

21   A    I was just actually quoting her in that.  You would have

22   to ask her what she was referring to.  Those weren't my

23   words.

24   Q    Well, what do you think it means?

25        MR. PISANI:  Once again, same objection.

JOHN KEVIN STONE, CSR

Pietrylo-cross                                    2.46

 1            THE COURT:  Well, he's responding.  You can -- he
 2    can answer the question to what he thought about it.
 3    Overruled.
 4    A    In my opinion, I -- in my opinion, I don't think so.
 5    Mr. Anton was already a father.  So I don't think it has
 6    anything to do with an unborn child, at least from what I
 7    gather what she said.
 8    Q    You think the child had already been born?
 9    A    I think, once again, it was just satirical and jest and
10    metaphorical.
11    Q    Susan was Mr. Anton's wife's name?
12    A    Yes.  And she was also a server at Houston's.
13    Q    Was she a server at this time?
14    A    I don't believe so.  I think this is shortly after she
15    left the company I think, because of their engagement.
16    Q    Or had she left the company because she was pregnant?
17    A    I -- you have to ask them.  I don't know.  That's
18    personal to them.
19    Q    Okay.
20            There's a reference here in the middle of the page,
21    "son, if you go to school today I'll give you any other day
22    this week you want off.  Now go do the dishes and we won't
23    have to vacuum tomorrow."  Is that a reference to his
24    management style in talking to his hypothetical son?
25    A    I believe so.

Pietrylo-cross                    2.47

1    Q    "Son, go back, vacuum the living room.  What?  I never
2    said you wouldn't have to vacuum.  And where is my cocaine?
3    Shut up."
4         The inference there being that Mr. Anton was using
5    cocaine?
6    A    Yes.  But I'd lake to state, once again, these weren't
7    actually my statements.  It was a quote somebody else wrote.
8    I have no knowledge of him ever doing any drug.
9    Q    But you posted it?
10   A    Yes.
11   Q    And you were just quoting someone else?
12   A    Yes.
13   Q    All right.
14        "Susan the Shooter shitted all over himself."
15        This is a reference to Mr. Anton referring to
16   different people by the nickname "shooter"?
17   A    Yes.
18        Mr. Anton had that nickname for me and would
19   repeatedly call me, even though I asked him not to.
20   Q    So you didn't like Mr. Anton very much, did you?
21   A    I did for awhile.
22   Q    "Here's the deal, Tijon's feeling -- feelings get all
23   hurt because no one wants to come to his lame ass wine
24   tastings, so his momma's boy way of revenge is to slap us
25   all with a test of the new wines.  But I will take care of

 1      my Spec-tator members.  I'm a good father after all.

 2              "The first rule about The Spec-tator is that we do

 3      not talk about The Spec-tator; the second rule of The

 4      Spec-tator is we do not talk about The Spec-tator;" and then

 5      you publish a wine test.  Is that correct?

 6      A    Correct.

 7      Q    And why were you publishing this wine test?

 8      A    I don't actually remember what my intentions were when I

 9      posted this.

10      Q    At the end of the wine test, which has 20 questions, you

11      write, "whoops.  If they decide to fuck us with this, it

12      will be in the near future.  Part of teamwork is helping

13      each other cheat on tests, bitches.  Post the answers to

14      anything you know."

15              Does that refresh your memory as to why you

16      published this wine test?

17      A    That's pretty clear, yes.

18      Q    Thank you.

19              And then you went on, am I right, to start adding

20      answers to those questions that you knew the answers to.  Is

21      that correct?

22      A    Correct.

23      Q    Now, did there come a time when there was a change in

24      the uniforms that waiters, service people were to wear?

25      A    I believe over the years there's been many times that

1    they changed the attire for the staff.

2    Q    Okay.

3          Well, let's look at this posting.  "What the

4    fucking fuck.  Okay?  Seriously, white button-down shirts.

5    What the fuck are they thinking?  Have they ever seen my

6    black shirt at the end of the night?"  Etcetera, etcetera.

7    Expressing unhappiness with a costume change, an outfit

8    change?

9    A    Once again, you probably have to ask her.  She wasn't

10    fired for any comments, but you have to --

11    Q    Answer my question.

12    A    I'm sorry, what is the question.

13    Q    Complaint about a costume change at the restaurant, a

14    server uniform?

15    A    Is that --

16    Q    Is that what this is?

17    A    In my opinion, yes, that is what this is.

18    Q    Okay.

19          Here is a topic called, "who would do that?  Who

20    would do that, make a baby with Robert."

21          Robert Anton?

22    A    I believe that's who she's referring to, yes.

23    Q    Mr. Anton's wife's name was Sue.  Correct?  Or Susan.

24    Correct?

25          "Only Sue could be, could possibly be capable of

Pietrylo-cross                                    2.50

1    reproducing Satan's offspring.  She can -- proceeds to drink
2    alcohol during pregnancy, only someone who truly cares about
3    the child they're carrying would abstain from any harmful
4    substances."
5          The spawn of Satan.
6          Here's a posting asking "who does that?  Who would
7    order their chicken rare, their prime rib rare, and proceed
8    to drink the blood lining the bottom of the platter plate.
9    Oh, yes, Miss Frick does that."
10         Miss Frick is a customer?
11   A    Yes.
12   Q    Is this the same Miss Frick that was referred to earlier
13   as Miss Frock or are they two different people?
14   A    I believe it's the same person.
15   Q    "Who would steal the husband of a woman passing of
16   cancer?  Oh, yes, Miss Frick does that as well.  Who would
17   try to get Brian P fired?  Once again, Miss Frick."
18         So you're talking, you're writing this, correct,
19   about a customer at the restaurant?
20   A    Yes.
21   Q    "I actually haven't seen her in a long time now.  Maybe
22   she's afraid of all the black people in the parking lot."
23   A    Hhmm-hmm.
24   Q    A comment again about the customer?
25   A    It's a -- well, I was referring to a comment that she

1     had made in the restaurant.

2     Q    And if you thought there was really a problem with that

3     customer and her attitude toward African-Americans, wasn't

4     it your obligation to let management know?  Didn't you have

5     a duty of loyalty to let management know there was a

6     problem?

7     A    Management had already been informed by someone else of

8     another situation and --

9     Q    I'm not asking you about anyone, someone else.  I'm

10    asking didn't you feel you had a duty if you thought about

11    it so much you were going to write about it on The

12    Spec-tator, didn't you have a duty to alert the company that

13    it may have a problem with one of its customers?

14    A    No.  In this situation because of the -- what we're

15    talking about, I don't think that that's something I would

16    even want to get myself involved in.

17    Q    Rankings.

18         So around -- let's see.  This was posted March 2nd.

19    And you start out, "how do you feel about the recent server

20    rankings?  And is being a top eight server more or less

21    important than being a friend to the top eight My Space

22    friends?"

23         This was about the time you were ranked number

24    three.  Correct?

25    A    Correct.

Pietrylo-cross                           2.52

1    Q    And Melonaid writes, "it's bullshit.  Has always been
2    bullshit, will always be bullshit.  They just like to see us
3    scramble."
4          Is that correct, what she wrote?
5    A    That's correct.  That's what she --
6    Q    I mean they wrote this?
7    A    That's what she wrote, yes.
8    Q    And then Sandra, Sandra was rather new, wasn't she, to
9    the restaurant?
10   A    I believe so, yes.
11   Q    Okay.
12         She writes, "shit, this sucks.  I don't even know
13   where I am in the rankings.  What the fuck.  I'm scared to
14   go to work today.  Oh, ugh, anyway, love you guys.  Since
15   this is the coolest group ever to be started."
16         So we have a new employee who perhaps it's her
17   first time being ranked and she's reading these comments.
18   Correct?
19   A    Correct.
20   Q    Continuing on talking about the rankings, you write, "I
21   think it's important for newer people not to get caught up
22   in all the ranking drama.  When you do that, it can really
23   effect your happiness at work.  Regardless of where you are
24   it's still a good job, even though it's a tough place to
25   work."

JOHN KEVIN STONE, CSR

```
 1              And Miss Helrig responds with, "I was pissed off
 2      because certain management dick-suckers moved up in ranking
 3      drastically, which means I gave Jason a rim job for no good
 4      reason."
 5              Jason's a manager?
 6      A   I believe that's who she was referring to.
 7      Q   And what's a rim job?
 8      A   It would be a sexual act.
 9      Q   Of what kind?
10      A   The technical term for it would be anallingus.
11      Q   Yes.
12              And then you respond to the rim job comment with a
13      comment of your own.  "Does anyone know the new spec on
14      fellatio?"
15              "Spec" meaning the specifications that the
16      restaurant used to satisfy customer needs, to make sure that
17      customers are being satisfied, to make sure that the
18      restaurant is operating at peak efficiency and you're asking
19      what the new spec is on fellatio.  Is that correct?
20      A   I don't understand the question you're asking me.  If I
21      said that?
22      Q   Are you using the word "spec"?
23      A   Yes, I am using the word "spec."
24      Q   In the same --
25      A   Yes.
```

Pietrylo-cross                    2.54

 1    Q    -- manner?

 2    A    It's a term that applies to a lot of different things,

 3    not just the restaurant business.

 4    Q    And then Doreen responds, "suck till you turn blue."

 5    And then Brian, you respond again to the rim job comment by,

 6    "it must fall into the third tear of rim jobs."

 7          What do you mean by third tier?

 8    A    As in tier at Houston's, we had tiers, servers were

 9    ranked through either the A tier, B tier or C tier by your

10    performance.  So I think that's what I was referring to with

11    my terminology and use of the word "tier."

12    Q    Using a term that Houston's uses for ranking its

13    servers, ranking the quality of its employees and you're

14    using it here.  Okay.

15          In the two months that The Spec-tator was in

16    operation, you never thought about whether your comments

17    could be affecting employee morale, did you?

18    A    It was completely outside of work and I don't believe it

19    affected morale at all.

20    Q    Answer the question, Brian.

21          You never thought about whether these postings

22    could be affecting employee morale, did you?

23    A    Actually, yes, I did think about it.  If anything, I

24    helped, thought the group actually established a little bit

25    of camaraderie between the staff, and because we were able

Pietrylo-cross                    2.55

 1      to vent we were even more positive at work.

 2      Q    You're more positive?

 3      A    Hhmm-hmm.

 4      Q    And you don't think there was ever a danger that venting

 5      over rankings, venting about customers, venting about

 6      management, could spillover and perhaps affect service in

 7      the workplace?

 8      A    Don't people do it anyway, in any workplace?

 9      Q    That's not what my question was.

10      A    I'm sorry.  Please repeat the question.

11      Q    You never once thought that this could spillover and

12      affect the way the 20 of you, the 21 of you acted in the

13      workplace?

14      A    No.

15      Q    Or treated customers?

16      A    I didn't.

17      Q    Or approach customer or approach management?

18      A    No, I don't think it had any effect.

19      Q    And sitting here today, you have no idea who saw this

20      web site other than the 21 of you?

