Marano-direct                    2.130

1   was greeting, or Tijon was at what we call hot expo, where

2   the manager works that function.  And she picked up the

3   phone and she handed the phone to Tijon without putting me

4   on hold.  So it was, you know, a half a second exchange.

5   Tijon got to the phone and I asked him how I would access

6   the site.

7   Q   And what did he say?

8   A   He said he wasn't sure, but he would find out.  So he

9   then turned to Karen again, without putting me on hold, and

10  asked her either "can I, or can Rob have the information on

11  how to access the site?"  So he walked me through it with

12  her, she walked him through it with her user name and

13  password, and he just repeated it to me and I wrote it down.

14  Q   What do you mean "she walked him through it"?  Did she

15  give him anything else besides the e-mail --

16  A   No, she walked him through it, the procedure, how to get

17  on and then he repeated it to me.

18  Q   And you overheard that?

19  A   I could hear her in the background.  I couldn't identify

20  what she was saying.

21  Q   Okay.

22  A   I wouldn't have been able to distinguish what she was

23  saying.  But I could hear her in the background, because

24  again, they were next to one another.  He he didn't put me

25  on hold.

JOHN KEVIN STONE, CSR

1    Q    Okay.

2         So then Tijon got this information?

3    A    Correct.

4    Q    And what did he say to you?

5    A    He just repeated what she said and that was the end of

6    that conversation.

7    Q    Which included her e-mail and password?

8    A    Correct.

9    Q    Okay.

10        And what else did he advise you what -- in how to

11   access the site?  Do you remember what he said?

12   A    No.

13   Q    Now, you sure when you had this call to get the

14   information, that you said that Karen picked up the phone

15   and knew it was you.  Correct?

16   A    She didn't know it was me, I identified myself.

17   Q    You identified yourself?

18   A    Yeah.

19   Q    And you're pretty sure Karen picked up the phone?

20   A    Yes.

21   Q    Couldn't have have been Tijon?

22   A    No.

23   Q    Isn't it a fact that you previously testified and said

24   when you called the restaurant that Tijon picked up the

25   phone and we spoke?

1    A    No.

2    Q    You never said that?

3    A    Well, if you read further down, when you clarified your

4    question, I clarified my answer.

5    Q    But didn't you initially say that when you called the

6    restaurant Tijon picked up the phone?

7    A    I said when Tijon picked up the phone, which is what he

8    did when I spoke to Tijon.

9    Q    Okay.

10         Now, you testified previously at a deposition about

11   this matter.  Correct?

12   A    I did.

13   Q    Okay.

14         That was on October 25th, 2007?

15         THE COURT:  Can you direct me to the line, the page

16   and the line?

17         MR. PISANI:  Yes.

18         THE COURT:  If you're going to use the --

19         MR. PISANI:  I was going to ask the preliminary

20   questions and get to that.

21         THE COURT:  What page?

22         MR. PISANI:  I'm going to direct Your Honor and

23   counsel to page 28 of his deposition.

24         THE COURT:  What line?

25         MR. PISANI:  I'm going to start with, so it's

Marano-direct                              2.133

1    complete, line 4, and we're going to go down to line 24.

2              THE COURT:  Can I see counsel at side bar, please.

3              ( Side bar conference ).

4              THE COURT:  All right.

5              You want to use this 20 line segment from page 28

6    of the deposition.  Are you proffering that it's a prior

7    inconsistent statement?

8              MR. PISANI:  Yes.

9              THE COURT:  All right.

10             Are you using it for some other purpose?

11             MR. PISANI:  Just as prior inconsistent statement.

12             THE COURT:  And what's the inconsistency?

13             MR. PISANI:  The only reason I need to do it from

14   the beginning, because they reference "he," and "he" and

15   "he," people won't know who the "he's" are.  So it starts

16   with, which he spoke to Tino, which is the subject, with you

17   Michael Lamb the first time, then you go on further down --

18             THE COURT:  What's the inconscistency?

19             MR. PISANI:  I called Tijon in the restaurant.

20   Okay.  He picked up the phone.  We spoke.  I asked him if I

21   can have the password and if he can describe it to me to

22   access the site.  That's line 22.

23             MS. GARDINER:  But page 30, Your Honor, clarifies

24   --

25             MR. PISANI:  But you can bring that up.

JOHN KEVIN STONE, CSR

Marano-direct                        2.134

1          MS. GARDINER:  No, no, you're not going to impeach
2     with something he clarified a page later.
3          MR. PISANI:  No, he's inconsistent.  He's not
4     clarifying.
5          MS. GARDINER:  Wait -- wait.  Excuse me.
6          On page 30, starting at line 18 he says, "but Karen
7     had answered the phone, so she knew it was me, and as she
8     told him the password, he told it to me."
9          MR. PISANI:  Okay.
10          And so that's inconsistent with what he said the
11     previous page.  He wasn't --
12          MS. GARDINER:  He was clarifying.  That's not
13     inconsistent.
14          THE COURT:  If you're going to do it, you have to
15     read both sections.  You can't -- it's -- the clarification
16     is within the context of the same communication.
17          MR. PISANI:  Okay.
18          THE COURT:  And the questions were not so clear.
19          MR. PISANI:  Okay.  It's not even that important,
20     so I'm going to withdraw.  I'll move.
21          THE COURT:  Okay.  Fair enough.
22          MR. PISANI:  Thank you, Your Honor.  Thank you.
23          MS. GARDINER:  Thank you.
24          ( End of side bar conference ).
25          THE COURT:  Would this be a good time for a break?

Marano-direct                    2.135

1           MR. PISANI:  Sure.  This would be a perfect.

2           THE COURT:  Ladies and gentlemen, I'm going to give

3      you your lunch break now.  It's a little after 12:45,

4      hopeful that you will be able to return by 1:45, so that we

5      can begin the afternoon session as promptly as possible.

6           You've been great about getting here despite

7      traffic troubles.  I know some of you had trouble with

8      McCarter Highway this morning.  There was a fire truck and a

9      police car on there even when I came through.  So I

10     understand that, and it's not a problem.

11          I just ask if you could have lunch in the vicinity

12     of the courthouse, so we don't have any car issues in

13     getting the afternoon started.  I appreciate it.  It's not

14     an order, just a request.

15          Okay.  Thank you.  Enjoy lunch, and of course, as

16     always, don't talk about this case with each other or with

17     anybody else.  Thank you.

18          We'll take the lunch recess now.

19          THE CLERK:  All rise.

20          MR. PISANI:  Thank you.

21          ( Jury exits ).

22          THE COURT:  You may step down.

23          THE WITNESS:  Thank you.

24          ( Witness exits ).

25          THE COURT:  All right.

2.136

1          Counsel, of course you will have a lunch recess as

2     well.

3          MR. PISANI:  Thank you.

4          THE COURT:  I don't need this to be an extended

5     colloquy.

6          Have you decided, Miss Gardiner, how you want to

7     handle whether you want to -- to cross-examine, in quotes,

8     obviously as a friendly witness, so it will be treated as

9     direct when you ask your questions of your own client, Mr.

10    Marano?

11         Are you planning on asking him questions now and

12    then recalling him in your own case, or do you want to take

13    it as it goes?

14         MS. GARDINER:  I think if there's -- I think I can

15    finish him, just to save time, I think on my cross/direct I

16    can probably go through everything, as long as there are no

17    objections because it wasn't covered in direct.

18         THE COURT:  Oh, I see.

19         MS. GARDINER:  If there are going to be --

20         THE COURT:  Oh, of course.

21         MR. PISANI:  I have no objection if you want to

22    pass him on other topics.

23         THE COURT:  So there won't be -- excuse me.

24         MR. PISANI:  I'm sorry.  Go ahead.

25         THE COURT:  What I'm hearing, and counsel will

2.137

```
 1      correct me if I'm wrong, just too save time myself.
 2              Pardon me.  There was interrupting.  There aren't
 3      going -- what counsel is saying, he's not going to object
 4      for beyond scope of direct.
 5              MS. GARDINER:  Right.  Right.
 6              MR. PISANI:  Correct.
 7              THE COURT:  And if that does, and if it keeps like
 8      that, great, you finish, I'm also not going to bar you of
 9      course if you want to recall him for something later.
10              MS. GARDINER:  Okay.
11              THE COURT:  I'm just drawing it to everyone's
12      attention.
13              MR. PISANI:  All right.  Great.
14              Thank you.
15              THE COURT:  All right.
16              Thanks.  Have a nice lunch.
17              ( After a luncheon recess court resumed ).
18              AFTERNOON      SESSION
19
20              THE CLERK:  All rise.
21              THE COURT:  All right.  You may be seated.
22              We're going to bring the jury in for the afternoon
23      session.
24              My courtroom deputy tells me they seem to be
25      getting along very well, responding with each other.  Seems
```

```
 1    to be very good, just on the degree of mirth she sees when
 2    she walks into the room.  Good cheer may be a better word
 3    than mirth.
 4               All right.  We're on cross/direct of Mr. Marano.
 5               MR. PISANI:  Yes, Your Honor.
 6               THE COURT:  No, you finished?
 7               MR. PISANI:  I'm sorry?
 8               MS. GARDINER:  He -- Mr. Pisani was not finished.
 9               You haven't finished?
10               MR. PISANI:  I haven't finished my direct.  I'm
11    sorry.
12               THE COURT:  That you haven't finished your direct.
13    I'm sorry.  I was remembering the conversation we had
14    immediately before lunch predicting the future.
15               MR. PISANI:  Yes.
16               THE COURT:  I like that, like the password "keepout
17    1."
18               MR. PISANI:  Ironic.
19               THE CLERK:  All rise.
20               ( Jury enters ).
21               THE COURT:  All right.
22               You may all be seated.
23               The witness may resume the stand.  Thank you for
24    being so prompt, ladies and gentlemen.  I really do
25    appreciate it.
```

JOHN KEVIN STONE, CSR

2.139

 1                    ( Witness resumes stand ).

 2                    THE COURT:  All right.

 3                    You're still under oath.

 4                    You may resume your questioning.

 5                    MR. PISANI:  Thank you, Your Honor.

 6      BY MR. PISANI:

 7      Q    I forgot, Mr. Marano, do you have a copy of your

 8      deposition up there?

 9      A    I do not.

10                    MR. PISANI:  May I give this to him in case he

11      needs to refer to?

12                    THE COURT:  You may.  Yes, of course.

13                    MR. PISANI:  Thank you very much.

14      BY MS. GARDINER:

15      Q    Okay.

16                    Mr. Marano, just prior to the break, based upon my

17      recollection we were talking about how you initially gained

18      access to The Spec-tator.  Remember that?

19      A    Yes.

20      Q    Okay.

21                    And I believe that you told me you learned how to

22      do that from Tijon Rodriguez.  Is that correct?

23      A    Right.

24      Q    When you had your conversation or conversations with Mr.

25      Rodriguez, did he tell you that The Spec-tator was a

Marano-direct                           2.140

1     password protected site, that you would need a password to
2     get on it?
3     A    Initially, when I met with him the first time?
4     Initially, when I met with him the first time, is that what
5     you're asking?
6     Q    No.   During any conversations you had with him to get
7     the information to get on to The Spec-tator, did he ever
8     tell you it was a password protected site?
9     A    Not that I recall.
10    Q    Okay.
11         Did there come a point in time when you learned
12    that it was a password protected site?
13    A    I'm assuming so, yes.
14    Q    Assuming?
15    A    Well, yeah, I don't remember that conversation or how I
16    came to learn about that but --
17    Q    Well, you didn't get on the site with going on to a
18    search engine like Google or Yahoo, did you?
19    A    No.
20    Q    Did you have a My Space account of your own at the time?
21    A    No.
22    Q    Did any other manager at Houston's give you their My
23    Space information to go on to The Spec-tator?
24    A    No.
25    Q    Okay.


JOHN KEVIN STONE, CSR

1          You weren't invited to participate in The

2    Spec-tator by Brian Pietrylo.  Correct?

3    A    Not by Brian, no.

4    Q    Okay.

5          So at some point in time you learned you needed a

6    password from someone.  Right?

7    A    Correct.

8    Q    How did you learn you needed a password?

9    A    I don't know.

10          When I went on the site the first time, obviously,

11    I needed to log in, and I knew I needed to log in, but I

12    knew prior to that, because I had asked Tijon for it, so I'm

13    not sure at what point I learned I needed a password.  But

14    at some point I knew I needed one.