21      A    Well, and all of you and your company as well now.

22      Q    But at the time it was up and running --

23      A    Yes.

24      Q    -- and you have no idea who any one of the members

25      showed it to.  Correct?

Pietrylo-cross                              2.56

1        A    Correct.

2              MS. GARDINER:  I have no further questions, Your

3        Honor.

4              THE COURT:  All right.  Thank you.

5              Any redirect?

6              MR. PISANI:  Yes, Your Honor.

7              THE COURT:  All right.

8        REDIRECT EXAMINATION

9        BY MR. PISANI:

10       Q    Okay.

11             Mr. Pietrylo, let's start with some of the comments

12       that have been shown to you by Miss Gardiner, first of all.

13             THE COURT:  What exhibit numbers are you using?

14             MR. PISANI:  I'm not, I'm going to ask him some

15       questions and then I'll get to the exhibit numbers.  I'm --

16             THE COURT:  okay.

17       BY MR. PISANI:

18       Q    First of all, any comment that has been referenced that

19       you made here today and shown on the screens, once again,

20       where were he those comments made?

21       A    At home.

22       Q    Okay.

23             Did you ever make any of those comments at the

24       workplace?

25       A    No, sir.

JOHN KEVIN STONE, CSR

Pietrylo-redirect                           2.57

```
 1    Q    Did you ever make any of those comments to the managers?

 2    A    No, sir.

 3    Q    The references to the comments to that one customer, did

 4    you ever confront her and make a comment to her?

 5    A    No.

 6    Q    Now, let me show you, which is exhibit under D-2, and

 7    it's page 00242.  At the bottom where it's referenced

 8    that -- "do you have an opinion that we can circle?  Finger

 9    does it good."

10         MS. GARDINER:  On that screen.

11    Q    See that comment at the bottom that you made?  "Does

12    anyone know the spec on fellatio."  Did you mean that

13    statement literally?

14    A    No, I did not.

15    Q    Is that a play on words?

16    A    It is.

17    Q    Is that taking a sexual innuendo and combining it with a

18    spec from work?

19    A    Yes.

20    Q    Did you literally mean there is such a thing at work?

21    A    No, sir.

22    Q    And if you look a little bit higher, there's a comment

23    by Miss Helrig.  Are you Miss Helrig?

24    A    Am I --

25    Q    Are you Miss Helrig?
```

JOHN KEVIN STONE, CSR

1    A    No, I'm not Miss Helrig.

2    Q    Is Doreen Marino Miss Helrig?

3    A    No, sir.

4    Q    And she says, "I was pissed off because certain

5    management dicker moved up in ranking, and that means I gave

6    Jason a ring job for no good reason."

7            To your knowledge, did she get reprimanded or fired

8    because she made that comment on The Spec-tator?

9    A    No, sir.

10    Q    All the other comments regarding the acid reference and

11    the Wotco reference, did you literally mean that Doreen was

12    going to torch the tables at the restaurant?

13    A    No, I did not mean anything.

14    Q    Was that once again a play on words?

15    A    Yes, sir.

16    Q    And a combination of things that occur at work and

17    comments that you combined it with?

18    A    Correct.

19    Q    And when you were shown the one that said at some point

20    in time you have to have permission to take a shit on the

21    clock, did you literally mean that?

22    A    No, sir.

23            MR. PISANI:  Referencing D-2, and it's page H

24    00235, Your Honor.

25            THE COURT:  Hhmm-hmm.

JOHN KEVIN STONE, CSR

Pietrylo-redirect                          2.59

1    BY MR. PISANI:

2    Q   I think you testified that a topic is started by the

3    first person who makes a statement.  Correct?

4    A   Correct.

5    Q   And this topic at the top says, "what the fucking fuck.

6    And then the first person is by a Melonaid.  Melonaid, yes?

7    A   Yes.  Yes.

8    Q   Is that you?

9    A   No, that's not me.

10   Q   Is that Doreen Marino?

11   A   No.

12   Q   Okay.

13        And she says, "okay, seriously, white button-down

14   shirts, what the fuck are they thinking?  Have they ever

15   seen my black shirt at the end of the night?  I can only

16   imagine what my white shirt will be looking like.  These

17   stupid corporate fucks," etcetera, etcetera.

18        Once again, to your knowledge, was Miss Melonaid

19   reprimanded or fired for making that statement on The

20   Spec-tator?

21   A   No, sir.

22   Q   And now I'm going to refer to D-2, and the document,

23   Your Honor, is H 00241.

24        Okay.  At the top it's talking about rankings and

25   you posted that, and you started that topic.  Correct?

JOHN KEVIN STONE, CSR

1   A   Correct.

2   Q   And you made a statement, and it was very generic,

3   simple statement.  "So how do you feel about the recent

4   server rankings?  Is being a top eight server more important

5   that being a top eight My Space friend?"

6           Correct?

7   A   Correct.

8   Q   No more words, no innuendo, they are, the comment is

9   responded to by Melonaid?

10  A   Yes.

11  Q   Then she pulls up what you said and she says, "it's

12  bullshit and will always be bullshit.  They like to see you

13  scramble and get pissed off by rankings.  The only good

14  thing that comes out of being a top eight server is the

15  money.  It's definitely less important than being in the

16  friends top eight."  Correct?

17  A   Yes.

18  Q   And you're not Miss Melonaid?

19  A   No.

20  Q   Doreen Marino is not Miss Melonaid?

21  A   No.

22  Q   And you already testified about what happened to her.

23          And underneath that we have Sandra.  Are you

24  Sandra?

25  A   No, sir.

Pietrylo-redirect                          2.61

1    Q    Is Doreen Marino "Sandra"?

2    A    No.

3    Q    She says, "shit, this sucks.  I don't even know where I

4    am in the ranking.  What the fuck.  I'm scared to go into

5    work today.  Ugh, ugh.  I don't know what that says,

6    a-l-t-e.  Anyway, love you guys.  This is the coolest group

7    to ever be started."

8         So you responded to that and you've read that.  In

9    your opinion, did that contain a positive comment about the

10   group.  Correct?

11   A    Correct.

12   Q    And Sandra is not you, and it's not Doreen, and you've

13   testified -- I don't think you testified to Sandra.  Do you

14   know what happened to her, did she get reprimanded?

15   A    I believe, no, she wasn't.  I don't think she was even

16   with the company when this -- no, she never.

17   Q    Did she get fired for making these statements?

18   A    No.

19   Q    And I'm not going to continue to go through it, but the

20   exhibit that's been marked into evidence contains many more

21   comments similar to this by many more people besides you and

22   Doreen.  Correct?

23   A    Correct.

24   Q    And to your knowledge, all these other people that were

25   referenced, Miss Melonaid, Sandra, did they make any

JOHN KEVIN STONE, CSR

Pietrylo-redirect                           2.62

```
1    comments like this at work?

2    A    No, sir.

3    Q    Did they make any comments directly to managers at work

4    like this?

5    A    No, sir.

6    Q    Did they make comments in front of customers like this

7    at work?

8    A    No.

9    Q    Were you present for any of those?

10   A    No.

11   Q    Okay.

12             MR. PISANI:  I believe this one is from D-2 A, Your

13   Honor, and it's the first page, H 00245.

14   BY MR. PISANI:

15   Q    Remember you were asked questions about Houston's logo?

16   A    Yes.

17   Q    Were you ever given that as a reason for your firing,

18   that you would -- you had used their logo without

19   permission?

20   A    No, sir.

21   Q    Okay.

22             Have they filed a claim or a suit against you

23   seeking damages for an alleged improper use of their logo?

24   A    No, sir.

25   Q    There was some discussion about your tax returns.
```

JOHN KEVIN STONE, CSR

Pietrylo-redirect                    2.63

1               Did you personally prepare your tax returns?

2      A    No, sir.

3      Q    Okay.

4               And there was a slight difference in your income

5      between the tax returns for 2005 and 2006.  Correct?

6      A    Correct.

7      Q    And there was a slight increase?

8      A    Yes.

9      Q    Why was there an increase?

10     A    Between the two, let me take a look real quick.  Papers

11     every where.  Okay.  The increase between 2005 and 2006?

12     Why was there an increase?

13     Q    Yes.  Did you work more hours?

14     A    Oh, I was definitely working a lot more hours in 2006.

15     Q    Do you know in 2006 how much of the $34,000 was

16     attributable to Houston's and how much was attributable to

17     Morton's?

18               MS. GARDINER:  Objection, Your Honor.

19               THE COURT:  Basis?

20               MS. GARDINER:  There's already been testimony he

21     doesn't know.

22               MR. PISANI:  I believe you asked him if he had a

23     W-2.

24               MS. GARDINER:  And I said, therefore you don't know

25     which -- how much went to each, and he answered "no."  Now

JOHN KEVIN STONE, CSR

```
 1      if he wants to change his answer, I guess --
 2              THE COURT:  He can ask the question, you can
 3      follow-up with redirect if you believe there's a change.
 4              You can answer briefly.
 5      A    Can you repeat the question one more time, please?
 6      Q    Okay.  I'll rephrase the question.
 7              Did you make -- had you stayed at Houston's the
 8      entire year, would you have made more money working at
 9      Houston's that year?
10      A    It's my belief, yes.
11      Q    Did you stay at Morton's the entire year 2007?
12      A    No, I left at the end of October.
13      Q    Okay.
14              And where did you go work after that?
15      A    I went to Florida and got a job at Bentley's Restaurant.
16      Q    Okay.
17              And then you worked there from the end of October
18      until the end of the year?
19      A    Yes.
20      Q    And do you know how much you made there?
21      A    That was probably about $200, that month it was very
22      slow.
23      Q    Now, when Miss Gardiner was talking to you about your
24      emotional distress claim, you said that there were three
25      things that you mentioned to Dr. Heimbach the first time you
```

Pietrylo-redirect                    2.65

1    went to him.  Correct?

2    A    Correct.

3    Q    And I think it was the firing from Houston's.  Correct?

4    A    Correct.

5    Q    The stress of your new job at Morton's?

6    A    Correct.

7    Q    And the legal process?

8    A    Yes.

9    Q    Okay.

10        Can you characterize in terms of percentages which,

11   if any, of those troubled you the most?

12   A    It would definitely have been my termination from

13   Houston's.

14   Q    She also mentioned that you, and you testified that when

15   you were a teen you cut yourself and that when you were a

16   teen you were depressed?

17   A    Correct.

18   Q    How old are you now?

19   A    I am 28.

20   Q    And in early 2007 how old were you?

21   A    I would have been 26 or -- 25 -- depends on what time of

22   the year, 25 or 26.