15    Q    You knew you couldn't get in on your own, you needed to

16    use somebody else's password to get in.  Is that fair to

17    say?

18    A    That's fair to say.

19    Q    Okay.

20          And the password you were going to gain access to

21    this site was from Karen St. Jean?

22    A    I'm sorry, repeat that.

23    Q    You used Karen St. Jean's e-mail and password to get on?

24    A    That's correct.

25    Q    And her password, do you remember what it was?

Marano-direct                                     2.142

1    A    Her password was Keepout 1.

2    Q    Keepout 1.

3         Now, where were you the first time you used Karen

4    St. Jean's e-mail address and password to access The

5    Spec-tator?

6    A    I was at home.

7    Q    At your home?

8    A    Yes.

9    Q    Was anybody else present?

10   A    No.

11   Q    Okay.

12        So explain to the jury what you did on your

13   computer to access The Spec-tator?

14   A    Sure.

15        I went onto My Space.com.  Which leads you to some

16   kind of My Space home page.  And then I believe it asks you

17   for some log-in information, which is where I put Karen's

18   e-mail and the password I believe, and then that prompts you

19   to, if I remember correctly, Karen's home page or her

20   profile.  And then within that profile there is a section, I

21   believe it was called "groups," and then you can select

22   that.  And it would take you to the groups that Karen

23   belonged to, which The Spec-tator was one of.  That's --

24   Q    And did you follow all those steps to get to The

25   Spec-tator?

1    A    To the best of my memory, yes.  But I don't recall
2    exactly what I went through.
3    Q    But did you finally get to The Spec-tator?
4    A    I did.
5    Q    And were you able to see -- what did you see, the
6    topics?
7    A    I saw the topics and postings.
8    Q    Okay.
9         Did you see the picture of Brian?
10   A    I did.
11   Q    Okay.
12        And you knew when you went on the first time after
13   you began to read the postings that Brian Pietrylo had
14   created The Spec-tator?
15   A    Yes, that was obvious.
16   Q    So did you read all of the postings that were on The
17   Spec-tator when you went on the first time?
18   A    I believe that I had read through all the postings.
19   Q    Okay.
20        And do you recall when you went on, was it the
21   beginning of May 2006?
22   A    It was the beginning of May.
23   Q    Okay.
24        Specifically May 5th, does that refresh your
25   recollection?  Well, let me ask you this.

Marano-direct                        2.144

```
 1              Did you also make copies --
 2     A    I did.
 3     Q    -- of all those postings?
 4     A    I did.
 5     Q    Okay.
 6              MR. PISANI:  May I approach the witness, Your
 7     Honor?
 8              THE COURT:  You may.
 9     BY MR. PISANI:
10     Q    Going to show you what's been marked D-2 A into
11     evidence.  Look through it and tell me if those are the
12     copies of the postings that you made?
13     A    Yes, these are the copies I made.
14     Q    Thank you.
15              And I believe they're pages H 00211 to H 00244.  So
16     if my math is right, that's about 33 pages of information?
17     A    Correct.
18     Q    Which would include postings, the first posting that you
19     saw is the first one on their March 2nd, 2006?
20     A    That's correct.
21     Q    And that's the one that has the -- that's the first one
22     Brian posted next to his picture?
23     A    March 2nd.
24     Q    '06.
25     Q    Oh, I'm sorry.  There's a -- so when you made a copy,
```

Marano-direct                              2.145

1     there's the date on May 5th, 2006 at the bottom?
2     A    Yes.
3     Q    Does that refresh your recollection when you made those
4     copies and went on?
5     A    That seems accurate.
6     Q    So you probably went on the first time on May 3rd, 2006?
7     A    Yes.
8     Q    So it contains all the postings from March 2nd, 2006 to
9     May 5th, 2006?
10    A    That would seem logical.
11    Q    Now, after you read and then made copies of all the
12    postings, did you call Tino Chimburello?
13    A    No.
14    Q    Okay.
15              Did you call Michael Lamb?
16    A    No.
17    Q    Did you tell Brian Pietrylo the next time you saw him at
18    the restaurant, or call him and tell him that you had been
19    on to The Spec-tator?
20    A    No.
21    Q    Did you, next time you saw Doreen Marino, did you tell
22    her you had been on The Spec-tator on May 5th, 2006?
23    A    No.
24    Q    The next work day did you fire Brian Pietrylo?
25    A    No.

Marano-direct                          2.146

1    Q    The next work day did you fire Doreen Marino?

2    A    No.

3    Q    Now, I believe you testified that you were upset by many

4    of the comments.  Correct?

5    A    That was one of many things that went through my mind,

6    yes.

7    Q    And that you believed that many of the comments violated

8    the four core values?

9    A    Yes.

10   Q    And you believed both -- both of those things on May

11   5th, 2006?

12   A    Yes.

13   Q    Now, Brian and Doreen were not the only ones that made

14   comments that you consider to violate the core values.

15   Correct?

16   A    Correct.

17   Q    There were other people on that Spec-tator who were

18   members and made comments that you believe that violate the

19   the core value?

20   A    There were.

21   Q    And were there many?

22   A    Several others.

23   Q    So did you ever do an investigation when you saw that

24   many employees were on this site making comments to each

25   other, that why are they making comments that I believe

Marano-direct                    2.147

1    violate the core values, is it the employees, is it the

2    company, is it a combination of both, did you ever do an

3    investigation like that?

4    A    Sure.  Jason and I had detailed conversations about

5    people that were on there, and the content of it, and what

6    we thought was problematic to the restaurant and what we may

7    or may not meet need to do about it.

8    Q    Did you speak to Brian or Doreen about it?

9    A    No.

10    Q    Did you speak to any of the other participants in

11    membership in it?

12    A    Not at that time.

13    Q    So you didn't speak to any of them about their concerns

14    or why did you say this or why did you do that?

15    A    Not at that time.

16    Q    Okay.

17          Did you speak to any of them other than Brian and

18    Doreen, which you said you did not speak to at any time,

19    right, until you will fired them?  About The Spec-tator.

20    A    Can you clarify the question.

21    Q    You never spoke to Brian and Doreen about The Spec-tator

22    until they were fired?

23    A    That's correct.

24    Q    Right?

25          Okay.  So did you speak to, prior to firing them,

1    did you speak to any of the members of The Spec-tator about

2    the comments that they had made on The Spec-tator?

3    A    No.

4    Q    So then your investigation was limited to conversations

5    with Jason Sokolow, the general manager?

6    A    Correct.

7    Q    After you went on the first time, did you let Brian or

8    Doreen know that you were going and intended to go on again?

9    A    No.

10   Q    When you went on the first time, you knew that you went

11   on The Spec-tator.  Right?  You didn't do it by mistake or

12   by accident, by just by clicking a button and it popped-up?

13   A    No, I knew what I was doing.

14   Q    And each time you went on you knew that you were on The

15   Spec-tator?

16   A    That's correct.

17   Q    And every time you went on you intended to be on The

18   Spec-tator?

19   A    That's correct.

20   Q    So May 5th you read and copy -- make copies of the

21   comments.  And the next day was May 6th.  And on May 6th did

22   you give Tino Chimburello and Michael Lamb Karen's e-mail

23   address and password?

24   A    I did.  It was, I believe it was very late on the 5th or

25   very early on the 6th.  It was the same evening.

```
 1    Q    Okay.

 2         And did you also give them explicit step-by-step

 3    instructions in writing on how to access the site?

 4    A    I believe I did.

 5    Q    How they could go on?

 6    A    Yes.

 7    Q    And how did you do that?  Did you do that in writing?

 8    A    Via e-mail.

 9    Q    You sent them an e-mail?

10    A    Yes.

11         MR. PISANI:  Your Honor, I'd like to have this

12    document marked, and I'm referring to P-2 I believe in my

13    packet.

14         THE COURT:  P-2?

15         MR. PISANI:  P-2.

16         I made a mistake before, but I think that's what it

17    is.  Right?

18         P-2, correct.

19         THE COURT:  All right.

20         You may -- you have the exhibit stickers, mark them

21    as P-2.  You can -- all exhibits should be premarked so you

22    just have to use them.

23         MR. PISANI:  I don't have them with me, Your Honor.

24    It won't take too long.

25         May I approach the witness?
```

Marano-direct                          2.150

1              THE COURT:  Yes, you may.

2     BY MR. PISANI:

3     Q    I'll show you what's been marked P-2 for identification,

4     ask you to review it and tell me if you can identify it?

5     A    Yes, this is my e-mail to them.

6     Q    That you sent to them?

7     A    Correct.

8              MR. PISANI:  Your Honor, at this time I'd like to

9     introduce this document into evidence.

10             THE COURT:  P-2.

11             Any objection?

12             MS. GARDINER:  None other than the ones I've

13    previously placed on the record.

14             THE COURT:  Fair enough.

15             P-2 is in evidence.

16             ( Received as marked ).

17             MR. PISANI:  Your Honor, I'd like to put it on to

18    the projection screen, please.

19             THE COURT:  Yes, you may.

20    BY MR. PISANI:

21    Q    Okay.

22             Can you see that, Mr. Marano?

23    A    I can.

24    Q    Okay.

25             If you look at the top of the e-mail it's dated --

JOHN KEVIN STONE, CSR

Marano-direct                           2.151

1    I mean to the right it says, "sent" at the top, up here, May

2    6th, 2006, about ten minutes after midnight.  Right?  A

3    Correct.

4    Q    So is that about the time that you sent them this

5    e-mail?

6    A    Yes.

7    Q    And you sent it to Tino Chimburello and Michael Lamb,

8    and you previously testified that they are the V.P. of

9    Operations overseeing 45 restaurants, that's Mr.

10   Chimburello, and Michael Lamb is the head of Human Resources

11   of over 6,000 employees?

12   A    Correct.

13   Q    And the subject is "My Space info."  Correct?

14   A    That's correct.

15   Q    And then you specifically state how to get into the

16   site, and you say go to www.My Space.com, under member,

17   log-in Karen Giacachino and Karen St. Jean used to be known

18   at Karen Giacachino before she got married?

19   A    I believe that is her maiden name.

20   Q    At Yahoo.com, and then underneath that it says, password

21   Keepout 1, and that's her password.  Correct?

22   A    Correct.

23   Q    And then the balance of it you give them explicit

24   instructions on how to get in.

25        And those are accurate, to the best of your of

JOHN KEVIN STONE, CSR

1    recollection that's how they would have done it at that
2    time?
3    A    I believe they are.
4    Q    So they would have gone to the far right of the main
5    screen in a blue box and you will see "my groups."  So does
6    that mean when you went on to Karen's My Space account and
7    saw her home page you could not see anything about The
8    Spec-tator there.  Correct?
9    A    I don't believe so.  I don't remember.
10   Q    Okay.
11              Well, you're telling them that they have to go to
12   the far right, the blue box and you'll see "my groups" and
13   click on that?
14   A    Right.
15   Q    So does that help your recollection if they have to go
16   to a box and click on it?
17   A    Yeah, that seems logical from this description, yes.
18   Q    Okay.
19              So they go to "my groups" and they click on "my
20   groups" and when you do that you still can't see any of the
21   comments.  Right?
22   A    No, I believe that brings up all the groups that Karen
23   was a member of.
24   Q    So it does -- oh, it brings up, I'm sorry, I didn't
25   hear?

Marano-direct                          2.153

1    A    It brings up the groups that Karen would be a member.

2    Q    Groups, right?

3    A    Yeah.

4    Q    But you don't see any of the comments made on any of the

5    groups?

6    A    I don't believe so.

7    Q    You have to go further.  Correct?

8    A    Right.  Correct.

9    Q    Next thing you to you have to do is click the Houston's

10   logo?

11   A    You have to click on Houston's trademark logo.  Correct.

12   Q    And you still can't see the comments?

13   A    I'm not certain.

14   Q    Well, let's see if this helps.  We go down to the next

15   sentence, it says, "scroll down just before the large photos

16   and on the rigth side of the screen click on view topics."

17   A    I'm not sure if you have to click on view all topics to

18   see all topics or you can see the first couple or the most

19   recent.  I'm not certain.

20   Q    Okay.

21        And then once they view on all topics, then you are

22   certain at that point then you will be able to read all the

23   postings listed since the inception eight weeks ago?

24   A    That's correct.

25   Q    And what are you basing the eight weeks ago, based on

JOHN KEVIN STONE, CSR

Marano-direct                    2.154

1      the comments you saw on the site?