23   Q    When is your birthday?  When is your birthday?

24   A    March 27th.  So --

25   Q    Okay.

JOHN KEVIN STONE, CSR

```
 1            So at the time that you were seeing Dr. Heimbach
 2    you had turned --
 3    A    26.
 4    Q    Okay.
 5            So that was a period then of almost seven years
 6    between the time you were a teenager and when you started
 7    seeing him.  Correct?
 8    A    Correct.
 9    Q    Okay.
10            So did you cut yourself at any time between the
11    time you turned 20 'til the time you were 26?
12    A    No, sir.
13    Q    Were you depressed at all between the time you were 20
14    until the time you were 26?
15    A    No, sir.
16    Q    Okay.
17            And I think I talked to you about this yesterday,
18    did you ever seek any type of psychiatric counselling for
19    anything prior to 2007?
20    A    No, sir.
21    Q    Okay.
22            And prior to 2007, were you ever put on any type of
23    medication for anything having to do with your emotional
24    state prior to 2007?
25    A    No, sir.
```

Pietrylo-redirect                2.67

1    Q    And prior to 2007, did you ever seek any type of

2    counselling from a psychologist or anyone else in the

3    medical field?

4    A    No, sir.  No, sir.

5    Q    Okay.

6         You remember Miss Gardiner showed you D -- the

7    pages in the handbook regarding the core values?

8    A    Yes.

9    Q    Okay.

10        Anywhere in those core values, let me get it out.

11   Does it reference anywhere in there that these values would

12   apply anyplace other than at work?

13   A    No, it actually states in your work.

14   Q    Okay.

15        And when you were there, did you comply with, and

16   when you were working, did you comply with these core

17   values?

18   A    Yes.

19   Q    In fact, were you ever written up at any time in your

20   employment for violating any of these four core values?

21   A    No, sir.

22   Q    Last area, training.

23        She mentioned to you that you received some

24   training and pointed out some documents to you?

25   A    Yes.

Pietrylo-redirect                          2.68

1    Q    How long did the training last?

2    A    It was usually about eight days.  I think I went -- mine

3    was only six or seven that I went through.

4    Q    And how much of that time did you spend on this issue of

5    core values?  Do you even remember spending any time on it?

6    A    Well, basically to get through training you have to

7    memorize what the four values are.  But it's kind of

8    something you do on your own time.  It's go over it with a

9    trainer, but it's up to you actually get them down.

10   Q    Okay.

11        How much time did you spend on it?

12   A    A day.  And --

13   Q    And that was back in 2004 when you started?

14   A    Yes.

15        MR. PISANI:  I have nothing further, Your Honor.

16   Thank you.

17        THE COURT:  Any recross?

18        MS. GARDINER:  Very briefly, Your Honor.

19   CROSS-EXAMINATION

20   BY MS. GARDINER:

21   Q    By creating The Spec-tator you gave all of the

22   participants the forum to post all of those messages that we

23   looked at.  Correct?

24   A    Correct.

25   Q    Do you recall that before this lawsuit was actually

JOHN KEVIN STONE, CSR

1    filed, did you know that your attorney received a letter

2    from Houston's corporate attorney?

3    A    I did.

4    Q    And one of the things that Houston's corporate attorney

5    wrote in that letter was the unauthorized use or complained

6    about in that letter was your unauthorized use of the

7    Houston's logo.  Correct?

8    A    Correct.

9    Q    And this lawsuit, to the best of your knowledge, was

10   filed in about at the end of November 2006?

11   A    I think you're right.  You would know, so I'm going to

12   agree, yes.

13   Q    And your breakdown, as you called it, was in January

14   2007?

15   A    Correct.

16            MS. GARDINER:  No further questions.

17            THE COURT:  All right.  Thank you.

18            You may step down.

19            ( Witness excused ).

20            THE COURT:  Ladies and gentlemen, it's been a long

21   morning.  I'm going to give you a very brief break, then

22   we'll come back and do between 45 minutes and an hour before

23   lunch.  Figure you can all use a late mid-morning break.  So

24   stretch your legs, go back to the jury room, have a glass of

25   water.  Don't know if you have time for a cup of coffee, but

2.70

```
 1    I'm going to let me you take a brief break just to go
 2    stretch your legs and we'll be back in ten minutes.
 3             Thanks.
 4             THE CLERK:  All rise.
 5             ( Jury exits ).
 6             THE COURT:  All right.
 7             Counsel, you can take a break too.  I'd just like
 8    to, with the jury not present, there's a lot of leading
 9    going on.  The hostile witnesses rules do not apply on your
10    own with Mr. Pietrylo, Mr. Pisani.  I'm letting it go
11    because there's been no objection.  But in general, and
12    counsel is obviously making a strategic decision not to
13    object, which I fully understand.  But understand, if you do
14    lead, and there is an objection, it will be sustained.
15             MR. PISANI:  I do, Your Honor.
16             THE COURT:  Okay.  Fair enough.
17             MR. PISANI:  Just trying to keep the process going
18    as quickly as possible.
19             THE COURT:  It's on conventional things that just
20    direct the witness to something or other I allow leading.
21    But when it gets to core matters that are in dispute, it's
22    up to counsel to decide whether to object to leading or not.
23    And it's up to counsel to decide whether to take the risk of
24    leading or not.  Those are all decisions you make.
25             MR. PISANI:  Right.
```

JOHN KEVIN STONE, CSR

1          MS. GARDINER:  Your Honor, we do have some revised

2    jury charges.  I typed them up last night after we met.

3    Counsel hasn't had a chance to review them.

4          THE COURT:  Okay.

5          MS. GARDINER:  But by the end of the day he will,

6    and we'll give them to you.

7          THE COURT:  That will be great.  We can -- I can

8    review them overnight and we'll begin the discussions we

9    have.

10          Has there been any decision, Mr. Pisani, whether

11    you're going to continue with the New Jersey public policy

12    cause of action?

13          MR. PISANI:  Yes, I am, Your Honor.

14          It's a very important issue for me.  I believe what

15    you say outside of work should not be a cause for you to be

16    fired, and in addition, the jury in addition can find that

17    they violated the right to privacy but not -- were not

18    wrongfully -- because they, if they wanted to accept the

19    test thing, I could -- they could find they violated privacy

20    but not the wrongful termination.

21          THE COURT:  All right.  It's still in the case.

22          MR. PISANI:  Thank you.

23          THE COURT:  Just provide appropriate non-advocacy

24    based jury instructions that describe the law on it.

25          MR. PISANI:  I think we worked on that.

2.72

```
 1              MS. GARDINER:  We worked on that last night, Your
 2     Honor.  There -- there are a couple of things in yellow at
 3     the end of each charge describing what we could not agree
 4     upon.  But it's not --
 5              MR. PISANI:  Like it was.
 6              MS. GARDINER:   -- like it was.
 7              THE COURT:  Not highlights.
 8              Okay.  That's good.  Good.  We pared this down.
 9              Can I just ask you briefly, what is the public
10     policy that you are claiming is the public policy?
11              MR. PISANI:  Their right to privacy, which is to
12     speak their own minds in their own time, in their own
13     private homes, and not having the consequence of getting
14     fired for it.
15              THE COURT:  And is there a seminal case in New
16     Jersey that defines when something is a matter of public
17     policy?
18              MR. PISANI:  I don't -- I cited many cases for
19     you --
20              THE COURT:  I --
21              MR. PISANI:   -- I don't think any of them are
22     here.  That's one of the reasons we're here, this is a kind
23     of a new issue, how far that right of privacy expands.  I
24     cited some cases to you from the Pennsylvania District
25     Courts, and that would apply in support of my position.
```

2.73

1          THE COURT:  No, I saw the cites.

2          MR. PISANI:  Yes.

3          THE COURT:  Your draft jury instruction basically

4    doesn't have them reach this issue unless they found a

5    violation of the right to privacy.

6          MR. PISANI:  Actually, the cases that I have state

7    that if they find the right of privacy has been violated,

8    that it's almost like a directed verdict as a matter of law

9    then by them finding, that they did violate public policy by

10   wrongfully discharging him.  And I cited three or four

11   cases.

12         THE COURT:  I'm sure you've cited the cases.  I'll

13   read them when I have a chance to between now and the charge

14   conference.

15         But what I'm just clarifying is, in your draft,

16   your version of the draft jury instructions, the jury only

17   gets the public policy cause of action if they have found

18   that there was a violation of the right to privacy.

19         MR. PISANI:  Right.

20         THE COURT:  Okay.

21         MS. GARDINER:  And we both agree that you have to

22   make the threshold decision.

23         THE COURT:  Of whether it is.

24         MS. GARDINER:  Of whether there was a significant

25   public policy.

JOHN KEVIN STONE, CSR

2.74

```
 1              THE COURT:  Public policy here.  Right.  I
 2      understand that.
 3              It's kind of like a Markman hearing I guess.  It's
 4      just that those don't normally come up in the middle of
 5      trial.  But I guess they do in the State of New Jersey.
 6              MS. GARDINER:  They do.
 7              THE COURT:  So we're --
 8              MS. GARDINER:  There's one other thing about
 9      punitive damages, Your Honor, which we don't have to go into
10      right now.
11              Counsel and I had a chance to talk about it and
12      perhaps at the end of the session today we can talk to you a
13      little bit more --
14              THE COURT:  Sure.
15              MS. GARDINER:   -- about why we still think
16      bifurcation is easier, and why it's not any other evidence
17      going in other than if there's liability found, us just
18      making arguments to the jury without any testimony on why
19      there should or should not be punitives, and why it's a
20      problem drafting --
21              THE COURT:  I'm happy to hear from you on it.
22              At least you're not asking that there be two
23      evidentiary phases of this trial.
24              MS. GARDINER:  No, not at all.
25              MR. PISANI:  Yes.
```

```
1            THE COURT:  That was my first and foremost concern
2    with what you were posing, and taking a short trial and
3    making it even more prolonged because of two stages of
4    evidence taking.
5            MS. GARDINER:  No.  The only thing --
6            THE COURT:  As long as, or one potential little
7    ground that occurred to me would be to, at this stage, when
8    they go in, pose interrogatories for the jury of the
9    predicate elements that they have to find under the statute
10   for punitives.  And if they answered those pred -- those
11   special interrogatories establishing factually a basis for
12   it, then perhaps allowing a brief argument on punitives and
13   then posing the question to them --
14           MS. GARDINER:  Yes, our following along those
15   lines --
16           THE COURT:  Yes.
17           MS. GARDINER:  -- was that counsel says, and I
18   think he's right, that the -- the words used in the statute
19   "willful, intentional," for punitive damages, are defined in
20   the case law, not using the words "malicious."  However, if
21   you go to the common law claims and the New Jersey punitive
22   damages act, we get into different wording, which is why
23   it's difficult to come up with one jury charge for all four
24   claims, and why we thought it would be better to see what
25   liability, if any, was found before we worried about the
```

2.76

```
 1     words to use and the definitions to use.  And it's --
 2               THE COURT:  Well, we'll talk about it further at
 3     the charge conference.
 4               MS. GARDINER:  Okay.
 5               THE COURT:  See if there's a way around that.
 6               Look, I understand the wording of the statute is
 7     anything but a gorgeous work of prose.
 8               MS. GARDINER:  That's true.
 9               THE COURT:  They use "intentional" in the punitive
10     damages section, but they also use "intentional" in the
11     regular section.  So you have to read --
12               MS. GARDINER:  And I --
13               THE COURT:   -- in connection with willful to
14     understand what they were meaning to say.
15               MS. GARDINER:  Absolutely.
16               THE COURT:  But then, again, they also in their
17     legislative history and the report, as I recall, referred to
18     changing terminology from "willful" to "intentional" and
19     then thinking that they're making it stronger language that
20     way, which of course makes absolutely no sense in that
21     report.  So the report is not --
22               MS. GARDINER:  I agree.
23               THE COURT:   -- is not of great utility.  When I
24     got to this section, I scratched my head saying, "who wrote
25     this?"
```

1          MS. GARDINER:  Well, we all do have that.

2          I do have a case that I don't believe was cited in

3     the papers, but I can give Your Honor the cite this

4     afternoon, that explains the case law, explains the change

5     from "willful" to "intentional."  It explains that willful

6     was meant to be more than intentional so --

7          THE COURT:  Yes.  But then you have somebody else

8     saying --

9          MS. GARDINER:  I know, yes, I know.

10          THE COURT:   -- well, that just basically shifts,

11     you know, you try to read it for what it's worth.