2      A   I think it was off of the first posting by Brian and the

3      date of that posting.

4      Q   Last sentence, "please call me once you've had a moment

5      to review"?

6      A   Correct.

7      Q   Did they call you?

8      A   They did not.

9      Q   Did you call them?

10     A   I'd spoken to them several times after that, yeah.

11     Q   Okay.

12             And did you discuss your e-mail?

13     A   Did we discuss my e-mail?   No.

14     Q   No.

15             Never brought it up?

16     A   The e-mail, no.

17     Q   The e-mail, no.

18             Did you you ever say, hey, did you go on and check?

19     A   Never.

20     Q   Never once?

21     A   No.

22     Q   So you sent it to them, you told them how to do it, you

23     you told them to call you once they did it, but after that

24     you never followed up and asked them if they had done it?

25     A   We had talked about the My Space site and content of it

Marano-direct                    2.155

1    in detail many times after that, but we never spoke about

2    the e-mail or whether they had actually gone on the site.

3    We had spoken about it many many times after that e-mail was

4    sent.

5    Q    Okay.

6         Based upon your conversations and what they said to

7    you, were you under the impression they had gone on under

8    their own?

9    A    No.

10   Q    So they didn't follow what you you said in the e-mail to

11   your knowledge?

12   A    Not to my knowledge.

13   Q    Now, after you sent this e-mail I believe you testified

14   at your deposition that you went on again?

15   A    Correct.

16   Q    Okay.

17        And when I asked you why you went on again,

18   remember what your response was?

19   A    I don't.

20   Q    You don't remember you said you don't know why you went

21   on again?

22   A    No.

23   Q    Okay.

24        If I showed you your deposition testimony, would

25   that help to refresh your recollection?

JOHN KEVIN STONE, CSR

Marano-direct                              2.156

```
 1    A    I trust that I said that.

 2    Q    So I don't need to show it to you?

 3    A    No.

 4    Q    Okay.

 5              And then you went on a third time?

 6    A    Correct.

 7    Q    Okay.

 8              And that was on or about May 10th, 2006.  Correct?

 9    A    That sounds accurate.

10    Q    Okay.

11              And why did you go on that time?

12    A    Same reason, just as to see if there were any additional

13    postings.

14    Q    So you wanted to see if there were any additional

15    postings?

16    A    Of course.

17    Q    So you were watching them?

18    A    No.

19    Q    You weren't watching?

20    A    No.

21    Q    Well, the second time, the third time, the fourth, you

22    never told Brian or Doreen you had been on?

23    A    Correct.

24    Q    You never told them you hadn't been on.

25    A    Correct?
```

Marano-direct                                    2.157

```
 1    Q    And you still think you got on and wanted to see if
 2    there were any additional postings, you weren't watching
 3    them?
 4    A    No, I wouldn't say that.
 5    Q    Okay.
 6         Now, after you went on the third time, did you let
 7    Tino Chimburello know that you had been on again?
 8    A    Yes.
 9    Q    And how did you do that?
10    A    I believe that was via e-mail as well.
11    Q    Okay.
12         MR. PISANI:  I'd like to have this one, I'll mark
13    it, Judge, as an exhibit, as P-3.
14         MR. PISANI:  May I approach the witness, Your
15    Honor?
16         THE COURT:  You may.
17    A    Yeah, that's my note too.
18    Q    That you sent on May 10th?
19    A    Yes.
20    Q    Okay.
21         That's five days after you went on the first time?
22    A    Correct.
23    Q    And that's probably a week after you got copies of some
24    of the postings from Robert Anton?
25    A    I think it's four days.  First time I went on was the
```

Marano-direct                    2.158

1      6th in the morning, and that's the 10th in the morning,

2      correct.  So that's four days.

3      Q    I believe --

4      A    Is that accurate?

5      Q    I don't know.  D dash -- it's you up to you.  D-2 has

6      May 5th, 2006 on the bottom.

7      A    Right.  So that was late evening of the 5th, that's

8      correct.

9      Q    I don't -- I'm not going do quibble, and this, it was

10     May 5th and this one is May 10th?

11     A    I just wanted to make sure.

12     Q    That's accurate?

13          MR. PISANI:  I'd like to introduce into evidence,

14     Your Honor --

15     A    Sure.

16          THE COURT:  Any objection?

17          MS. GARDINER:  No, Your Honor.

18          THE COURT:  P-3 is in evidence.

19          ( Received as marked ).

20          MR. PISANI:  Your Honor, I'd like to put it on the

21     the projector.

22          THE COURT:  You may.  You may publish it.

23     BY MR. PISANI:

24     Q    Okay.

25          Mr. Marano, you see the e-mail?

JOHN KEVIN STONE, CSR

Marano-direct                                2.159

1    A    I do.

2    Q    You sent that at 1:38 in the morning?

3    A    Correct.

4    Q    And it was to Tino Chimburello, "My Space."  Correct?

5    A    Correct.

6    Q    And it states that, "the My Space site has been pulled

7    off the web, I just logged on and it is gone"?

8    A    Correct.

9    Q    Okay.

10        Did Mr. Chimburello ask you to go back on to the

11   site and then respond to him and let him know what you

12   found?

13   A    No.

14   Q    Okay.

15        Why did you send Mr. Chimburello this e-mail?

16   A    I thought that was an important piece of information.

17   Q    Now, you were the one who fired Brian Pietrylo and

18   Doreen Marino.  Correct?

19   A    Correct.

20   Q    Well, why did you fire --

21   A    That's actually not correct.  I fired Brian and I

22   believe Jason fired Doreen.

23   Q    At your direction?

24   A    At our directive, correct.

25   Q    You told Jason to fire Doreen.  Right?  Correct?

Marano-direct                          2.160

1    A    Yes.  Yes.

2    Q    And they happened different days?

3    A    They did.

4    Q    Brian was fired, do you remember what day?

5    A    I don't.

6    Q    Was it after you had sent this e-mail to Mr.

7    Chimburello?

8    A    I don't recall.

9    Q    And then Doreen was fired subsequent to Brian.  Correct?

10   A    That's correct.

11   Q    Like the neck next day or so?

12   A    That sounds accurate.

13   Q    So let's start with Doreen.  Why did you fire Doreen?

14   A    Well, Doreen, in my opinion, was living with Brian.

15   Brian was the creator of the site.  His postings and

16   comments not only opened the forum, but initiated and

17   provoked the other members to create comments, which Doreen

18   also participated in.

19           So I looked at Doreen as her comments were

20   egregious and damaging, but I also look at her almost as a

21   co-creator.  And the fact that they were living together and

22   she was certainly privy to all the things that he put on

23   there.  And I'm sure they had lots of dialogue about all

24   that.

25           And in addition to that, I couldn't imagine

JOHN KEVIN STONE, CSR

1    terminating Brian and having Doreen still employed there,

2    and how bad that could be for the morale of the restaurant.

3    Q    Did you ever have a conversation with Doreen about

4    whether she was a co-creator or not?

5    A    No.

6    Q    Do you have any idea how many comments Doreen actually

7    made and posted?

8    A    There weren't many.  I believe there were two.

9    Q    Just a couple?

10   A    Yeah.

11   Q    So then basically in your mind she was basically guilty

12   by association?

13   A    No.  Her comments were very egregious, if you asked me.

14   Q    Well, if she wasn't with Brian and they weren't a

15   couple, would you have fired her?

16   A    That's not the case.  I didn't think about it that way.

17   Q    Why did you fire Brian?

18   A    Well, Brian's obvious, he's the creator of the site.

19   All the things I just mentioned about him creating, opening

20   the forum, initiating the dialogue, the comments that he

21   made, the posting the test, company logo being on the site,

22   there were many many facets as to why I fired Brian.

23   Q    I don't want to misspeak your testimony.

24   A    Sure.

25   Q    And you went pretty fast, so I'm trying to write them

Marano-direct                    2.162

1    down.  But you can correct me if I'm wrong.

2    A    Sure.

3    Q    I think you said you fired him for a number of reasons.

4    Right?

5    A    Several reasons.

6    Q    Okay.

7         One was he was the creator of The Spec-tator?

8    A    Correct.

9    Q    The comments that he made on The Spec-tator?

10   A    Correct.

11   Q    The wine list or test?

12   A    Publishing the wine test.

13   Q    And the use of the Houston logo.  Correct?

14   A    I said that, correct.

15   Q    Now, where did you fire him?

16   A    At the restaurant.

17   Q    Who else was present?

18   A    Jason Sokolow.

19   Q    Okay.

20        When you fired him, what do you remember telling

21   him?

22   A    I remember telling Brian that we're going to have a

23   difficult conversation, and that it had come to my attention

24   that this site was created that went against the four values

25   of Houston's, and went into how damaging I thought that

1    could be, and there really wasn't too much dialogue beyond

2    that.  You know, I wanted to give a very round about reasons

3    so he could understand why his comments and how damaging

4    that could all be.

5    Q    And what did you say to him?

6    A    I just explained what I said to him.

7    Q    I mean, I'm sorry, what did he say to you?

8    A    That he never intended it to be, he never intended it to

9    turn into what it turned into, and he offered to take down

10   the site.

11   Q    He offered to take down the site?

12   A    He did.

13   Q    And what was your response to that?

14   A    It's too late for that.

15   Q    Why was it too late?

16   A    Because 21 people had been privy to two months of

17   barbing of guests, managers, values, been exposed to a test.

18   I mean use of the company logo associated with something

19   completely negative.

20   Q    So it was your opinion that this group and the comments

21   they made were violating your core values.  Correct?

22        Did you have any factual information, meaning that

23   did you or were you told that when they were at Houston's

24   working that the people who were making comments on this

25   site in this group that wasn't broadcasted to anybody, that

1    they were exhibiting a poor behavior or they were exhibiting
2    a lack of professionalism?
3    A    In my opinion?
4    Q    In your opinion.  Right.
5    A    In my opinion, any reasonable person who read the
6    comments on those sites and does not think that that will
7    affect the morale of the 21 people reading those comments, I
8    don't think there's a logical thought process there if
9    anyone thinks that that is not damaging.
10   Q    Okay.
11        Let me ask you this.  You -- Houston's has a
12   document, correct, called a written counselling form?
13   A    Correct.
14   Q    And what is the purpose of the counselling form?
15   A    Well, there are several purposes.  One, if someone does
16   an outstanding job in any one area, if they go above and
17   beyond for a effort, we can certainly commend them by
18   documenting that and putting it in their file.  And the same
19   things for something incredibly egregious, if something were
20   done, especially if it becomes habitual, if something's done
21   and we want to document that employee, we will document it,
22   go over it with them and we will put it in their file.
23   Q    Are you familiar with the forms?
24   A    I am.
25   Q    Have you seen -- have you seen them before?

 1    A    I have.

 2    Q    Have you reviewed them before?

 3    A    It's been sometime, but I have.

 4    Q    Okay.

 5         Did you review Brian Pietrylo's employment file at

 6    any time prior to his termination?

 7    A    I believe I did.

 8    Q    Did it contain any type of prior written counselling

 9    forms that were issued to him by Houston's?

10    A    I think it may have had one.

11         THE COURT:  Can I see counsel at side bar, please.

12    Oh, I'm sorry.  I didn't mean to interrupt.  I'd like to see

13    you both.

14         MS. GARDINER:  I was asking the same thing.

15         THE COURT:  Oh, okay.

16         ( Side bar conference ).

17         THE COURT:  Reason I requested a side bar, I've let

18    a lot of this area go by under the theory of giving latitude

19    towards what's essentially cross-examination.

20         MR. PISANI:  Right.

21         THE COURT:  Because I know you're testing his

22    credibility and everything else.

23         But you're -- and perhaps because this is an area

24    of law that you do in the state court all the time, this is

25    beginning to resemble a straightforward wrongful termination

Marano-direct                                    2.166

1   case, and really, in my opinion, getting off the issue of
2   the privacy rights that you are really seeking to assert,
3   and to some kind of extent you're just kind of overlapping
4   things into the generic wrongful termination examination
5   type of stuff, I'm guessing you do when you do these state
6   court wrongful termination.
7            MR. PISANI:  I do.  And I do a lot of different
8   cases, but the purpose of this, I'm almost done, it --
9            THE COURT:  I'm not going to stop --
10           MR. PISANI:  I almost done.
11           THE COURT:   -- I'm just cautioning you about time.
12           MR. PISANI:  Just so you know the purpose of this
13  is that it's his opinion that the overflow into the
14  workplace, okay, they have these forms.
15           THE COURT:  Okay.
16           MR. PISANI:  Okay.  I'm going to show him the
17  forms, I just laid --
18           THE COURT:  Just wait a minute.  Time out.
19           MR. PISANI:  Yes.
20           THE COURT:  In her trial brief, all over the place
21  she stipulated that they were terminated because of the
22  content of The Spec-tator site.  That's in her brief.  It's
23  in her I think jury instructions, or perhaps in the
24  commentary to the jury instructions.  So there's not a
25  question as to whether they were fired because of the

Marano-direct                    2.167

1    content of The Spec-tator, that is stipulated.