12          MS. GARDINER:  And go from there.

13          THE COURT:  Yes.

14          MS. GARDINER:  But I think it's just a matter of

15     the -- of the definitions that go to the jury on what they

16     have to find.

17          THE COURT:  So you're saying in the common law,

18     that the elements, the predicate elements under New Jersey

19     common law for punitive damages are what?

20          MS. GARDINER:  I think they're the same.  I'm

21     saying counsel for plaintiff does not believe that the word

22     "malicious" should be mentioned in connection -- or

23     "malicious" or "evil minded" fact should be mentioned in --

24          MR. PISANI:  The common law says "malicious" and

25     "willful."  The statute says "willful" or "intentional."

2.78

```
 1      But then they don't define obviously what they mean.
 2              MS. GARDINER:  And isn't the description for the
 3      statutory claim --
 4              THE COURT:  So if they find that they invaded their
 5      right of privacy under the common law, then it would be
 6      willful and malicious.  If they find that they violated the
 7      statute, it would be willful or intentional.  If they find
 8      both, then what do you do?
 9              MS. GARDINER:  I don't think there's a big
10      difference.
11              MR. PISANI:  See, that's -- now if you decide that
12      "intentional" means "malicious," then we can go with the
13      standard charge.
14              THE COURT:  Well, "intentional," let me put it this
15      way, without making any finding, that it necessarily means
16      "malicious" at this stage.  I will obviously make such a
17      ruling if I need to at the charge conference.  One thing you
18      can, if the two of you continue to have these discussions,
19      and I encourage them, is that "intentional" in the punitive
20      damages section of the statute has to mean more than the
21      "intentional" in the regular part of the statute which has a
22      $1,000 --
23              MR. PISANI:  I agree a hundred percent on that.
24              THE COURT:  And the question is what that more is.
25              MR. PISANI:  Right.
```

2.79

```
 1                THE COURT:  Okay.  Fair enough.
 2                MS. GARDINER:  Thank you, Your Honor.
 3                THE COURT:  You're welcome.
 4                MR. PISANI:  Thank you, Judge.
 5                THE COURT:  You're welcome.
 6                ( After a brief recess court resumed ).
 7                THE CLERK:  All rise.
 8                THE COURT:  You may all be seated.  Thanks.
 9           We're going to get the jury.  It's 11:45.  We'll go
10      until about 12:45.  Depending on where we are in the direct
11      of the next witness.
12                I always have the first half of the morning session
13      much longer than the second half of the morning session.  I
14      can see you both nodding yes, so I don't have to give the
15      explanation.
16                MR. PISANI:  That's fine.
17                THE COURT:  There's a reason for it.  As people
18      come in in the beginning of the day with much, at the best
19      alertness that they have all day, and then we have to pace
20      the break to allow them to maintain that.
21                THE CLERK:  All rise.
22                ( Jury enters ).
23                THE COURT:  All right.
24                You may all be seated.
25                You may call your next witness.
```

2.80

```
 1              MR. PISANI:  Okay.

 2              Thank you, Your Honor.

 3              At this time I'd like to call my next witness,

 4    Karen St. Jean to the stand.

 5              THE COURT:  All right.

 6              Miss St. Jean may take the stand.

 7              Neither side has requested a sequestration order.

 8    Is that correct?

 9              MR. PISANI:  No.

10              MS. GARDINER:  There isn't one.

11              THE COURT:  Okay.

12              Please raise your right hand and place your left

13    hand on the Bible.

14    K A R E N      S T.   J E A N, sworn.

15              THE CLERK:  Please state and spell your name for

16    the record.

17              THE WITNESS:  Karen St. Jean.  Oh, Karen,

18    K-a-r-e-n, St. Jean, S-t-J-e-a-n.

19              MR. PISANI:  May I begin?

20              THE COURT:  ( Indicates affirmative ).

21    DIRECT EXAMINATION

22    BY MR. PISANI:

23    Q    Good morning, Miss St. Jean.

24    A    Morning.

25    Q    How are you today?
```

St. Jean-direct                                    2.81

1      A    Okay.

2      Q    My name is Fred Pisani, I'm an attorney and I represent

3      Brian Pietrylo and Doreen Marino.  I'm going to ask you a

4      couple questions.

5      A    Okay.

6      Q    Okay?

7      A    Okay.

8      Q    You need to answer --

9      A    Yeah.  Okay.

10     Q    -- speak up, too, so everybody can hear you, please.

11     A    Okay.

12     Q    Okay.

13          In March 2006, were you employed?

14     A    Yes.

15     Q    And by whom were you employed?

16     A    Houston's.

17     Q    Houston's Restaurant where?

18     A    In Hackensack, New Jersey.  Hackensack, New Jersey.

19     Q    At the Riverside Square Mall?

20     A    Yes.

21     Q    In what capacity were you employed by them at that time?

22     A    I was -- I was a greeter and I was serving also.

23          THE COURT:  Is anybody having any trouble hearing?

24          MR. PISANI:  I am.

25     A    I'm sorry.

JOHN KEVIN STONE, CSR

St. Jean-direct                                    2.82

1          THE COURT:  That's okay.  I understand that.  It's

2     perfectly understandable to be nervous.  You have two

3     choices.

4          THE WITNESS:  Okay.

5          THE COURT:  For -- this room is a very large cubic

6     space, as you can see.

7          THE WITNESS:  Okay.

8          THE COURT:  So you can either try to speak very

9     close to the mike, or you can sit back in your chair, ignore

10    the microphone, but then speak up the way I am.  Take your

11    pick.

12         THE WITNESS:  Sorry.

13         THE COURT:  But if you interrupt, it's not --

14         THE WITNESS:  Okay -- okay.

15         THE COURT:  All right.  Good.

16         THE WITNESS:  All right.

17         THE COURT:  So try to really speak even

18    uncomfortably loud for you --

19         THE WITNESS:  Okay.

20         THE COURT:   -- to be able to hear you.  It's not

21    criticism of you, some voices carry in this room and some

22    just don't.

23         THE WITNESS:  Okay.

24    BY MR. PISANI:

25    Q    Okay.  Thank you.

JOHN KEVIN STONE, CSR

St. Jean-direct                      2.83

1           I believe you said you were a greeter?

2    A    I was greeting and I was a server as well.

3    Q    And what did you do as a greeter?  What does a greeter

4    do?

5    A    We welcome all the guests in, when they walk in we seat

6    the guests, we, you know, we usher them to the table, we

7    clean the tables and set them up, you know.  And that's

8    basically it.

9    Q    Okay.

10           And in March of 2006, for how long had you been

11   employed in that capacity with Houston's?

12   A    I started working there in October 2004, so...

13   Q    While you were working in Houston's between October 2004

14   and March 2006, did you have occasion to work with Brian

15   Pietrylo?

16   A    Yes.

17   Q    During that time did you have occasion to work with

18   Doreen Marino?

19   A    Yes.

20   Q    Did you become friends with either one of them?

21   A    We were, I mean I guess you become friends with people

22   at work.

23   Q    Well, did you consider yourself a friend of Brian's?

24   A    Yes.

25   Q    Okay.

St. Jean-direct                                   2.84

1           How about Doreen?

2      A    We talked, she was nice.

3      Q    In March 2006, who were the day-to-day managers at

4      Houston's when -- I mean -- do you understand what I mean by

5      the question?

6      A    Well, yeah, the managers.

7      Q    That were there everyday when you would come to work,

8      and who were they?

9      A    They were Jason Sokolow.

10          THE COURT:  Is anybody having any trouble --

11          THE WITNESS:  I'm sorry.

12          THE COURT:   -- with the sound?  Is it -- are you

13     all able to hear okay?

14          MS. GARDINER:  It sounds fuzzy.

15          THE COURT:  Sounds very fuzzy.

16          THE WITNESS:  Is it me?

17          THE COURT:  I'm going to ask -- I'm going to try

18     the second approach.

19          THE WITNESS:  Okay.

20          THE COURT:  Lean back, be comfortable.  Okay?

21          Now, put the microphone closer to you and lower.

22     And put it as close to you as you can pull it, and sit back

23     in your chair.  And now try talking in a -- not even a

24     conversational voice, as if you're talking to the way back

25     of the room where the clock is.  Okay?

St. Jean-direct                                    2.85

 1                 THE WITNESS:  Okay.
 2                 THE COURT:  Good.  That's better.
 3                 THE WITNESS:  Is that better?
 4                 THE COURT:  Keep it up like that.  Great.  Perfect.
 5                 THE WITNESS:  Sorry.
 6     BY MR. PISANI:
 7     Q    Need me to repeat the question?
 8                 THE COURT:  He was asking you to name the
 9     day-to-day managers at that time.
10     A    So Jason Sokolow, who was our G-M.
11                 THE COURT:  Hhmm-hmm.
12     A    Tijon Rodriguez, who in March of 2006 I believe he was
13     the greeter manager.  And Robert Anton, who was server,
14     service manager.
15     Q    He was a manager?
16     A    Yes.
17     Q    Were you friends with any of them?
18     A    Tijon Rodriguez.
19     Q    Was Jason Sokolow Mr. Rodriguez's and Mr. Anton's boss?
20     A    Yes.
21     Q    At the time did you know a Rob Morano?
22     A    Yes.
23     Q    And who is he, is he seated at the table over here?
24     A    Yeah, he's sitting next to Miss Gardiner.
25     Q    And who was -- do you know what his capacity was back in


                        JOHN KEVIN STONE, CSR

1      2006?