2            MR. PISANI:  But this basically goes to his

3    credibility about the reason that the -- involving the core

4    values, and I'm saying --

5            THE COURT:  So you're not stipulating -- accepting

6    that stipulation, you're not -- don't want me to I say they

7    stipulated to --

8            MR. PISANI:  Stipulated to what?

9            THE COURT:    -- is that what you're saying, that

10   they were fired?

11           MR. PISANI:  That's not what he's saying.  If you

12   listen to what he's saying, he gave a whole myriad of

13   additional reasons.  I want to talk to him --

14           THE COURT:  Okay.  Use your time how you wish.

15           MR. PISANI:  How much time --

16           THE COURT:  A lot of time -- about three hours, 15

17   minutes, give or take.

18           MR. PISANI:  I only have -- I'm going to read, I

19   have loads of time --

20           MS. GARDINER:  I haven't gotten -- first of all,

21   you haven't told me what you're reading of Anton yet.  I

22   haven't gotten any pages, so I haven't had a chance to see

23   if I need anything.

24           MR. PISANI:  I will do that before I leave today.

25           MS. GARDINER:  But second of all, this case, and I

Marano-direct                              2.168

1    was objecting and asking for a side bar at the same time you

2    called us up, the case law in employment areas is clear that

3    neither the court, nor the jury, sits as a super H-R

4    department, and whether Mr. Marano was or was not mistaken

5    about this having an effect on morale is not the issue here.

6            THE COURT:  I agree.  Absolutely.  No question

7    about it.

8            MS. GARDINER:  So -- and that's what we're getting

9    at here.

10           THE COURT:  I am just cautioning you, to the extent

11   you're using it to test his credibility you can have a few

12   more questions.  But it's really having --

13           MR. PISANI:  I'm almost done with it.

14           THE COURT:  Okay.

15           MR. PISANI:  I'm almost done.

16           MS. GARDINER:  It's also confusing to the jury, and

17   I'm going to ask for an instruction that their decision

18   making has nothing to do with whether he was, right or

19   wrong, about whether this was affecting the morale.  It has

20   nothing to do with whether he was right or wrong about just

21   firing them or not other people.  That's not in this case.

22           THE COURT:  Yes, that really is not in this case.

23           MR. PISANI:  But --

24           THE COURT:  We don't need to give them that

25   instruction now.  But he's certainly free to argue that in

1    summation.

2              MR. PISANI:  Sure -- sure.

3              THE COURT:  I've asked for jury instructions in

4    causes of action that don't turn me into a mouthpiece for

5    either side.

6              MR. PISANI:  Right.

7              THE COURT:  And I'm sticking with that.

8              But I'm just making sure that you both, that you

9    remember that what the cause of action is that you're trying

10   to move.

11             MR. PISANI:  But I also have a wrongful discharge

12   based on right to privacy.  And it goes to his credibility,

13   if they don't --

14             THE COURT:  Yes.  But wrongful discharge based on

15   the right to privacy is a separate question that needs to be

16   -- what the evidence is needs to be about, you're basically

17   going into, did you do an investigation of other people.

18   There's no selective discharge claim.  What he did with

19   other people is just not relevant.  So you have to stay

20   focused.  It's not a particular, typical wrongful

21   termination, and indeed, it's an at will employment

22   situation.  But what you've got, what you have testified

23   under and a right under the Stored Communications Act, which

24   you've gone through.  And a right under right of privacy.

25             MR. PISANI:  Right.

Marano-direct                          2.170

```
 1              THE COURT:  Which I don't think you have any other
 2       questions as to the right of privacy.
 3              MR. PISANI:  The only thing, I have credibility,
 4       it's going to take ten minutes, I'm going to show him those,
 5       finish this and that's it.
 6              THE COURT:  Okay.  Just finish up.  I was just
 7       cautioning you.
 8              MR. PISANI:  I'm not going to spend that much time,
 9       I promise.
10              THE COURT:  Okay.
11              ( End of side bar conference ).
12              THE COURT:  You may proceed.
13              MR. PISANI:  Thank you, Your Honor.
14       BY MR. PISANI:
15       Q    Getting back to where we were prior to the side bar, the
16       form also has specific reasons for counselling.  Correct?
17       A    Correct.
18       Q    And it has specific reasons, violation of company
19       policies, inconsistent work behavior, poor attitude.
20       Correct?
21       A    Correct.
22              MS. GARDINER:  Can I just -- did you say violation
23       of public policy?
24              THE COURT:  Company policy.
25              MR. PISANI:  No, I said company policy.
```

JOHN KEVIN STONE, CSR

Marano-direct                          2.171

 1                THE COURT:  Company policy.

 2                MS. GARDINER:  Okay.  I just didn't.

 3                MR. PISANI:  I apologize if you believe I said it,

 4     but I believe I said company policy.

 5                THE COURT:  Which specific form are you referring

 6     to?

 7                MR. PISANI:  D-22.

 8                THE COURT:  D-22.

 9                You can go ahead.  I'm fine.

10                MR. PISANI:  Okay.

11                Okay.

12                May I approach the witness?

13                THE COURT:  You may.

14     BY MR. PISANI:

15     Q    Have you ever seen that form before?

16     A    I have.

17     Q    And it's consistent with the things you described about

18     the form?

19     A    Yes.

20     Q    And is it also an actual one that was issued to Brian

21     Pietrylo?

22     A    It is.

23     Q    And have you seen it before?

24     A    I have.

25     Q    And the reason he got this one is for what?

JOHN KEVIN STONE, CSR

Marano-direct                          2.172

1    A    It says, Brian ordered to chef without asking to take a

2    break during the shift, without asking the manager.

3    Q    All right.

4              Now, to your knowledge -- strike that.

5              Did you check at any time between March of 2006 and

6    May of 2006 when you fired Brian and Doreen, to see if any

7    of the members of The Spec-tator had been issued any written

8    counselling forms with regard to your core values, the

9    inconsistent work behavior, poor attitude, violation of

10   company policies?

11   A    I had gone through Doreen's and Brian's files prior to

12   terminating them.

13   Q    And there were none there for them for those three

14   things?

15   A    I'm sorry?

16   Q    They had never been issued a counselling form for either

17   poor attitude, inconsistent work behavior, or violation of

18   company policies?

19   A    No.  The only one I remember seeing for Brian was that

20   one there.

21   Q    Right.

22             Did you see, look to see if any of the other

23   members of The Spec-tator who you were concerned about had

24   been issued any of these forms for insubordination, poor

25   attitude, or violation of company's policies?

Marano-direct                          2.173

1    A    I did not.

2    Q    Now, you said that when you met with Brian you gave him

3    the reasons why you fired him.  Right?

4    A    Some of the reasons.

5    Q    Yes.

6         And at the time that you fired him did you prepare

7    any notes with regard to the firing?

8    A    I did.

9    Q    Okay.

10        And they were contemporaneous when you actually

11   fired him, that means you did it pretty much after he left

12   but not like yesterday?

13   A    Correct.

14   Q    Okay.

15        And when did you do the notes?

16   A    I believe just after we had our discussion.

17   Q    After he left.

18        So is it fair to say that those notes would have

19   the best recollection of what occurred at the time as

20   opposed to how you're testifying today?

21   A    I'm sure they're much more accurate in terms of words

22   that were used, but I'm not sure that they contain the full

23   content of the conversation.

24   Q    Okay.

25        So we'll show it to you.  And I believe this one, I

Marano-direct                        2.174

1     hope I'm right, is P-4.  We'll use P-4.

2            MR. PISANI:  May I approach the witness, Your

3     Honor?

4            THE COURT:  You may.

5     A    Yes, these are notes I prepared after Brian and I spoke.

6            MR. PISANI:  I'd like to introduce P-4 into

7     evidence, Your Honor.

8            THE COURT:  Any objection?

9            MS. GARDINER:  No.

10           THE COURT:  P-4 is in evidence.

11           ( Received as marked ).

12           MR. PISANI:  May I put it on the projection screen?

13           THE COURT:  You may.

14           MR. PISANI:  Okay.

15     BY MR. PISANI:

16     Q    At the top it says, "conversation with Brian."  Correct?

17     A    Correct.

18     Q    "Brian, we're not going to have uncomfortable -- would

19     want to read your handwriting?  Because I don't know if I'm

20     reading it right.

21           MR. PISANI:  Your Honor, can he read part of it?

22           THE COURT:  Why don't you highlight the section

23     you'd like him to read.

24           MR. PISANI:  Okay.

25           Great.

1    BY MR. PISANI:

2    Q    Read that paragraph.

3    A    Sure.

4         "It has come to my attention that you have created

5    a web page on My Space.com that is dedicated to making a

6    mockery of the restaurant and the management, which quite

7    frankly I am less concerned with the fact that the site goes

8    against all our beliefs, values, principles that we strive

9    so hard to achieve.

10   Q    And then Brian's response was?

11   A    That was never intended to turn into -- do you want me

12   to read the whole thing?

13   Q    Yes.

14   A    "It was never intended to turn into this.  It was

15   lighthearted and fun.  It is not malicious.  It was a place

16   for people to go and vent."

17   Q    And did you give any credence to that statement, did you

18   think it had any validity?

19   A    No.

20   Q    And then you respond further that you "need to part ways

21   and I'm sure you understand," and he said, "I do," and he

22   said, "thank you."  Correct?

23   A    Sure.  Would you like me to read that.

24   Q    No, you don't have to read it.

25        Okay.  Now, when you wrote those notes you never

Marano-direct                          2.176

1      referred in there to one of the reasons you gave, which was

2      the wine test.  Correct?

3      A    Correct.

4      Q    You never referred to Houston logo.  Correct?

5      A    That's correct.

6      Q    In fact, isn't it true that when I took your deposition

7      I asked you if the notes were accurate and contained

8      everything that you wanted to say, you remember that?

9      A    Vaguely.

10     Q    And that you said that they weren't totally accurate.

11     Correct?

12     A    Okay.  If it's in the deposition I trust that it's

13     there.

14     Q    I'm going to allow him to say, he can answer he doesn't

15     remember or he does remember then I'm sure.

16          MS. GARDINER:  I'm just objecting because I'd like,

17     A, page, and B, I don't know that you're accurately

18     reflecting the --

19          MR. PISANI:  Your Honor, I'm referring to --

20          THE COURT:  Restate your question.

21          MR. PISANI:  Sure.

22     BY MR. PISANI:

23     Q    Do you remember testifying about the notes at the

24     deposition and I asked you if they were accurate?

25     A    I don't remember that specifically, no.

JOHN KEVIN STONE, CSR

1              THE COURT:  Okay.

2              That's it.  Go to the deposition.

3    BY MR. PISANI:

4    Q    Now, if I -- if I show you the deposition, would that

5    help to refresh your recollection?

6    A    Of course.

7              MR. PISANI:  I'm referring to page 115, Your Honor.

8              THE COURT:  All right.

9              Look at page 115 of your deposition.

10             THE WITNESS:  Okay.

11             THE COURT:  Does that refresh your recollection?

12             MR. PISANI:  Read -- may I give him the lines?

13             THE WITNESS:  Yes.

14             THE COURT:  You can refer him to the lines, but

15   don't read from the deposition if you're using it to refresh

16   your recollection.

17             MR. PISANI:  I'll give the lines.

18   A    If I may, I believe it starts on page 114, where it

19   says, "reflect generally what we talked about," and it then,

20   you said, "does it contain accurately the reasons why you

21   fired him," and I said it "briefly describes some of the

22   reasons."

23   Q    Right.

24             And then we -- you don't have to read it, this is

25   just to refresh your recollection.  Refer to page 115.