2      A    Yes.  He was our regional manager.

3      Q    Was he at the restaurant on a daily basis?

4      A    Not on a daily basis, but he was there several times a

5      week.

6      Q    Do you know anyone named Tino Chimburello?

7      A    I know of him, I've never met him.

8      Q    Okay.

9           You've never met him?

10     A    No.

11     Q    Did you ever have a conversation with him?

12     A    No.

13     Q    Okay.

14          Do you know a Michael Lamb?

15     A    Same situation.  I know of him, I've never met him.

16     Q    Okay.

17          Have you ever had a conversation --

18     A    No.

19     Q    -- with him about anything?

20     A    No.

21     Q    Between March 2006 and May 2006, did you have your own

22     My Space account?

23     A    Yes.

24     Q    For how long did you have your My Space account?

25     A    I had it for a little bit over a year.

St. Jean-direct                           2.87

1    Q    What did you have to do to get a My Space account?

2    A    You have to register your e-mail address and then set up

3    a password.

4    Q    Okay.

5              Did you do that?

6    A    Yes.

7    Q    What was your e-mail address at that time?

8    A    Karen Giacomano at Yahoo.com.

9    Q    And your password?

10   A    It was Keepout 1.

11   Q    Now, you selected that password?

12   A    Yes.

13   Q    And when you typed it in and selected it, it's like most

14   passwords, you don't see it?

15   A    Yes.

16   Q    It's got little asterisks or little black dots?

17   A    Yes.

18   Q    Where did you set up your My Space account, on a

19   computer at home?

20   A    Yes.

21   Q    Did there come a time when Brian Pietrylo invited you to

22   join a group?

23   A    Yes.

24   Q    And when was that?

25   A    When he first started it.  I don't --

JOHN KEVIN STONE, CSR

St. Jean-direct                    2.88

1    Q    Okay.

2          Do you have any idea of the time frame?

3    A    I don't.  I don't know the time frame.

4    Q    And do you know the group he invited you to be part of?

5    A    Yes.

6    Q    What was that?

7    A    The Spec-tator.

8    Q    And and how did he invite you?

9    A    He sent me a --

10         THE COURT:  Voice up.

11   A    Oh.  He sent me an invite through the -- through My

12   Space.

13   Q    Okay.

14         And you actually then subsequently saw that

15   invitation?

16   A    Yes.

17   Q    And you saw that invitation on a computer?

18   A    Yes.

19   Q    What computer?

20   A    My home computer.

21   Q    Your home computer.

22         And now did you accept the invitation?

23   A    Yes, I did.

24   Q    And what did you have to do to accept the invitation?

25   A    You just clicked, you just clicked on accept or ignore,

St. Jean-direct                              2.89

1    and I accepted it.

2    Q    And did you do that at home on your home commuter as

3    well?

4    A    Yeah.  Yes.

5    Q    So after you accepted, did you ever then go on to The

6    Spec-tator?

7    A    Yes.

8    Q    Okay.

9         And how do you do that?

10   A    You have to sign in to your My Space account.

11   Q    Okay.

12        With your e-mail address?

13   A    Yes.

14   Q    And your password?

15   A    Yes.

16   Q    And then what happens?

17   A    And then you you have like a bunch of groups that you

18   are a part of, and then you click on one of them.

19   Q    Okay.

20        When you went on The Spec-tator through your own My

21   Space account, when you're -- do you have a home page --

22   A    Yes.

23   Q    -- that pops up?

24   A    Yes.

25   Q    Can you see The Spec-tator at all on your home page?

St. Jean-direct                          2.90

1    A    Yes.

2    Q    Can you see any of the comments on your home page?

3    A    No.

4    Q    Okay.

5         So you have to do what to actually see comments?

6    A    You have to click on the group.

7    Q    Okay.

8         So did you then go on The Spec-tator?

9    A    Yes.

10   Q    Okay.

11        Did you go on The Spec-tator more than once?

12   A    Yes.

13   Q    How often would you go on The Spec-tator?

14   A    Maybe two or three times a week.

15   Q    Okay.

16        And when you went on The Spec-tator, how did you go

17   on The Spec-tator, on a computer?

18   A    Yes.

19   Q    Okay.

20        And where was that computer located?

21   A    At home.  At home.

22   Q    Okay.

23        When you went on, what would you do on The

24   Spec-tator?

25   A    Just read.

St. Jean-direct                                    2.91

1    Q    The comments?

2    A    Yes.

3    Q    Did you ever write or post any messages yourself?

4    A    No.

5    Q    After you became a member of The Spec-tator, did you

6         show The Spec-tator to any of the managers?

7    A    Yes.

8    Q    And who was that?

9    A    Mr. Rodriguez.

10   Q    And he's your friend?

11   A    He was my husband's friend, so yes, he was my friend.

12   Q    And where did you show him The Spec-tator?

13   A    At his house.

14   Q    Okay.

15            And why were you at his house?

16   A    We were having dinner.

17   Q    Okay.

18   A    With his wife.

19   Q    Did you show him it to him before or after dinner?

20   A    After.

21   Q    Okay.

22            And how did you show it to him?

23   A    I signed in with my name and my password.

24   Q    You signed in?

25   A    Yes.

JOHN KEVIN STONE, CSR

St. Jean-direct                        2.92

1    Q    Okay.

2         Did you give him your e-mail and password at that

3    time?

4    A    No.

5    Q    Okay.

6         Did he ask for it, your e-mail and your password at

7    that time?

8    A    No.

9    Q    And when you showed it to him, what happened?  Did you

10   point out certain comments or --

11   A    No, I initially signed on to my My Space page and on to

12   the group, because Brian had posted a video, it had nothing

13   to do with Houston's, it was just about a server, that my

14   husband thought it was hilarious, and he wanted me to show

15   Tijon.

16   Q    Did you -- did you think it was hilarious?

17   A    I thought it was funny.  But it had nothing to do with

18   Houston's or employees thre or managers, it was just about

19   servers.

20   Q    And but it was on The Spec-tator?

21   A    Yes.

22   Q    Okay.

23        So then you showed him the video?

24   A    Yes.

25   Q    Okay.

```
 1              And then what happened?
 2    A    And then he noticed that it was, you know, it was the
 3    group that he had heard people talking about.
 4    Q    Okay.
 5    A    And then he wanted to read some of the comments.
 6    Q    And did you read them to him or did he?
 7    A    He read them himself.
 8    Q    He did.  He just read them himself.  Were you there when
 9    he was reading them?
10    A    Yes.
11    Q    Okay.
12              Did you have a conversation with him at all after
13    he read them?
14    A    No.  We actually had a -- you know, a laugh, because I
15    mean about about some of the comments and -- yeah.
16    Q    Did you think some of the comments were funny?
17    A    I thought they were.
18    Q    Did you think some of the comments were satirical?  Do
19    you know what I mean by the word "satirical"?
20    A    No.
21    Q    A play on words, the --
22    A    I mean I didn't really read --
23    Q    Okay.
24              Now, after you showed Mr. Rodriguez The Spec-tator
25    and you searched, specifically showed him that video you
```

St. Jean-direct                    2.94

1        just referred to --

2    A    Yes.

3    Q    -- did any other manager ask you for your password?

4    A    Yes.

5    Q    And who was that?

6    A    Robert Anton.

7    Q    And he you mentioned before is a manager?

8    A    Yes.

9    Q    Okay.

10            And where did he ask you for your password?

11   A    He asked me at work.

12   Q    So you had gone to work --

13   A    Yeah.

14   Q    -- subsequent to showing Tijon?

15   A    Yes.

16   Q    I'm -- oh, I'm sorry.

17            And you were in your work uniform?

18   A    Yes.

19   Q    And how long had you been working?

20   A    That day that he asked me?

21   Q    Yes, that day.

22   A    Couple of hours.

23   Q    Okay.

24            And was he on duty that day as a manager?

25   A    Yes.

St. Jean-direct                    2.95

1    Q    Okay.

2          And where did he approach you?

3    A    He had -- I don't know exactly where he had approached

4    me, but I know he took me to the side by the bar.

5    Q    And do you remember what he -- I know it's a long time

6    ago, but what he generally said to you?

7    A    He just said that it was wrong what they were saying on

8    there.

9    Q    Okay.  Hhmm-hmm.

10   A    And that something had to be done.

11   Q    Okay.

12         What else?

13   A    And he asked me for my password and my e-mail.

14   Q    And did you give him your e-mail and your password?

15   A    Yes.

16   Q    Did you say anything to him?

17   A    Oh -- no.

18   Q    Okay.

19         When you gave it to him, did you feel pressured in

20   any way?

21   A    It was -- it wasn't like he didn't pressure me, like,

22   oh, you have to give me the password.  I just felt, I mean

23   in any situation, I -- you know, I felt I had to give it to

24   him.

25   Q    Why?

JOHN KEVIN STONE, CSR

St. Jean-direct                                            2.96

1    A    Well, because I worked there.  And I -- and it was

2    basically me who, you know, like I'm the one who like opened

3    Pandora's box, and I -- so, you know, I felt like I --

4    Q    And he was the manager that day?

5    A    Yes.

6    Q    Would you have given it to him if he wasn't a manager?

7    A    No.

8    Q    So if one of the co-workers came up to you and asked you

9    for your password, would you have given it to them?

10   A    No.

11   Q    Did you feel something would happen to you if you did

12   not give him the password?

13   A    I felt that I probably would have gotten in trouble.

14   Q    Okay.

15        Why did you feel that way?

16   A    Because I mean it was a big deal.

17   Q    Did you -- did he ask you for the password subsequently

18   again?

19   A    Yes.

20   Q    And was that also at work?

21   A    Yes.

22   Q    Okay.

23        And did you give it to him?

24   A    Yes.

25   Q    Why did you give it to him this time?

St. Jean-direct                    2.97

1    A    Because I gave it to him the first time.

2    Q    Okay.

3         Did you ever give your password to Rob Morano?

4    A    No.

5    Q    Did you ever authorize Rob Morano to use your password?

6    A    Not that I -- not that I remember.  I mean I said in my

7    deposition, I know -- I know, and you can stop me if I'm

8    like rambling, but I said I never gave it to him.  But

9    there's this one instance, and I keep running over and over

10   in my mind that like, you know, that Tijon had asked me and

11   I just don't remember if I did or not, and I don't remember

12   that to recall.

13   Q    To the best of your recollection, did you ever authorize

14   him to use your password?

15   A    I don't remember.  I don't remember if I authorized it,

16   like he never asked me directly for my password.

17   Q    And you're sure about that, he never directly asked you?

18   A    No, he never directly asked me.

19   Q    Did he ever ask you -- I'm referring to Rob Morano.

20   A    Hhmm-hmm.

21   Q    Did he ever ask you to show him The Spec-tator the way

22   you showed Tijon?