JOHN KEVIN STONE, CSR

Marano-direct                                    2.178

1    A    Okay.

2    Q    Because now we're talking about the notes.  Okay?

3         And read from line 9 on to yourself.

4              THE COURT:  What's the pending question?

5    A    Yeah.

6    Q    The pending question is that I asked him if he remembers

7    telling me that the notes were not completely accurate at

8    his deposition, that's the first question.

9    A    I don't remember that question, no.

10             THE COURT:  I don't see that question.  So why

11   don't you pose your next question.

12             MR. PISANI:  Okay.

13             THE COURT:  This is not a central issue so --

14             MR. PISANI:  Yes.

15   BY MR. PISANI:

16   Q    Do you remember testifying that Brian had told you that

17   he was willing to take down the site?

18   A    Yes.

19   Q    But you did not include it in your notes.  Correct?

20   A    That's correct.

21   Q    Okay.

22        And do you remember on page 115 --

23             MR. PISANI:  I'm talking about a prior inconsistent

24   statement now, Your Honor.

25             THE COURT:  Then you need to come to side bar and

JOHN KEVIN STONE, CSR

Marano-direct                              2.179

1    satisfy a proffer.

2              MR. PISANI:  The proffer for it being inconsistent?

3              THE COURT:  What makes it inconsistent.

4              Come to side bar.

5              ( Side bar conference ).

6              THE COURT:  All right.

7              MR. PISANI:  Okay.  I believe his testimony was

8    that he didn't include the wine test and logo in his notes,

9    but those were some reasons why, and now in his dep I asked

10   him was it accurate, he said no, Brian told me, you know,

11   that he would take down the site.

12             THE COURT:  I don't get --

13             MS. GARDINER:  You didn't ask him, he said that's

14   not accurate.  And he said --

15             MR. PISANI:  No, no, I'm not talking about his dep,

16   I'm talking about him questioning -- I'll ask him again if

17   you want, and then I'm going to go to it, he didn't include

18   the wine test or the reference to the other item because he

19   said he didn't include everything but --

20             THE COURT:  Mr. Pisani, you're so far afield of

21   what this case --

22             MS. GARDINER:  So --

23             THE COURT:   -- is about.  Really far afield.

24             This is not your standard wrongful termination

25   case.  This is a wrongful termination case based on the

JOHN KEVIN STONE, CSR

 1    causes of action in your complaint.  It's -- you're --
 2              MR. PISANI:  But this goes to his credibility.
 3              THE COURT:  It really doesn't.  He -- you are so
 4    far afield of credibility.  Why don't you start with a whole
 5    new, brand new question that's clear, and then don't read
 6    from a deposition unless you're able to say question, you
 7    ask him a question, now he gives you an answer, and if that
 8    answer is directly contradicted by something in his
 9    deposition --
10              MR. PISANI:  Right.
11              THE COURT:   -- then say, isn't it a fact when I
12    took your deposition I asked you, question, you read your
13    question --
14              MR. PISANI:  Then the number.
15              THE COURT:   -- and you gave the answer.  It has to
16    be not somewhere in a big paragraph.
17              MR. PISANI:  Right.  Right.
18              THE COURT:  When you take a deposition that has all
19    this chopped up discussion --
20              MR. PISANI:  I know.  It's hard.
21              THE COURT:   -- and you don't have anything in a
22    deposition that creates the foundation --
23              MR. PISANI:  Right.
24              THE COURT:   -- for impeaching with a prior
25    inconsistent statement in a deposition.

1          MR. PISANI:  Right.

2          THE COURT:  The reason I'm sounding a little

3    preachy, because this is a very common area where lawyers

4    get tripped up, and I'm always teaching law clerks and

5    interns about taking a deposition in a way --

6          MR. PISANI:  Yes.

7          THE COURT:  -- so you set this up.  But right now,

8    whenever I look at the page, when you're referring --

9          MR. PISANI:  That's the problem, its all over, we'd

10   have to read five pages.  That's the problem.

11         THE COURT:  Right.

12         So you can't read five pages or use this that way.

13         MR. PISANI:  Right.  Right.

14         I'm not going to go there.  I'll ask him

15   something --

16         THE COURT:  Okay.

17         MR. PISANI:  Fair enough.

18         MS. GARDINER:  Thank you very much, Your Honor.

19         ( End of side bar conference ).

20   BY MR. PISANI:

21   Q   I don't even know if I asked you this, and if I did

22   counsel, object.

23         I just want to make sure we're clear.  You didn't

24   reference in the notes the reasons you gave today regarding

25   wine test or the logo?

```
 1    A    I did not reference them in my notes.

 2    Q    Were they important reasons why you let him go?

 3    A    Yes.

 4    Q    But you didn't put them in your notes?

 5    A    I did not put them in my notes.  I put in comments from

 6    Brian, nor did I put in comments from Brian about taking

 7    down the site.

 8    Q    Okay.

 9              MR. PISANI:  Just give me one moment, Your Honor.

10              THE COURT:  Sure.

11              MR. PISANI:  I believe I have nothing further.

12    Thank you.

13              THE COURT: All right.

14              Miss Gardiner.

15              MS. GARDINER:  I can start or we can take a break.

16              THE COURT:  I believe -- we've only been back from

17    lunch for an hour, so why don't you get started for a half

18    hour or so.

19              MS. GARDINER:  Great.

20              THE COURT:  And take a break right in the middle of

21    the afternoon.

22              MS. GARDINER:  I may not need a half hour.

23              THE COURT:  Even better.  Take a break at the end

24    of this witness.

25              All right.  You may proceed.
```

JOHN KEVIN STONE, CSR

Marano-cross                          2.183

1    CROSS-EXAMINATION

2    BY MS. GARDINER:

3    Q    Mr. Marano, when you wrote these notes after you

4    terminated Mr. Pietrylo, were you trying to document every

5    single reason for his termination?

6    A    No.

7              I'm, you know, during the course of the day-to-day

8    business and the decisions you make, you never think three

9    years later you'd be sitting in a courtroom needing notes to

10   refer back to.

11   Q    And in fact, when you said that it had come to your

12   attention that Mr. Pietrylo had created a web site on My

13   Space that is dedicated to making a mockery of the

14   restaurant and the management, what did that include?

15   A    What didn't it include?  I mean the comments about the

16   sexual innuendos, the comments about the guests,

17   lightheartedness or spoofs, things about specs and, you

18   know, all of the terminology used in the restaurant.

19   Q    It included everything?

20   A    Everything, yeah.  You name it.

21   Q    So this was a shorthand way of you saying The Spec-tator

22   is not what we want going on, the content, and whether it's

23   the use of the logo or the use of the wine test, is that

24   what you were saying?

25   A    It is.

JOHN KEVIN STONE, CSR

Marano-cross                                    2.184

```
 1   Q   You know, in counsel's questioning we didn't have a
 2   chance to learn anything about you.  And I want to take just
 3   a minute.
 4           Can you tell the jury just a little bit about
 5   yourself?  How old are you?
 6   A   I'm 34 years old.
 7   Q   Are you married?
 8   A   I am.
 9   Q   Do you have any children?
10   A   I do.  I have two children and one on the way.  A four
11   year old and a two year old.
12   Q   Congratulations.
13   A   Thank you.
14   Q   And I believe you said you had worked for Hillstone
15   Restaurant Group for how long?
16   A   12 years.
17   Q   And when all of this took place, how long had you been a
18   general manager -- I'm sorry, a regional manager.
19   A   About four months when this site was created, when Brian
20   and Doreen were terminated probably about six months, five
21   or six months.
22   Q   Now, I want to talk to you about when you learned about
23   The Spec-tator and what happened after that.
24   A   Sure.
25   Q   You testified that you learned about The Spec-tator in a
```

JOHN KEVIN STONE, CSR

1    meeting during a morning, and that meeting was with Mr.

2    Anton and Mr. Rodriguez.  Do you know what date that was,

3    based on the documents you've seen now showing when you

4    copied The Spec-tator postings?

5    A    I believe, from looking at the documents, it's the 5th

6    of May.

7    Q    The 5th of May.

8          So you learned from your meeting with Tijon and Mr.

9    Anton around 11 o'clock, 11:30 in the morning on the 5th of

10   May.  Do you know what day of the week the 5th of May was?

11   A    I believe it was a Friday.

12   Q    You learn on a Friday morning that this site exists.

13   And I believe you testified you can't recall whether Mr.

14   Anton gave you copies of The Spec-tator that day or

15   subsequently.  But you also, do you remember meeting with

16   him at any time after Friday, May 5th?

17   A    I don't.  Logically, it would make sense that he gave

18   them to me that morning.  But I just don't remember him

19   giving me those papers.

20   Q    And you testified that later on that same day when you

21   were coming home, you were on the phone with either Tino

22   Chimburello or Michael Lamb and one of them asked you how to

23   access The Spec-tator?

24   A    That's correct.

25   Q    If Robert Anton had given you the password, would you

1      have given it to them in that conversation that evening?

2      A    Of course.

3      Q    There is an e-mail that you were shown, Plaintiffs'

4      Exhibit 2, to Mr. Chimburello and Mr. Lamb, at midnight the

5      following day, Saturday, May 6th.  And you're mailing them

6      the information on how to go into the site?

7      A    Yes.

8      Q    Why were you e-mailing it to them at that particular day

9      and time?

10     A    Well, normally, when that was my job function, I would

11     go out in the morning, spend the entire day in the

12     restaurants, and when I got home, whether it would be 7, 8,

13     9 o'clock at night, I would spend time with my kids, my

14     wife, if the kids weren't awake I'd spend time with my wife

15     and spend time with my family, and then when everyone went

16     to bed, I'd go down to my office and then I'd work for a few

17     hours just to wrap up my day and prepare for the next day.

18     So it was very normal for me to be working at midnight or 1

19     a.m.

20     Q    And this particular Friday, May 6th, after you obtained

21     the access information from Karen and Tijon, through Tijon,

22     did you follow that same routine?

23     A    Did I follow the same routine to get on the site?

24     Q    When you went home, did you spend time with your family?

25     A    Oh, yes.

Marano-cross                              2.187

1    Q    On that Friday?

2    A    ( Indicates affirmative ).

3    Q    So it was later on on Friday, later on Friday night when

4    you first accessed The Spec-tator?

5    A    Correct.  I got home from my day and -- right.

6    Q    And it was shortly after that that you sent it to Mr.

7    Chimburello and Mr. Lamb, the access information?

8    A    That's accurate, yes.

9    Q    Did either of them in the following three or four days

10   call you up and say anything about, "I can't believe what

11   I'm seeing"?

12   A    No.

13   Q    Did any of those men ever give you any indication they

14   had seen the web site?

15   A    No.  And here's what I want to try and relay, is it's 45

16   restaurants, and there's a lot going on, and it's not like

17   we're sitting behind desks, you know, waiting for e-mails to

18   come across.  So we're working on administrative documents,

19   everyone is mobile, nobody has an office, you all work off

20   mobile phones, and Blackberry's, we're in our cars all day

21   long, and we're on planes, and there's a lot happening in

22   all the restaurants all the time.  Whether it be a leak or,

23   you know, electricity going out, or, you know, a manager not

24   showing up to work, or all kinds of things that everyone is

25   dealing with, especially Human Resources.  And Tino and

```
 1    myself as well as the rest of the regionals.
 2              So they're dealing with these problems many, many,
 3    many times throughout the day.  So it's not -- it's not a
 4    game where we would, where the opportunity to sit around and
 5    take your time, peruse through it, and it's much more
 6    organic, fast paced environment, where we're making
 7    decisions relatively quickly.
 8    Q    Now, counsel has made much of the fact that between May
 9    5th and May 10th when you terminated Mr. Pietrylo, that you
10    went on the web site two more times?
11    A    Correct.
12    Q    Let's talk about the second time you went on the web
13    site.
14              Do you recall that time?
15    A    I remember going on a second time.  I couldn't tell you
16    what day or what time it was.
17    Q    Why did you go on the second time?
18    A    I wanted to see if there were additional postings.
19    Q    Because you were investigating?
20    A    Correct.
21    Q    And when you went on the third time, had you made the
22    decision to fire Mr. Pietrylo and Mr. -- Miss Marino?  And I
23    believe the third time was when you found that the -- I
24    believe you testified the third time was when you found the
25    site had been closed down?
```