23   A    No.

24   Q    After you gave the password to Mr. Anton the first

25   time --

St. Jean-direct                                2.98

1    A    Hhmm-hmm.

2    Q    -- did you have any second thoughts about what you had

3    done?

4    A    Well, I felt guilt, 'cause I didn't want anybody to get

5    in trouble.

6    Q    You didn't want to get in trouble either.  Right?

7    A    Well, yeah.  I mean I didn't want this to be a big --

8    you know, a big deal.

9    Q    Did you share those thoughts with any manager?

10   A    Well, I told Tijon, I asked him why he had gone and told

11   them.

12   Q    Did you share your thoughts with Jason Sokolow?

13   A    Yeah, I did as well.  I went up to him and I asked him,

14   well, I told him, like that I felt really guilty, and I felt

15   bad, and I didn't know -- I didn't want anybody to know it

16   was me.

17   Q    Did you also tell him that they had asked me for my

18   password and I really didn't want to give it to them?

19   A    No, I don't remember saying that.  ( Witness tearing

20   up - wiping eyes ).

21   Q    Are you okay?  You need a break?

22   A    No, I'm fine.

23   Q    You're not crying because I'm asking you questions, I

24   hope not?

25   A    No.

St. Jean-direct                          2.99

1     Q    I don't mean to make you upset.

2     A    No, I'm --

3              THE COURT:  She's fine.

4              It's just, you know, it's not an everyday

5     occurrence when someone has to sit in a witness box with a

6     -- in a huge federal courtroom with a bunch of people

7     staring, and I think she's having a very perfectly normal

8     human reaction.

9              THE WITNESS:  No, I'm fine.  I just want this to be

10    over.

11             THE COURT:  I can tell from her face and voice

12    she's fine.

13             THE WITNESS:  Yeah.

14             THE COURT:  And she'll let me know if we need a

15    break.

16             THE WITNESS:  Yeah.

17             MR. PISANI:  Okay.  May I continue?

18             THE COURT:  You may.

19             MR. PISANI:  Thank you.

20    BY MR. PISANI:

21    Q    Karen, prior to today, did you and I go over your

22    previous deposition testimony?

23    A    Yes.

24    Q    Where are you presently working?

25    A    At Houston's.

St. Jean-direct                    2.100

1    Q    You are back working at Houston's in Riverside Square
2    Mall?
3    A    Yes.
4    Q    And when did you start working for Houston's again?
5    A    About two or three weeks.
6    Q    I'm sorry?
7    A    Two or three weeks.
8    Q    Two or three weeks ago?
9    A    Yes.
10   Q    Had you previously reapplied for a position there prior
11   to two or three weeks ago?
12   A    I didn't officially reapply.  I had told my cousins to
13   pass the word on, that I wanted to come back to work.
14   Q    Okay.
15        Did you get a response back?  And when was -- I'm
16   sorry, strike that.
17        When was that, approximately?
18   A    About two or three months ago.
19   Q    Okay.
20        And did you hear back through any source in terms
21   of the whether or not you'd be able to come back?
22   A    Yes, I did.
23   Q    And what did you hear?
24   A    They said that the general manager that was working
25   there at the time when I had left Houston's didn't really

JOHN KEVIN STONE, CSR

St. Jean-direct                          2.101

1     recommend me to come back.

2     Q    So they said they did not recommend you to come back?

3     A    Yeah.  He just said, I guess he didn't --

4     Q    Okay.

5              So how did you end up back there?

6     A    Because I was having dinner, it was the day after

7     Mother's Day, with my mother-in-law, and my cousins work at

8     Houston's, and you know, one of my cousins actually came up

9     to me and asked and told me that Michelle Wilson, who is the

10    general manager at Houston's now in Riverside Square Mall,

11    had asked if I still wanted to -- if I was still interested

12    in working there.

13    Q    Hhmm-hmm.

14    A    And she asked if I had a job so...

15    Q    And what did you say?

16    A    My cousins told her I was currently working, and she

17    said, well, does she still want to work here, because, you

18    know, they were in need of geeters.

19    Q    So first they weren't interested, and then later on --

20    and that was about two or three weeks ago?

21    A    Yeah.

22    Q    They contacted you or you contacted them again?

23    A    The second time?

24    Q    The second time.

25    A    The second time I was there my cousin told Michelle that

St. Jean-direct                     2.102

1       I was there and then --

2    Q    They came over to you?

3    A    No, my cousin came over to me.

4    Q    Yes.  But did anyone from Houston's come over to you and

5    offer you a job?

6    A    Michelle did.

7    Q    And who's Michelle?

8    A    Michelle Wilson, she's a general manager.

9    Q    Okay.

10          And then you took the job?

11   A    Yes.

12   Q    And what are you doing now for them?

13   A    I am a greeter.

14   Q    Greeter again?

15   A    Yes.

16   Q    And after you returned to work for Houston's about two

17   or three weeks ago, were you contacted by any of Houston's

18   corporate lawyers about this case?

19   A    Yes.

20   Q    Did you meet with him or her to discuss your deposition

21   testimony?

22   A    Yes.

23   Q    And as you have taken the stand today and have just

24   testified, what you just testified to is the truth?

25   A    Yes.

JOHN KEVIN STONE, CSR

St. Jean-direct                              2.103

```
 1              MR. PISANI:  Thank you very much.
 2              THE COURT:  All right.
 3              Any cross-examination.
 4              MS. GARDINER:  Just a couple.
 5      CROSS-EXAMINATION
 6      BY MS. GARDINER:
 7      Q    You and I met once about a week ago, hhm?
 8      A    Yes.
 9      Q    And you told me at that time that you knew that you were
10      hired at Houston's the second time because they only had two
11      geeters and they were short, and your cousin had told the
12      general manager that you needed -- that you were looking to
13      come back.  Correct?
14      A    Yes.
15      Q    And isn't it true that I told you at that time I had
16      just learned you had been rehired?
17      A    Yes.  That's correct.
18      Q    And didn't I tell you that regardless of how you
19      testified today your job had nothing to do with your
20      testimony?
21      A    Absolutely.
22      Q    And didn't I tell you that all I wanted you to do was
23      tell the truth?
24      A    Yes.
25      Q    Okay.
```

St. Jean-cross                          2.104

1            That's all I have.

2            THE COURT:  All right.

3            Thank you.

4            MS. GARDINER:  That's it.

5            You can go home.

6            THE COURT:  Any recross?

7            Any redirect?

8            MR. PISANI:  No, Your Honor.

9            THE COURT:  All right.

10            Thank you.

11            You may step down.

12            ( Witness excused ).

13            THE COURT:  Probably have time to get started on

14     one more witness before lunch.

15            MR. PISANI:  I know.

16            Since miss St. Jean took so short, I was just

17     wondering if the Court can indulge me for two minutes, so I

18     can just get my things together and I can call the next

19     witness.

20            THE COURT:  Sure.

21            MR. PISANI:  You want to take a short break or just

22     let me --

23            THE COURT:  Well, I don't want to send the jurors

24     back --

25            MR. PISANI:  Okay.

JOHN KEVIN STONE, CSR

```
 1              THE COURT:   -- to the jury room and bring them
 2     back.
 3              MR. PISANI:  Let me just get my stuff together
 4     then.
 5              THE COURT:  Okay.  That's fine.
 6              MR. PISANI:  Thank you.
 7              Your Honor, --
 8              THE COURT:  Yes.
 9              MR. PISANI:   -- with the next witness I'm going to
10     be referring to some documents, once again I have the
11     booklets.
12              THE COURT:  Okay.
13              MR. PISANI:  I may also be referring to some
14     deposition testimony, so I'd like to give you and counsel
15     copies.
16              THE COURT:  Yes, that would be fine.
17              Does either attorney wish any further instruction,
18     preliminary instruction, on the use of a deposition?  I gave
19     a short one in the open -- in the preliminary instructions,
20              THE COURT:  Yes, that would be fine.
21              Does either attorney wish any further instruction,
22     preliminary instruction on the use of a deposition.  I gave
23     a short one in the open -- in the preliminary instructions.
24     Does either counsel wish another one?
25              MR. PISANI:  I don't.
```

JOHN KEVIN STONE, CSR

```
 1                THE COURT:  Okay.
 2                MR. PISANI:  May I approach with this, Your Honor?
 3                THE COURT:  Yes, you may.
 4                MR. PISANI:  Okay.
 5                Your Honor, I'm ready.
 6                THE COURT:  All right.
 7                You may call your next witness.
 8                MR. PISANI:  Thank you for your indulgence.
 9                I would like to call to the stand at this time Mr.
10      Rob Marano.
11                THE COURT:  All right.
12                Mr. Morano, you may take the stand.
13                THE CLERK:  Please raise your right hand and place
14      your left hand on the Bible.
15      R O B E R T     M A R A N O, sworn.
16                THE CLERK:  Please state and spell your name for
17      the record.
18                THE WITNESS:  Robert Marano.  M-a-r-a-n-o,
19      DIRECT EXAMINATION
20      BY MR. PISANI:
21      Q   Good morning, Mr. Marano.
22      A   Good morning.
23      Q   My name is Fred Pisani, as you know.
24                How are you doing today?
25      A   Well thanks.
```

Marano-direct                              2.107

1    Q    I have some questions to ask you.

2    A    Sure.

3    Q    By whom are you employed?

4    A    Hillstone Restaurant Group.

5    Q    How long have you been employed by them?

6    A    About 12 years.

7    Q    And what was your position in March of 2006?

8    A    Regional supervisor.

9    Q    And how long have you been employed by the regional

10   supervisor?

11   A    March 2006 would have been about four months.

12   Q    And prior to that, what was your position?

13   A    I had had several positions prior to that, was the

14   general manager of Houston's Citicorp in Manhattan.

15   Q    Okay.

16        And as the regional supervisor, what were your

17   general duties and responsibilities at that time?

18   A    Very broad, but you're ultimately accountable for every

19   aspect of the restaurant, maintenance of the physical plant,

20   morale, profitability, food quality execution, quality of

21   service, everything that had to do with the restaurant.

22        THE COURT:  I'm going to have to ask you also to

23   keep your

24        THE WITNESS:  Sure.

25        THE COURT:  It's not just having the microphone

JOHN KEVIN STONE, CSR

Marano-direct                           2.108

1      closer, in fact, sometimes it's better if you sit

2      comfortably back in the chair.

3                  THE WITNESS:  Okay.

4                  THE COURT:  Move the mike closer, but almost ignore

5      the microphone.

6                  THE WITNESS:  Sure.

7                  THE COURT:  And shout to the back of the room.

8                  THE WITNESS:  Okay.  That better?

9                  THE COURT:  All right.

10     BY MR. PISANI:

11     Q    Was one of your duties to oversee seven restaurants at

12     that time?