Marano-cross                                        2.189

```
 1    A    Correct.  And to answer your question, yes.
 2    Q    And again, why were you going on this third and final
 3    time?
 4    A    Same reason.
 5    Q    To see if there were anymore postings?
 6    A    Correct.
 7    Q    Now, counsel also has stressed that at least five days
 8    passed between the first time you went on the web site and
 9    when Mr. Pietrylo was fired.  From about 11 o'clock or
10    midnight on Friday to the 10th when Mr. Pietrylo was
11    terminated, it's about five days.  It covers a Saturday, a
12    Sunday, a Monday, a Tuesday.
13         Why did it take four or five days to actually
14    physically terminate Mr. Pietrylo?
15    A    Well, terminating people is not something we take
16    lightly.  So one, I wanted to make sure my decision was well
17    thought out, and I certainly wanted to speak with Glenn, our
18    general counsel, again, before I made my final decision, and
19    it being a weekend, there's not a lot of that happening.
20    Glenn or Tino or Michael even being available.
21         And then Monday would be the day that I typically
22    not work, since I was on the operational side.  So Tuesday
23    was kind of the normal course, Tuesday would be my Monday,
24    if you will.  And Tuesday I made my decisions, I had spoken
25    to Glenn, I had spoken to Tino, Michael, told them my
```

JOHN KEVIN STONE, CSR

Marano-cross                    2.190

1    reasons for wanting to terminate Brian and Doreen.  We were
2    all in agreement and we would call them in the following
3    day.
4    Q    And just to clarify, because I know you said Glenn a
5    number of times, and I know who you're talking about.  But
6    who is Glenn?
7    A    Sure.  Glenn Meyers is our general counsel.
8    Q    When you accessed The Spec-tator, you did it through
9    Karen St. Jean's My Space page.  Right?
10   A    Correct.
11   Q    And the little link that said "my groups," that was on
12   her My Space page.  Right?
13   A    Correct.
14   Q    And when you accessed The Spec-tator, all you could see
15   was The Spec-tator.  Is that correct?
16   A    That's correct.
17   Q    Could you see anything else on anyone else's My Space
18   page except for The Spec-tator?
19   A    Not that I recall.  It's just The Spec-tator.
20   Q    There's no dispute in this case that Brian and Doreen
21   were making these postings at times when they were not at
22   work.  So why did you care?
23   A    Well, there's a few reasons why I cared.
24        The first and foremost reason was the information,
25   the content of those comments, and how that could affect the

JOHN KEVIN STONE, CSR

Marano-cross                    2.191

1    co-workers and the people that were invited to the site.

2    Specifically, the new employees, could be so damaging.

3           For example, if you look at the comments about the

4    guests.  You know, Mrs. Maneschevitz and the other guests.

5    There is no possible way anyone you could read those

6    comments, separate that from their mind and then go wait on

7    Mrs. Maneschevitz and give her the service she deserves.

8    It's an impossibility.  Can't be done.  They're going to

9    have some preconceived notions of Mrs. Maneschevitz.  And

10   they are opinions, if you will, or her tipping or gratuity

11   procedures.  It's just there's no way that she's going to be

12   able to get the service she deserves.  And there was many of

13   those examples in there.

14   Q    After Miss St. Jean provided you with her password, did

15   you have any other conversations with her?

16   A    I did.

17   Q    Tell me about that?

18   A    I don't remember what it was, a few days later one of

19   the managers, it may have been Jason, may have been Tijon,

20   had said to me that Karen was very uneasy with the fact that

21   she had given me and the rest of the managers her password.

22   So I felt it fitting to talk to Karen about that.

23          So I approached her and I said, "Karen, I want you

24   to know you did the right thing.  No one's going to know

25   that you gave us your password.  And if they find out and

JOHN KEVIN STONE, CSR

Marano-cross                                    2.192

1    they treat you differently or badly, it's my responsibility

2    to make sure while you're in this building that you're

3    protected."

4    Q    Did -- when the manager told you that she was

5    uncomfortable, did they relate the source of her discomfort?

6    A    She felt she was worried that people were not going to

7    be nice to her anymore, and that she would lose her friends

8    because the staff would find out that she was the one who

9    let management know about the site.

10   Q    Now, there were 19 other members of The Spec-tator you

11   did not terminate.  Why not?

12   A    Like I explained earlier to Mr. Pisani, Brian being the

13   creator and the initiator, the provoker of all of those

14   topics and comments, it was obvious to me that Brian could

15   no longer work in that building.

16        And Doreen being Brian's significant other, living

17   with him, and her comments being damaging and even

18   threatening, some of them, I could not see that being a good

19   fit either.

20        And you know, some of those comments, you know, in

21   that posting, you know, they open us up to potential

22   lawsuits as well.

23   Q    But why didn't you fire the other people who

24   participated?

25   A    I didn't think their comments -- well, I didn't think

 1    they needed to know.  That was a decision I felt I made.
 2    Brian was initiator, Doreen lived with him, and that's what
 3    happened.
 4    Q    Did anyone ever speak with the other 18, 19 members of
 5    The Spec-tator group about their comments, about their
 6    participation?
 7    A    Yes.
 8    Q    Who did?
 9    A    I did.  And Jason did.
10    Q    And when was that?
11    A    Well, I think some of them, like Jessica for example, I
12    don't think she ever came back from her honeymoon.  So that
13    we have never had the opportunity to speak with her.  There
14    may have been a few others that were not working there at
15    the time, or had already moved on.  So I don't believe that
16    we spoke to the other 19.

17            But the ones that were still working at the
18    restaurant were spoken to either by me or Jason about the
19    content, their feelings about the restaurant.  My opening
20    question to each one of them was, you know, do you enjoy
21    working here, and do you still want to be a part of this
22    organization.  And if their answer was "yes," then we had a
23    dialogue about what the expectations were going forward and
24    everyone of them answered yes.
25    Q    Was this -- was this also in May or some other time?

JOHN KEVIN STONE, CSR

1    A    Yeah, this was shortly after Brian was terminated.

2    Q    Do you believe that you had Karen St. Jean's

3    authorization to access The Spec-tator?

4    A    I wouldn't believe I did, I know I did.

5             MS. GARDINER:  At this time, Your Honor, that's all

6    I have.

7             THE COURT:  All right.  Thank you.

8             Is there any redirect?

9             MR. PISANI:  Just one or two questions.

10            THE COURT:  All right.  You may ask.

11   REDIRECT EXAMINATION

12   BY MR. PISANI:

13   Q    Mr. Marano, you were just asked by Miss Gardiner about a

14   conversation you had with Karen.

15   A    Yes.

16   Q    And you gave the details of that conversation.

17   A    Yes.

18   Q    So now you know which conversation I'm referring to.

19   A    I do.

20   Q    Now, is that the only one you had with Karen after Tijon

21   had given you her password with regard to this?

22   A    To the best of my memory, yes.

23   Q    Do you recall when you had the conversation?

24   A    I don't.

25   Q    Okay.

```
 1              Was it before -- strike that.
 2              Did you go back on to The Spec-tator after you had
 3      this conversation with Karen?
 4      A    I don't recall if the last time I went on was prior or
 5      post to my having the conversation with her.
 6              MR. PISANI:  Okay.  I have nothing further.
 7              THE COURT:  Anything further?
 8              All right.  Thank you.
 9              You you may step down.
10              THE WITNESS:  Thank you.
11              ( Witness excused ).
12              THE COURT:  All right.
13              Ladies and gentlemen of the jury, it's 3:05.  I'm
14      willing to keep going with the next witness unless you would
15      like a break.  I'm not meaning to suggest that you shouldn't
16      have one.  Could I just have a show of hands as to how many
17      of you would like a mid-afternoon break?  It's 3:05.  We
18      have a few requests for a mid-afternoon break.  Three
19      requests.  You're indifferent.
20              A JUROR:  Doesn't matter.
21              THE COURT:  Is that a yes?  Yes?
22              A JUROR:  I need to go.
23              THE COURT:  Okay.  We'll take a very brief break.
24      Brief afternoon break.
25              Ladies and gentlemen, please don't talk about this
```

2.196

1      case and we'll bring you back and keep going shortly.
2               THE CLERK:  All rise.
3               ( Jury exits ).
4               THE COURT:  All right.  A brief break for you as
5      well, just to sort of access the ladies and gentlemen's
6      room.
7               MS. GARDINER:  Did you give them a time to come
8      back?
9               THE COURT:  They're just going back down to the
10     jury room, I think Julianne's  -- I'm going to try to keep
11     this to break ten minutes.  It takes ten minutes to get
12     down, use the facility and come back.  It's really going to
13     be that.  I'm hoping they don't even make a pot of coffee.
14               MS. GARDINER:  Okay.  Thank you.
15               THE COURT:  Okay.
16               ( After a brief recess court resumed ).
17               THE COURT:  You can be seated.
18               We're bringing the jury in momentarily.
19               You can put your next witness on the stand, if you
20     want to save time.
21               MR. PISANI:  And I have the booklet for --
22               THE COURT:  That's great.  I appreciate them very
23     much.
24               Do you want the notebooks to be able to use them?
25               MR. PISANI:  I have one for all of us  You can keep

JOHN KEVIN STONE, CSR

```
 1      them, I've been carrying --
 2              MS. GARDINER:  You don't want to take them back to
 3      your office?
 4              MR. PISANI:  No, that's okay.
 5              THE COURT:  If you don't want to reuse them --
 6              MR. PISANI:  May I approach to give you this --
 7              THE COURT:  Yes.
 8              MR. PISANI:  Doreen, you can take the stand.
 9              THE COURT:  All right.  Great.  Thank you.
10              MR. PISANI:  She said you can.
11              THE COURT:  You can go ahead up there.
12              I appreciate them in notebooks.  The purpose,
13      obviously, for future reference and for other trials, it can
14      be in a manila folder as long as you've got a readily
15      ascertained set of documents, you know, you're working with
16      that witness with, you've got duplicate copies, it runs that
17      much more smoothly.
18              MR. PISANI:  Actually for me it really helped,
19      because I'm usually looking.  So it was very good.
20              THE COURT:  Try to use it with other judges.
21              MR. PISANI:  I will.  Thank you.
22              THE CLERK:  All rise.
23              ( Jury enters ).
24              THE COURT:  All right.
25              You may all be seated.
```

```
 1              Would you please swear in the witness.
 2              THE CLERK:  Please raise your right hand and place
 3       your left hand on the Bible.
 4       D O R E E N    M A R I N O, sworn.
 5              THE CLERK:  Please state and spell your name for
 6       the record.
 7              THE WITNESS:  Doreen Marino.  D-o-r-e-e-n,
 8       M-a-r-i-n-o.
 9              THE COURT:  You may start.
10              MR. PISANI:  Thank you Your Honor.
11       DIRECT EXAMINATION
12       BY MR. PISANI:
13       Q    Good afternoon, Doreen.
14       A    Good afternoon, Frank.
15       Q    Are you one of the plaintiffs in this matter?
16       A    I am.
17       Q    Why don't you tell the jury a little bit about yourself.
18       Where do you reside?
19       A    Currently, I'm living in Nyack, New York.
20       Q    And how long have you been living there?
21       A    Two weeks.
22       Q    Where did you live before that?
23       A    Brooklyn, New York.
24       Q    Do you have any children?
25       A    I have two teenagers.
```

Marino-direct                           2.199

 1     Q    Okay.

 2          And how -- can you tell the jury a little bit about

 3     your educational background?

 4     A    I graduated in 1989 with a Bachelors of Science in

 5     business administration, concentration in marketing, minor

 6     in psychology.

 7     Q    And when did you get that degree?

 8     A    1989.

 9     Q    Where did you meet Brian Pietrylo?

10     A    Islamorada, Florida.

11     Q    In what year?

12     A    I met him in 2000.

13     Q    Did there come a time when you had a relationship with

14     Brian?

15     A    Yes.

16     Q    And when did that start?

17     A    October 11th, 2001.  I remember dates.

18     Q    Wow.  Okay.

19          And did you at subsequently live together?

20     A    That was the day he moved in.

21     Q    And you were together from October 11th, 2001 until

22     when?

23     A    October of 2007.

24     Q    Of?

25     A    2007.

Marino-direct                                    2.200

1    Q    I'm sorry.  I thought you said October 7th.  October

2    2007?

3    A    October 2007.

4    Q    Okay.

5         Why aren't you and brown Brian together any longer?

6    A    I believe there was a couple of different reasons.  One

7    being the great deal of stress from this process, the legal

8    process, we've gone through for the past three years, put a

9    big strain on our relationship emotionally and financially.