13     A    That's correct.

14     Q    And those are, the restaurants were located in Maryland,

15     New Jersey, New York and Massachusetts?

16     A    That's correct.

17     Q    Okay.

18                 And out of the group of restaurants that you were

19     supervising, only one of them was called a Houston's at that

20     time?

21     A    No.

22     Q    How many of those seven were Houston's?

23     A    All of them.

24     Q    They were all seven Houston's?

25     A    Yes.

Marano-direct                                2.109

1    Q    Okay.

2            Now, the Houston's are owned by the Hillstone

3    Restaurant Group?

4    A    That's correct.

5    Q    Okay.

6            Are there other restaurant chains besides Houston's

7    that are owned by the Hillstone Restaurant Group?

8    A    There are other concepts, yes.

9    Q    I'm sorry?

10   A    There are other concepts.

11   Q    Concepts, is that -- do you mean restaurants or --

12   A    Yes, there are other brands within the Hillstone group.

13   Q    And what are those?

14   A    Bandiera is a brand.  Bandiera.

15   Q    Okay.

16   A    Gulf Stream.

17           F-A-R-G.  That's really it.

18   Q    Approximately how many restaurants did Hillstone

19   Restaurant Group own?

20   A    45.

21   Q    Who is Tino Chimburello?

22   A    He's the Vice President of Operations.

23   Q    Where is he -- where was he stationed in 2006 in or

24   about March?

25   A    San Francisco.


                        JOHN KEVIN STONE, CSR

Marano-direct                              2.110

1    Q   Okay.

2            In May 2006 was he also in San Francisco,

3    California?

4    A   Right.  Yes.

5    Q   Okay.

6            And he oversaw all 45 of these restaurants?

7    A   Yes.

8    Q   Does he still today?

9    A   Yes.

10   Q   Okay.

11           Who's Michael Lamb?

12   A   He's Director of Human Resources.

13   Q   For the entire 45 restaurants?

14   A   Correct.

15   Q   And that's approximately how many employees?

16   A   Approximately 6,000.

17   Q   And in March of 2006 where was he stationed?

18   A   San Francisco, as well.

19   Q   Now, are you familiar with Houston's core value system?

20   A   Yes.

21   Q   How many core values are there?

22   A   Four.

23   Q   And are what the four?

24   A   Teamwork, aim to please approach, excuse me.  Sorry.

25   Q   Take your time.

Marano-direct                    2.111

1    A    Sorry.  I forgot them.  I'm just nervous.

2    Q    Would a document help to refresh your recollection?

3    A    Of course.

4              MR. PISANI:  If I can only find it, I can give it

5    to you to refresh your recollection.

6              Here it is.

7    BY MR. PISANI:

8    Q    Does Hillstone have a service employee handbook?

9    A    Yes.

10   Q    Okay.

11             And is included in the handbook the written four

12   core values that you could not recall for two of them?

13   A    Yes.

14   Q    Okay.

15             MR. PISANI:  May I approach the witness, Your

16   Honor?

17             THE COURT:  You may.

18   BY MR. PISANI:

19   Q    I'm going to show you what's already in evidence as D-1.

20   I'm going to refer you to page 5, and ask you to look at it.

21   And then maybe you can tell me if that helps to refresh your

22   recollection.

23   A    Yeah, two I forgot are professionalism and positive

24   mental attitude.

25   Q    Thank you.

Marano-direct                    2.112

```
 1              By the way, are you familiar with that handbook?
 2      A    I am.
 3      Q    Have you reviewed it over the course of your employment
 4      as the regional supervisor?
 5      A    Yes.  Not recently, but yes.
 6      Q    When was the last time you reviewed it?
 7      A    I don't recall.
 8      Q    Okay.
 9              Do you recall if that document contains any
10      prohibition from employees using work computers to access
11      the internet?
12      A    Not that I recall.
13      Q    Okay.
14              Does it have any type of provision in there which
15      prohibits them from engaging in posting or e-mailing or
16      blogging outside the workplace on their own time?
17      A    Not that I recall.
18              MR. PISANI:  Can I have the document back.
19              ( Document handed back ).
20      BY MR. PISANI:
21      Q    Okay.
22              Let's talk a little bit about how you first found
23      out about The Spec-tator.
24      A    Sure.
25      Q    Okay?
```

Marano-direct                                    2.113

1           How did you find out about The Spec-tator?

2       A   One morning I would visit a different restaurant

3       everyday.  So one more morning I came to Riverside Square,

4       and shortly after I arrived at the restaurant I was

5       approached by two managers, Robert Anton and Tijon

6       Rodriguez, who had asked to speak with me.

7               THE COURT:  We need you to speak louder.

8       A   Sure.  Of course.

9               So I arrived at the restaurant one morning and

10      Tijon Rodriguez and Robert Anton had asked to speak with me.

11              So we grabbed a table in the dining room, as we

12      normally would to have a conversation, and they said,

13      roughly, that there was a web site or some kind of internet

14      site out there that had damaging comments about the

15      restaurant and the staff and the managers.  That was really

16      it.

17      Q   Okay.  You say "they"?

18      A   Yeah.

19      Q   Do you recall, was it one of them or both of them that

20      mentioned this web site?

21      A   I don't recall which one specifically brought it up, it

22      was kind of a collective conversation.

23      Q   Did they identify the web site?

24      A   In terms of?

25      Q   The name of it.

JOHN KEVIN STONE, CSR

Marano-direct                           2.114

1    A    Not that I recall.

2    Q    Okay.

3         Well, how did you find out that it was The

4    Spec-tator?

5    A    Well, that's -- later on.

6    Q    Okay.

7    A    Yeah.  I'm sure we'll talk about that, but later on I

8    was able to gain access to the site and print the postings.

9    Q    Okay.

10        So I want to make  sure I get this right.  So the

11   first time you spoke with Tijon and Robert Anton, they did

12   not identify The Spec-tator directly, they talked about a

13   web site?

14   A    To the best of memory.

15   Q    Is that true?

16   A    I don't know whether they called it Spec-tator or not.

17   If they would have I'm not sure that would have triggered

18   anything to me but --

19   Q    And what was your response to them?

20   A    I didn't really have a response.  It was really

21   listening to what they had to say and try to understand the

22   scope of it.

23   Q    And after you heard what they said, what did you do

24   next?

25   A    Well, we left the table and just outside the back

Marano-direct                                2.115

1     entrance of the restaurant it leads to the mall.  So I went
2     into the mall and I called my immediate supervisor, who is
3     Tino Chimburello, and I also called Michael Lamb.
4     Q    Hhmm-hmm.
5          So let's start first with Tino Chimburello.
6     A    Sure.
7     Q    What do you remember him -- what did you say to him when
8     you made this call?
9     A    That it had come to my attention that there was a web
10    site that had been created by one of the staff members of
11    Riverside Square that was really dedicated to making a
12    mockery of the restaurant, and it had damaging comments
13    about the managers.
14    Q    And you made this comment to him before you had even
15    seen anything on the site?
16    A    Correct.
17    Q    And did you tell him that you had not seen the site,
18    that somebody had told you this?
19    A    We didn't get that far.
20    Q    Okay.
21         And what was his response to you?
22    A    He had asked me if I had spoken to Glenn, who is our
23    general counsel.
24    Q    And what did you say?
25    A    No.

JOHN KEVIN STONE, CSR

Marano-direct                    2.116

1    Q    Okay.

2         And then what did he say to you?

3    A    He asked me to call Glenn.

4    Q    Okay.

5         Did you call Glenn?

6    A    I did.

7    Q    Okay.

8         Did you call Glenn before or after you called

9    Michael Lamb?

10   A    I don't recall.

11   Q    Okay.

12        At some point in time you called Michael Lamb

13   within that same time frame when you went outside the

14   restaurant?

15   A    Correct.

16   Q    This is on your cell phone?

17   A    Correct.

18   Q    Yes?

19   A    Yes.

20   Q    Okay.

21        What did you say to Michael Lamb?

22   A    Very similar to what I said to Tino.

23   Q    Well, what did you say that you can remember?

24   A    That it had come to my attention that there was a web

25   site that was created by a staff member of Riverside Square

Marano-direct                          2.117

1     that it was dedicated to making fun of the restaurant and

2     its managers.

3     Q    Okay.

4          Did you tell them that you'd been told this, that

5     you had not looked at The Spec-tator yourself at that point?

6     A    Again, I don't think that's anything that I offered.

7     It's nothing that he asked, so I don't think we got that

8     far.

9     Q    Okay.

10         And what did he tell you to do?

11    A    He had the same advice, to call Glenn.

12    Q    Okay.

13         So then you called Glenn, and I'm not going to get

14    into what you and he discussed.

15    A    Sure.

16    Q    But after that conversation, what happened next?

17    A    I don't remember if I stayed at Riverside Square or went

18    to see -- to one of the restaurants there, but that would be

19    a normal course of action for me, to maybe stop at the

20    Riverside in the morning, since it was the closest

21    restaurant to my house, so I'd stop there on my way to the

22    city or way to the airport, if I were traveling that day.

23    So I'm not sure if I went there or left there and went to

24    another restaurant or whatever I did, but I went about my

25    day.

Marano-direct                          2.118

1    Q    Okay.

2         And what happened next with regard to The

3    Spec-tator?

4    A    At some point I had spoken to Tino and Michael again,

5    which again was very normal for me to talk to, especially

6    Tino, several dozen times throughout the course of the day.

7    At some point either one or both, I don't remember whom, had

8    asked me how they could access the site.

9    Q    Do you remember which one asked you how they could

10   access the site?

11   A    I don't recall.

12   Q    Okay.

13        But you're sure it was one of them, either Tino or

14   Michael Lamb?

15   A    Yeah, it could have been one or both.  I really don't

16   remember.

17   Q    Okay.

18        But at least one?

19   A    Correct.

20   Q    So you're superiors specifically asked you how they

21   could access the site?