10   That was probably a big reason.

11   Q    Any others?

12   A    We were basically friends before we became more than

13   friends.  So we were still friends, we maintained our

14   friendship, so we decided that we should part as friends and

15   maintain that friendship, rather than go through something

16   bad and destroy it.  So we decided amongst ourselves to part

17   ways.

18   Q    And are you still friends today?

19   A    Absolutely.

20   Q    Now, with regard to your work history, when did you

21   start to work in the restaurant industry?

22   A    I believe it was 1987, while I was in college.

23   Q    Okay.

24        Why did you continue to work in the restaurant

25   industry as opposed to pursuing something with your degree?

JOHN KEVIN STONE, CSR

Marino-direct                            2.201

```
 1    A    I did pursue something, I mean prior to graduating,

 2    after graduation I left the restaurant industry and stayed

 3    out of the restaurant industry until 1998.

 4    Q    And then you returned to the restaurant industry?

 5    A    I returned, yes.

 6    Q    And you've been involved in that industry ever since?

 7    A    Yes.

 8    Q    Okay.

 9              Did there come a time when you started to work at

10    Houston's?

11    A    Yes.

12    Q    Did Brian start to work there at the same time?

13    A    Same day.

14    Q    Same day?

15    A    Same day.

16    Q    Do you remember when that day was?

17    A    The exact date day I do not remember, but it was March

18    2004.

19    Q    Okay.

20              And in what capacity were you hired by Houston's?

21    A    As servers.

22    Q    Okay.

23              In 2004, what was your compensation?

24    A    2.13 an hour plus tips.

25    Q    At that time in 2004, approximately how many hours on
```

Marino-direct                                    2.202

1     the average did you work at Houston's?

2     A   About 28 to 30 hours.  Initially, it was maybe a little

3     bit more, to compensate, primarily working lunches at the

4     beginning.  After your training you only were allowed to

5     work lunch, which is not as many hours, not as much money as

6     the night shift, so I would sometimes work five -- five to

7     six shifts a week.

8     Q   Are there any better work shifts than others during the

9     day?  What's the best time to work in terms --

10    A   Friday and Saturday nights.

11    Q   Okay.

12        Do you have to work up the ladder to get those

13    shifts?

14    A   Yes.

15    Q   Okay.

16        Did there come a time when you were able to secure

17    those types of work hours?

18    A   Yes.

19    Q   And when was that?

20    A   A few months after I was allowed to start working

21    nights, but I didn't get the exact schedule I wanted until

22    sometime later into my working there for awhile.

23    Q   So you don't recall what year or month when you got

24    those shifts?

25    A   I really got the ideal schedule, had to be the following

JOHN KEVIN STONE, CSR

Marino-direct                            2.203

1    year, probably December of 2005 I started doing head wait.

2    Q    What is "head wait"?

3    A    Head wait would be the -- as Brian did, would be the end

4    of the day financial reports, you gathered the financial

5    reports from all the servers and you collected the money and

6    you did the inputting, you have all the numbers, into the

7    system, making sure that everything was accounted for and

8    that the money balanced.  And with head weight you got the

9    best station in the house.

10   Q    And you had secured that by December 2005?

11   A    I started training for that and I actually had one head

12   wait shift which would be Wednesday afternoons.

13   Q    Did you have that shift at the time of your termination?

14   A    Yes.

15   Q    Were you able to work Friday and Saturdays as of the

16   date of your termination, were you working those nights?

17   A    I was working Friday day, Friday lunch and Saturday

18   nights.  Saturday nights were the best nights to work.

19   Q    And how long did it take you to get to work the Saturday

20   nights?

21   A    I would say at least a good six -- six months.

22   Q    Hhmm-hmm.

23        I'd like to direct your attention to March of 2006.

24   Were you still working at Houston's?

25   A    I was.

Marino-direct                                    2.204

 1    Q    And at that time who were the day-to-day managers at
 2    Houston's?
 3    A    Jason Sokolow was the general manager.  Tijon Rodriguez,
 4    Robert Anton.
 5    Q    Okay.
 6             And in early 2006, did you own a personal computer?
 7    A    I did.
 8    Q    Okay.
 9             Where did you maintain the computer?
10    A    At home in the living room.
11    Q    Okay.
12             Did Brian have one as well or did you share one?
13    A    No, we shared one.
14    Q    Okay.
15             Did you have a laptop computer as well?
16    A    No.
17    Q    What about work, as an employee there were you able to
18    access on their computers the internet?
19    A    No.
20    Q    Are you familiar with My Space?
21    A    Yes.
22    Q    Okay.
23             And what is it?
24    A    It's a social networking place.
25    Q    And you've heard the testimony before about that?

Marino-direct                                           2.205

 1    A    Yes.

 2    Q    Did there come a time when you joined My Space?

 3    A    I did, with two -- February 6, 2006, I remember that

 4    because it's my son's birthday.

 5    Q    Okay.

 6              And when you joined, did you join over a computer?

 7    A    Yes.

 8    Q    Whose computer?

 9    A    My computer.

10    Q    At home?

11    A    At home.

12    Q    Okay.

13              And to join, I think you've heard prior testimony

14    that you have to use a e-mail address and personal password?

15    A    Yes.

16    Q    And did you select --

17    A    I already had the e-mail address established, I then

18    created a password for my account.

19    Q    At any point in time after that did Brian invite you to

20    become a member of The Spec-tator?

21    A    He did.

22    Q    Okay.

23              When was that, approximately?

24    A    When he set it up, I believe I was initially one of the

25    first people to join.  Maybe not the first person to join.

JOHN KEVIN STONE, CSR

Marino-direct                                    2.206

```
 1    Q    Did you have anything to do with the actual set up of
 2    The Spec-tator?
 3    A    I had no -- nothing to do with the set up of the group.
 4    I didn't know he set up a group until he told me he set the
 5    group up.
 6    Q    And did he tell you verbally or did he do what he did
 7    with the members and send them an invitation?
 8    A    I believe he told me that he set up a group and he was
 9    going to send me an invitation or did, he did send me an
10    invitation to the group.
11    Q    And did he actually end up sending you a invitation, I
12    think you have to do to be to part of --
13    A    Yes, that's required to be a part of the group.
14    Q    And did you send the invitation --
15    A    I did.
16    Q    And that's by electronic message?
17    A    Yes.
18    Q    And when you accepted the invitation, were you at home?
19    A    Yes.
20    Q    Now, after you joined, you now were a member of The
21    Spec-tator.  Correct?
22    A    Correct.
23    Q    Do you remember the first time you went on to The
24    Spec-tator?
25    A    I do not recall the very first time I went on, but I did
```

 1    not -- I was not as active on the computer as Brian.  He
 2    kind of monopolized the computer most of the time.  So I
 3    would just go on randomly.
 4    Q    When you accessed The Spec-tator, did you ever make any
 5    postings?
 6    A    I made one posting.  I mean I initiated one topic, I
 7    made very few -- a few, if that many, postings.
 8    Q    So you initiated one topic?
 9    A    Yes.
10    Q    And you had what, two or three additional comments?
11    A    Yes.
12    Q    And that's all?
13    A    That's it.
14    Q    The entire time?
15    A    The entire time.
16    Q    And when you initiated the topic and you made the
17    additional couple of postings, where were you when you did
18    that?
19    A    At home.
20    Q    Do you recall the topic that you started?
21    A    I do.
22    Q    And what was the topic?
23    A    The topic was the 4:30 in time.
24          MR. PISANI:  Your Honor, I'm going to refer to
25    what's already in evidence, D-2 --

Marino-direct                                    2.208

 1                   MS. GARDINER:  A.

 2                   MR. PISANI:  -- A.

 3                   THE COURT:  All right.

 4                   MR. PISANI:  And it's number H 00214.  I'd like to

 5      put it on the projection.

 6                   THE COURT:  This is the part of D-2 A that's been

 7      subdivided?

 8                   MR. PISANI:  Yes.  And it's already in evidence.

 9                   THE COURT:  Yes.

10                   MR. PISANI:  Thank you.

11      BY MR. PISANI:

12      Q    Okay.

13                   I'd like you to look at the top.  Because you can't

14      see it.  The topic says, "the 4:30 in time."  You see that,

15      the top here?

16      A    Yes.

17      Q    And then you're the author, Doreen?

18      A    That's me.

19      Q    Okay.

20                   And you see the comments that you made?

21      A    Yes.

22      Q    And you used some foul language --

23      A    Yes.

24      Q    -- in that comment?

25      A    Yes.

1    Q    Why did you use foul language?

2    A    I was angry.

3    Q    Why were you angry?

4    A    Because the in time had been changed, which directly

5    affected our income during the day, during the lunch shift.

6    Q    And so what did that have anything to do with anything?

7    A    I was just upset, venting about the 4:30 in time and the

8    change of time.  Because of the incompetency of other people

9    in the restaurant, that other people were able to work

10   efficiently, had to suffer for, and it was because of

11   somebody's decision-making to effect my income, which I was

12   not happy about it.

13   Q    Did you ever bring that or were you part of any group

14   that brought that to the attention of management in

15   Houston's?

16   A    Yes.

17   Q    Okay.

18        And who was part of that group?

19   A    I don't recall exactly every person that was there

20   attending, but it was during pre-shift.  Pre-shift being 10,

21   15, 20 minute meeting that we would have before each shift

22   with a manager and the staff, the wait staff for that day,

23   for that shift.  And we talked about it amongst, with

24   ourselves, and brought it to the attention of the manager.

25   That how it's affecting us as servers and how it affects our

Marino-direct                                         2.210

1       income.

2       Q    Okay.

3            Now, during that meeting did you or any of the

4       other group members use that type of language?

5       A    No.

6       Q    Okay.

7            Is there a difference why you would use it in this

8       posting and not use it when you were having this discussion

9       at work?

10      A    Absolutely.

11      Q    What's the difference?

12      A    Professionalism at the workplace.

13      Q    Okay.

14           I'd like to show you, it's D-2 A.  It's already in

15      evidence.  And it's H 00238, Judge.

16           THE COURT:  238.  All right.

17           MR. PISANI:  Yes.  D-2 A.  H 00238.

18           THE COURT:  238.

19           Do you want to post it?

20           MR. PISANI:  Oh, yes.

21           THE COURT:  You may.

22           MR. PISANI:  I was waiting for permission to.

23           THE COURT:  Oh, of course.

24      BY MR. PISANI:

25      Q    Thank you.  You notice that one, Doreen, I think was a

1      topic called "Who does that."  Is that correct?

2      A    I can only see the middle part of the --

3      Q    Well, that's the top page.  You responded to what

4      somebody else had written.  Right?

5      A    Yes.

6      Q    Because obviously it was, had you do a posting?

7      A    Right.  It's a reply.

8      Q    Doesn't it say so, it's a reply.  And this, I'm

9      referring to the middle section here.

10     A    Right.

11     Q    Okay.

12             Miss Helrig wrote, and Miss Helrig is not you.

13     Right?

14     A    No, it's not.

15     Q    And so does that indicate to you she started this topic?

16     A    Yes.

17     Q    She says, "Who would do that."  And then the next

18     question is, "make a baby with Robert."

19             Who wrote -- those are her words?

20     A    Those are her words.

21     Q    Her comments?

22     A    Right.

23     Q    And then you responded?

24     A    Yes.

25     Q    And then you said what you said, "Only Sue could

Marino-direct                                    2.212

1     possibly be capable of reproducing Satan's off-spring."
2          Did you literally really mean Mr. Anton's wife is
3     producing Satan's off-spring?
4     A    ( Laughter ).  No.  Not literally.
5     Q    Did you really mean the following part, "she proceeds to
6     drink alcohol during pregnancy, only someone who truly cares
7     about the child they're carrying would abstain from any
8     harmful substances"?
9     A    Yes.
10    Q    And that's based on?
11    A    I witnessed her at work at Houston's having two glasses
12    of wine during her pregnancy.
13    Q    And was she visibly pregnant?
14    A    Yes.
15    Q    And so this is your opinion?
16    A    That's my opinion.
17    Q    That's something you wouldn't do?
18    A    Right.  Correct.
19    Q    Did you ever make this comment to Mrs. Anton in her
20    presence?
21    A    Not to her directly, no.  She was no longer working at
22    Houston's at the time.  But --
23    Q    Did you ever make this comment to any managers?
24    A    No.
25    Q    I'm sorry, no?

JOHN KEVIN STONE, CSR

Marino-direct                                      2.213

1    A    No.

2    Q    And the last one I want to show you is D-2 A.  It's H

3    00243.