22   A    Correct.

23   Q    And what did you tell them?

24   A    I told them that I didn't have any information on how to

25   access it, but I could call Tijon and find out how he was

Marano-direct                          2.119

```
 1    given permission the first time.
 2    Q    Okay.
 3         So the first time you had a conversation with Tijon
 4    Rodriguez and Robert Anton, they never told you, neither one
 5    of them told you how they had gotten on to The Spec-tator?
 6    A    Yeah, Tijon had explained that he was -- the whole story
 7    that Karen explained earlier, he and Karen were having
 8    dinner socially, and he had gained access and he -- that's
 9    how he was shown the site first time.
10    Q    Okay.
11         And did Robert Anton tell you how he had gained
12    access to the site?
13    A    No.
14    Q    He didn't?
15    A    No.
16    Q    But he told you about the content of the site that he
17    had seen.  Yes?
18    A    Correct.  Yes.
19    Q    Okay.
20         And as regional supervisor, you didn't ask him,
21    "hey Bob, Mr. Anton, Tijon told me how he got on, how did
22    you get on"?
23    A    No.
24    Q    Never came up?
25    A    No.
```

JOHN KEVIN STONE, CSR

Marano-direct                                    2.120

```
 1    Q    During that meeting or any subsequent meeting, did Mr.
 2    Anton ever give you Karen St. Jean's password?
 3    A    No.
 4    Q    You're aware that under oath Mr. Anton has testified at
 5    deposition that he did give you --
 6    A    I am aware of that.
 7    Q     -- the password?
 8    A    Yes.
 9    Q    Did Mr. Anton give you copies of The Spec-tator?
10    A    He did.
11    Q    He did?
12    A    Yes.
13    Q    When did he give you copies of The Spec-tator?
14    A    I don't recall.  That's something I thought a lot about.
15    I don't know if it was initially at that first meeting,
16    which would make a lot of sense, or it was sometime
17    thereafter.  But what I do recall is he and I had never met
18    again face-to-face talking about The Spec-tator after that
19    first meeting.  So logically, it would make sense that he
20    gave them to me at that first meeting.  But I don't recall
21    that.
22    Q    But you do recall he did in fact give you copies of The
23    Spec-tator?
24    A    Yes.
25    Q    Okay.
```

JOHN KEVIN STONE, CSR

Marano-direct                           2.121

1              What did you do when you got the copies of The

2    Spec-tator?

3    A    Read through them.

4    Q    Okay.

5              Pretty much contemporaneously after, did you read

6    them as soon as he gave them to you, or did you go somewhere

7    else and start reading them?

8    A    I don't recall.

9    Q    Okay.

10             Within a short period of time after that you read

11   them?

12   A    That would make more sense, sure.

13   Q    Okay.

14             So if he gave them to you at that first meeting --

15   A    Hhmm-hmm.

16   Q    -- the copy would show that it was The Spec-tator.

17   Correct?  And that it would have various postings.  Right?

18   On it that you read?

19   A    I'm assuming that it would say The Spec-tator somewhere

20   on there, yes.

21   Q    So you still stand by your statement previously that the

22   first time you talked to Tijon and Mr. Anton you didn't know

23   the name of The Spec-tator and had not read or gone on to

24   The Spec-tator?

25   A    Yes.

JOHN KEVIN STONE, CSR

Marano-direct                                2.122

```
 1    Q    Okay.
 2              So when you got the copies from Mr. Anton, this was
 3    before you ever went on The Spec-tator.  Correct?
 4    A    I don't know.  Like I said, I don't remember if it was
 5    at that first meeting or sometime after that.  But
 6    logically, it would make sense they gave them to me at that
 7    first meeting.  So --
 8    Q    And at the first meeting you had not gone on to The
 9    Spec-tator?
10    A    Correct.
11    Q    Okay.
12              So when you read the copies that Mr. Anton gave
13    you, what was your impression?
14    A    Lots of impressions.  I was shocked at the content of
15    the comments.  I was shocked that the Houston's logo was on
16    there.  I was shocked that people that we held in relatively
17    high regard could possibly feel that way about the place
18    that they worked.  That I felt was a really special place to
19    be and work.  I was shocked about how they were speaking
20    about their managers and even some of their co-workers.
21    Very surprised.
22    Q    And were you able to identify when you read the postings
23    the first time, who were the people involved, the workers or
24    the employees that were involved in this?
25    A    From the printouts that Robert gave me, or the first
```

JOHN KEVIN STONE, CSR

Marano-direct                           2.123

1      time I'd even ever seen the site?

2      Q    Yes, that Robert gave you.

3      A    I believe I could identify some of them.  I don't

4      believe I was able to identify all of them.

5      Q    Okay.

6           Who were you able to identify?

7      A    I'd have to see the postings in order to clarify that.

8      Q    Okay.

9           I'd like to show you -- Your Honor, may I approach

10     the witness with a document?

11          THE COURT:  Yes.

12     BY MR. PISANI:

13     Q    I'm confused, because we have the two documents and both

14     seem to be marked D-2 A.  I think the big one is just D-2.

15          MS. GARDINER:  I think, Your Honor --

16          MR. PISANI:  They're both 2 A.

17          MS. GARDINER:   -- Her Honor named this A, the big

18     one A, and that should be, that's a B.

19          MR. PISANI:  Oh, that's a B.

20          MS. GARDINER:  That's a B.

21          MR. PISANI:  Great.  I need better glasses.

22          Okay.  May I approach?

23          THE COURT:  Yes.

24     BY MR. PISANI:

25     Q    Okay.

JOHN KEVIN STONE, CSR

Marano-direct                          2.124

1              I'm going to he show you what's been marked D-2 B

2    for identification.  See if you can look through it.

3    A    Okay.

4    Q    Can you identify what that is?

5    A    Yes.

6    Q    What is it?

7    A    These are the pages that I was given by Robert.

8    Q    These are the pages that Robert gave you?

9    A    Correct.

10   Q    Okay.

11             Now, on the bottom of it, and there's marked or

12   Bates stamped H 00245 through H 00449.  Correct?

13   A    Correct.

14   Q    Okay.

15             And they're dated when?  On the bottom, 5-3-2006.

16   Correct?

17   A    Correct.

18   Q    And what does that indicate?

19   A    The date?

20   Q    Yes.

21   A    When they were printed.

22   Q    When they were printed.  Correct?

23   A    My assumption, yes.

24   Q    And so these are the copies that Mr. Anton gave you?

25   A    Yes.

Marano-direct                    2.125

1    Q   So now looking through the document, who were you able
2    to -- bless you.  Who were you able to identify was involved
3    in The Spec-tator as of May 3rd, 2006?
4    A   Well, on this first page here the only person I
5    recognize is Yvette and that's her real name and phone
6    number.
7    Q   Hhmm-hmm.
8    A   Alba, I can't remember who that is by the photo, there's
9    more than one person, I'm not sure which one was her, Alba,
10   employee at Riverside Square as well.
11           THE COURT:  Can everyone hear?  Having --
12           THE WITNESS:  I'm sorry.  Speak up a little.
13           THE COURT:  Everyone is requesting -- your voice
14   doesn't carry very well.
15           THE WITNESS:  Sure.  Sure.  Sorry.
16           THE COURT:  Just need to --
17   A   Alba, also an employee at Riverside Square.  But I don't
18   recognize her by the picture.  I believe Lano was a former
19   employee, but I don't believe while I was supervisor there
20   that he was employed there.  And then on the following page
21   there's a posting by BriGuy, who I could identify is Brian
22   by the photos as well.
23   Q   And he's one of the plaintiffs, Brian Pietrylo?
24   A   Correct.
25   Q   So when you get that copy from Mr. Anton, you knew Brian

Marano-direct                                    2.126

1      was one of the people involved?

2      A    Yes.

3      Q    Okay.

4            How about Doreen Marino?

5      A    There is a posting here by Doreen, but there's no photo.

6      Q    Okay.

7            Did you have any Doreen's, to your knowledge, that

8      were employed at Houston's other than Doreen Marino at that

9      time?

10     A    Not that I know of.

11     Q    Okay.

12     A    And then there's also a posting by Abe, who was a new

13     employee.  Sandra who was also a new employee.  And

14     Melonaid, I was not able to identify who that was.

15     Q    So you testified that you were, you know, upset about

16     these postings when you read them, and that they violated

17     the core values, and you had this copy and you knew who some

18     of them were, including Brian Pietrylo.

19           Did these copies and the comments that were made in

20     D-2 A, in your mind, give you grounds to fire Brian Pietrylo

21     at that moment?

22     A    At that moment I hadn't thought through the whole

23     situation, you know, I knew there was more content by

24     reading through that.

25           THE COURT:  Is there an objection?

JOHN KEVIN STONE, CSR

Marano-direct                                    2.127

1            MS. GARDINER:  I'm trying -- I just want to correct

2    it.  You said Exhibit 2 A.

3            MR. PISANI:  I'm sorry.

4            MS. GARDINER:  And I think you meant 2 B.  I just

5    want the record to be clear.

6    Q    I'm sorry D-2 B.

7            Would you like me to repeat the question?

8    A    Please.

9    Q    You had the copies, you knew who some of the players

10   were, you knew Brian Pietrylo was one of them.  You

11   testified about how you know he violated the core values,

12   and I asked you at that moment, didn't you have grounds to

13   fire Brian Pietrylo for what he had said or done in these

14   postings in D-2 B?

15   A    Thank you for clarifying that.

16           The answer to that question would be, I'm not sure

17   I thought through that whole thing to that level.  But I

18   certainly think there were grounds for termination based on

19   what's in those pages, yes.

20   Q    And in fact, D-2 B included the so-called posting of

21   some of the answers to the wine test.  Right?

22   A    Correct.

23   Q    And that's on the second page, H 00246?

24   A    It is.

25   Q    Yet you didn't fire Brian Pietrylo that day or the next

JOHN KEVIN STONE, CSR

Marano-direct                          2.128

1     day.  Correct?

2     A    Correct.

3     Q    In fact, you didn't fire him for sometime after that.

4     Correct?

5     A    Correct.

6     Q    And you then proceeded to go on to The Spec-tator?

7     A    Correct.

8     Q    On more than one occasion?

9     A    That's correct.

10    Q    So now going back to the history of what you say

11    factually happened, you were talking about, you know, that

12    you met with Tijon and Mr. Anton; Mr. Anton may have given

13    you this on that first meeting; you didn't go on; you called

14    Tino and Michael Lamb; right; and one of them said to you,

15    we'd like to get on to the web site, can you try to get the

16    information to do it.  Right?

17    A    I'm not sure one of them said "I'd like to get on," but

18    they certainly asked how they would get on.

19    Q    Okay.

20              How they would get on.  Okay.

21              Now, you still don't know how to get on, right, at

22    that point?

23    A    What point of the day are we talking about?

24    Q    When they asked you, we'd like to find out how to get

25    on?

JOHN KEVIN STONE, CSR

Marano-direct                    2.129

```
 1    A    I did not.

 2    Q    You have no idea how to get on.  Right?

 3    A    That's correct.

 4    Q    So then you said, you did what?

 5    A    I was in my car, and I remember being on my street

 6    having a conversation with one of them, and I told them that

 7    I would call the restaurant, speak with Tijon, and ask him

 8    how to access the site.

 9    Q    Okay.

10         And did you do that?

11    A    I did.

12    Q    Well, why would you think Tijon would know how to access

13    the site when he told you that Karen had showed him the

14    site?

15    A    Because Tijon at that point was the only one I knew of

16    who had been on the site.

17    Q    Okay.

18         So you thought he would know how to access the

19    site?

20    A    Sure.  If anyone, it would be him.

21    Q    Okay.

22         So when you called him, what did you say to him?

23    A    Well, I called the restaurant and Karen answered the

24    phone, and I asked for Tijon.  And she handed the phone to

25    Tijon.  So either Tijon was at the front door while Karen
```