4              MR. PISANI:  May I post it, Your Honor?

5              THE COURT:  Yes.

6              MR. PISANI:  Thank you.

7    BY MR. PISANI:

8    Q    And you're at the top there and you say, "Suck it until

9    you turn blue."

10             Did you literally mean that statement?

11   A    No, not literally.

12   Q    Did you ever use that type of statement at the

13   workplace?

14   A    Never.

15   Q    Did you ever tell a manager --

16   A    No.

17   Q    -- this?

18             Did you ever tell a customer this?

19   A    No.

20   Q    And those are the only comments --

21   A    Yes.

22   Q    -- that you can recall ever posting --

23   A    Yes.

24   Q    -- on The Spec-tator?

25   A    That was all of them.

JOHN KEVIN STONE, CSR

Marino-direct                              2.214

```
 1   Q    Would you say with regard to the other members, did you

 2   post more or less than most of the other members?

 3   A    Less.

 4   Q    You heard some testimony in the last couple of days

 5   you've been sitting here, right?  And you've been hearing

 6   about this wine test?

 7   A    Yes.

 8   Q    Did you have anything to do with the wine test?

 9   A    No.

10   Q    Did you post anything about a wine test?

11   A    No.

12   Q    But you were still fired.  Right?

13   A    Yes.

14   Q    So how long was The Spec-tator operating, to your

15   knowledge, where people could go on and post?

16   A    It began I believe March 2006 and Brian deleted

17   everybody in May 2006.  So March, April, May.

18   Q    When you -- when were you fired?

19   A    I was fired May 10th, 2006.

20   Q    And who fired you?

21   A    Jason Sokolow and Nate Ernst, who was the kitchen

22   manager.

23   Q    Did you know you were going to get fired when you came

24   in that day?

25   A    When -- I had an inclination.
```

Marino-direct                              2.215

1    Q    And why is that?

2    A    That I might, that I might be sat down and talked to.  I

3    had an inclination I might be fired, yes.

4    Q    And what was the inclination based on?

5    A    The reason that Brian was fired.

6    Q    So he was fired before you?

7    A    Yes.

8    Q    And then he came home and did you discuss it?

9    A    I actually brought him to the meeting.  So we were out

10   when -- we were at the mall when he was fired and proceeded

11   to tell me why he was fired after his meeting.

12   Q    Did you have a conversation with him at the mall before

13   the meeting about what the purpose of that meeting was for?

14   A    Yes.

15   Q    And what did he tell you?

16   A    Actually, it was my -- it was my suggestion, I told him

17   he's probably getting a promotion.

18   Q    And why did you think that?

19   A    Because he was a top ranking server prior, being number

20   one, all of management were very fond of him, thought very

21   highly of him, the guests thought very highly of him, and

22   just his work ethic and the way he worked, he just fit the

23   profile for the next step up, which would be service

24   captain.

25   Q    So prior to Brian getting fired, did any member of

JOHN KEVIN STONE, CSR

Marino-direct                                              2.216

1     management ever approach you and talk to you about The
2     Spec-tator?
3     A    No.
4     Q    When was the first time you learned that management
5     people like Robert Anton or Rob Morano had accessed The
6     Spec-tator?
7     A    Had accessed it?
8          It was sometime after.  Can't say how long after we
9     were fired, but it was after we were fired.  We did not know
10    that they had actual access to the site until much after we
11    were fired.
12    Q    So the entire time you were participating in it and
13    Brian had created, and the two of you got fired, neither one
14    of you had any idea that management had been on there?
15    A    No.
16    Q    So after you were fired from Houston's, did you try to
17    get a job?
18    A    Yes.
19    Q    How long did it take you to get a job?
20    A    Two weeks after.  We actually got a job two weeks after.
21    But that day, right afterwards, I mean we started looking
22    for work.
23    Q    Immediately?
24    A    Immediately.  Absolutely.  Two people in the same
25    household out of income is a bad -- a bad scene.  So we -- I

Marino-direct                              2.217

1    knew at that point we needed to get jobs right away.

2    Q    So how did you try to find jobs, what did you do?

3    A    The first place we went to was Legal Seafood, where

4    we -- where one of the former managers of Houston's was

5    working.  I don't know her last name.  Shondi was a manager

6    for Legal Seafood at the time.  We went immediately to see

7    her, spoke to her.  And we actually started the interviewing

8    process.  But she told us honestly she didn't think we would

9    be happy working there.

10   Q    Hhmm-hmm.

11   A    Because of the way Houston's works, the money, that she

12   knows that the servers -- that Houston's makes, she did not

13   -- she would hire us, but she wanted to do what was best for

14   us, and she wanted us to be happy, and she thought it would

15   be better if we did not work there.

16   Q    So you did not --

17   A    No.

18   Q    -- continue your application to work there?

19   A    No.  We stopped, we did not follow through with the

20   final interview and we decided to go elsewhere.

21   Q    And where did you go elsewhere?

22   A    We went to Morton's, where we knew one of the former

23   employees of Houston's, John Cory Simms.  He was now the

24   kitchen manager at Morton's.  So we went upstairs to

25   Morton's and Cory was there.  We spoke to Cory and he

Marino-direct                           2.218

1    recommended that the assistant manager, Chad Alvis, hire us

2    immediately.

3    Q    And did you get offered a job?

4    A    Immediately.

5    Q    And which Morton's is this?

6    A    Morton's at the Riverside Square Mall.

7    Q    Same place where Houston's is?

8    A    Yes, upstairs.

9    Q    And when were you hired, do you know the date?

10   A    Well, there's initially a waiting period where we have

11   to go through, we went through, we applied, but then we have

12   to go for a drug test.  And the process of going for the

13   drug test, waiting for the results of the drug test, we had

14   to wait a little bit for that.  I think it was a week or so.

15   Q    Hhmm-hmm.

16   A    So the actual, my actual hire date is May 25th, 2006.

17   Q    And you were hired in what capacity?

18   A    Server.

19   Q    And what was your hourly rate going to be?

20   A    2.13 an hour plus tips.

21   Q    Okay.

22        Was the tips structure going to be any different

23   than Houston's?

24   A    Yes.

25   Q    And what is the difference?

JOHN KEVIN STONE, CSR

Marino-direct                                2.219

1     A    The difference is the payout, the tip share that we paid
2     was primarily the difference.  The payout was much more than
3     we had been accustomed to at Houston's.  And the income was
4     not regular.  It was not a steady paced restaurant.  Where
5     you knew at Houston's, you knew on any given night you were
6     making 150, 200, 250.  You could always guesstimate how much
7     you were going to make at Houston's and you could sort of
8     know by your schedule how much a week you were going to
9     make.
10            Morton's is a high end restaurant, high end people
11    come in, and a lot of VIP's, status people come in, and when
12    you're new, you were not given those privileges of those
13    tables a lot of times.  So I would sometimes make $60 a
14    night.  Sometimes.  Or maybe the next night make $150.  So
15    it was not a steady regular income.
16    Q    What -- is Morton's more expensive to eat at than
17    Houston's?
18    A    Very much so.
19    Q    Did you have health insurance coverage at Houston's?
20    A    I did.
21    Q    Did you have to contribute to it?
22    A    I did.
23    Q    How much was the contribution?
24    A    I believe it was $66 bi-weekly.
25    Q    Okay.

JOHN KEVIN STONE, CSR

Marino-direct                                    2.220

1            And when you went to Morton's, did they offer you

2       health insurance?

3       A    You had to wait initially, whatever the -- until open

4       enrollment, but yes, they do have coverage available.

5       Q    Do you have to pay for it?

6       A    Yes.

7       Q    And how much does it cost?

8       A    It -- it would be about $180 a month.  For a single.

9       Q    Did you --

10      A    For a single, and then it would be much more than that

11      for a family plan.

12      Q    Did you elect the coverage?

13      A    No, I did not take the coverage.

14      Q    Why not?

15      A    At the time I did not want to extend myself and have

16      that extra $180 coming out of my pockets.

17      Q    Now, you had mentioned when you were working at

18      Houston's about how over time you were able to get some

19      better shifts and hours?

20      A    Yes.

21      Q    Remember that?

22           And when you went to Morton's did you have to start

23      all over again?

24      A    Yes.

25      Q    So what type of hours and shifts were you getting when

Marino-direct                              2.221

1    you started at Morton's?

2    A    It's only dinner shifts, they're only open for dinner.

3    Q    They're only --

4    A    They're only open for dinner.  There are no lunch.  so

5    there's only seven shifts from which to choose from.  But

6    they do cut accordingly, meaning that if it's slow they'll

7    send you home, or by 9 o'clock, if there's no more people

8    coming in, no more reservations, they will send you home.

9    So sometimes you might have one or two tables and then you

10   get sent home.  And not that you want to, you'd like to

11   stay, but those extra tables would go to the closers.

12   Q    Hhmm-hmm.

13   A    So closer being a better shift, you come in later and

14   you usually get the end of night tables, which is usually,

15   generally or typically more money.

16   Q    Okay.

17        As time has gone on, so you didn't get those in the

18   beginning.  Right?

19   A    No, not at all.

20   Q    Have you gotten them since, as we sit here today are you

21   offered those types of situations?

22   A    Along the way I had, yes.  I had gotten a couple of

23   closing shifts.

24   Q    When did that start?

25   A    Maybe after at least after six months of being there.

Marino-direct                              2.222

1   Q   I'm sorry?

2   A   Maybe at least after six months of being there.

3   Q   Okay.

4       In 2006, did you have occasion to file United

5   States -- United States tax return?

6   A   Yes.

7       MR. PISANI:  I'd like to refer counsel and Your

8   Honor to Exhibit P-10.  I'm marking it.

9       May I approach the witness?

10      THE COURT:  You may.

11      MR. PISANI:  Thank you, Your Honor.

12  BY MR. PISANI:

13  Q   Like to show you P-10, see if you can identify it?

14  A   It's my income tax return for 2006.

15  Q   And how much income does it show for 2006?

16  A   28,404.

17  Q   And in 2006, that was the time you got fired from

18  Houston's.  Right?  So is that a combination?

19  A   That would be a combination of Houston's and Morton's.

20  Q   Okay.

21      And the amount it was 28,404?

22  A   Yes.

23      MR. PISANI:  I'd like to admit this into evidence,

24  Your Honor.

25      THE COURT:  Any objection?

JOHN KEVIN STONE, CSR

Marino-direct                                    2.223

```
 1              MS. GARDINER:  No objection.

 2              THE COURT:  All right.

 3              P-10 is that?

 4              MR. PISANI:  Yes, Your Honor, P-10.

 5              THE COURT:  P-10 is in evidence.

 6              ( Received as marked ).

 7      BY MR. PISANI:

 8      Q   All right.

 9              Did you file a return in 2007?

10      A   Yes.

11      Q   And in 2007 you were only working at Morton's?

12      A   Correct.

13      Q   And this one we will mark as P-13.

14              MR. PISANI:  May I approach, Your Honor?

15              THE COURT:  You may.

16      BY MR. PISANI:

17      Q   Show you what's been marked P-13 for identification.

18              Is that your 2007 tax return that you filed?

19      A   Yes.

20      Q   And how much amount of income does that show?

21      A   27,307.

22      Q   And that's less than what you made the prior year?

23      A   Yes.

24      Q   Now, in 2009, from January 'til now, how has business

25      been at Morton's?
```

JOHN KEVIN STONE, CSR

1    A    Horrible.

2    Q    Are you working more or less hours than you were last

3    year?

4    A    I'm working the same hours, I am a full time bartender

5    currently.  But I'm making significantly more -- less money.

6    Q    And why is that?

7    A    The economy.  We are a high end restaurant and -- and a

8    poor economy, the first thing people stop doing is going out

9    to eat at the high end places.

10   Q    Hhmm-hmm.

11   A    So we've been greatly affected by the harsh economy.

12   Q    And between January and today, which is about six

13   months, half a year, you said you were making less.  How

14   much in tips and hourly rate have you made?

15   A    Well, my hourly rate has changed as a bartender.  I do

16   make $6 an hour.  Which mostly goes to taxes.  I see very

17   little of that $6 an hour, if any.  And --

18   Q    How much -- how much do you --

19   A    Do I get?

20   Q    How much have you made in the first -- you said before

21   that you're making a lot less than you used --

22            MS. GARDINER:  May we approach, Your Honor?

23            THE COURT:  You may.

24

25


JOHN KEVIN STONE, CSR